## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ATRIUM CORPORATION, *et al.*,[1] | Case No. 10-10150 ( ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF GREGORY T. FAHERTY, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF ATRIUM CORPORATION, IN SUPPORT OF FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Gregory T. Faherty, hereby declare as follows under penalty of perjury:

1.    I am the President and Chief Executive Officer of Atrium Corporation, a corporation organized under the laws of the State of Delaware, and certain of the other 19 debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "*Atrium*" or the "*Debtors*"). I have worked for the Debtors since January 25, 2006. In this capacity, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records.

2.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information gathered from my

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company - West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042). The Debtors' main corporate address is 3890 W. Northwest Highway, Suite 500, Dallas, Texas 75220.

review of relevant documents and information supplied to me by members of the Debtors' management team and advisors. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and ensure that their restructuring goals can be implemented with limited disruption to operations, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "*First Day Pleading*" and, collectively, the "*First Day Pleadings*"), filed concurrently herewith. I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

4. In fact, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use cash on hand to make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

5. To assist the Court in becoming familiar with the Debtors and the initial relief sought by the Debtors to stabilize operations and facilitate a restructuring, this declaration is organized as follows: (a) Part I is an introduction, which briefly discusses the reasons for filing these cases and summarizes the Debtors' pre-negotiated plan of reorganization; (b) Part II provides an overview of the Debtors' businesses and capital structure; (c) Part III describes the events leading up to the filing of these chapter 11 cases; (d) Part IV describes the Debtors' pre-negotiated plan of reorganization, including the related Lock-Up Agreement (as defined below)

K&E 15848192.24
DEL1 73702-1

and the steps the Debtors intend to take to facilitate an expeditious exit from chapter 11; and (e) Part V (and **Exhibit A** attached hereto) provides an overview of the relief the Debtors seek at the first two hearings in these chapter 11 cases, which relief the Debtors believe is critical to stabilizing business operations and, ultimately, facilitating the Debtors' reorganization

# I.
# INTRODUCTION

## A. Company Overview

6. Founded in 1948, Atrium is one of the largest manufacturers and distributors of residential windows and patio doors in the United States. Notably, Atrium is one of the few companies in the industry with a national presence.

7. Atrium offers a comprehensive product line of aluminum and vinyl windows and patio doors, as well as other complementary building material products, to leading national homebuilders (including Pulte, D.R. Horton and Lennar), distributors (including Norandex-Reynolds (Saint Gobain), McCoy's, BMC West and Ted Lansing) and leading home center retailers (including The Home Depot and Lowe's). The Debtors have built their businesses through market share gains, new product development and operational improvements that have resulted from vertical integration, operational efficiencies and savings from increasing scale. Atrium has also selectively acquired businesses that strategically add distribution channels and vertical integration opportunities through new product offerings and entry into new geographic markets. The Debtors had approximately $531 million in net sales in 2009 and approximately $611.6 million in net sales in 2008.

## B. Reason for the Filing of these Chapter 11 Cases

8. From an operational standpoint, the filing of these chapter 11 cases is largely unnecessary. Although Atrium — like many companies in the U.S. homebuilding and home-

3

improvement industry — has suffered as a result of the precipitous decline in housing prices that triggered a global economic recession, the foundation of its business model is still intact and Atrium's core operations remain strong. Unfortunately, however, the Debtors are overleveraged. With falling homes prices and rising unemployment weakening consumers' purchasing power and deflating demand for the Debtors' products, declining revenues have left the Debtors unable to service their indebtedness obligations on a current basis. Indeed, with approximately $656 million of secured and unsecured indebtedness — greater than 12 times the Debtors' estimated 2009 EBITDA — the Debtors' debt burden is simply unmanageable.

9.     The Debtors have been proactive in exploring any and all possibilities to restructure their balance sheet, including an attempted out of court restructuring in October 2008 that involved extensions of debt maturities and an infusion of equity from the Debtors' sponsor, Kenner & Company, Inc. ("*Kenner*"), as well as removal of excess manufacturing capacity and a reduction in the workforce to streamline operations and reduce costs. Unfortunately, continuing economic weakness, particularly in the homebuilding sector, has undermined these efforts. As a result, the Debtors engaged in further discussions with their key creditor constituencies regarding all available restructuring options, including a chapter 11 filing.

## C.     Commencement of the Chapter 11 Cases

10.     On the date hereof (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors have also filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

4

11.     Simultaneously with the commencement of these chapter 11 cases, Debtor North Star Manufacturing (London) Ltd. (*"North Star"*), Atrium's Canadian affiliate, has sought relief under the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice (the *"Canadian Court"*) in Toronto, Ontario, Canada. North Star intends to seek Bankruptcy and Canadian Court approval of a customary, cross-border protocol that will govern procedures for, among other things, Court-to-Court communications, as well as approval (by joint hearing or otherwise) for matters requiring a ruling by both Courts.

12.     To facilitate their restructuring in chapter 11 and provide assurances to key constituents such as employees, customers and vendors that the Debtors' operations will continue uninterrupted, the Debtors have developed key strategies to effectuate a smooth transition of their operations into chapter 11, including the following:

- developing and presenting a comprehensive request for various "first-day" relief, which includes obtaining authority to access postpetition financing and seeking relief targeted to ensure that employee obligations such as wages and benefits are honored, critical vendors are immediately paid and customer programs are continued (all as explained on **Exhibit A**);

- moving forward on an expeditious basis with an already pre-negotiated chapter 11 plan of reorganization (as discussed below), that is supported by the vast majority of the Debtors' secured lenders;

- implementing a comprehensive communications plan so that all of the Debtors' key constituents know where they stand and are aware of the steps that the Debtors have taken to help ensure these constituents are protected; and

- hiring and proposing retention of qualified and experienced professionals to assist the Debtors with their reorganization plans, including Moelis & Company LLC (*"Moelis"*) as the Debtors' financial advisor and the law firms of Kirkland & Ellis LLP and Klehr Harrison Harvey Branzberg LLP as the Debtors' bankruptcy counsel.

5

**D.     The Debtors' Pre-Negotiated Restructuring**

13.     The Debtors have commenced these chapter 11 cases to effectuate an efficient and expeditious restructuring of their balance sheet.  Through this restructuring, the Debtors hope to reduce the substantial debt burden that hinders their ability to effectively compete in an already difficult market.  In fact, a successful restructuring will allow the Debtors to concentrate their resources on generating revenue and expanding market share.  To this end, the Debtors have undertaken year-long negotiations with their key creditor constituencies to ensure this goal is quickly realized.

14.     These negotiations have been successful.  Over the past several months, the Debtors, the agent under the senior secured credit facility (the "*Senior Secured Agent*") and an ad hoc group of the senior secured lenders (the "*Ad Hoc Group of Senior Secured Lenders*") have reached a consensus regarding the details of a pre-negotiated plan of reorganization (the "*Plan*"). The Plan, filed contemporaneously herewith, provides for the reorganization of the Debtors as a going concern and will shed at least $400 million of outstanding debt obligations. The Debtors, the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders are committed to working together to implement the Plan to ensure a quick and efficient emergence from chapter 11.

15.     To that end, the Debtors and the members of the Ad Hoc Group of Senior Secured Lenders – who hold more than two-thirds in amount of the Debtors' secured indebtedness obligations – have entered into the Restructuring and Lock-Up Agreement, a copy of which is attached hereto as **Exhibit B** (the "*Lock-Up Agreement*").  The Lock-Up Agreement seeks to ensure that the Debtors move forward with the Plan process as expeditiously as possible, and at the same time, binds the lenders to support the Plan if the Debtors are successful in taking the steps necessary to meet the milestone deadlines included therein.  This agreement enables the

K&E:15848192.24
DEL1 73702-1

Debtors to enter into chapter 11 with the confidence that sufficient votes will be cast to ensure a speedy and successful exit from chapter 11.

16.    The Debtors believe that the Plan will maximize the value of their estates and will provide the best recovery to the Debtors' creditors. Specifically, the Plan contemplates a restructuring of the Debtors as a going concern pursuant to one of two alternatives. The first alternative, which the Plan refers to as the *"New Value Alternative,"* contemplates (a) a new money investment of $125,000,000 from a group of investors, including the Debtors' current majority equity holder, Kenner, in exchange for a 92.5% interest in reorganized Atrium and (b) new debt obligations of at least $250,000,000, which, together with Kenner's equity infusion, will be used to satisfy the claims of the Debtors' prepetition secured lenders. The remaining 7.5% of Reorganized Atrium's equity will be distributed to the bondholders.

17.    For the New Value Alternative to be implemented, the commitments with respect to the new money investment and the new loans must be delivered and approved by the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders within 45 days of the Petition Date. Notably, the New Value Alternative — and its contemplated investment from Kenner — is subject in all respects to higher and better offers. Indeed, the Debtors' proposed financial advisor and investment banker, Moelis, has already started an open and thorough marketing process to ensure that the value of the Debtors' estates is maximized for the benefit of all stakeholders.

18.    If the New Value Alternative is not completed under the terms and deadline set forth in the Plan, distributions will be made according to a second alternative, which the Plan refers to as the *"Stand-Alone Alternative."* The Stand-Alone Alternative contemplates, among other things, the senior secured lenders receiving, on a *pro rata* basis, a share of (a) a new first-

7

priority senior secured term loan totaling $200,000,000 and (b) 98% of reorganized Atrium's new common stock. The remaining 2% of Reorganized Atrium's new common stock is to be distributed to the bondholders.

19.     Under either of the restructuring alternatives, bondholder recoveries are contingent upon the classes of bondholders voting in favor of the plan and all holders of the 11.0% senior subordinated notes agreeing to waive their priority rights under the senior subordinated notes indenture. Absent satisfaction of these conditions, bondholder recoveries will be distributed to the prepetition senior secured lenders.

20.     In addition, the Plan provides that holders of qualified unsecured trade claims (*i.e.*, those creditors that continue to provide the Debtors with goods and services) will receive payment in full in cash on account of such claims, and holders of general unsecured claims will receive a pro rata share of a small cash distribution.

## II.
## OVERVIEW OF THE DEBTORS' BUSINESSES AND CAPITAL STRUCTURE

### A.     The Debtors' Business Operations

#### i.     Sales and Marketing

21.     The Debtors' marketing strategy capitalizes on the complementary nature of their distribution channels. Specifically, the Debtors have a multi-channel distribution network that includes one-step, two-step and direct distribution, each as detailed below. This distribution strategy maximizes market penetration and reduces reliance upon any one distribution channel for the sale of products. Further, the Debtors' track record as a manufacturer and distributor of windows and patio doors for more than five decades has allowed them to develop long-standing relationships with key distributors. The Debtors continuously seek to secure the leading distributors in each market but avoid over-dependence on any single customer. The Debtors also

8

sell to major home center retailers who serve the important function of targeting the remodeling and replacement market segment.

22. The Debtors' key distribution channels are summarized below:

- The Debtors derived approximately 50.1% of net sales in 2008 and 54.7% in the first eleven months of 2009 from one-step distribution. One-step distribution involves the sale of the Debtors' windows and patio doors to home centers, lumberyards and retail distributors, which will then sell to homeowners, homebuilders and remodelers/contractors. Though lumberyards and retail distributors are not required to carry the Debtors' products on an exclusive basis, it is not unusual for them to do so.

- The Debtors derived approximately 2.1% of net sales in 2008 and 2.2% in the first eleven months of 2009 from two-step distribution. Two-step distribution involves the sale of windows and patio doors to a wholesale distributor who then sells the products to home centers, lumberyards and retail distributors. These intermediaries will in turn sell the windows and patio doors to homeowners, homebuilders and remodelers/contractors. Wholesale distributors tend to maintain product inventory to service the needs of their client base for small quantities. Two-step distribution is more common where customers generally do not require sufficient volume to purchase directly.

- The Debtors derived approximately 24.1% of net sales in 2008 and 34.1% in the first eleven months of 2009 from direct distribution. Direct distribution involves the sale of the Debtors' windows and patio doors directly to homebuilders, multi-family builders and remodelers/contractors without the use of an intermediary. Selling direct increases the Debtors' profit margins while at the same time offering builders more favorable pricing. In some high value markets, this channel dominates market share, making direct sales necessary to compete.

23. Promotional efforts to window and patio door customers are focused on cooperative advertising programs that are offered to certain major customers. This generates exposure in customers' local media, including newspaper, radio and television, generating sales

9

at individual locations. The Debtors also invest in in-store displays and kiosks and product knowledge classes for customers' employees to further generate awareness within the stores.

24. The Debtors market window and patio door products through a sales force consisting of approximately 150 company-employed salaried and commissioned sales representatives and approximately 15 independent commissioned sales representatives. Each division is supported by a sales manager, company sales representatives and, in some cases, independent sales representatives. The sales managers coordinate sales and marketing activities among both company-employed and independent sales representatives.

25. Customer service plays a key role in the marketing process. One to two week on-time delivery of market-to-order products, order fill rate, consistency of warranty and non-warranty service and flexibility in meeting changing customer requirements have made it possible to build a large and loyal customer base that includes companies such as Pulte, D.R. Horton and Lennar, three of the nation's largest home-builders, The Home Depot and Lowe's, the nation's largest home center retailers, and thousands of independent distributors.

26. The pricing and product offering strategy focuses on offering the consumer lower price points at acceptable margins. The Debtors execute this strategy in two steps: (a) by having an appropriately designed offering for each region and standardized components to simplify the overall offering and reduce inventory levels; and (b) by offering the market "good", "better" and "best" options within the product offering that provide customers a price point and product that meets their needs. Certain of the products in the offering have been redesigned (with particular emphasis on reducing product costs) to create an offering with three distinct price points. This promotes more "trading up" to higher quality products by the customer and displays a complete product line.

10

### ii.     The Debtors' Product Lines

27.     The Debtors have consolidated their brand names into the flagship Atrium®

brand and the well-known regional brands of HR™, Champion™, Superior, Thermal™ and

North Star®.  Additionally, the Debtors utilize multi-branding to alleviate channel conflict using

such other names as Ellison® and Masterview®.  A full product line of windows and patio doors

enables the Debtors to differentiate themselves from competitors, leverage multi-channel

distribution systems and be well positioned to benefit from shifts in product preferences.

Because regional product preferences exist for aluminum and vinyl windows and patio doors, the

Debtors work to provide a broad product line that effectively serves their national customer base.

In addition, the Debtors serve several of their significant customers through private brand

labeling.

### iii.     Intellectual Property

28.     Various trademarks are owned and/or registered by the Debtors in the United

States, Canada and Mexico, including the following:  Atrium, Atrium Windows and Doors,

Applause, Champion Window, DreamGlas, DreamSpace, The French Classic, Improving Your

View of the World, Masterview, North Star, Park Avenue, Safe Harbor, Silent Guard and

Weatherlok.  Among the various pending trademark applications filed by the Debtors are the

following:  Atrium Wizard, Aspirations, Can Do Attitude, Dynasty, Install Atrium Instill

Confidence and UltraGrain.  In addition, the Debtors own several patents and patent applications

concerning various aspects of window assembly and related processes.  The Debtors are not

aware of any circumstances that would have a material adverse effect on their ability to use their

trademarks and patents.  As long as the Debtors continue to renew trademarks when necessary,

the trademark protection provided is perpetual.  The patents will expire at various times over the

next 20 years.

K&E:15848192.24
DEL1 73702-1

#### iv. Business Facilities

29.     The Debtors' principal executive office is located at 3890 West Northwest Highway, Suite 500, Dallas, Texas 75220. The Debtors operate 18 manufacturing facilities and maintain 37 distribution centers strategically located in 21 U.S. states and Canada. The Debtors also have an agreement with a manufacturing facility in Juarez, Mexico (which is neither owned nor leased by the Debtors). As discussed above, the Debtors distribute through multiple channels, allowing them to reach the greatest number of end-customers and provide nationwide service to those customers.

30.     The Debtors operate on a vertically integrated basis, as follows:

- the extrusion of aluminum and vinyl lineals, which are utilized internally in fabrication operations and/or sold to third-parties;

- the manufacture of aluminum screens;

- the manufacture and assembly of window and patio door units, including the cutting and insulation of glass, the pre-hanging of doors, and the sale of such units to homebuilders, multi-family builders, remodelers/contractors, home centers, lumberyards, and retail distributors;

- a turn-key installation program for multi-family builders in which the Debtors supply and install many of their products, including interior/exterior doors, moldings, hardware, bath accessories and miscellaneous special products under the R.G. Darby brand.

K&E:15848192.24
DEL1 73702-1

**B.     The Debtors' Prepetition Organizational Structure**

31.     The following chart generally depicts the Debtors' prepetition organizational structure and summarizes those entities that are a borrower or guarantor with respect to some or all of the Debtors' outstanding indebtedness:[2]



**C.     The Debtors' Prepetition Capital Structure**

32.     As of December 31, 2009, the Debtors have outstanding secured and unsecured indebtedness totaling approximately $655.9 million. These obligations include: (a) $383.1 million outstanding under the Senior Secured Credit Agreement (defined below), which is secured by substantially all of the Debtors' assets; (b) $47.9 million outstanding under certain 11.0% unsecured notes due 2012 (the "*11.0% Senior Subordinated Notes*"); and

---

2       Atrium Ventanas de Mexico, Atrium Servicios de Mexico, Atrium Funding Corporation and Atrium Funding Corporation II are not Debtors in these chapter 11 cases.

13

(c) $220.3 million outstanding under certain 15.0% unsecured notes due 2012 (the "*15.0% Senior Subordinated Notes*" and, together with the 11.0% Senior Subordinated Notes, the "*Senior Subordinated Notes*"). Additionally, the Debtor ACIH, Inc. is obligated on $4.6 million outstanding under 11.5% unsecured notes due 2012 (the "*ACIH Notes*").

33.     The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 31, 2009. Further detail with respect to each debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of December 31, 2009 | Maturity Date | Security Status |
|---|---|---|---|---|
| Senior Secured Credit Agreement | Revolver: $46 million | Revolver: $34.1 million[3] | May 2011 | Secured |
| | Term Loan: $335 million | Term Loan: $349.0 million | May 2012 | Secured |
| 11.0% Senior Subordinated Notes | $42 million | $47.9 million | December 2012 | Unsecured |
| ACIH Notes | $174 million | $4.6 million[4] | December 2012 | Unsecured |
| 15.0% Senior Subordinated Notes | $186 million | $220.3 million | December 2012 | Unsecured |

i.      **The Senior Secured Credit Agreement**

34.     On October 15, 2008, Atrium Companies, Inc., as credit agreement issuer, and each of the Debtors (other than Atrium Corporation) as guarantors, GE Business Financial Services, Inc., as agent, GE Capital Markets, Inc. and CIT Capital Securities LLC, as lead arrangers and bookrunners, and CIT Capital Securities LLC, as syndication agent, amended and restated the Old Credit Facility (the "*Senior Secured Credit Agreement*"). The Senior Secured Credit Agreement waived the Debtors' defaults under the prior credit facility, which consisted of

---

[3]    This includes approximately $12.4 million in issued and outstanding letters of credit.

[4]    In October 2008, the Company exchanged 97.45% of the ACIH Notes for the 15.0% Senior Subordinated Notes and equity warrants.

14

a $370 million secured term loan and a $50 million secured revolving credit facility (together, the *"Old Credit Facility"*), while increasing the interest rate thereunder and establishing new financial covenants.

35.     The Senior Secured Credit Agreement includes: (a) a revolving credit facility in the amount of approximately $46 million; (b) a $20 million sublimit for the issuance of letters of credit; (c) a $10 million sublimit for swing line loans; and (d) a term loan facility in the amount of approximately $335 million. A total of approximately $383.1 million was outstanding under the Senior Secured Credit Agreement as of December 31, 2009.

36.     Each of the Debtors (other than Atrium Corporation) unconditionally guaranteed the obligations under the Senior Secured Credit Agreement. In addition, the obligations under the Senior Secured Credit Agreement, and the obligations of the guarantors under the guarantees, are secured by substantially all of Debtors' assets, including:

- a first priority perfected security interest in all of the capital stock of each of the Debtors (except Atrium Corporation and ACIH, Inc.); and

- a first priority perfected security interest in substantially all other present and future assets and properties, including accounts receivable, inventory, machinery, equipment, contracts, domestic intellectual property, license rights and general intangibles (other than the accounts receivable and other assets that are pledged to secure the A/R Facility, as defined below).

**ii.     The Swap Agreement**

37.     On December 27, 2007, Atrium Companies, Inc. entered into a swap agreement with Merrill Lynch Capital Services (the *"Swap Contract"*). As of the Petition Date, approximately $4.7 million of termination payments was due under the Swap Contract, inclusive of accrued and unpaid interest and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Swap Contract (the *"Swap Contract*

15

*Claims*"). The Swap Contract Claims are secured by liens on and security interests in substantially all of the Debtors' assets. These liens and interests are of equal priority to the obligations under the Senior Secured Credit Agreement.

### iii. The A/R Facility

38.    On December 28, 2007, Atrium Companies, Inc., and certain of its subsidiaries entered into an accounts receivable securitization facility for a five year term expiring on December 28, 2012 (the "*A/R Facility*").[5] Pursuant to the A/R Facility, each participating Debtor agreed to sell, on a non-recourse and ongoing basis, a pool of receivables comprising their entire trade receivable portfolio to Atrium Funding Corporation II (the "*SPV*") — a special purpose, bankruptcy-remote entity wholly-owned by Atrium Companies, Inc. Contemporaneously therewith, the SPV entered into an agreement with a group of financial institutions, with General Electric Capital Corporation acting as the administrative agent, pursuant to which the financial institutions agreed to fund advances to the SPV to enable the SPV to purchase receivables from the participating Debtors, subject to certain reserves and eligibility criteria. As a condition to the financial institutions' agreement to fund advances under the A/R Facility, the SPV agreed to assign and pledge all of its right, title and interest in and to the receivables to the administrative agent, for the benefit of the funding financial institutions. The SPV is not a Debtor in these chapter 11 cases.

39.    The Debtors' net accounts receivable balance as of November 30, 2009, includes $12.7 million of retained interests in receivables that have been transferred to the SPV in

---

[5]    The Debtor entities party to the A/R Facility are: Aluminum Screen Manufacturers, Inc., Atrium Door and Window Company - West Coast, Atrium Door and Window Company of Arizona, Atrium Door and Window Company of the Northeast, Atrium Door and Window Company of the Northwest, Atrium Door and Window Company of the Rockies, Atrium Extrusion Systems, Inc., Atrium Florida, Inc., Atrium Vinyl, Inc., Atrium Windows and Doors of Ontario, Inc., Superior Engineered Products Corporation, and Thermal Industries, Inc.

K&E:15848192.24
DEL1 73702-1

connection with the A/R Facility and is net of the obligations of the SPV to the lenders under the A/R Facility. As discussed in **Exhibit A**, the Debtors have filed a motion seeking authority to continue the A/R Facility on a postpetition basis.

      **iv.**    **The Senior Subordinated Notes**

      40.    Atrium Companies, Inc. issued the 11.0% Senior Subordinated Notes and 15.0% Senior Subordinated Notes in October 2008. The Senior Subordinated Notes are governed by an indenture by and among Atrium Companies, Inc. and each of the other Debtors (except Atrium Corporation) as guarantors, and U.S. National Bank Association, as trustee, dated October 15, 2008 (the "*Senior Subordinated Notes Indenture*"). The Senior Subordinated Notes, which mature on December 15, 2012, are jointly and severally, absolutely and unconditionally guaranteed by each of the Debtors in these chapter 11 cases except Atrium Corporation.

      41.    In the event of any distribution or payment that would otherwise be made in respect of the 11.0% Senior Subordinated Notes or the 15.0% Senior Subordinated Notes (other than regularly scheduled payments of interest, whether in the form of cash or payment-in-kind interest), including, without limitation, any distribution or payment that is made in connection with any refinancing or recapitalization of Atrium Companies, Inc., upon the sale of all or any part of the assets of Atrium Companies, Inc. or any of its subsidiaries or the winding up of their affairs (including pursuant to an event of liquidation under chapter 7 or chapter 11 of the Bankruptcy Code, state law, or otherwise), holders of the 11.0% Senior Subordinated Notes are entitled to receive, in the aggregate, (a) prior to December 15, 2011, an amount equal to 75% of the aggregate principal amount of, and unpaid interest on, the 11.0% Senior Subordinated Notes (the "*Prior Payment Amount*") and (b) on or after December 15, 2011, the Prior Payment Amount as of December 15, 2011, before holders of the 15.0% Senior Subordinated Notes are entitled to receive all or any portion of any such distribution or payment. Thereafter, any

17

distribution to the holders of the 15.0% Senior Subordinated Notes and the 11.0% Senior Subordinated Notes is pro rata in accordance with otherwise applicable law and the terms of the Senior Subordinated Notes Indenture.

42. Atrium Corporation is a signatory to only one provision of the Senior Subordinated Notes Indenture, pursuant to which holders of the majority in principal amount of the 15.0% Senior Subordinated Notes are entitled to appoint one director and one observer to Atrium Corporation's Board of Directors, and holders of the majority in principal amount of the 11.0% Senior Subordinated Notes are entitled to appoint one observer to Atrium Corporation's Board of Directors.

### v. The ACIH Notes

43. ACIH, Inc. issued the ACIH Notes in December 2004. The ACIH Notes are governed by an indenture by and between ACIH, Inc., as issuer and U.S. National Bank Association as trustee dated as of December 28, 2004 (as amended from time to time, the "*ACIH Notes Indenture*"). Pursuant to the October 2008 restructuring, 97.4% of the ACIH Notes were exchanged for the 15.0% Senior Subordinated Notes and equity warrants (described below). With respect to the unexchanged ACIH Notes, the ACIH Notes Indenture is still in effect; however, pursuant to the Ninth Supplemental Indenture, by and between ACIH, Inc. and U.S. National Bank Association, dated as of October 15, 2008, many operative provisions with respect to events of default and covenants for the ACIH Notes have been eliminated.

### vi. Preferred Stock

44. Atrium Corporation has three classes of preferred stock: Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, all of which are convertible into common stock. For the Series A Preferred Stock, 55,656 shares are authorized and outstanding. All outstanding shares of Series A Preferred Stock were issued to KAT CP Coinvestment, LLC

18

pursuant to a purchase agreement in March 2007. There are 478,087 authorized shares of Series B Preferred Stock, all of which are outstanding and held by KAT CP Coinvestment - Series B, LLC. There are 95,617 authorized shares of Series C Preferred Stock, of which 19,938 are outstanding. Highland Crusader Offshore Partners LP holds 13,118 of these shares and Highland Credit Opportunities CDO, Ltd. holds the remaining 6,820 shares.

45.     The holders of Series B Preferred Stock own 50% of the capital stock of Atrium Corporation on a fully diluted basis. Upon the exercise of all of the warrants, the issuance of the Series C Preferred Stock and the conversion thereof into common stock (described below), holders of the warrants would own 10% of the common stock of Atrium Corporation on a fully diluted basis.

46.     The Series A Preferred Stock ranks senior to the common stock but ranks junior to the Series B Preferred Stock and Series C Preferred Stock, with respect to dividend preference and ranking upon the liquidation, dissolution or winding up of Atrium Corporation. The Series B Preferred Stock and Series C Preferred Stock rank pari passu with each other in all respects (except that Atrium Corporation has the right to redeem the Series C Preferred Stock) and are senior to all other classes of Atrium Corporation's capital stock, including the Series A Preferred Stock.

### vii.     Warrants

47.     In connection with the Debtors' October 2008 restructuring (discussed below), holders of the ACIH Notes were offered warrants entitling the holder to receive a specified number of fully paid and non-assessable shares of Series C Preferred Stock of Atrium Corporation (the *"ACIH Warrants"*). The ACIH Warrants' exercise price is subject to adjustment and they entitle the holders to purchase Series C Preferred Stock convertible, in the

K&E:15848192.24
DEL1 73702-1

aggregate, into ten percent of the outstanding common stock of Atrium Corporation. Currently, there are warrants outstanding for the purchase of 75,679 shares of Series C Preferred Stock.

###### viii.  Common Stock

48.    Atrium Corporation has 2,500,000 authorized shares of common stock. As of the Petition Date, 862,542.47 shares were outstanding. The largest shareholder is ATR Acquisition, LLC (a Kenner-affiliated entity) with 251,453.72 shares, followed by Kenner Equities IV, L.P. (also a Kenner-affiliated entity) with 41,176.47 shares and ML Global Private Equity Fund, L.P. with 10,646.279 shares. Several individuals affiliated with Atrium Corporation each hold small numbers of shares.

## III.
## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

49.    A number of factors have contributed to the Debtors' decision to commence these chapter 11 cases. Although the Debtors' business is operationally sound, the Debtors' substantial funded debt burden, together with the sustained downturn in the U.S. homebuilding and home improvement sector, has impaired the Debtors' ability to meet their debt obligations on a current basis.

### A.    The Debtors' Substantial Funded Debt Burden

50.    As of the Petition Date, the Debtors have $655.9 million in indebtedness, equal to roughly 12 times the Debtors' estimated 2009 EBITDA. At this level of indebtedness, essentially all cash flow from operations must be dedicated to servicing debt, thereby straining operational flexibility and significantly restricting growth opportunities.

### B.    Deterioration in Economic Conditions

51.    A severe economic recession, which was triggered by a collapse in housing prices, a credit crunch and diminished levels of demand, has had a debilitating impact on the

K&E:15848192.24
DEL1 73702-1

Debtors' businesses. The recession left a large inventory of houses, but deprived individuals of the resources to purchase them, thereby dampening housing demand. As housing demand subsided, so did demand for the Debtors' products. Economic insecurity has curtailed individuals' home remodeling plans, further hurting the Debtors' bottom line. The depressed revenues from this economic slowdown impede the Debtors' ability to both service their debt obligations and invest in the capital and labor necessary for their businesses to succeed.

52. The extent of the housing downturn illuminates the Debtors' difficulties. "Housing starts" (*i.e.*, the number of residential building construction projects that have begun during a particular time period) fell almost 13% from 2.07 million in 2005 to 1.8 million in 2006.[6] In addition, sales in connection with repair, renovation and remodeling weakened in the United States in 2006 compared with 2005. The housing market downturn in the United States intensified during 2007, with housing starts in 2007 falling almost 25% (from the 2006 rate) to 1.4 million, and continued during 2008, with housing starts in 2008 falling over 33% (from the 2007 rate) to approximately 904,000. Total single-family housing starts in 2009 are projected to further decline by 40% from 2008 levels. In total, housing starts have fallen from 2.07 million in 2005 to approximately 650,000 in 2009 – a precipitous decline of nearly 70%.

---

[6] "Housing starts" are considered a leading indicator in the United States housing market. The United States Census Bureau and the United States Department of Housing and Urban Development jointly publish a monthly report on housing starts entitled the *New Residential Construction Report*.

K&E:15848192.24
DEL1 73702-1

**C.     The Debtors' Out-of-Court Restructuring Initiatives**

53.     In response to the deteriorating economic conditions, in 2008 the Debtors restructured their balance sheet and began efforts to streamline operations.

> **i.     The Debtors' 2008 Balance Sheet Restructuring**

54.     Before October 2008, and in addition to obligations outstanding under the Old Credit Facility, the Debtors also had outstanding $174 million of ACIH Notes and $40 million of 12% senior subordinated notes due August 20, 2012 (the "***Old Senior Subordinated Notes***"). Further economic deterioration in 2008 prevented the Debtors from satisfying their obligations under the Old Credit Facility, the ACIH Notes and the Old Senior Subordinated Notes on a current basis.

55.     To prevent their overleveraged balance sheet from jeopardizing ongoing business operations, the Debtors (i) amended the Old Credit Facility to increase the interest rate thereunder from LIBOR plus 3.75% to LIBOR plus 5.00% for the first two years and then LIBOR plus 9.50% thereafter; (ii) exchanged all of the Old Subordinated Notes for the 11.0% Senior Subordinated Notes; and (iii) exchanged 97.4% of the ACIH Notes for the 15.0% Senior Subordinated Notes and the ACIH Warrants. In addition, Kenner agreed to make a $50 million ($40 million of which was used to pay down secured debt under the Old Credit Facility).

> **ii.     The Debtors' Operational Restructuring**

56.     In direct response to the weakened U.S. housing and building products markets, and in connection with their balance sheet restructuring efforts, the Debtors have taken significant steps to reduce costs. These initiatives have included: internal operational restructuring and other efficiency initiatives; product rationalization; consolidation of manufacturing operations in North Texas; the closing of branches in Florida; the closure of a facility in Shelton, Connecticut; the consolidation of manufacturing facilities in Tolleson,

22

Arizona and Anaheim, California; and the transfer of manufacturing capacity in Jacksonville, Florida to North Texas.  Further, Superior Engineered Products Corporation, a Debtor based in Ontario, California, completed the sale of its non-core millwork division in December 2009, and the Debtor Atrium Florida, Inc. recently completed the sale of its hurricane shutter division.

57.     As part of this operational restructuring, the Debtors have also reduced their workforce to better align their labor supply with the diminished demand resulting from the sustained downturn.  Since 2006, headcount has been reduced from a peak of approximately 7,300 employees, on a pro forma basis, to 3,990 employees as of November 30, 2009.

58.     In total, the forgoing cost-cutting initiatives generated approximately $34.8 million in savings in 2007, $35.0 million in 2008 and are expected to generate over $30 million in savings in 2009.

## IV.
## THE DEBTORS' PRE-NEGOTIATED RESTRUCTURING

59.     Unfortunately, the Debtors' restructuring efforts in October 2008 and beyond did not sufficiently shield them from the sustained downturn in the economy.  Indeed, on May 11, 2009, the Debtors did not make scheduled interest payments due under the Senior Secured Credit Agreement (the "*May Interest Payment*").  While certain of the senior secured lenders agreed to forbear from exercising remedies in connection with this default, and the Debtors ultimately made the May Interest Payment, it became apparent to both the Debtors and the senior secured lenders that a more permanent restructuring was necessary to substantially deleverage the Debtors' balance sheet.   Beginning in late July and August 2009, the Debtors and the senior secured lenders continued discussions and negotiations regarding a comprehensive restructuring that would likely involve the commencement of cases under chapter 11 of the Bankruptcy Code.

23

60.     Over the course of the last several months, the Debtors and the senior secured

lenders have engaged in extensive discussions that ultimately led to an agreement among the

parties as evidenced by the Lock-Up Agreement and the Plan itself. Although various iterations

and negotiations were had along the way, the Plan (and related Lock-Up Agreement) provides

for a swift and complete balance sheet restructuring, paving the way for operational efficiency

and allowing the Debtors to capitalize on growth opportunities in the recovering homebuilding

and home-improvement sector.

## A.     The Pre-Negotiated Chapter 11 Plan

61.     The Plan provides for the reorganization of the Debtors as a going concern and is

based on a settlement among the Debtors, the Senior Secured Agent and the Ad Hoc Group of

Senior Secured Lenders. Among other things, the Plan contemplates one of two restructuring

alternatives:

- *New Value Alternative*. This restructuring option contemplates an equity investment from Kenner & Company, Inc. ("***Kenner***"), the Debtors' current equity sponsor, and certain other potential investors, of $125,000,000, in exchange for 92.5% of Reorganized Atrium's New Common Stock (subject to dilution on account of the Management Equity Incentive Plan), which will be applied to the distribution to the Holders of Senior Secured Claims. The New Value Alternative further contemplates that Reorganized Atrium will obtain new secured loans in an aggregate amount equal to at least $250,000,000, the proceeds of which will be applied to satisfy the Claims of Holders of Senior Secured Claims. For the New Value Alternative to be implemented, valid and binding commitments to deliver the equity investment and new secured loans must be delivered to and approved by the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders within 45 days of the Petition Date (the "***New Value Alternative Deadline***").

- *Stand-Alone Alternative*. If commitments are not delivered to or approved by the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders by the New Value Alternative Deadline, the Plan provides for implementation of the Stand-Alone Alternative, which contemplates that Holders of Senior Secured Claims will receive, on a Pro Rata basis, a share of (a) a new first-

24

priority senior secured term loan totaling $200,000,000 and (b) 98% of Reorganized Atrium's New Common Stock (subject to dilution on account of the Management Equity Incentive Plan).

62.     Notably, the New Value Alternative — and its contemplated investment from Kenner — is subject in all respects to higher and better offers. Indeed, the Debtors' proposed financial advisor and investment banker, Moelis, has already started an open and thorough marketing process to ensure that the value of the Debtors' estates is maximized for the benefit of all stakeholders.

63.     In connection with the New Value Alternative, Holders of 11.0% Senior Subordinated Notes Claims will receive a Pro Rata share of 2.5% of Reorganized Atrium's New Common Stock and Holders of 15.0% Senior Subordinated Notes Claims will receive a Pro Rata share of 5.0% of Reorganized Atrium's New Common Stock; in connection with the Stand-Alone Alternative, Holders of 11.0% Senior Subordinated Notes Claims and Holders of 15.0% Senior Subordinated Notes Claims will together receive a Pro Rata share of 2.0% of Reorganized Atrium's New Common Stock. Any distribution to Holders of Senior Subordinated Notes Claims is contingent — in either restructuring scenario — on (a) the Class of Holders of 11.0% Senior Subordinated Notes and the Class of Holders of 15.0% Senior Subordinated Notes voting to accept the Plan and (b) 100% of the Holders of the 11.0% Senior Subordinated Notes Claims agreeing to waive their Priority Rights under the Senior Subordinated Notes Indenture. In the event either or both of the foregoing conditions are not satisfied, the recoveries otherwise to be afforded to Holders of Senior Subordinated Notes Claims will be distributed to the prepetition senior secured lenders.

64.     The Plan further contemplates that under either the New Value Alternative or the Stand-Alone Alternative, holders of qualified unsecured trade claims will receive payment in full in cash on account of such claims following execution of a qualified vendor support agreement.

25

Moreover, holders of allowed general unsecured claims will receive the lesser of (i) $0.04 on account of each dollar of the holder's allowed general unsecured claim and (ii) on a Pro Rata basis, a share of a $200,000 cash distribution.

## B.     The Lock-Up Agreement

65.     The Debtors and certain senior secured lenders (the "***Consenting Lenders***") entered into the Lock-Up Agreement on January 20, 2010. The Lock-Up Agreement seeks to ensure that the Debtors move forward with the Plan process as expeditiously as possible, and at the same time binds the Consenting Lenders to support the Plan if the Debtors are successful in taking the steps necessary to meet the milestone deadlines included therein. Specifically, the Consenting Lenders have agreed to vote their Senior Secured Claims in favor of the Plan and refrain from taking any actions that will interfere with, postpone or delay the implementation of the Plan, so long as the Debtors are pursuing the Plan on the following agreed-upon timeline:

- commencement of the chapter 11 cases on or before **January 20, 2010**;

- filing of the Plan and related solicitation materials at the time the chapter 11 cases are commenced;

- entry of the Court's order approving the solicitation materials **within 40 days** after filing of the Plan (or as soon thereafter as the Court's schedule permits);

- entry of the Court's order confirming the Plan **within 70 days** after the solicitation materials have been approved (or as soon thereafter as the Court's schedule permits); and

- the effective date of the Plan must occur **within 20 days** after confirmation of the Plan.

66.     The Lock-Up Agreement further provides that the Debtors, along with its financial advisor, Moelis, will conduct a thorough marketing process to non-affiliate bidders in connection with the New Value Alternative and Stand-Alone Alternative. Further, the Lock-Up

26

Agreement makes clear that the New Value Alternative is subject in all respects to higher and better offers.

**V.**

**RELIEF SOUGHT IN THE DEBTORS' FIRST DAY PLEADINGS**

67.     It is critically important for the Debtors to maintain the services, loyalty and goodwill of, among other constituencies, their employees, vendors and customers. Achieving this goal is likely to be particularly challenging while operating in chapter 11. The Debtors have filed First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant consequences because parties may refuse to continue to provide services to, or do business with, the Debtors.

68.     Several of the First Day Pleadings request authority to pay certain prepetition claims. I am told by my advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims in those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

69.     I have reviewed each of the First Day Pleadings. The facts stated therein and attached hereto as **Exhibit A** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the

27

Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

K&E:15848192.24
DEL1 73702-1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of January 2010.

By: _____

Name:    Gregory T. Faherty

Title:     Chief Executive Officer and President
           Atrium Corporation