## Exhibit A

## Description of First Day Pleadings

## THE DEBTORS' FIRST DAY PLEADINGS

As explained in my declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (each, a "***First Day Pleading***" and, collectively, the "***First Day Pleadings***"), to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and to ensure that their restructuring goals can be implemented with limited disruption to operations.[1]  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  In fact, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to obtain postpetition financing and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.

In my opinion, approval of the relief requested in the First Day Pleadings, each of which is explained herein, will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

## FINANCING MOTIONS

**A.**    **Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Secured Financing Pursuant to 11. U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C §§ 361, 362, 363 and 364; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)**

1.    The Debtors require access to liquidity under the DIP Facility to prevent immediate and irreparable harm to the Debtors' estates.  The DIP Facility will ensure that the Debtors are able to continue ongoing business operations, preserve the value of estate assets, maintain favorable relationships with suppliers and customers, pay employees and satisfy other

---

[1]    Capitalized terms used in this Exhibit but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

working capital and general corporate needs, all of which are necessary to maintain the value of the Debtors' businesses and, ultimately, effectuate a successful business reorganization.

2.     Specifically, the Debtors seek authority to obtain an aggregate $40 million senior secured priming and superpriority delayed draw term loan credit facility (the "**DIP Facility**") in accordance with the terms and conditions of that certain debtor in possession credit agreement (the "**DIP Credit Agreement**") among Atrium Companies, Inc. as borrower (the "**Borrower**"), the other Debtors as guarantors (the "**DIP Guarantors**"), GE Business Financial Services Inc. (formerly known as Merrill Lynch Business Financial Services Inc.) as administrative agent and collateral agent (the "**DIP Agent**" or "**Collateral Agent**") and a syndicate of financial institutions party thereto (the "**DIP Lenders**").

3.     The Debtors seek authorization to (a) use proceeds of the DIP Facility to provide working capital for, and for other general corporate purposes of, the Debtors, including the payment of certain costs and expenses in connection with these chapter 11 cases and for payment of the costs and fees of the Prepetition Secured Lenders, as well as a portion of the interest accruing under the Prepetition Secured Credit Agreement as part of the proposed adequate assurance granted to the Prepetition Secured Lenders pursuant to section 364(d) of the Bankruptcy Code; (b) grant to the DIP Agent, for the benefit of itself and the other DIP Lenders, senior liens on substantially all of the Debtors' assets pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code; (c) grant superpriority administrative claims to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code, with such claims having recourse to all prepetition and postpetition property of the Debtors' estates now owned or hereafter acquired, which, solely upon entry of a final order, will include the proceeds of certain avoidance actions and the Debtors' rights under section 506(c) of the Bankruptcy Code; (d) use "cash collateral" (as such

K&E 16030284.7
DEL1 73705-1

term is defined in section 363 of the Bankruptcy Code) of the Debtors' Prepetition Secured Lenders; (e) grant adequate protection to the secured parties under the Prepetition Secured Credit Agreement, (f) vacate the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the interim and final orders pursuant to this motion; (g) waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the relief requested; and (h) schedule a final hearing, pursuant to Bankruptcy Rule 4001 to consider entry of a final order authorizing the transactions described above on a final basis.

4.      As of December 31, 2009, the Debtors have outstanding secured and unsecured indebtedness totaling approximately $655.9 million. These obligations include: (a) $383.1 million outstanding under the Prepetition Secured Credit Agreement, which is secured by substantially all of the Debtors' assets; (b) $47.9 million outstanding under certain 11.0% unsecured notes due 2012 (the "*11.0% Senior Subordinated Notes*"); and (c) $220.3 million outstanding under certain 15.0% unsecured notes due 2012 (the "*15.0% Senior Subordinated Notes*" and, together with the 11.0% Senior Subordinated Notes, the "*Senior Subordinated Notes*"). Additionally, Debtor ACIH, Inc. is obligated on $4.6 million outstanding under 11.5% unsecured notes due 2012 (the "*ACIH Notes*").

*The Debtors' Liquidity Needs and the DIP Budget*

5.      The Debtors are one of the largest manufacturers and distributors of residential windows and patio doors in the United States. A severe economic recession, which was triggered by a collapse in housing prices, a credit crunch and diminished levels of demand, has had a debilitating impact on the Debtors' businesses. The recession left a large inventory of houses, but deprived individuals of the resources to purchase them, thereby dampening housing

4

demand. As housing demand subsided, so did demand for the Debtors' products. Economic insecurity has curtailed individuals' home remodeling plans, further hurting the Debtors' bottom line. The depressed revenues from this economic slowdown impede the Debtors' ability to both service their debt obligations and invest in the capital and labor necessary for their businesses to succeed.

6.    With the assistance of their advisors, the Debtors have analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization within the contemplated timeframe. In undertaking this analysis, the Debtors and their advisors have considered the Debtors' near-term projected financial performance, including demand for the Debtors' products and the cost to manufacture such products. The Debtors' management also conferred with key operational divisions to understand essential business metrics in both the near and long-term.

7.    As part of the Debtors' recent financial analysis and projections, the Debtors developed a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials.

*The Debtors' Efforts to Obtain Postpetition Financing*

8.    Beginning in early December, Moelis & Company LLC ("***Moelis***"), the Debtors' proposed financial advisor and investment banker, approached a broad set of potential lenders, including "traditional lenders" (*e.g.*, money-center banks) and "non-traditional lenders" (*e.g.*, hedge funds), regarding a possible extension of financing to the Debtors. Because of the

K&E 16030284.7
DEL1 73705-1

potential complexity of obtaining Postpetition financing that would "prime" the Prepetition Secured Lenders under the Prepetition Secured Credit Agreement, and the short timeframe in which the Debtors were likely to need access to postpetition funding, Moelis chose to target a group of potential lenders that, in its professional judgment, would be most likely to provide postpetition financing to the Debtors under the specific circumstances and dynamics of these chapter 11 cases.

9.     Ultimately, although the Debtors received preliminary indications regarding pricing and terms for postpetition financing from three financing sources in addition to the proposal submitted by the Prepetition Secured Lenders, Moelis's analysis of the various financing proposals revealed that the Debtors had limited options for postpetition financing and that the proposed DIP Financing presented the best option available for the Debtors under the circumstances.

10.     Specifically, the key terms of the proposed DIP Financing are as follows:

**Amount**.  a $40 million delayed draw term loan, $15 million of which will be made available to the Debtors upon entry of an interim order.  Borrowings under the DIP Facility that are repaid cannot be reborrowed;

**Interest**.  a floating rate equal to the LIBOR Rate plus 950 basis points per annum (payable monthly in arrears);

**Term**.  a six month term, with the possibility of a three month extension in the sole discretion of the majority lenders' to the extent that the majority lenders determine the Company is diligently pursuing confirmation of the plan in good faith;

**Covenants**.  (i) a "budget" variance covenant set at not greater than twenty percent in the aggregate for disbursements during the prior four week period tested on a weekly basis; (ii) maintenance of minimum liquidity of $5,000,000; (iii) maintenance of minimum EBITDA (tested monthly on a trailing twelve month basis) of $45,000,000; (iv) maximum capital expenditures (tested monthly on a trailing twelve month basis) at levels set at a twenty percent cushion to the combined actual trailing months included in the trailing twelve months and that portion of such twelve month period reflected in the Company's operating plan;

6

**Priority**. the granting of "priming" liens on substantially all of the Debtors' assets and junior liens on assets subject to certain existing prepetition liens;

**Fees**. a $50,000 arranging fee, a non-refundable agency fee of $50,000 per quarter, an upfront facility fee totaling $1.2 million, an unused line fee equal to 1.0%; and

**Events of Default**. in addition to standard and customary events of defaults, all plan-related milestones in the Lock-Up Agreement are also included as events of default in the proposed DIP Facility.

**B.     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Enter Into and Perform Under Amended Securitization Documents; (B) Sell Accounts Receivable Pursuant Thereto; (C) Grant Security Interests and Super-Priority Administrative Claim Status in Connection Therewith; and (D) Assume Certain Securitization Documents Pursuant to Section 365 of the Bankruptcy Code**

11.     The Debtors seek authority to enter into the Seventh Amendment and Waiver to Securitization Agreements (the "*Seventh Amendment*," and the financing made available thereby the "*A/R Facility*"), dated as of January 20, 2010, by and among Atrium Companies, Inc. ("*ACI*," the "*Servicer*" or the "*Parent*"), as servicer and originator, each of the Debtors signatory thereto as originators (collectively, and including ACI, the "*Originators*"), Atrium Funding Corporation II, a non-Debtor, bankruptcy remote entity that is wholly-owned by ACI (the "*SPV*") and General Electric Capital Corporation, as sole advancing institution and administrative agent ("*GECC*"). The Debtors' ability to maintain access to the liquidity made available under the A/R Facility is essential to the Debtors' prospects for successful reorganization.

*Overview of the A/R Facility*

12.     Certain of the Debtors (referred to herein and in the Interim Order as the "*Originators*") have historically obtained liquidity from the sale of Receivables under the terms of the A/R Facility. The Receivables arise from the sale of inventory or the rendition of services

7

by the Originators in the ordinary course of business. The A/R Facility is governed by a number of interrelated documents (collectively, the "***Securitization Documents***").

13.    Access to the A/R Facility pursuant to the Securitization Documents allows the Debtors to convert their Receivables to cash without waiting for such accounts to mature or to engage in any collection efforts, providing them with a crucial and accessible source of liquidity. Participating in the A/R Facility decreases the Debtors' exposure to risks associated with non-payment on account of customers on the other side of the Receivables, providing another significant benefit to the Debtors to mandate the continuation of the A/R Facility.

14.    The A/R Facility involves two complimentary sets of transactions. *First*, pursuant to the Prepetition Sale Agreement the Originator sells the Receivables to the SPV. *Second*, GECC makes advances to the SPV secured by those Receivables pursuant to the Prepetition Funding Agreement.

15.    Specifically, under and subject to the terms and conditions of the Prepetition Sale Agreement, on each business day the Originators are obligated to transfer to the SPV all of the Receivables owned by the Originators on that day. In return for each transfer of the Receivables under the Prepetition Sale Agreement, the SPV pays the purchase price to the applicable Originator in cash and, to the extent the sale price for the Receivables exceeds the amount of cash available to the SPV, with the proceeds of a subordinated loan made by the respective Originator to the SPV (each such loan, a "***Subordinated Loan***").

16.    Each Subordinated Loan made by an Originator to the SPV is evidenced by, bear's interest and is payable in accordance with the terms and conditions of, a Subordinated Note executed by the SPV in favor of each of the respective Originators. Additionally, in the event the SPV is unable to pay the purchase price for the Receivables in immediately available

8

funds or with the proceeds of Subordinated Loans, the Parent identifies Receivables then owned by it which have not been previously acquired by the SPV and transfers such Receivables as a capital contribution to the SPV.

17.     The SPV's purchase of the Receivables is funded by amounts borrowed from GECC under the Prepetition Funding Agreement, pursuant to which GECC has committed to make loans from time to time to the SPV – up to a maximum amount of $60 million in the aggregate – to finance such purchases.

18.     Several other agreements work to implement the operation of the A/R Facility, as follows:

- under the Receivables Assignments, each Originator sells or contributes all of such Originator's right, title and interest in, to and under all of its Receivables in accordance with the terms of the Prepetition Sale Agreement;

- pursuant to the Power of Attorney, the Servicer has granted the SPV authority to take certain actions under the Prepetition Sale Agreement with respect to the sale, collection or other disposition of the Receivables;

- under the Originator Support Agreement, the Parent agrees with the SPV that it will cause each of the Originators (each of which is indirectly or directly owned by the Parent) to perform and observe of all of the terms, conditions, agreements and undertakings on the part of such Originator or the Servicer under the Prepetition Securitization Documents; and

- pursuant to the Administrative Services Agreement, to provide the SPV with administrative, back office and related services and the SPV agreed to pay to the Parent (from the SPV's own funds) an annual administrative servicing fee as well as the SPV's allocated share of the Parent's shared overhead expenses that are not related to such administrative servicing fee.

K&E 16030284.7
DEL1 73705-1

As of November 30, 2009, the Debtors' net accounts receivable balance includes $12.7 million of retained interests in Receivables that have been transferred to the SPV and is net of the obligations of the SPV to the lenders under the A/R Facility.

*The Debtors' Proposed Restructuring and Need to Maintain the A/R Facility*

19.     In addition to the liquidity provided under the DIP Facility, I believe that maintaining access to liquidity made available under the A/R Facility is essential to the Debtors' reorganization prospects.  Although the agent under the A/R Facility – GECC – is a separate and district entity from the prepetition agent under the proposed DIP Financing, the Debtors understood from early discussions with those parties that the Debtors would not have postpetition access to the A/R Facility if the Debtors pursued postpetition financing from sources other than the incumbent lenders.  Indeed, the Debtors' decision to proceed with the DIP Financing is inextricably linked to having continued availability under the A/R Facility during the chapter 11 cases.

20.     Notably, maintaining the A/R Facility minimizes the sizing requirements of the Debtors' postpetition financing needs, thereby minimizing administrative expenses in these chapter 11 cases.  Absent an amendment to the terms of the A/R Facility to provide for its continuation, I understand the securitization would terminate (by its express terms) and the Debtors would be left without an important source of liquidity and the size of the overall financing facility.  As a result, a competing postpetition financing facility would need to be sized to incorporate this los liquidity.

*The Proposed Seventh Amendment and Interim Order*

21.     It is my understanding that after engaging in good faith, arm's-length negotiations with GECC, the Seventh Amendment and the Interim Order together waive the defaults that

10

otherwise would terminate the A/R Facility upon the commencement of these chapter 11 cases. As a result, the Debtors are able to continue selling Receivables under the A/R Facility after the Petition Date.

22.     Under the Seventh Amendment, GECC has agreed to waive certain termination events that occurred with respect to the A/R Facility solely as a result of the commencement of the chapter 11 cases (the *"Bankruptcy Waiver"*).     Additionally, the representations and warranties made in the certain of the Securitization Documents are qualified to exclude any noncompliance resulting solely from the filing of these chapter 11 cases.  Upon execution of the Seventh Amendment, the SPV paid a $500,000 amendment fee to GECC.  Section 4 of the Seventh Amendment further provides that the Bankruptcy Waiver will become effective upon execution of the Seventh Amendment.

23.     I firmly believe that the Seventh Amendment is justified under the circumstances of these chapter 11 cases and necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing.  Indeed, GECC would not agree to modification and extension of the A/R Facility without the inclusion of such terms, each of which was heavily negotiated between the parties.  In addition, the Debtors have determined, in the exercise of their sound business judgment, that agreeing to such provisions was appropriate in light of the circumstances surrounding the Debtors' proposed DIP Financing.

**C.     Debtors' Motion for Entry of An Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System; (B) Honor Certain Prepetition Obligations Related to the Cash Management System; (C) Maintain Existing Business Forms; and (D) Grant Claims and Perform Under Certain Intercompany Arrangements and Historical Practices**

24.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system comprised of two principal components:  (a) one in the United States (the *"U.S. Cash Management System"*) and (b) one in Canada (the *"Canadian Cash*

11

*Management System*," and, together with the U.S. Cash Management System, the "*Cash Management System*"). The Debtors use the Cash Management System to collect, transfer and disburse funds generated from their United States and Canadian operations, facilitate cash monitoring, forecasting and reporting, and enable the Debtors to maintain control over the bank accounts (collectively, the "*Bank Accounts*").

25. The U.S. Cash Management System consists of approximately 43 Bank Accounts with the following financial institutions: (a) Bank of America, N.A. ("*Bank of America*"); (b)Wells Fargo Bank, N.A. ("*Wells Fargo*"); (c) PNC Bank, N.A. ("*PNC Bank*"); (d) National City Bank ("*National City Bank*");[2] and (e) Bank Independent ("*Bank Independent*," collectively with Bank of America, Wells Fargo, PNC Bank and National City Bank, the "*U.S. Banks*"). The Canadian Cash Management System consists of five Bank Accounts with Bank of America and the Royal Bank of Canada ("*RBC*") (collectively, with the U.S. Banks, the "*Banks*"). The Debtors' financial personnel manage the Cash Management System from the Debtors' principal executive office in Dallas, Texas.

26. The Debtors have designed the Cash Management System to meet their operating needs, enable them to centrally control and monitor corporate funds, ensure cash availability and liquidity, invest excess cash, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balances.

27. The Cash Management System further provides the Debtors with the ability to, among other things: (a) quickly create status reports on the location and amount of funds, which in turn, allows management to track and control such funds; (b) ensure cash availability; and

---

2    PNC Bank is the principal subsidiary of PNC Financial Services Group, Inc., which in late 2008, purchased National City Bank's parent, National City Corp.

12

(c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. I believe that these controls are crucial given the significant volume of cash transactions managed through the Cash Management System on a daily basis. Additionally, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. I believe that the continued use of the Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts. Further, the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

*The U.S. Cash Management System*

      i.     The Integrated Operating Accounts

28. The centerpiece of the U.S. Cash Management System is an operating Bank Account (Account No. 7737) that Atrium Companies, Inc. ("***Atrium Companies***") maintains with Bank of America (the "***Operating Account***"). The Operating Account serves as the primary source of funds for accounts payable, payroll and other obligations related to the Debtors' U.S. operations.

29. The Operating Account's primary source of cash is the receipt of funds from a Bank Account that non-Debtor Atrium Funding Corporation II maintains with Bank of America (Account No. 5131) (the "***Borrower Account***"). The Borrower Account receives funds collected from the Debtors' prepetition accounts receivable facility (the "***A/R Facility***"). Funds from the Borrower Account are swept into the Operating Account on a daily basis.

K&E 16030284.7
DEL1 73705-1

30.     Funds from the Operating Account are disbursed to the following domestic operating accounts on an as-needed basis:

- **Atrium Companies Accounts**.   The Operating Account funds Atrium Companies' accounts payable, flexible benefits and payroll Bank Accounts with Bank of America (Account Nos. 4616, 2627, 4624, 4632 and 4640, respectively).

- **ASM Accounts**.  The Operating Account funds Debtor Aluminum Screen Manufacturers, Inc.'s ("*ASM*") accounts payable and payroll Bank Accounts with Bank of America (Account Nos. 6710 and 6652, respectively).  ASM also maintains a Bank Account with Bank of America (Account No. 6559), which I am informed ASM does not utilize and intends to close.

- **Florida Accounts**.  The Operating Account funds Debtor Atrium Florida, Inc.'s permit, accounts payable and payroll Bank Accounts with Bank of America (Account Nos. 9789, 8484, 8476, 9011 and 9029, respectively).  Atrium Florida, Inc. also maintains Bank Accounts with Bank of America (Account Nos. 9776 and 9469), which I am informed Atrium Florida, Inc. does not utilize and intends to close.

- **Superior Engineered Accounts**.   The Operating Account funds Debtor Superior Engineered Products Corporation's ("*Superior*") accounts payable and payroll Bank Accounts with Bank of America (Account Nos. 7593 and 7601, respectively).  Superior also maintains a Bank Account with Bank of America (Account No. 2217), which I am informed Superior does not utilize and intends to close.

- **Champion Accounts**.   The Operating Account funds Debtor Champion Window, Inc.'s accounts payable, deposit, payroll and two petty cash accounts with Bank of America (Account Nos. 7047, 7050, 7063, 5622 and 5630, respectively).

- **Atrium TWIP Account**.   The Operating Account funds Atrium Companies' Bank Account with Bank of America (Account No. 9391), which provides funding for its self-insured retention insurance policy in connection with the "opt-out" requirements of the State of Texas' Work Injury Program (the "*TWIP*").  Atrium Companies also maintains a Bank Account in connection with the TWIP with Bank of America (Account No. 9273), which I am informed TWIP does not utilize and intends to close.

14

- Bank Independent Accounts. The Operating Account funds Debtor R.G. Darby Company, Inc.'s ("*R.G. Darby*") accounts receivable, petty cash and payroll Bank Accounts with Bank Independent (Account Nos. 6499, 6502 and 2387, respectively) (the "*Darby Accounts*"). Funds generated by R.G. Darby are not automatically swept into the Operating Account; rather, a manual sweep occurs whenever the available balance in the Darby Accounts surpasses $150,000. I am informed that, on average, the Darby Accounts maintain an aggregate of approximately $150,000.

- Thermal Industries Accounts. The Operating Account funds Debtor Thermal Industries, Inc.'s controlled disbursement, revolving, payroll funding, payroll disbursement and petty cash Bank Accounts with PNC Bank (Account Nos. 0688, 7337, 2396, 1170 and 7258, respectively).

- West Coast Petty Cash Account. The Operating Account funds Debtor Atrium Door and Window Company-West Coast's ("*West Coast*") Bank Account with Bank of America (Account No. 7643), which is primarily used to cover costs associated with remitting any outstanding compensation to a terminated employee on the same date of an employee's termination as required under California law. This Bank Account is also used for maintenance and other related expenses. I am informed that this Bank Account holds approximately $10,000 at any given time.

- Total Trim Accounts. The Operating Account funds Debtor Total Trim, Inc.'s ("*Total Trim*") account receivable, petty cash and payroll Bank Accounts with Bank Independent (Account Nos. 6529, 6510, and 2395, respectively). The Debtors estimate that these Bank Accounts maintain an average $50,000 in total funds.

ii.     The Stand-Alone Accounts

31.     In addition to the Bank Accounts described above, all of which receive funds directly from the Operating Account, certain Debtors maintain the following stand-alone accounts:

- Atrium Corp. Account. The Operating Account funds Debtor Atrium Corporation's Bank Account with Bank of America (Account No. 7669), which facilitates transfer of the certain shares of Atrium Corporation's equity interests. I am informed that this account holds approximately $2,000 to $3,000 at any given time.

K&E 16030284.7
DEL1 73705-1

- Wells Fargo Accounts. Debtor Atrium Door and Window Company of the Rockies funds a petty cash Bank Account with Wells Fargo (Account No. 5543). In addition, Atrium Companies funds an operating account with Wells Fargo (Account No. 1060) for the purpose of paying banking fees. I am informed that these Bank Accounts maintain average balances of $5,000 and $2,500 respectively, in funds at any given time.

- ACIH Account. Debtor ACIH, Inc. maintains a Bank Account with Bank of America (Account No. 6102). I believe that ACIH, Inc. does not utilize this account and intends to close it.

- Northwest Petty Cash Account. Debtor Atrium Door and Window Company of the Northwest ("*Northwest*") funds a petty cash Bank Account with Bank of America (Account No. 7656). I am informed that that this Bank Account maintains an average of $75,000 in total funds.

- West Coast Petty Cash Account. Debtor Atrium Door and Window Company-West Coast ("*West Coast*") funds a petty cash Bank Account with Bank of America (Account No. 7643), which is primarily used to cover compensation that is due and owing to a terminated employee, which, under California law, is required to be remitted in full upon the date of such termination. This Bank Account is also used for maintenance and other related expenses. The Debtors estimate that this Bank Account holds approximately $10,000 at any given time.

*The Canadian Cash Management System*

32. The Debtors also maintain a separate Canadian Cash Management System. The principal components of the Canadian Cash Management System are three Bank Accounts with RBC that are primarily funded and maintained by Debtor North Star Manufacturing (London) Ltd. ("*North Star*"). These accounts are maintained for the purpose of funding operating costs, benefits costs and payroll (Account Nos. 626-8, 554-5 and 134-5, respectively) (the "*RBC Accounts*"). North Star also maintains a USD-denominated accounts payable with Bank of America (Account No. 7321) for payment of USD-denominated raw materials and operating costs. Moreover, Atrium Companies maintains an account with Bank of America (Account No. 0205) that holds Canadian-denominated funds received from North Star (as required under the

16

Debtors' prepetition senior secured credit facility) until such time when it is economically advantageous for the Debtors to convert such funds into U.S. dollars (collectively, the "*Canadian BofA Account*" and, together with the RBC Accounts, the "*Canadian Accounts*").

33. North Star does not participate in the A/R Facility and the funds held in the Canadian Accounts are held outside of the U.S. Cash Management System. The Operating Account does, however, periodically fund the Canadian Accounts on an as needed basis. To comply with the Debtors' obligations under their prepetition senior secured credit facility, funds held in the Canadian Accounts are swept into the Canadian BofA Account when the aggregate balance in the RBC Accounts exceeds $2 million. The Debtors estimate that the Canadian Accounts maintain an average balance ranging from $750,000 to $2 million at any given time.

*The Debtors' Ordinary Course ACH Payments, Bank Fees and Preparation for the Chapter 11 Filing*

34. In the ordinary course of business, the Debtors conduct transactions by debit, wire or automatic clearing house payments and other similar methods ("*ACH Payments*"). In addition, a certain percentage of the Debtors' customer receipts are received through wire transfer payments. In certain instances, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH Payments, and the failure to do so may result in penalties.

35. Further, the Banks charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses (collectively, the "*Bank Fees*").

17

*The Debtors' Intercompany Transactions*

36.     Certain of the Debtor entities maintain business relationships with each other, resulting in intercompany receivables and payables (collectively, the "***Intercompany Claims***"). These costs and revenues, as well as income taxes and management fees, are then allocated among the legal entities resulting in Intercompany Claims.   Indeed, as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the Operating Account), there may be, at any given time, Intercompany Claims owed by one Debtor affiliate to another (the "***Intercompany Transactions***") in connection with the disbursement of funds.

37.     The Debtors maintain records of all Intercompany Transactions (including fund transfers) and, therefore, are able to ascertain, trace and account for the Intercompany Transactions.  At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

*The Debtors' Existing Business Forms and Checks*

38.     In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates and avoid unnecessarily confusing their employees, customers and suppliers, I believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date - without reference to the Debtors' status as debtors in possession - rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

18

## OPERATIONAL MOTIONS PURSUANT TO RULE 6003

**A.**     **Debtors' Motion for Entry of Interim and Final Orders Authorizing, But not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Other Compensations and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs**

*Overview of the Debtors' Workforce*

39.     As of the Petition Date, the Debtors employ 3,729 employees in the United States (the "***U.S. Employees***") and 251 employees in Canada (the "***Canadian Employees***," and together with the U.S. Employees, the "***Employees***"). Of the 3,980 Employees, approximately 3,968 are full-time Employees (*i.e.*, they work a minimum of 30 hours per week) and approximately 12 are part-time Employees.

40.     I understand from my colleagues in the human resources department that 725 of the Employees are members of two union locals: (a) UNITE HERE Local 2630, located in Wylie, Texas; and (b) UNITE HERE Local 2629/31/32, located in Dallas, Texas (together, the "***Union Employees***").[3] Atrium Companies, Inc. is subject to a collective bargaining agreement with each of these union locals (the "***Collective Bargaining Agreements***").

41.     In addition, the Debtors supplement their business needs and workforce with 29 independent contractors (the "***Independent Contractors***") and 218 temporary employees who are retained through third-party employers and agencies (the "***Temporary Employees***").

42.     The Employees, Independent Contractors and Temporary Employees perform a variety of critical functions, including sales, customer service, purchasing, manufacturing and a variety of administrative, accounting, legal, financial, managerial, supervisory and other related tasks. I believe that their skills, knowledge and understanding with respect to the Debtors'

---

[3]     In certain instances, the Union Employees are not entitled to participate in, or are restricted in their participation of, certain of the Debtors' programs that are made available to the Employees in the ordinary course of business, including, the U.S. Health Benefits (as defined herein) and the Debtors' 401(k) Plan (as defined herein).

K&E 16030284.7
DEL1 73705-1

operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses. Just as the Debtors depend on the Employees, Independent Contractors and Temporary Employees to operate their businesses on a daily basis, those individuals also depend on the Debtors. In fact, the vast majority of these individuals rely exclusively on payments received from the Debtors with respect to wages, other compensation, expense reimbursements and health and other benefits for their basic living necessities.

*Wages, Payroll and Other Compensation*

### (i)    Wage Obligations

43.    In the ordinary course of business, the Debtors incur payroll obligations for base wages, salaries and overtime compensation owed to their Employees, Independent Contractors and Temporary Employees (collectively, the *"Wage Obligations"*). Depending on an individual's status, Wage Obligations are paid on either a weekly, bi-weekly or monthly basis. My colleagues in the human resources department have informed me that on a bi-weekly basis, Wage Obligations average a total of approximately $3.3 million and CAD $451,000. [4]

44.    Although the Debtors have paid their wage, salary and other employee-related obligations in accordance with their ordinary compensation schedule, as of the Petition Date. I understand that certain prepetition obligations may be due and owing. Indeed, I believe that certain amounts may be outstanding on account of unpaid compensation because (a) discrepancies exist between the amounts paid and the amounts that should have been paid and (b) some payroll or invoice checks issued before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

---

[4]    Currency amounts provided herein are stated in U.S. dollars (*"USD"*), unless stated otherwise (*e.g.*, Canadian dollars (*"CAD"*)).

K&E 16030284.7
DEL1 73705-1

45.     Specifically, the Unpaid Wage Obligations consist of the following:

- Employee Compensation.  Employee compensation consists of amounts owed to the Debtors' full and part-time Employees, including prepetition wages and salaries, but excluding commissions, severances, bonuses, relocation expense reimbursements and vacation times.  As of the Petition Date, I am informed that the Debtors owe approximately $4 million and CAD $270,000 on account of compensation owed to the Debtors' Employees in the ordinary course of business (the "*Unpaid Employee Compensation*").

- Director Compensation.  Each director on the Board of Directors of Atrium Corporation (the "*Board*") receives an annual compensation of $25,000, paid in arrears and in equal installments on a quarterly basis.  As of the Petition Date, I am informed that approximately $3,600 on account of prepetition services provided by directors of the Board (the "*Unpaid Director Compensation*").  Although I do not believe the obligation to remit the Unpaid Director Compensation will not arise until after the Petition Date (*i.e.*, the end of the first quarter 2010), out of an abundance of caution, the Debtors seek the authority to remit the Unpaid Director Compensation and any additional director compensation that has accrued since the Petition Date in the ordinary course of business, when such obligations become due and owing.

- Independent Contractor Compensation.  The Debtors' aggregate monthly payments to their 29 Independent Contractors total approximately $457,000 and CAD $2,000.  As of the Petition Date, I am informed that approximately $18,000 has accrued and remains outstanding on account of prepetition services and approximately $175,000 could become due and payable upon satisfaction of certain conditions with respect to outstanding services yet to be performed by the Independent Contractors (collectively,     the     "*Unpaid     Independent     Contractor Compensation*").

- Temporary Employee Compensation.  The Debtors retain 218 Temporary Employees from various third-party employment agencies, and typically remit compensation for the Temporary Employees' services directly to such third-party agencies, which in turn pay the Temporary Employees.  The Debtors estimate that their aggregate monthly obligations for Temporary Employees total approximately $380,000, which includes monthly fees that the Debtors remit to third-party agencies in exchange for the services they provide with respect to Temporary Employees.  As of the Petition Date, I am informed that $34,000 has accrued and remains

21

outstanding on account of prepetition services performed by the Temporary Employees (the "***Unpaid Temporary Employee Compensation***").

**(ii)     Commissions Programs**

46.      In addition to the Wage Obligations, 131 U.S. Employees and three Canadian Employees participate in a commissions program offered by the Debtors to incentivize performance and maximize sales and production (the "***U.S. Commissions Programs***" and the "***Canadian Commissions Programs***," respectively and together, the "***Commissions Programs***").

47.      For a majority of the Employees who participate in the U.S. Commissions Programs, commissions are paid in addition to base salary and typically consist of a monthly commission that ranges between 1% and 5% on a portion of their sales, which is paid on either a monthly or quarterly basis. Similarly, under the Canadian Commissions Programs, participating Employees receive, in addition to their base salary, a monthly commission that ranges between 0.5% and 1% on a portion of their sales. Commissions under this program are paid on an annual basis. [5]

48.      I believe that commissions earned under the Commissions Programs are an integral component of a participating Employee's ordinary course compensation, and in some instances, comprise a significant portion of a participating Employee's annual compensation. Because commissions are only paid to high-performing individuals, I believe that continuing to honor these obligations is vital to the success of the Debtors' continued business operations.

49.      I am informed that that approximately $170,000 in prepetition amounts remains earned and unpaid on account of the Commissions Programs (the "***Unpaid Commissions***") as of the Petition Date.

---

[5]      Four Employees who participate in the U.S. Commissions Program do not receive a base salary.

22

### (iii) Payroll Services

50.     The majority of the Debtors' Wage Obligations are made by direct deposit through the electronic transfer of funds from the Debtors' payroll department directly to each Employee's bank account, with the balance of the Employees receiving checks. Most of the Debtors outsource this operation to third-party service providers, including Automatic Data Processing, Inc. ("*ADP*") and Alliance Payroll Services ("*Alliance*").[6]

51.     Specifically, ADP and Alliance are responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state and local tax filings. In addition, for each payroll period, ADP and Alliance process direct deposit transfers, or administer payroll checks to Employees, from certain disbursement accounts funded by the Debtors with the amounts necessary to satisfy the Debtors' payroll obligations. I believe that these services are crucial to providing the Debtors with a payroll system that functions seamlessly.

52.     The Debtors incur approximately $492,000 per year in fees for the services provided by ADP and Alliance. As of the Petition Date, I am informed that approximately $20,000 has accrued and remains outstanding on account of on account of fees owed to ADP for services rendered prepetition (the "*Unpaid Payroll Service Fees*"). The Debtors are seeking the authority to remit the Unpaid Payroll Service Fees and continue to use ADP and Alliance in the ordinary course of business on a postpetition basis.

---

[6]     North Star does not utilize ADP or Alliance to assist in processing its respective payroll. North Star does, however, process their payroll utilizing licensed software subject to an annual support fee of approximately CAD $9,000 and utilizing electronic deposit services provided by the Royal Bank of Canada at a monthly cost of approximately CAD $200. As of the Petition Date, no amounts remain outstanding on account of these services. By this motion, North Star seeks the authority, in its discretion, to continue retaining these services in the ordinary course of business on a postpetition basis.

K&E 16030284.7
DEL1 73705-1

## Deductions and Payroll Taxes

53.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees, Independent Contractors and Temporary Employees' gross pay, including garnishments, child support and similar deductions (collectively, the "*Deductions*"), which either the Debtors or a third-party service provider then forward to the appropriate recipients. On a bi-weekly basis, I understand that Deductions total approximately $28,000 and CAD $400. As of the Petition Date, approximately CAD $115.00 in Deductions has not been remitted to the appropriate third-party recipients (collectively, the "*Unremitted Deductions*").

54.     In addition to the Deductions, the Debtors are required by law to withhold amounts from Employees, Independent Contractors and Temporary Employees' wages that are related to federal, state, provincial and local income taxes, including social security and Medicare taxes, employment insurance and Canadian pension plan taxes, for remittance to the appropriate taxing authorities (collectively, the "*Payroll Taxes*"). On a bi-weekly basis, the Debtors estimate that they deduct and remit to appropriate third-party recipients approximately $1.2 million and CAD $150,000 on account of the Payroll Taxes. As of the Petition Date, the Debtors do not owe any amounts on account of unremitted Payroll Taxes.

55.     Out of an abundance of caution, because the Unremitted Deductions are only held in trust, however, the Debtors pursuant to the Interim Order, seek to remit the Unremitted Deductions and continue collecting and remitting the Deductions and Payroll Taxes in the ordinary course of business on a postpetition basis.

## Reimbursable Expenses

56.     The Debtors reimburse certain Employees and members of the Board for reasonable, customary and approved expenses incurred on behalf of the Debtors in the scope of

24

their employment and service, including travel expenses, U.S. and Canadian purchasing cards and automobile expenses (collectively, the "***Reimbursable Expense Programs***") as follows:

- Travel Expenses. The Debtors routinely reimburse certain Employees and members of the Board for expenses such as travel, meals, parking, automobile mileage and other business-related expenses that are incurred in the scope of their employment or service as members of the Board. Based on historical figures, I am informed that the Debtors owe approximately $5,000 on account of prepetition travel expenses that remain outstanding as of the Petition Date (the "***Unpaid Travel Expenses***").

- U.S. Employee Purchasing Cards. The Debtors issue American Express corporate credit cards to approximately 106 U.S. Employees for business-related expenses (collectively, the "***U.S. Employee Purchasing Cards***"). Although all participating Employees are personally liable for charges incurred on the U.S. Employee Purchasing Cards, the Debtors remit a direct payment to American Express for certain of the U.S. Employee Purchasing Cards, whereas, with respect to certain other credit cards, the participating Employees pay American Express directly and are subsequently reimbursed by the Debtors. I am informed that as of the Petition Date, the Debtors owe approximately $33,000 on account of prepetition obligations relating to the U.S. Employee Purchasing Cards (the "***Unpaid U.S. Employee Purchasing Cards Expenses***").

- Canadian Employee Purchasing Cards. North Star issues VISA credit cards distributed by the Royal Bank of Canada to approximately 15 Canadian Employees for business-related expenses, 35 fuel credit cards and one Home Depot credit card for use by its purchasing department (collectively, the "***Canadian Employee Purchasing Cards***"). The Debtors guarantee the Canadian Employee Purchasing Cards and remit direct payment for the balance of the Canadian Employee Purchasing Cards to the respective credit card vendor. I am informed that the Debtors owe approximately CAD $5,000 on account of prepetition obligations relating to the Canadian Employee Purchasing Cards (the "***Unpaid Canadian Employee Purchasing Cards Expenses***").

- Automobile Expenses. The Debtors provide certain Employees with either (i) a company-leased vehicle; (ii) a monthly stipend for automobile-related expenses in lieu of a company-leased vehicle; (iii) a T-Check Systems fuel card by which certain Employees may incur fuel-related expenses; or (iv) access to the Debtors' fuel program with Pilot Travel Centers LLC (the "***Automobile and***

25

> *Fuel Program*"). The Debtors estimate that their monthly expenses with respect to the Automobile and Fuel Program are approximately $242,000 and CAD $1,300. I am informed that as of the Petition Date, approximately $76,000 and CAD $800 has accrued and remains outstanding on account of the Automobile and Fuel Program (the "*Unpaid Automobile and Fuel Expenses*").

57.     To avoid unnecessary disruption and, in certain instances, liability with respect to the Debtors' Employees, the Debtors should be granted the authority, in their discretion, pursuant to the Interim Order, to pay the Unpaid Reimbursable Expenses in an amount not to exceed $1,000 per eligible Employee and to continue the Reimbursable Expense Programs in the ordinary course of business on a postpetition basis. The Debtors also seek the authority, pursuant to the final order, to remit any remaining Unpaid Reimbursable Expenses that accrued as a result of prepetition obligations in an amount not to exceed $10,950 per eligible Employee.

*Employee Bonus Programs*

58.     The Debtors maintain several bonus programs that are utilized to encourage and incentivize their rank-and-file Employees while, at the same time, directly increase the Debtors' revenue (collectively, the "*Employee Bonus Programs*"). I believe that the Employee Bonus Programs are an integral part of the Debtors' culture and a fundamental component of the compensation structure for many Employees.

59.     Specifically, certain of the Debtors provide Employee Bonus Programs in the ordinary course of business on a division-by-division basis whereby eligible Employees, depending upon their respective statuses, can either earn a flat sum, a certain percentage of an accrued amount or a certain percentage of their annual salary in the form of an annual, semi-annual or monthly bonus. The amount of such bonuses generally depend on various factors, including, an Employee's production quality, schedule adherence, safety, order accuracy, training completion, closed complaints and other metrics within the control of an Employee's

K&E 16030284.7
DEL1 73705-1

respective department, which, in certain instances, concern a division's EBITDA and the individual Employee's "management by objectives" performance. For certain Employees, the bonus program year occurs from December through November, with incentives paid the following December. For other Employees, the bonus program year is based on the calendar year, with bonuses paid the following April.

60. As of the Petition Date, I am informed that approximately $1.7 million and CAD $750,000 has accrued and remains outstanding on account of monies earned prepetition pursuant to the Employee Bonus Programs made available to the Debtors' rank-and-file Employees (the "*Unpaid Employee Bonuses*").

*Employee Severance Obligations*

61. The Debtors have historically maintained a severance program whereby each eligible Employee earns one week of severance benefits for each year of the first five years of employment, plus one half of a week of severance benefits for every subsequent year of the individual Employee's service through the date of termination (the "*Employee Severance Program*").

62. As of the Petition Date, I am informed that 13 current or former Employees are receiving or will receive payments under the Employee Severance Program for services rendered prepetition. Approximately $307,000 has accrued and remains outstanding on account of the Employee Severance Program (the "*Unpaid Severance*"). I believe that if the Debtors are unable to continue the Employee Severance Program and satisfy the Unpaid Severance obligations, then current Employees may question the Debtors' commitment to the Severance Program, which is intended to ease their financial burden in the event they are terminated. Moreover, I feel that employee morale and loyalty will be jeopardized at a time when employee

27

support is critical. I believe that it is important that the Debtors fulfill their commitment under the Severance Program and reassure all Employees that the Debtors honor their obligations to Employees – both during and after their tenure with the Debtors – including those incurred postpetition under the Employee Severance Program.

*Employee Benefits Plans*

63.     The Debtors maintain various employee benefit plans and policies, including health care, prescription drug benefits, dental and vision plans, and flexible benefits plans (collectively, and as discussed in more detail below, the "***Employee Benefits Plans***").

**(i)     U.S. Health Benefits**

64.     All regular, full-time, U.S. Employees are eligible to receive the following medical, prescription drug, dental and vision insurance coverage (collectively, the "***U.S. Health Benefits***"):

- Medical and Prescription Drug Plans. BlueCross BlueShield of Texas and BlueCross BlueShield of Alabama administer the Debtors' domestic medical and prescription drug coverage plans for approximately 2,000 covered Employees (the "***Medical Plans***"). The Debtors' average annual cost to administer the Medical Plans is approximately $14 million, net of Employee contributions. I am informed that the Debtors owe approximately $1,109,000 on account of prepetition obligations under the Medical Plans.

- Dental Plan. MetLife Dental PPO and CIGNA DHMO administer the Debtors' domestic dental plans for approximately 1,800 covered Employees (the "***Dental Plans***"). The Debtors' average annual cost to administer the Dental Plans is approximately $910,000, net of Employee contributions. I am informed that $75,000 has accrued and remains outstanding on account of prepetition obligations under the Dental Plans.

- Vision Plan. Vision Service Plan administers the Debtors' U.S. vision benefits plan for approximately 1,300 Employees (the "***Vision Plan***"). The Debtors' average annual cost to administer this plan is approximately $341,000, net of Employee contributions. I am informed that approximately $21,000 has

28

accrued and remains outstanding on account of prepetition obligations under the Vision Plan.

65.     As of the Petition Date, the Debtors estimate that they owe a total of approximately $1,205,000 on account of unpaid U.S. Health Benefits that accrued prepetition (the "**Unpaid U.S. Health Benefits**"). I believe that the U.S. Health Benefits are vital to the Debtors' Employees, and that the Debtors should be permitted to continue providing the U.S. Health Benefits in the ordinary course of business on a postpetition basis.

**(ii)     Canadian Health Benefits**

66.     Similar to the U.S. Health Benefits, all regular, full-time Canadian Employees are eligible to receive the following medical, prescription drug, dental and vision insurance coverage (collectively, the "**Canadian Health Benefits**"):

- Medical and Prescription Drug Plans.   The Great-West Life Assurance Company ("**GWLAC**") administers the Debtors' Canadian medical and prescription drug coverage plans for all of its Canadian Employees (the "**Canadian Medical and Prescription Drug Plans**"). The Canadian Medical and Prescription Drug Plans are non-contributory and do not require that the Debtors withhold deductions from Canadian Employees' paychecks on account of these Plans. The Debtors' average annual cost to administer the Canadian Medical and Prescription Drug Plans is approximately CAD $128,000.   I am informed that the Debtors owe approximately CAD $5,300 on account of prepetition obligations under the Canadian Medical and Prescription Drug Plans.

- Dental Plan. GWLAC administers the Debtors' Canadian dental plan for all of its Canadian Employees (the "**Canadian Dental Plan**"). The Canadian Dental Plan is non-contributory and does not require that the Debtors withhold deductions from Canadian Employees' paychecks on account of this Plan.   The Debtors' average annual cost to administer the Canadian Dental Plan is approximately CAD $112,000. I am informed that approximately CAD $4,600 on account of prepetition obligations is outstanding under the Canadian Dental Plan.

- Vision Plan. GWLAC administers the Debtors' Canadian vision benefits plan for all of its Canadian Employees (the "**Canadian Vision Plan**"). The Canadian Vision Plan is non-contributory and

29

does not require that the Debtors withhold deductions from Canadian Employees' paychecks on account of this Plan. The Debtors' average annual cost to administer the Canadian Vision Plan is approximately CAD $13,700. I am informed that the Debtors owe approximately CAD $1,000 on account of prepetition obligations under the Canadian Vision Plan is outstanding.

67.     In addition, the Debtors employ Regroup Benefit Solutions to serve as a broker in assisting the Debtors to procure the Canadian Health Benefits described above. The Debtors pay Regroup Benefit Solutions a monthly fee of approximately CAD $917, in advance, on a quarterly basis and I understand that, as of the Petition Date, no amounts have accrued and remain outstanding on account of prepetition broker services related to the Canadian Health Benefits.

68.     I understand that the Debtors owe a total of approximately CAD $11,000 on account of unpaid Canadian Health Benefits that accrued prepetition (the "*Unpaid Canadian Health Benefits*"). Considering that the Canadian Health Benefits are vital to the Debtors' Employees, I believe the Debtors should be granted the authority to remit the Unpaid Canadian Health Benefits and to continue providing the Canadian Health Benefits in the ordinary course of business on a postpetition basis.

**(iii)    Union Employees' Health Benefits**

69.     The Debtors provide medical, prescription drug, dental, vision and other health coverage to their Union Employees in accordance with the terms of the Collective Bargaining Agreements (the "*Union Employees' Health Benefits*"). In addition to the benefits mentioned above, the Union Employees' Health Benefits include hospitalization, surgical, diagnostic testing, primary care, vision care, prescription drug card, term life insurance, disability and accidental death and dismemberment benefits for all eligible employees. The Debtors are also obligated to make a dental plan available to all Union Employees and their dependents.

30

70.     The medical and prescription drug coverage is administered by the Amalgamated National Health Fund and covers all Union Employees who have two or more years of service with the Debtors. The Debtors' average monthly contribution on behalf of all eligible Union Employees for the Union Employees' Health Benefits is approximately $153,000. The dental and vision plans are administered by Assurant, Inc. and covers all Union Employees who have been employed by the Debtors for at least 90 days. The average monthly contribution on behalf of all eligible Union Employees for the dental and vision plans is $3,500. As of the Petition Date, there are no outstanding obligations with respect to the Union Employees' Health Benefits.

**(iv)     Flexible Benefits Plan**

71.     The Debtors offer all of their full-time U.S. Employees who are not covered under the Collective Bargaining Agreements the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible, out-of-pocket health care and dependent care costs and expenses (the "*Flexible Benefits Plan*"). A third-party – TaxSaver Plan – administers the Flexible Benefits Plan. The Debtors estimate that approximately 2,600 Employees participate in the Flexible Benefits Plan.

72.     The average annual cost of administering the Flexible Benefits Plan is approximately $31,000. I am informed that approximately $74,000 has accrued and remains outstanding on account of the Flexible Benefits Plan (the "*Unremitted Flexible Benefits Plan Deductions*") as of the Petition Date.

*Employee Workers' Compensation, Insurance Plans and Disability Benefits*

**(i)     Workers' Compensation Programs**

73.     The Debtors provide workers' compensation insurance for their Employees at the mandated level required by each state in the United States and provinces of Canada in which the

31

Debtors operate (collectively, the ***Workers' Compensation Programs***"). Specifically, the Workers' Compensation Programs are as follows:

- Zurich Policies. The Debtors maintain two workers' compensation policies with Zurich American Insurance Company (***"Zurich"***), which cover Employees working in 26 states (the ***"Zurich American Policies"***).[7] Both policies cover the period beginning April 1, 2009 and ending April 1, 2010. The Zurich American Policies generally include deductibles of $500,000 per claim/accident. The Debtors pay a total of approximately $341,000 in annual premiums for the Zurich American Policies, which are paid in monthly installments of approximately $36,000 per month. Under the Zurich American Policies, the Debtors retain a $1.17 million reserve and, as of the Petition Date, I am informed that $150,000 is outstanding on account of prepetition claims submitted to Zurich (the ***"Outstanding Zurich Claims"***). Additionally, I am informed that no amounts remain outstanding with respect to the Debtors' annual premium under the Zurich American Policies.

- Washington Workers' Compensation Program. Employees who work in the state of Washington receive workers' compensation coverage through the Washington Department of Labor and Industry (the ***"Washington Workers' Compensation Program"***). The Washington Workers' Compensation Program covers the period beginning July 1, 2009 and ending June 30, 2010. Under this program, the Debtors maintain a zero deductible per accident and a total, estimated, annual premium of approximately $261,000, which the Debtors pay on a quarterly basis. I am informed that approximately $88,200 has accrued and remains outstanding on account of prepetition services provided under the Washington Workers' Compensation Program (the ***"Unpaid Washington Workers' Compensation"***).[8]

---

[7] Specifically, the Zurich American Policies cover Employees who work in Alabama, Arkansas, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Missouri, North Carolina, New Jersey, Nevada, New York, Oregon, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia and Wisconsin.

[8] In conjunction with the Washington Workers' Compensation Program, the Debtors employ The Association of Washington Business d/b/a Comp Wise (***"Comp Wise"***) to serve as a third-party administrator and consultant with respect to claims filed thereunder. Comp Wise bills the Debtors on a quarterly basis for services performed by Comp Wise three to four months in arrears. The amount that Comp Wise bills to the Debtors is based on a percentage of premium payments made by the Debtors to the Washington Department of Labor and Industry. For each of the fourth quarter of 2008 and the first two quarters of 2009, the respective service fee that the Debtors paid to Comp Wise was approximately $10,500. As of the Petition Date, approximately $8,100 has accrued and remains outstanding on account of

32

- Ohio Workers' Compensation Program. Employees who work in the state of Ohio receive workers' compensation coverage through the Ohio Bureau of Workers' Compensation (the "*Ohio Workers' Compensation Program*"). The Ohio Workers' Compensation Program covers the period beginning July 1, 2009 and ending February 28, 2010. Under this program, the Debtors maintain a zero deductible per accident and a total, estimated, annual premium of approximately $12,000, which the Debtors pay on a bi-yearly basis. I am informed that approximately $6,000 has accrued and remains outstanding on account of prepetition services provided under the Ohio Workers' Compensation Program (the "*Unpaid Ohio Workers' Compensation*").

- Canadian Workers' Compensation Program. The Debtors maintain a workers' compensation program for certain of their Canadian Employees (the "*Canadian Workers' Compensation Program*"), which is a compulsory program administered by Canada's Workplace Safety and Insurance Board (the "*WSIB*") and fully funded by North Star. The cost for this program per Canadian Employee is CAD $3.41 per CAD $100 of Canadian Employee earnings, to maximum earnings of CAD $77,600 per Canadian Employee. Payment under the Canadian Workers' Compensation Program is due to the WSIB at the end of each subsequent month of coverage. The Debtors estimate that the Canadian Workers' Compensation Program costs approximately CAD $395,000 per year. I am informed that approximately CAD $30,000 has accrued and remains outstanding on account of prepetition obligations under the Canadian Workers' Compensation Program (the "*Unpaid Canadian Workers' Compensation*").

**(ii)     Texas Workers' Injury Plan**

74.     In addition to the Workers' Compensation Programs described above, the Debtors maintain a Texas Workers' Injury Plan (the "*TWIP*") in connection with their operations in Texas. The TWIP is a welfare benefit plan subject to the Employee Retirement Security Act of 1974 (as amended "*ERISA*"). The TWIP protects participating Debtor entities (the "*PDEs*")[9] from certain liability as nonsubscribers to the Texas Workers' Compensation Act by providing

---

prepetition services performed by Comp Wise. This amount is included in the amount of estimated Unpaid Washington Workers' Compensation.

[9]     The PDEs are Debtors Atrium Companies, Inc., Aluminum Screen Manufacturers, Inc. and Champion Window, Inc.

33

non-fringe disability, death, dismemberment and medical benefits with respect to any covered injury or illness sustained by Texas Employees in the course and scope of their employment.

75.     Coverage under the TWIP is provided by North American Capacity Insurance Company. The current policy covers the period October 1, 2009 through October 1, 2010. Under this policy, the PDEs maintain a $250,000 self-insured retention per occurrence with excess employers' liability insurance in the amount of $10 million combined single limit and $25 million aggregate limit.

76.     The PDEs' annual premium under the TWIP is approximately $473,000, payment of which occurs through a combination of a down payment in the amount of $118,804 and nine monthly installments of $39,284 each. As of January 1, 2010, I am informed that the PDEs paid $235,936 of the annual premium. The PDEs' next premium payment in the amount of $39,284 is due on February 1, 2010. Approximately $164,000 remains outstanding for all claims that arose during or before the current policy period (together, with the $39,284 outstanding premium payment, the "*Outstanding TWIP Claims and Payments*").

77.     Moreover, to the extent that any of the Debtors' Employees are asserting claims under the TWIP, I believe that the Court should modify the automatic stay under section 362 of the Bankruptcy Code to permit these Employees to proceed with their claims.

**(iii)     Third-Party Fees Related to Employee Benefits, the TWIP and Workers' Compensation Programs**

78.     In conjunction with the Employee Benefits Plans, the TWIP and Workers' Compensation Programs discussed above, the Debtors employ PartnerSource, Inc., Milliman, Inc., Injury Management Organization, ADP, EmployEase, SHPS, Inc., Lockton Dunning Benefit Company, Inc., CONEXIS Benefits Administrators, L.P. and 1-2-1 Claim, Inc. to

34

perform brokerage, consulting, risk financing, administrative and actuarial services (collectively, the "**_Third-Party Benefits Programs_**"). I understand that the aggregate total cost for retaining these companies is approximately $370,000 per year and that approximately $56,000 has accrued and remains outstanding on account of prepetition obligations owed to these companies for the services they provide (the "**_Unpaid Third-Party Benefits Expenses_**").

        **(iv)**     **Life and Accidental Death and Dismemberment Insurance**

79.     Most of the Debtors provide basic term life and accidental death and dismemberment insurance coverage for their full-time Employees (at no cost to the Employees) in an amount equal to a percentage of a respective Employee's annual salary, with certain of the Debtors capping such coverage at amounts between $25,000 and $300,000 (the "**_Life Insurance_**"). CIGNA Group Insurance provides the U.S. Employees' Life Insurance coverage and GWLAC provides the Canadian Employees' Life Insurance coverage.

80.     Life and Accidental D&D Insurance coverage costs the Debtors approximately $42,000 and CAD $5,000 per month. As of the Petition Date, approximately $42,000 and CAD $2,250 has accrued and remains outstanding on account of Life and Accidental D&D Insurance coverage (the "**_Unpaid Life and Accidental D&D Insurance_**")

        **(v)**     **Disability and Executive Health Care Benefits**

81.     The Debtors also provide eligible Employees with short-term and long-term disability benefits (the "**_Disability Benefits_**"). CIGNA administers the Disability Benefits program for U.S. Employees and GWLAC administers Disability Benefits program for the Canadian Employees. The Debtors estimate that the cost of the Disability Benefits totals approximately $60,000 and CAD $6,250 per month in the aggregate. Approximately $60,000

K&E 16030284.7
DELI 73705-1

and CAD $4,250 has accrued and remains outstanding on account of Disability Benefits relating to prepetition obligations (the "***Unpaid Disability Benefits***").

82.     Additionally, Atrium Companies, Inc. offers long-term disability and health care benefits to certain executive-level Employees (the "***Executive Health Care Benefits***"). These benefits, which are underwritten by Unum Group, provide a range of benefits, including replacement income in the event that an eligible Employee becomes unable to fulfill his or her duties as a result of a non-work related illness or injury sustained during the course of such Employee's employment. The Debtors estimate that the aggregate monthly cost to provide the Executive Health Care Benefits is approximately $18,500. As of the Petition Date, approximately $37,000 has accrued and remains outstanding on account of the Executive Health Care Benefits (the "***Unpaid Executive Health Care Benefits***").

*Vacation Time, Leaves of Absence and Paid Holidays*

83.     The Debtors provide all full-time Employees with vacation time as a paid, time-off benefit (the "***Vacation Time***"). The amount of available Vacation Time, and the rate at which such Vacation Time accrues, is generally determined by the Employee's position, length of full-time employment and the location of that Employee's employment. When taking those factors into account, Employees can receive between one to five weeks of Vacation Time per year.

84.     Most of the Debtor entities apply a "use it or lose it" Vacation Program – Employees who do not use the Vacation Time they earned during a calendar year lose the ability to use such Vacation Time during the subsequent year. For certain of the Debtor entities, however, upon approval from a respective Employee's manager, those Employees are permitted to carry-over a limited amount of Vacation Time to the subsequent calendar year. Additionally,

36

upon terminating an Employee, the Employee's final paycheck will include any available, unused Vacation Time. As of the Petition Date, Employees accrued approximately $4 million in Vacation Time (the "***Unpaid Vacation Time***"). This amount, however, is not a current cash pay obligation as Employees are only entitled to be paid for accrued and unused Vacation Time in the event they are terminated.

85. The Debtors also provide Employees with certain other leaves of absence as required by law (collectively, the "***Leaves of Absence***"). Leaves of Absence include family medical leave, pregnancy, adoption and foster care leave, military leave, jury duty, voting leave, personal leave and bereavement leave. The Debtors do not accrue Leaves of Absence for their Employees and Leaves of Absence are not reflected as a liability on the Debtors' balance sheets.

86. Furthermore, the Debtors maintain a policy whereby Employees receive compensation for certain non-working holidays (the "***Paid Holidays***"). Paid Holidays differ slightly among the Debtor entities and can vary between seven to ten Paid Holidays per calendar year. In addition, for those non-exempt, hourly Employees who exceed their minimum, weekly work-hour requirement (40 hours per week) and perform work on a Paid Holiday, such Employees receive overtime compensation equal to one and one-half times their respective hourly rate. The same applies for Union Employees who work on Paid Holidays pursuant to the applicable Collective Bargaining Agreements.[10]

*Employee Savings and Retirement Plans*

87. In the ordinary course of business, the Debtors provide their Employees with certain retirement and savings plans, as follows (collectively, "***Employee Savings and Retirement Plans***"):

---

[10] Any amounts that accrued and remain outstanding on account of the Paid Holidays are accounted for under the Unpaid Wage Obligations.

- <u>401(k) Retirement Plans</u>. The Debtors maintain a retirement savings plan for the benefit of all eligible U.S. Employees that meet the requirements of section 401(k) of the Internal Revenue Code (the "***401(k) Plan***"). Approximately 2,300 Employees participate in the 401(k) Plan.[11] The Debtors also have a limited matching program to induce eligible Employees to participate in this valuable savings opportunity (the "***Matching Obligation***"). The Debtors withhold approximately $250,000 in the aggregate each month from participants' paychecks on account of their 401(k) contributions and do not currently make Matching Obligations. I have been informed that as of the Petition Date, the Debtors have withheld approximately $95,000 in Employee contributions, $3,300 in "catch-up contributions and $26,000 in Employee loan repayments (collectively, the "***Unremitted 401(k) Contributions***") that they seek to remit to the proper authority.

- <u>UNITE HERE Pension Plans</u>. Pursuant to the terms of the Collective Bargaining Agreements, the Debtors are required to contribute $0.10 per compensated hour for hours worked, vacation hours, holiday hours, bereavement leave hours and jury duty hours for all Union Employees who have at least 15 years of service with the Debtors (the "***Pension Plans***"). The Pension Plans cost the Debtors approximately $20,000 per year on average. I have been informed that as of the Petition Date approximately $2,000 has accrued and remains outstanding on account of the Pension Plans (the "***Unpaid Pension Obligations***").

- <u>Registered Retirement Savings Plan</u>. North Star maintains a Registered Retirement Savings/Deferred Profit Sharing Plan (the "***RRS/DPS Program***") pursuant to which eligible Employees may make annual contributions. North Star provides a matching program whereby it matches 50% of each participating Employee's first CAD $1,000 contribution per year. I have been informed that no amounts have accrued and remain outstanding on account of the RRS/DPS Program.

88.  I believe that the Employee Savings and Retirement Plans are critical to the Debtors' operations and, in the case of the Pension Plans, are separate obligations that the Debtors are required to honor under the Collective Bargaining Agreements.

---

[11]  The Union Employees are not entitled to participate in the Debtors' 401(k) Plan.

K&E 16030284.7
DEL1 73705-1

*Miscellaneous Employee Programs*

89.     In addition to the programs and benefits described above, the Debtors also provide a number of miscellaneous benefit programs to their Employees (collectively, and as described below, the "***Employee Programs***"). Although the Employee Programs do not comprise a significant expense of the Debtors, I firmly believe that such programs are vital to the well-being and success of their Employees.

**(i)     Employee Assistance Program**

90.     Because personal problems can have an impact on an Employee's effectiveness at work, the Debtors make professional counseling services available to eligible Employees and their dependents through an Employee assistance program (the "***Employee Assistance Program***"). The Debtors pay approximately $31,000 on an annual basis to continue the Employee Assistance Program. I am informed that the Debtors owe approximately $2,600 on account of Employee Assistance Program obligations relating to the prepetition period (the "***Unpaid Employee Assistance Program Expenses***").

**(ii)     Relocation Program**

91.     The Debtors maintain a relocation services program for Employees who are required to relocate their residence as a result of additional or amended employment responsibilities (the "***Relocation Program***"). Employees who are eligible to participate in the Relocation Program are reimbursed for expenses incurred during their search for, and purchase of, a replacement residence, temporary living arrangements, termination of lease and related forfeitures and penalties, disposition of current residence, moving costs and tax assistance. The amount of expenses covered under the above-listed costs varies according to each eligible Employee's job level.

39

92.     Currently, three Employees are receiving or are eligible to receive benefits under the Relocation Program. I understand that if all current obligations under the Relocation Program accrued immediately, the Debtors would owe approximately $82,000 (the "**Relocation Program Obligations**").

### (iii)    Tuition Program

93.     Debtors Aluminum Screen Manufacturers, Inc., Thermal Industries, Inc., North Star and a division of Atrium Companies, Inc., provide their respective Employees, as well as the Union Employees under the Collective Bargaining Agreements, with a tuition reimbursement program that offers expense reimbursement for tuition, books and other costs related to education that is complementary to the Employee's respective job function and beneficial to his or her skill development (the "*Tuition Program*"). Although the Tuition Program differs among the participating Debtor entities, it generally requires a minimum tenure of service, successful completion of an educational course and a maximum reimbursement amount that ranges between $4,000 per participant and $10,000 in the aggregate for Union Employees. For the 2009 calendar year, the Debtors estimate that the aggregate cost of the Tuition Program was approximately $25,000. I am informed that a similar amount may accrue under the Tuition Program for the 2010 calendar year. Additionally, I understand that, as of the Petition Date, no amounts have accrued and remain outstanding on account of the Tuition Program.

### (iv)    Safety Glasses Program

94.     Debtor North Star offers Canadian Employees the opportunity to purchase prescription safety glasses through pre-determined, qualified optometrists (the "*Safety Glasses Program*"). For those Canadian Employees who choose to participate in the Safety Glasses Program, each Employee is allowed up to CAD $22.50 for prescription safety glasses that are

40

equal to or less than CAD $45, or CAD $25 for prescription safety glasses that cost more than CAD $45, once every two years. The cost is credited to the respective Employee's earnings and partially offsets the full cost of the prescription safety glasses withheld from each Employee. As of the Petition Date, I understand that a *de minimis* amount has accrued and remains outstanding on account of the Safety Glasses Program.

**B.** **Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to Pay or Honor Prepetition Obligations of (A) Certain Critical Vendors and (B) Holders of Administrative Claims Under Section 503(b)(9) of the Bankruptcy Code**

95. The Debtors' operations rely upon third-party vendors and suppliers to provide the Debtors with numerous goods and services. Many of the supplies and services that the Debtors use to manufacture and sell their products are available from different sources such that no one supplier's failure to do business with the Debtors would have a significant adverse impact on business operations. There is, however, a limited class of vendors and suppliers that I believe are critical to the Debtors' business operations and that may cease providing goods and services to the Debtors during these chapter 11 cases. The Debtors have designated vendors and suppliers in this limited class as "*Critical Vendors*," and identified the Critical Vendors as creditors who maintain prepetition claims. I believe that the Debtors' ability to ensure the Critical Vendors continue to provide goods and services is vital to the success of their businesses and overall restructuring efforts.

96. The identification of the Critical Vendors has been the culmination of an extensive review of the Debtors' business operations and trade creditor base. The Debtors, together with their advisors, spent significant time before the Petition Date reviewing and analyzing their books and records, and consulting operations management and personnel in each of their business divisions, to identify certain critical business relationships, the disruption of

41

which would impair the Debtors' ability to continue as a going concern. As part of this process, the Debtors examined a variety of factors to identify the limited group of creditors that would qualify as Critical Vendors.

97. The Debtors also considered whether a vendor or supplier delivered goods to the Debtors in the 20-day period before the Petition Date such that it is entitled to an administrative claim under section 503(b)(9) of the Bankruptcy Code. The Debtors designated this group of claimants as "*503(b)(9) Claimants*." Importantly, the Debtors did not include in the classification of Critical Vendors those claimants who are subject to a prepetition contract and who are therefore likely to be compelled to perform after the Petition Date or other claimants that the Debtors are seeking authority to pay (or otherwise address) pursuant to various other "first-day" motions (such as holders of lien claims and other priority claims).

98. Only after this thorough process did the Debtors identify the Critical Vendors. The following are examples of the goods and services provided by the third-party claimants that the Debtors have designated as Critical Vendors:

> Suppliers of Long Replacement or Lead Time Materials. The Debtors purchase from suppliers numerous goods that: (i) require extensive testing to ensure satisfaction of the Debtors' standards; (ii) navigate through a complex supply chain, usually requiring eight or more weeks before arriving at the Debtors' premises; and (iii) require tooling and machines that are specifically designed to test the safety and sustainability of such goods. I believe that if the Debtors were unable to continue purchasing these goods, which include, polyvinyl chloride pellets, specialized paint, sealant, aluminum billets and coil, steel fasteners, aluminum extrusions, injection molding and stamping, from their current suppliers, the Debtors would sustain significant financial loss as a result of the time and expense necessary to replace such suppliers and the Debtors' inability to fulfill customers' orders.
>
> Suppliers of High Volume Purchases. In the ordinary course of business, the Debtors purchase from suppliers high volumes of certain products, including, but not limited to, glass, polyvinyl chloride compound, integrid and intercept coil, so as to satisfy the

42

current demand of the Debtors' customers. I believe that there are, however, a limited number of competitive sources that are capable of servicing the Debtors' high volume needs. Accordingly, in the event that the Debtors' high-volume suppliers failed to provide these goods to the Debtors on a postpetition basis, I believe the Debtors would suffer significant financial loss from their failure to fulfill customers' orders and additional expense attendant to replacing the large volume of necessary goods from multiple substitute suppliers.

Suppliers of Market-Specified Materials. The Debtors purchase from suppliers certain goods and materials that are specifically marketed in the Debtors' advertisements to their customers. These items include doors, solar mesh, skylights and specialized wrap. I believe that if the Debtors were unable to purchase these materials from their suppliers on a postpetition basis, the Debtors would suffer significant financial loss, as the Debtors would be unable to fulfill customers' orders according to the representations presented in the Debtors' marketing materials.

99.     In short, the Critical Vendors supply the goods and services that are vital to the Debtors' business operations. The Debtors have carefully considered whether the payments on account of the Critical Vendor Claims are necessary and whether such payments will ensure that the Debtors will have access to adequate amounts of trade credit on a postpetition basis. As noted above, the Debtors have undertaken a thorough review of their accounts payable and their lists of prepetition vendors to identify those vendors that are essential to the Debtors' operations. In determining the kinds and amount of claims that may be payable pursuant to the requested relief, the Debtors consulted with senior management of the Debtors' various business segments and other personnel throughout the Debtors' operations to identify the creditors that are most essential to the Debtors' operations.

100.     I believe that payment of the Critical Vendor Claims will be necessary to preserve operations and successfully reorganize. The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date. During this period, the Debtors and their advisors will be focusing on stabilizing operations and pursuing confirmation

43

of a plan of reorganization as expeditiously as possible. At the same time, Critical Vendors may attempt to assert their considerable leverage and stop providing goods and services going forward, suddenly and without notice, potentially crippling operations. I believe that the continued availability of trade credit, in amounts and on terms consistent with those which the Debtors have in place today, is clearly advantageous as it allows the Debtors to maintain operations and profitability.

*Overlap Between the Critical Vendors and the 503(b)(9) Claimants*

101.    During the 20-day period before the Petition Date, the Debtors received goods from certain creditors (the "***503(b)(9) Claimants***") in the ordinary course of business. I believe that the goods provided by the 503(b)(9) claimants are essential to the Debtors' sustained operations. Indeed, I believe that if the 503(b)(9) Claimants are not timely paid for the goods received by the Debtors during the 20-day period before the Petition Date, those vendors may cease to provide the Debtors with postpetition trade credit and may refuse to continue providing the Debtors with goods postpetition. Significantly, there is substantial overlap between the Critical Vendor Claims and the 503(b)(9) Claims because many of the Critical Vendors deliver their goods to the Debtors on a rolling basis, with inventory arriving on a daily basis. Because of the priority status afforded to 503(b)(9) Claims, such claims must be paid in full upon confirmation of a chapter 11 plan. As a result, I understand that the relief sought solely affects the timing of payment with respect to these creditors' claims.

*The Debtors' Proposed Procurement Policy*

102.    In light of the foregoing, the Debtors propose to pay prepetition claims of Critical Vendors and 503(b)(9) Claimants up to a maximum of $2.5 million pursuant to the Interim Order and a maximum of $7.5 million pursuant to the Final Order, where such payment becomes

44

necessary on a postpetition basis to ensure that the particular vendor will provide necessary goods and services to the Debtors. Despite the critical need for the receipt of essential goods and services, the Debtors have historically sought to bargain with their vendors to achieve the lowest price, the best service and quality and the most favorable payment terms possible for each necessary product or service. The Debtors recognize that efficiency in procurement is critical to achieving profitability. To that end, the Debtors have developed valued relationships with many suppliers who have met the Debtors' standards for price, service, quality and payment terms, and they hope to maintain and improve upon those vendor relationships on a postpetition basis.

103. To further ensure that the Debtors' business operations will be minimally impacted during these chapter 11 cases, the Debtors seek to condition payment to Critical Vendors and 503(b)(9) Claimants upon an agreement by the creditor in question to provide goods and/or services on Customary Trade Terms, including reasonable and customary price, service, quality and payment terms in accordance with the Procurement Policy. Pursuant to the Procurement Policy, any Critical Vendor or 503(b)(9) claimant must provide the Debtors with (a) the amount of their estimated claims; (b) a description of customary trade terms between the parties; (c) acknowledgment that such Critical Vendor or 503(b)(9) Claimant has reviewed the Procurement Policy; and (d) consent not to separately seek payment in the form of a reclamation claim (the *"Vendor Agreement"*). By entering into the Vendor Agreement, the Critical Vendor or 503(b)(9) Claimant agrees to continue doing business with the Debtors on customary trade terms, however, if such Critical Vendor or 503(b)(9) Claimant is found to be in breach of the Vendor Agreement, the Debtors are authorized to seek, among other things, injunctive relief and avoidance of payments pursuant to the Vendor Agreement.

K&E 16030284.7
DEL1 73705-1

**C.    Debtors' Motion for Entry of an Order Authorizing, but not Directing the Debtors to Maintain and Administer Customer Programs and Honor Prepetition Obligations Related Thereto**

104.    The Debtors have created numerous long-standing customer relationships through six decades of experience in the windows industry.  These relationships have, in large part, been sustained by the Debtors' customer programs, which incentivize sales, develop brand loyalty and establish (and maintain) customer goodwill (the "*Customer Programs*").  In the ordinary course of business, the Debtors make payments to customers or otherwise honor accrued prepetition obligations incurred by the Debtors under their Customer Programs (collectively, and as identified below, the "*Customer Program Obligations*").  I believe that any failure to continue the Customer Programs and honor the Customer Program Obligations could erode hard-earned brand loyalty and customer goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful reorganization.

*Warranty Programs*

105.    In connection with the sale of their products, the Debtors offer customers a warranty to ensure that certain of the Debtors' products perform as intended (the "*Warranty Programs*").  Although the details of each Warranty Program vary with the competitive environment in which particular products are sold, all of the Warranty Programs generally guarantee against damaged and defective products for a limited period of time.  The security and certainty the Warranty Programs provide ensure that customers can purchase the Debtors' products with confidence and that unintended product failures will not burden customers with undue costs.  If the Debtors cannot provide their customers with this certainty, I believe that customers are likely to turn to a competing manufacturer who can offer this necessary security.

46

106. As of the Petition Date, I understand that approximately $800,000 in Customer Program Obligations with respect to the Warranty Programs has accrued and remains outstanding. These obligations are generally non-cash in nature.

*Rebate Programs*

107. One of the Debtors' most successful Customer Programs is their volume-based rebate program (the "**Rebate Program**"). I understand that customers that contribute to more than half of the Debtors' total revenue participate in the Rebate Program.

108. The terms of a particular rebate are a function of the unique relationship that the Debtors have with a particular customer. Generally, the Rebate Program allows the Debtors to compensate those customers who reach certain sales targets. Such compensation may be provided by either direct payment or through a credit towards that customer's future purchase of the Debtors' products and is paid on a monthly, quarterly or annual basis.

109. The Rebate Program, which enables the Debtors to maintain competitive pricing, is standard practice in the Debtors' industry. As of the Petition Date, the Debtors estimate that approximately $2.4 million with respect to the Rebate Program has accrued and remains outstanding, approximately $1.2 million of which constitutes potential cash obligations.

*Cooperative Advertising and Marketing Allowances*

110. The Debtors also provide their customers with cooperative advertising and marketing allowances (collectively, the "**Allowance Programs**"). Because many of the end-users of the Debtors' products purchase these products through the Debtors' customers, the Allowance Programs serve the important function of encouraging the Debtors' customers to highlight why the Debtors' products are superior to those of the Debtors' competitors.

47

Customers that contribute to approximately one-half of the Debtors' total revenue participate in the Allowance Programs.

111.    The Allowance Programs permit the Debtors to increase their market share by exposing their products to a broad audience. If the Allowance Programs are not continued, or related outstanding obligations not honored, I believe the Debtors' customers are likely to scale back promotion of the Debtors' products. Absent customer-driven advertising that demonstrates the advantages of the Debtors' products, end-users will not be able to easily discern the benefits of purchasing the products, thereby damaging the Debtors' bottom line.

112.    The Debtors owe approximately $500,000 with respect to the Allowance Programs as of the Petition Date, approximately $250,000 of which constitutes potential cash obligations.

*Payment Terms Discount Program*

113.    The Debtors and their customers normally operate on 30-day trade terms (*i.e.*, customers normally have 30 days from the purchase of the Debtors' products to pay the Debtors for such purchases). The Debtors benefit when customers make payments sooner than 30 days because cash on hand increases, thereby reducing reliance on borrowed money to finance operations. To encourage customers to make payments sooner rather than later, the Debtors offer certain customers a discount in connection with early payments (the "***Payment Terms Discount Program***").

114.    If the Payment Terms Discount Program is not continued, I believe the Debtors' liquidity position is likely to be harmed as customers will have no incentive to pay the Debtors sooner than the 30 days in which their balance is due. Additionally, I believe the Debtors will lose a competitive edge as customers will prefer to purchase products from those of the Debtors'

K&E 16030284.7
DEL1 73705-1

competitors who offer similar programs. Approximately $300,000 with respect to the Payment Terms Discount Program has accrued and remains outstanding, as of the Petition Date, the full amount of which is a non-cash obligation.

**D.**  **Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, Debtors to Pay Prepetition Claims of Shippers, Warehousemen, Processors and other Lien Claimants**

115.    The Debtors require the delivery of raw materials on a regular basis for the production and distribution of their finished products throughout North America and Canada. The Debtors' pricing policies, marketing strategies and general business operations rely on their ability to receive raw materials and distribute finished products in a timely fashion. To maintain their operations and efficiently transport raw materials and finished products, the Debtors employ an extensive distribution network that uses both foreign and domestic third-party carriers who are in current possession of the Debtors' property as of the Petition Date (collectively, and as discussed below, the "*Possessory Lien Claimants*").

116.    Specifically, the Debtors' domestic distribution network depends upon the use of reputable domestic common carriers, truckers, rail carriers, barge owners and stevedores (collectively, the "*Shippers*") to deliver raw materials to the Debtors' production facilities and distribute finished products to the Debtors' customers. The services provided by the Shippers are essential to the Debtors' day-to-day operations. At any given time, there are numerous shipments of raw materials, works in process and finished products en route to or from the Debtors' manufacturing facilities. Thus, it is a certainty that some of the Shippers are currently in possession of the Debtors' property. The delivery of these goods is vital to maintaining the Debtors' operations during this critical time of transition into chapter 11. I believe that if the Debtors do not pay the prepetition, ordinary course obligations owed to these Shippers, they may refuse to deliver or release such property, thereby disrupting the Debtors' business operations.

49

117.     The Debtors also rely upon third-party contractors to store raw materials and finished products in the ordinary course of their businesses (the "*Warehousemen*"). In the event that the Debtors fail to remit payment owed to the Warehousemen, I believe that they may refuse to release the goods they retain pending satisfaction of their claims, thereby disrupting the Debtors' operations.

118.     Furthermore, the Debtors rely on third-party processors to manufacture or finish goods according to the Debtors' detailed specifications using, in many cases, the Debtors' proprietary technology, other intellectual property and production equipment (the "*Processors*"). At any given time, the Processors may be performing services on, and therefore be in possession of, the Debtors' supplies, raw materials, works in process and finished goods. Accordingly, I believe the Debtors' failure to satisfy payment obligations to the Processors would result in the Processors' refusal to return the Debtors' goods and equipment, thereby disrupting the Debtors' business operations.

119.     In addition to the various Possessory Lien Holders described above, the Debtors also employ several third-party logistics coordinators to manage the transport of their raw materials and finished products (the "*Logistics Coordinators*"). The Logistics Coordinators work with Possessory Lien Holders to deliver and store the Debtors' raw materials and finished products. In many instances, the Debtors' payments to Possessory Lien Holders are funded through the Logistics Coordinators on a pass-through basis.

120.     I believe that any interruption in payments to Logistics Coordinators would likely result in a lengthy delay in the Debtors' payments to their Possessory Lien Holders and a serious risk of the Possessory Lien Holders withholding delivery or services. These delays could have a

K&E 16030284.7
DEL1 73705-1

significant adverse impact on the Debtors' businesses and impede their ability to operate in chapter 11.

121. The machinery and equipment the Debtors use at their facilities, as well as the facilities themselves, require a significant amount of ongoing maintenance and repair. The Debtors rely on, and routinely contract with, a number of third parties for such maintenance and repair. I am informed that under applicable state law, many parties maintaining and repairing the Debtors' real and personal property have a right to assert and perfect construction, materialman's, mechanics' or other statutory liens, which attach to the Debtors' real and personal property (collectively, the "*Statutory Lien Claimants*").

122. As described above, Possessory Lien Claimants may have liens on the goods in their possession. I believe they may be unwilling to release these goods since this may result in their secured claims against the Debtors becoming unsecured. Therefore, unless the Debtors are authorized to pay amounts owed to the Possessory Lien Claimants, I believe that it is highly unlikely that the Debtors will continue to obtain goods currently in transit.

123. Additionally, vendors who are Statutory Lien Claimants hold and may perfect liens on estate property for which goods or services were provided prepetition. I believe that if the Statutory Lien Claimants possess lien rights or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to satisfy amounts owed to Statutory Lien Claimants could have a material adverse impact on the Debtors' business operations, to the detriment of the Debtors' creditors.

124. I am informed that approximately $1,750,000 has accrued and remains unpaid on account of the Prepetition Lien Claimants. Because of the substantial harm that may befall the Debtors if the Prepetition Lien Claimants fail to release the goods in their possession, I believe

K&E 16030284.7
DEL1 73705-1

the Debtors should be granted the authority to remit payment on account of the Prepetition Lien Claimants in amount up to $1,400,000 during the 21-day period after the Petition Date. Pursuant to the Final Order, the Debtors should be granted the authority to pay Prepetition Lien Claimants in an amount up to $1,750,000.

**E.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, Debtors to Pay Certain Taxes, Canadian Taxes and Fees**

125.    The Debtors (a) collect sales Taxes from their customers and incur sales, use, franchise, property and other Taxes in the operation of their U.S. and Canadian businesses; (b) collect and incur goods and services, sales and withholding Canadian Taxes for the operation of their Canadian business; (c) incur Fees necessary to operate their businesses, including license and permitting Fees, annual reporting Fees and other similar assessments; and (d) remit such Taxes, Canadian Taxes and Fees to various taxing, licensing and other governmental authorities in the U.S. and Canada (collectively, the "*Authorities*"). The Debtors pay the Taxes, Canadian Taxes and Fees monthly, quarterly, semi-annually or annually to the respective Authorities, as required by applicable laws and regulations.

126.    I believe any delinquency or failure to make timely payments that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. The Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their businesses, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process. The Authorities may also attempt to impose penalties, suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates. I am also informed that certain directors and officers might be subject to personal liability

52

which would undoubtedly distract these key employees from their duties related to the Debtors' restructuring.

127.     The Debtors' various tax obligations are summarized below:

Sales and Use Taxes. The vast majority of the Debtors' products are sold to distributors and retailers for resale to consumers; thus, the Debtors collect relatively *de minimis* amounts of sales Taxes. The Debtors generally remit these sales Taxes monthly to the Authorities. The Debtors incur the bulk of their sales and use Taxes in Texas and California. Overall, the Debtors collect and remit to the Authorities approximately $775,000 per month and approximately $9.3 million per year in sales and use Taxes for their U.S. businesses. Although I am informed that the Debtors are current with respect to sales and use Taxes, I understand that approximately $552,000 of sales and use Taxes have accrued and remain unpaid for the prepetition period. Of this total amount, approximately $113,000 in prepetition sales and use Taxes for December 2009 business activity are due in the first 21 days after the Petition Date and approximately $439,000 in prepetition sales and use Taxes are due on February 20, 2010.

Franchise Taxes and Other Similar Taxes. The Debtors also pay franchise and other similar Taxes to certain Authorities to operate their U.S. businesses in numerous states. The Debtors incur the bulk of these Taxes in Texas. On an annual basis, I am informed that the Debtors remit approximately $639,000 in franchise and other similar Taxes for their U.S. businesses. I am informed that the Debtors are current with respect to payment of franchise and other similar Taxes. Approximately $573,000 of franchise and other similar Taxes have accrued and remain unpaid for the prepetition period. The Debtors' franchise and similar Taxes will come due at different times during 2010, with a significant portion due in May 2010.

Property Taxes. Authorities in the U.S. and Canada impose Taxes on the Debtors relating to property that the Debtors own for the operation of their businesses. I am informed that approximately $2.3 million in property Taxes have accrued and remain unpaid for the prepetition period. Of this amount, $2,188,000 is due on January 31, 2010, $42,700 is due on February 1, 2010 and $12,200 is due on February 28, 2010. I understand that if the Debtors do not pay the prepetition property Taxes to the applicable Authorities when due, these Authorities will immediately assess substantial, irreversible penalties for failure to make timely payment. In addition, I am also informed that non-payment of property Taxes

53

when due would allow the applicable Authorities to impose liens on the Debtors' property under section 362(b)(18) of the Bankruptcy Code.

Ohio CAT Tax. The Debtors are also required by the State of Ohio to pay the Ohio CAT Tax based on the previous quarter's gross receipts for sales in Ohio. I am informed that approximately $8,600 in Ohio CAT Tax has accrued and remains unpaid for the prepetition period. The Ohio CAT Tax payment is due on February 10, 2010.

Canadian Taxes. The Debtors pay Canadian Taxes to certain Canadian Authorities, including a federal goods and services Tax (the "*GST*"), certain provincial sales Tax (the "*PST*"), withholding Taxes and income Taxes. The Debtors collect the GST and PST on sales and, conversely, claim input tax credits (the "*Tax Credits*") from the Canadian Authorities on the purchase of goods and services. The Debtors generally collect a higher amount of Canadian Taxes, as compared to the amount of Tax Credits they can claim, resulting in a net payable from the Debtors each month to the Canadian Authorities. Historically, the Debtors owe approximately $2.6 million per year in GST and $1.8 million per year in PST, while claiming approximately $871,000 in Tax Credits per year. I am informed that approximately $54,600 in net GST and PST have accrued and remain unpaid for the prepetition period. Of that amount, approximately $22,600 in net GST is due on February 28, 2010 and $32,000 in PST is due on February 23, 2010.

The Debtor North Star is subject to two types of withholding Tax. The first is a withholding Tax based on the interest paid to Debtor Atrium by North Star for an intercompany loan. The second withholding Tax is based on the deemed dividend that North Star pays to Atrium each year, which is the net cash outflow from North Star to Atrium as of December 31st for each year. The withholding Tax on the interest is due on the 15th day of the month following the interest payment. The withholding Tax on the deemed dividend is due on December 31st of the following year (*i.e.*, the withholding Tax due on the 2009 deemed dividend is determined by the net cash outlay from North Star to Atrium as of December 31, 2009, but is due on December 31, 2010). I am informed that North Star did not pay certain withholding Taxes for 2007, 2008 and partial 2009 activity, which resulted in North Star having to file a Voluntary Disclosure Agreement ("*VDA*") with the Canada Revenue Agency in July 2009. Since the VDA was filed, most of the outstanding withholding Taxes and the associated interest have been paid, but I am informed that there is an

54

additional unpaid prepetition associated interest payment in an approximate amount of $9,300 due in February or March 2010. North Star also pays income Taxes to the Canada Revenue Agency in monthly installments. I am informed that as of the Petition Date approximately $637,900 in income Tax accrued and remains unpaid for the prepetition period, of which $171,500 is due on January 31, 2010 and $466,400 is due on February 28, 2010. I understand that if the Debtors do not pay the prepetition income Taxes to the applicable Authorities when due, these Authorities will assess immediate, irreversible penalties for failure to make a timely payment, which, pursuant to section 507(a)(8)(G) of the Bankruptcy Code, may be entitled to priority treatment under a plan of reorganization.

Business License Fees. I understand that state and local laws require the Debtors to pay Fees to obtain a wide range of business licenses and permits from a number of Authorities. The method for calculating amounts due for such licenses and permits, and the deadlines for paying such amounts, varies by jurisdiction. Further, I understand that certain states require the Debtors to (a) pay annual reporting Fees to state governments to remain in good standing for purposes of conducting business within the state and (b) pay various business Taxes or Fees based on gross receipts or other bases, as determined by the taxing jurisdiction. The Debtors pay approximately $14,000 in Fees each year. I am informed that approximately $2,222 in Fees accrued and remain unpaid for the prepetition period which are due in January and February 2010.

**F.**   **Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to (A) Continue Prepetition Insurance Coverage; (B) Maintain Financing of Insurance Premiums; (C) Maintain Funding for an Insurance Letter of Credit; and (D) Maintain Funding for Insurance Brokers**

128.   In the ordinary course of business, the Debtors maintain a number of Insurance Policies. The Insurance Policies provide coverage for, among other things, general liability, excess general liability, property, fiduciary liability, directors' and officers' liability, excess directors' and officers' liability, crime, kidnap and ransom, environmental liability, automobile liability, excess employer's indemnity, and workers' compensation. The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets. In

K&E 16030284.7
DEL1 73705-1

many instances coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities.

129.    A summary of the Debtors' insurance policies follows below:

*Self-Paid Insurance Policies*

130.    The Debtors maintain several Insurance Policies pursuant to which the Debtors pay the insurer directly, either in an up-front sum or in periodic payments (collectively, the "*Self-Paid Insurance Policies*").

i.    **Zurich Self-Paid Insurance Policies**:

131.    The Debtors maintain certain Self-Paid Insurance Policies through the related entities of Zurich North America, American Zurich Insurance and Zurich American Insurance (collectively, and as described in further detail below, the "*Zurich Self-Paid Insurance Policies*"). The Debtors pay the premiums for the Zurich Self-Paid Insurance Policies in monthly installments. The Debtors also maintain a $9 million letter of credit that backs the Debtors' deductibles under these Policies (the "*Zurich Letter of Credit*"). The Zurich Letter of Credit is reviewed annually with the next review occurring in February 2010. The Zurich Letter of Credit is scheduled to increase by an as of yet undetermined amount on April 1, 2010.

132.    The Zurich Self-Paid Insurance Policies include business automobile, workers' compensation and workers' compensation retro. I am informed that no amounts on account of premiums for the Zurich Self-Paid Insurance Policies are outstanding as of the Petition Date.

133.    In connection with the Zurich Self-Paid Insurance Policies and the Zurich general liability Insurance Policy discussed below, the Debtors maintain an escrow account that is drawn upon by Zurich to pay approved claims under these Insurance Policies. The Debtors then receive a monthly bill to cover the amounts drawn down by Zurich for claims payments. Each month, the Debtors reimburse Zurich for approximately $38,000 for business automobile claims,

56·

approximately $262,000 for general liability claims and approximately $114,000 for workers' compensation and workers' compensation retro claims. I understand that approximately $300,000 in prepetition amounts is owed to Zurich for claims paid under the business automobile and general liability Insurance Policies.

i.    **Other Self-Paid Insurance Policies**

134.    In addition to the Zurich Self-Paid Insurance Policies, the Debtors maintain another group of Self-Paid Insurance Policies through various insurance companies, including Zurich entities, that cover general liability, property, excess earthquake, fiduciary and crime, kidnap and ransom, flood, pollution, environmental, workers' compensation and employer's indemnity liability (collectively, the "*Other Self-Paid Insurance Policies*"). I am informed that, as of the Petition Date, the Debtors owe approximately $80,000 in connection with the Washington State workers' compensation fund, approximately $3,000 in connection with the Ohio State workers' compensation fund and approximately $39,000 in connection with the employer's indemnity Insurance Policy.

i.    **Canadian Self-Paid Insurance Policies**

135.    The Debtors also maintain a group of Canadian Self-Paid Insurance Policies that provide coverage for Debtor North Star, including a comprehensive business insurance package of commercial boiler and machinery, commercial property, auto, general liability and umbrella coverage, as well as a workers' compensation program for Canadian employees. I am informed that as of the Petition Date, the Debtors owe approximately $30,000 CAD on January 31, 2010 in connection with the Canadian workers' compensation program. In addition, I understand that the Debtors renewed the Canadian Self-Paid Insurance Policies included in the comprehensive business insurance package on January 17, 2010 at an approximate cost of $123,000 CAD, of which $40,900 CAD is due and owing as of the Petition Date.

57

*Financed Policies*

136.     Certain of the Debtors' insurance policies require payment of the entire premium at inception. Because it is not always economically advantageous for the Debtors to pay premiums in full up front, the Debtors often finance the premiums for certain policies (collectively, the "***Financed Policies***") under financing agreements with third-party lenders. The Financed Policies benefit the Debtors by spreading out the cost of the Policies over the applicable coverage period. The Financed Policies include commercial and excess umbrella, directors' and officers' liability, property and excess earthquake coverage. The Financed Policies, as well as any upcoming monthly installment payments are described more fully in the Policy Summary. As of the Petition Date, the Debtors owe approximately $100,000 in monthly installment payments due on February 1, 2010.

*Financing Agreements*

137.     As of the Petition Date, the Debtors maintain three premium Financing Agreements with Flatiron Capital to cover the premiums for the Financed Policies.

138.     The first Financing Agreement covers $419,158 in premiums for the Commercial Umbrella and Excess Umbrella Financed Policies. The Debtors paid a 15% down payment to Flatiron Capital of $62,873.70, financing $356,284.30 at a 5.90% interest rate. Under the terms of this Financing Agreement, the Debtors are required to make ten monthly payments of $36,598.97 beginning on May 1, 2009 to cover the financed amount of the premiums and the applicable finance charges.

139.     While I understand that there are no prepetition amounts due and owing to Flatiron Capital under this Financing Agreement as of the Petition Date, the Debtors' next scheduled monthly payment of $36,598.97 is due on February 1, 2010.

K&E 16030284.7
DEL1 73705-1

140. The second Financing Agreement covers $343,557 in premiums for the Directors' and Officers' Liability, the Excess Directors' and Officers' Liability, and the Directors' and Officers' Side A Management Liability Financed Policies. The Debtors made a 10% down payment to Flatiron Capital of $34,355.70, financing $309,201.30 at a 3.90% interest rate. Under the terms of this Financing Agreement, the Debtors are required to make ten monthly payments of $31,475.52 beginning on March 10, 2009 to cover the financed amount of the premiums and the applicable finance charges. The Debtors do not have any outstanding obligations to Flatiron Capital for this Financing Agreement.

141. The third Financing Agreement covers $728,144.59 in premiums for the Property and Excess Earthquake Financed Policies and related insurance broker fees for Wells Fargo Insurance Services, Inc. ("*Wells Fargo*"). The Debtors made a down payment to Flatiron Capital of $109,349.19, financing $618,795.40 at a 4.45% interest rate. Under the terms of this Financing Agreement, the Debtors are required to make ten monthly payments of $63,148.63 beginning on January 1, 2010 to cover the financed amount of the premiums and the applicable finance charges.

142. I understand that there are no prepetition amounts due and owing to Flatiron Capital for this Financing Agreement as of the Petition Date and that the Debtors' next scheduled monthly payment of $63,148.63 is due on or before February 1, 2010.

*The Debtors' Insurance Brokers*

143. To assist with the procurement and negotiation of their Insurance Policies, the Debtors employ three different Insurance Brokers to handle various aspects of the Debtors' insurance coverage.

59

144.     The Debtors employ Wells Fargo to assist with the procurement and negotiation of the majority of the Debtors' domestic Insurance Policies.  In connection with these services, the Debtors pay Wells Fargo (a) an annual guaranteed commission of $483,000, of which $383,000 is due in six monthly installments beginning on April 1, 2009; $75,000 is due on December 1, 2009; and $25,000 is due on February 10, 2010, and (b) a potential annual bonus of up to $105,000 for Wells Fargo's level of performance of certain services, such as renewing policies, claims consulting and loss control (collectively, the *"Broker's Fees"*).  As addressed above, the Debtors have financed $75,000 of the $483,000 guaranteed commission under a Financing Agreement with Flatiron Capital, which requires the Debtors to make ten monthly payments of $7,500 each, beginning on January 1, 2010.  As of the Petition Date, the Debtors have paid $458,000 of the guaranteed commission and $103,725 in bonus payments.

145.     The Debtors also employ PartnerSource, Inc. (*"PartnerSource"*), to assist with the procurement and negotiation of the Debtors' excess employer's indemnity Insurance Policy that applies to the TWIP.   The Debtors pay PartnerSource an annual fee of $95,000 plus applicable expenses.  I understand that as of the Petition Date, the Debtors do not have any amounts due and owing to PartnerSource.

146.     The Debtors also employ McFarlan Rowlands to assist with the procurement and negotiation of the Debtors' Canadian Self-Paid Insurance Policies.    The commission compensation for McFarlan Rowlands is paid directly by the insurance companies and is included in the annual premiums quoted to the Debtors for the Canadian Insurance Policies. McFarlan Rowlands invoices the Debtors annually upon renewal of the Canadian Insurance Policies in mid-January, in an amount consistent with the quoted premiums.  The Debtors then pay one-third of the amount on receipt of the invoice, the next third after thirty days and the last

third after sixty days. For the auto fleet Canadian Insurance Policy, there is also a payment mechanism that is used to adjust for vehicles that are added or removed from the corporate fleet during the year, which amounts are reconciled and then invoiced separately at the end of the coverage term. As of the Petition Date, the Debtors owe McFarlan Rowlands $40,900 CAD in premiums for the Canadian Self-Paid Insurance Policies and $1,350 CAD for six months of insurance coverage for a vehicle added to the corporate fleet during 2009, after the premium had already been calculated and paid for the auto fleet Canadian Insurance Policy.

G.     **Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services**

147.   In the ordinary course of business, the Debtors obtain gas, water, sewer, electric, telephone and other similar utility services from various Utility Providers. Approximately 293 Utility Providers render these services to the Debtors (the "*Utility Service List*"). On average, the Debtors spend a total of approximately $809,000 per month for utility services.

148.   Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. I believe that any interruption in utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, thereby seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. Thus, it is critical that utility services continue uninterrupted during these chapter 11 cases.

## PROCEDURAL MOTIONS

A.     **Debtors' Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief**

149.   The Debtors have incurred, and currently are incurring, significant net operating losses (the "*NOLs*") and certain other tax and business credits (the "*Tax Credits*," and, together

61

with the NOLs, the "***Tax Attributes***"). As of the Petition Date, the Debtors estimate that they have NOLs of approximately $440 million which, based on a combined federal and state income tax rate of approximately 40%, could translate into a potential future tax savings of approximately $176 million. I believe the Debtors' Tax Attributes are a valuable asset of the Debtors' estates, the availability of which will facilitate the Debtors' successful reorganization and serve to improve recoveries to their creditors.

150. If, however, holders of equity securities were permitted to trade in the Debtors' stock, or seek to take worthless deductions, I understand such actions could severely limit or even eliminate the Debtors' ability to use their valuable Tax Attributes, which could lead to significant negative consequences for the Debtors, their estates and the overall effort to maximize value for all stakeholders.

## B. Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases

151. The Debtors' operations are highly integrated. Atrium Corporation is the direct or indirect parent of each of the other 19 Debtors. Additionally, each of the 20 affiliated Debtor entities (other than Atrium Corporation) is directly liable for, or a guarantor of, the obligations that the Debtors seek to restructure as part of these chapter 11 cases. Thus, many, if not all, of the motions filed in the chapter 11 cases will implicate many, if not all, of the Debtors.

152. I believe that the 20 Debtors are "affiliates" as that term is defined under section 101(2) of the Bankruptcy Code. The Debtors also share significant debt obligations that will be addressed in these chapter 11 cases. Thus, I believe joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest and that entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration

will also allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.

153.    I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective constituencies because this motion requests only administrative, not substantive, consolidation of the Debtors' cases.  I do not believe that parties in interest will be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the chapter 11 cases.

## C.    Debtors' Motion for Entry of an Order Implementing a Procedural Protocol for the Administration of the Cross-Border Insolvency Proceeding

154.    North Star Manufacturing (London) Ltd., the Company's Canadian affiliate (the "*Canadian Debtor*"), has contemporaneously sought relief under the Companies' Creditors Arrangement Act (R.S.C. 1985, c. C-36, as amended, the "*CCAA*") in the Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*," and together with this Court, the "*Courts*") in Toronto, Ontario, Canada (the "*CCAA Proceeding*").  The Canadian Debtor intends to seek Bankruptcy Court and Canadian Court approval of a customary cross-border protocol that will govern procedures for, among other things, court-to-court communications and obtaining approval (by joint hearing or otherwise) for matters requiring approval by both this Court and the Canadian Court (the "*Protocol*").  If no administrative procedures are implemented to coordinate the activities of the Courts and other parties in connection with theses Restructuring Proceedings, I am advised that there is a risk that inefficiencies and lack of communication will adversely affect the Debtors' reorganization efforts and the rights and interests of creditors and other parties.

K&E 16030284.7
DEL1 73705-1

## PROFESSIONAL RETENTION AND COMPENSATION MOTIONS

**A.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of The Garden City Group, Inc. as Notice, Claims and Balloting Agent**

155.    The Debtors believe that they may have more than 20,000 potential creditors. To alleviate the heavy administrative burden on the clerk of the court, the Debtors seek to retain The Garden City Group, Inc. ("*GCG*") as notice, claims and balloting agent in these chapter 11 cases. GCG has substantial experience in matters of this size and complexity and has acted as the official notice, claims and balloting agent in many large bankruptcy cases.

**B.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date**

156.    The Debtors seek to retain Kirkland and Ellis LLP ("*K&E*") as their attorneys. K&E has extensive expertise in the field of debtors' protections and creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code. Moreover, K&E is extremely familiar with the Debtors' businesses and management team, having represented the Debtors in restructuring matters since August 2009.

**C.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Klehr Harrison Harvey Branzburg LLP as Co-Counsel to the Debtors *Nunc Pro Tunc* to the Petition Date**

157.    The Debtors seek to retain Klehr Harrison Harvey Branzburg LLP ("*Klehr Harrison*") as the Debtors' co-counsel in these chapter 11 cases. Klehr Harrison has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations      under      chapter      11      of      the      Bankruptcy      Code.

K&E 16030284.7
DEL1 73705-1

**D.  Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisor and Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date**

158.  The Debtors seek to retain Moelis & Company LLC ("*Moelis*") as the Debtors' financial advisor and investment banker.  Moelis provides a broad range of corporate advice to its clients, including, with respect to:  (a) general corporate finance; (b) mergers, acquisitions and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising.  Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

**E.  Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Deloitte Financial Advisory Services as Bankruptcy Administrative Services Providers to the Debtors *Nunc Pro Tunc* to the Petition Date**

159.  The Debtors seek to retain Deloitte Financial Advisory Services LLP (*"Deloitte FAS"*) as their bankruptcy administrative services provider.  Deloitte FAS has a wealth of experience in providing administrative services in corporate restructurings and reorganizations.  Moreover, in the months leading up to the commencement of these chapter 11 cases, Deloitte FAS personnel have devoted substantial amounts of time and effort assisting the Debtors to prepare for these chapter 11 cases and operations in chapter 11 more generally.

**F.  Debtors' Application for Entry of an Order Authorizing the Employment and Retention of PricewaterhouseCoopers LLP as Tax Advisor to the Debtors *Nunc Pro Tunc* to the Petition Date**

160.  The Debtors seek to retain PricewaterhouseCoopers LLP ("*PwC*") as the Debtors' tax advisor.  PwC is a leading full-service, accounting, consulting and financial services firm.  PwC has considerable experience in providing accounting, tax, auditing and financial advisory services to businesses in chapter 11 cases.

K&E 16030284.7
DEL1 73705-1

**G. Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Deloitte and Touche LLP as Independent Auditor and Accountant to the Debtors *Nunc Pro Tunc* to the Petition Date**

161. The Debtors seek to retain Deloitte & Touche LLP (*"D&T"*) as their independent auditor. D&T has a wealth of experience in acting as an independent auditor and has performed such services in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

**H. Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

162. The Debtors employ approximately 48 professionals including various attorneys, accountants and other professionals in the ordinary course of their business (the "*OCPs*"). The OCPs provide services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including specialized legal, accounting, auditing, tax and litigation services.

163. The Debtors also employ, in the ordinary course of business, service providers such as management and customer consultants, public relations specialists, actuaries and other non-professional service providers (collectively, the "*Service Providers*"). Although some of the Service Providers have professional degrees and certifications, they provide services to the Debtors that, while integral to the day to day operation of the Debtors' business, do not relate directly to, or materially affect, the administration of these chapter 11 cases.

164. The OCPs and Service Providers have a great deal of knowledge, expertise and familiarity with the Debtors and their operations. Although I believe that the Debtors anticipate that the OCPs and Service Providers will want to continue to represent the Debtors on an ongoing basis, I believe that some may not do so if the Debtors cannot meet their payment obligations on a regular basis.

K&E 16030284.7
DEL1 73705-1

165. Moreover, in light of the large number of OCPs and Service Providers and the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP and Service Provider. Additionally, I am aware that Service Providers may hold unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition. I do not believe that any of the OCPs or Service Providers, however, hold interests materially adverse to the Debtors, their creditors or other parties in interest.

**I.    Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals**

166. It is my understanding that establishing procedures for payment professionals retained in these chapter 11 cases (collectively, the *"Professionals"*) will streamline the administration of these chapter 11 cases by facilitating efficient review of the Professionals' fees and expenses.

K&E 16030284.7
DELI 73705-1