# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ATRIUM CORPORATION, *et al.*,[1] | ) Case No. 10-_____ (___) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, AND 363; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)

Atrium Corporation and its debtor affiliates as debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"),[2] respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company – West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042). The Debtors' main corporate address is 3890 W. Northwest Highway, Suite 500, Dallas, Texas 75220.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' restructuring, are set forth in greater detail in the Declaration of Gregory T. Faherty, President and Chief Executive Officer of Atrium Corporation, in Support of First Day Motions (the "*First Day Declaration*"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), on January 20, 2010 (the "*Petition Date*"). Simultaneously with the commencement of these chapter 11 cases, the Debtor North Star Manufacturing (London) Ltd. sought relief under the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Ontario, Canada (the "*CCAA Proceeding*").

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rules 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

## Relief Requested

4.     By this motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "*Interim Order*"), and a final order (the "*Final Order*" and, together with the Interim Order, the "*DIP Orders*"), authorizing the Debtors to enter into and perform under the $40 million DIP Credit Agreement (as defined below and substantially in the form attached hereto as **Exhibit 1** to **Exhibit A** and incorporated by reference herein).[3] More specifically, the Debtors seek authority to:

    a.     permit ACI, pursuant to the Interim Order and before entry of the Final Order, to borrow up to $15 million under the DIP Facility;

---

[3]     Specifically, the Debtors seek authority to enter into the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement (together with any other agreements, documents and instruments related thereto, as each of the same may be amended, supplemented or modified from time to time, the "*DIP Credit Agreement*," and the postpetition financing made available hereby, the "*DIP Facility*" or "*DIP Financing*"), dated as of January 20, 2010, by and among Atrium Companies, Inc. ("*ACI*"), as borrower, each of the other Debtors, as guarantors, GE Business Financial Services Inc., as administrative and collateral agent (the "*DIP Agent*") and a syndicate of financial institutions (collectively, with the DIP Agent, the "*DIP Lenders*").

b.    grant to the DIP Agent, for the benefit of itself and the other DIP Lenders, senior liens on substantially all of the Debtors' assets pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code;

c.    grant superpriority administrative claims to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

d.    use "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) of the Debtors' Prepetition Secured Lenders (as defined below);

e.    grant adequate protection to the secured parties under the Second Amended and Restated Credit Agreement, dated as of October 15, 2008, (the "*Prepetition Secured Credit Agreement*"), among ACI, as borrower, certain other Debtors, as guarantors, GE Business Financial Services Inc. (formerly known as Merrill Lynch Business Financial Services Inc.), as administrative agent and collateral agent (in such capacity, the "*Prepetition Secured Agent*") and the lenders party thereto (collectively, the "*Prepetition Secured Lenders*," and together with the Prepetition Secured Agent, the "*Prepetition Secured Parties*");

f.    vacate the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Interim Order and the Final Order;

g.    waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

h.    pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

5.    In support of this motion, the Debtors submit the Declaration of Jared J. Dermont, a Partner and Managing Director of Moelis & Company LLC, the Debtors' proposed financial advisor and investment banker, a copy of which is attached hereto as **Exhibit B** (the "*Dermont Declaration*").

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)

6. Pursuant to Bankruptcy Rule 4001(c), the Debtors submit this concise statement listing certain material terms contained in the DIP Credit Agreement and the DIP Orders. As discussed in detail herein, the Debtors believe that the terms of the contemplated DIP Financing are appropriate and justified in the context of, and the circumstances relating to, these chapter 11 cases.[4]

a. ***Amount of Borrowing***. The DIP Financing contemplates a $40 million delayed draw term loan, $15 million of which will be made available to the Debtors upon entry of the Interim Order. Borrowings under the DIP Facility that are repaid cannot be reborrowed. DIP Credit Agreement at §§ 2.01, 2.02, 2.04.

b. ***Interest Rate.*** The applicable interest rate on the DIP Financing will be (i) 8.5% plus the Alternative Base Rate (as described herein and set forth in section 1.01 of the DIP Credit Agreement) for the period such loan is an Alternative Base Rate Loan; and (ii) 9.5% plus the LIBOR Rate (as described herein and set forth in section 1.01 of the DIP Credit Agreement) for the period such loan is a LIBOR Loan. DIP Credit Agreement at §§ 1.01, 3.02.

c. ***Pricing, Economic Terms and Fees***. The DIP Financing contemplates the payment of various fees, including (i) a $50,000 arranging fee payable to the DIP Agent that is earned and payable upon entry of the Interim Order; (ii) a non-refundable agency fee payable in advance upon entry of the Interim Order and every three months thereafter, in the amount of $50,000; (iii) an upfront facility fee totaling $1.2 million, $600,000 of which will be payable to the DIP Agent for distribution to the DIP Lenders on a pro rata basis upon entry of the Interim Order; and (iv) an unused facility fee equal to 1.0% per annum on the average daily

---

[4] Capitalized terms used in this concise statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement. This concise statement is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the Interim Order. To the extent of any inconsistency between this concise statement and the proposed DIP Credit Agreement, the DIP Credit Agreement shall govern.

unused balance of the DIP Facility, payable monthly in arrears. Interim Order at ¶ 2(g); DIP Credit Agreement at § 2.05.

d.  ***Conditions to Closing and Borrowing.***  Among the conditions for borrowing under the DIP Facility is the Court's approval of an amendment and waiver relating to the Debtors' continuation of their prepetition accounts receivable securitization facility on a postpetition basis. The Debtors have filed a separate motion seeking this approval. Interim Order at ¶ 2(i).

e.  ***Maturity.***  The DIP Facility will mature on July 20, 2010, with the possibility of extension to October 20, 2010, to the extent that, among other things, the Majority Lenders determine that the Debtors are diligently pursuing the confirmation of the Plan in good faith.  DIP Credit Agreement at §§ 1.01, 2.12.

f.  ***Events of Default.***  The DIP Credit Agreement sets forth a number of events of default, including (i) the entry of an order or orders granting relief from or modifying the automatic stay applicable under section 362 of the Bankruptcy Code to the holder(s) of security interests in the Collateral; (ii) reversal, vacatur or modification (without consent of the requisite percentage of Lenders) of the Interim Order; (iii) failure to obtain entry of the Final Order within 40 days after the Petition Date (or a later date as agreed upon by the Majority DIP Lenders); and (iv) failure to obtain the final securitization order.  Interim Order at ¶ 2(f); DIP Credit Agreement at § 10.

g.  ***Priority of DIP Liens.***  The DIP Financing contemplates the granting of postpetition liens on substantially all of the Debtors' assets (the "***DIP Collateral***"), including: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on all unencumbered DIP collateral and, solely upon entry of the Final Order, proceeds of the Debtors' claims and causes of actions under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code; (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all DIP Collateral that is subject to certain prepetition liens (the "***Prepetition Prior Liens***"); and (iii) pursuant to section 364(d)(1) of the Bankruptcy Code a first priority, senior priming lien on all DIP Collateral that is senior and priming to certain prepetition liens, including those under the Prepetition

Secured Credit Agreement, but that is junior to the Carve-Out and the Prepetition Prior Liens. Interim Order at ¶¶ 2(j)-(k); DIP Credit Agreement at § 2.13.

h. ***Priority of DIP Claims.*** In addition to the DIP Liens, the DIP Financing contemplates that all of the DIP Obligations will constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and will have priority, subject only to the Carve-Out, over all administrative expense claims whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Interim Order at ¶¶ 2(m).

i. ***Effect on Existing Liens.*** The DIP Facility includes priming liens granted pursuant to section 364(d)(1) of the Bankruptcy Code with respect to the Prepetition Secured Parties during the time between entry of the Interim Order and the Final Order. Additionally, the DIP Facility contemplates the provision of adequate protection to the Prepetition Secured Parties in the form of replacement liens (subject to, among other things, the Carve-Out and the DIP Liens), superpriority claims pursuant to section 507(b) of the Bankruptcy Code (subject to the DIP Super-Priority Claims and the Carve-Out) and certain postpetition payments, including payments to the Prepetition Secured Agent for accrued fees, costs and expenses as well as a portion of the interest accruing under the Prepetition Secured Credit Agreement. Interim Order at ¶¶ 2(j)-(k); 4.

j. ***Borrowing Conditions.*** In addition to customary borrowing conditions appropriate for debtor in possession financing agreements, access to the DIP Facility is conditioned upon, among other things, entry of the Interim Order within five days of the Petition Date, payment of the fees and expenses of the Prepetition Secured Parties up to the Closing Date, payment of the Upfront Facility Fee and the filing of the Plan and Disclosure Statement on the Petition Date. DIP Credit Agreement § 7.

k. ***Carve-Out.*** The Interim Order provides that each of the DIP Liens, DIP Super-Priority Claims, Prepetition Liens, Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims are subject and subordinate to the Carve-Out. The Carve-Out applies to United States Trustee fees, professionals fees of the Debtors and the Committee. Interim Order at ¶ 7.

<u>**Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)**</u>

7.     The DIP Credit Agreement also includes certain provisions that the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i).  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

a.     **Local Rule 4001-2(a)(i)(B) – *Validity, Perfection and Amount of Prepetition Obligations*.**  As part of the Interim Order, the Debtors' stipulate and agree that all obligations of the Debtors and liens granted by the Debtors under the Prepetition Secured Credit Agreement are valid, binding, enforceable and perfected.  Additionally, the Interim Order provides that the liens granted to the Prepetition Secured Parties are not subject to avoidance, recharacterization or subordination and are subject and subordinate only to the DIP Liens, the Carve-Out and certain other permitted liens under the Prepetition Secured Credit Agreement. Additionally, the Interim Order contemplates a release by the Debtors of the Prepetition Secured Parties of any and all "claims" (as defined in the Bankruptcy Code) with respect to the Prepetition Obligations and Prepetition Liens.  The Interim Order refers to these provisions as the *"Debtors' Stipulations."*  Interim Order at ¶¶ D(i)-(iii).

b.     **Local Rule 4001-2(a)(i)(B) – *Committee Challenge Period*.**  The Interim Order provides that the Debtors' Stipulations are binding upon the Debtors in all circumstances as well as each other party in interest, including any Committee, unless such Committee or other party commences a contested matter or adversary proceeding challenging or otherwise objecting to the Debtors' Stipulations or against any or all of the Prepetition Secured Parties on or before 60 days after entry of the Final Order.  Interim Order at ¶ 6.

c.     **Local Rule 4001-2(a)(i)(C) – *Waiver of Section 506(c) Claims*.**  Subject to entry of the Final Order, no costs or expenses of administration of these chapter 11 cases shall be charged against or recovered from the DIP Lenders, the Prepetition Secured Lenders, the DIP Collateral, the Prepetition Collateral (as defined in the Interim Order) and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without prior written

consent of the DIP Agent or the Prepetition Secured Agent. Interim Order at ¶ 8.

d. **Local Rule 4001-2(a)(i)(D) – *Grant of Liens on Avoidance Actions.*** The DIP Credit Agreement contemplates the grant of postpetition liens to the DIP Lenders on certain avoidance actions, solely upon entry of the Final Order. Interim Order at ¶¶ 2(j)-(k).

e. **Local Rule 4001-2(a)(i)(F) – *Treatment of Committee Professionals.*** The Committee's professional fees are included in the Carve-Out. As discussed above, each of the DIP Liens, DIP Super-Priority Claims, Prepetition Liens, Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims are subject and subordinate to the Carve-Out. Interim Order at ¶ 7.

## Introduction

8.     The Debtors require access to liquidity under the DIP Facility to prevent immediate and irreparable harm to their estates. The DIP Facility will ensure that the Debtors are able to continue ongoing business operations, preserve the value of estate assets, maintain favorable relationships with suppliers and customers, pay employees and satisfy other working capital and general corporate needs, all of which are necessary to maintain the value of the Debtors' businesses and, ultimately, effectuate a successful reorganization.

9.     As explained in the First Day Declaration, the Debtors have commenced these chapter 11 cases to effectuate an efficient and expeditious restructuring of their balance sheet. Through this restructuring, the Debtors seek to reduce the substantial debt burden that hinders their ability to effectively compete in an already difficult market. To this end, the Debtors have undertaken extensive negotiations with their key creditor constituencies to ensure this goal is quickly realized.

10.     These negotiations have been successful. Contemporaneously herewith, the Debtors have filed a pre-negotiated plan of reorganization (the "***Plan***") that is supported by the

Prepetition Secured Agent and a vast majority of the Prepetition Secured Lenders, as evidenced by the Restructuring and Lock-Up Agreement that is attached as an exhibit to the First Day Declaration (the "*Lock-Up Agreement*"). Among other things, the Plan provides for the reorganization of the Debtors as a going concern and will result in the elimination of at least $350 million of outstanding debt obligations.

11. To implement the restructuring contemplated under the Plan and the Lock-Up Agreement, the Debtors require continued and immediate access to liquidity. As discussed below and in the Dermont Declaration, the Debtors' decision to proceed with the DIP Financing comes only after a dedicated and diligent review of other financing alternatives. After a review of such alternatives and arm's-length and extensive negotiations with the DIP Lenders, the Debtors determined that the only viable source of financing was that proposed by the DIP Lenders. Thus, to ensure the Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, the DIP Facility should be approved.

### The Debtors' Outstanding Prepetition Indebtedness

12. As of December 31, 2009, the Debtors have outstanding secured and unsecured indebtedness totaling approximately $655.9 million. These obligations include: (a) $383.1 million outstanding under the Prepetition Secured Credit Agreement, which is secured by substantially all of the Debtors' assets; (b) $47.9 million outstanding under certain 11.0% unsecured notes due 2012 (the "*11.0% Senior Subordinated Notes*"); and (c) $220.3 million outstanding under certain 15.0% unsecured notes due 2012 (the "*15.0% Senior Subordinated Notes*" and, together with the 11.0% Senior Subordinated Notes, the "*Senior Subordinated Notes*"). Additionally, the Debtor ACIH, Inc. is obligated on $4.6 million outstanding under 11.5% unsecured notes due 2012 (the "*ACIH Notes*").

13. The chart below summarizes the Debtors' prepetition indebtedness, including

9

approximate amounts outstanding as of December 31, 2009. Further detail with respect to each debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of December 31, 2009 | Maturity Date | Security Status |
|---|---|---|---|---|
| Prepetition Secured Credit Agreement | Revolver: $46 million | Revolver: $34.7 million[5] | May 2011 | Secured |
| | Term Loan: $335 million | Term Loan: $349.0 million | May 2012 | Secured |
| 11.0% Senior Subordinated Notes | $42 million | $47.9 million | December 2012 | Unsecured |
| ACIH Notes | $174 million | $4.6 million[6] | December 2012 | Unsecured |
| 15.0% Senior Subordinated Notes | $186 million | $220.3 million | December 2012 | Unsecured |

## A.    The Prepetition Secured Credit Agreement

14.    On October 15, 2008, Atrium Companies, Inc., as borrower, and each of the Debtors (other than Atrium Corporation), as guarantors, entered into the Prepetition Secured Credit Agreement. The Prepetition Secured Credit Agreement waived the Debtors' defaults under the Debtors' prior credit facility while increasing the interest rate thereunder and establishing new financial covenants.

15.    The Prepetition Credit Agreement includes: (a) a revolving credit facility in the amount of approximately $46 million; (b) a $20 million sublimit for the issuance of letters of credit; (c) a $10 million sublimit for swing line loans; and (d) a term loan facility in the amount of approximately $335 million. A total of approximately $383.7 million was outstanding under the Prepetition Secured Credit Agreement as of December 31, 2009.

16.    Each of the Debtors (other than Atrium Corporation) unconditionally guaranteed

---

[5]    This includes approximately $12.6 million in issued and outstanding letters of credit.

[6]    In October 2008, the Company exchanged 97.45% of the ACIH Notes for the 15.0% Senior Subordinated Notes and equity warrants.

the obligations under the Prepetition Secured Credit Agreement. In addition, the obligations under the Prepetition Secured Credit Agreement, and the obligations of the guarantors under the guarantees, are secured by substantially all of Debtors' assets, including:

- a first priority perfected security interest in all of the capital stock of each of the Debtors (except Atrium Corporation and ACIH, Inc.); and

- a first priority perfected security interest in substantially all other present and future assets and properties, including accounts receivable, inventory, machinery, equipment, contracts, domestic intellectual property, license rights and general intangibles (other than the accounts receivable and other assets that are pledged to secure the A/R Facility, as defined below).

17. The Debtors have been in default under the Prepetition Secured Credit Agreement since May 2009 after failing to make a payment thereunder.

**B.     The A/R Facility**

18. On December 28, 2007, Atrium Companies, Inc., and certain of its subsidiaries entered into an accounts receivable securitization facility for a five year term expiring on December 28, 2012 (the "*A/R Facility*").7 Pursuant to the A/R Facility, each participating Debtor agreed to sell, on a non-recourse and ongoing basis, a pool of receivables comprising their entire trade receivable portfolio to Atrium Funding Corporation II (the "*SPV*") — a special purpose, bankruptcy-remote entity wholly-owned by Atrium Companies, Inc. Contemporaneously therewith, the SPV entered into an agreement with a group of financial institutions, with General Electric Capital Corporation acting as the administrative agent,

---

7     The Debtor entities party to the A/R Facility are: Aluminum Screen Manufacturers, Inc., Atrium Door and Window Company – West Coast, Atrium Door and Window Company of Arizona, Atrium Door and Window Company of the Northeast, Atrium Door and Window Company of the Northwest, Atrium Door and Window Company of the Rockies, Atrium Extrusion Systems, Inc., Atrium Florida, Inc., Atrium Vinyl, Inc., Atrium Windows and Doors of Ontario, Inc., Superior Engineered Products Corporation, and Thermal Industries, Inc.

pursuant to which the financial institutions agreed to fund advances to the SPV to enable the SPV to purchase receivables from the participating Debtors, subject to certain reserves and eligibility criteria.

19.     As a condition to the financial institutions' agreement to fund advances under the A/R Facility, the SPV agreed to assign and pledge all of its right, title and interest in and to the receivables to the administrative agent, for the benefit of the funding financial institutions. The SPV is not a Debtor in these chapter 11 cases. The Debtors' net accounts receivable balance as of November 30, 2009 includes $12.7 million of retained interests in receivables that have been transferred to the SPV in connection with the A/R Facility and is net of the obligations of the SPV to the lenders under the A/R Facility.

20.     In connection with the filing of this motion, the Debtors have filed a separate motion for authority to enter into and perform under an amendment to the operative documents governing the A/R Facility that will permit the Debtors to continue the A/R Facility on a postpetition basis (the "*A/R Motion*").

## C.     The Swap Agreement

21.     On December 27, 2007, Atrium Companies, Inc. entered into a swap agreement with Merrill Lynch Capital Services (the "*Swap Contract*"). As of the Petition Date, approximately $4.7 million of termination payments was due under the Swap Contract, inclusive of accrued and unpaid interest and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Swap Contract (the "*Swap Contract Claims*"). The Swap Contract Claims are secured by liens on and security interests in substantially all of the Debtors' assets. These liens and interests are of equal priority to the obligations under the Prepetition Secured Credit Agreement.

## D.    The Senior Subordinated Notes

22.    Atrium Companies, Inc. issued the 11.0% Senior Subordinated Notes and 15.0% Senior Subordinated Notes in October 2008. The Senior Subordinated Notes are governed by an indenture by and among Atrium Companies, Inc. and each of the other Debtors (except Atrium Corporation) as guarantors, and U.S. National Bank Association, as trustee, dated October 15, 2008 (the "*Senior Subordinated Notes Indenture*"). The Senior Subordinated Notes, which mature on December 15, 2012, are jointly and severally, absolutely and unconditionally guaranteed by each of the Debtors in these chapter 11 cases except Atrium Corporation.

23.    In the event of any distribution or payment that would otherwise be made in respect of the 11.0% Senior Subordinated Notes or the 15.0% Senior Subordinated Notes (other than regularly scheduled payments of interest, whether in the form of cash or payment-in-kind interest), including, without limitation, any distribution or payment that is made in connection with any refinancing or recapitalization of Atrium Companies, Inc., upon the sale of all or any part of the assets of Atrium Companies, Inc. or any of its subsidiaries or the winding up of their affairs (including pursuant to an event of liquidation under chapter 7 or chapter 11 of the Bankruptcy Code, state law, or otherwise), holders of the 11.0% Senior Subordinated Notes are entitled to receive, in the aggregate, (a) prior to December 15, 2011, an amount equal to 75% of the aggregate principal amount of, and unpaid interest on, the 11.0% Senior Subordinated Notes (the "*Prior Payment Amount*") and (b) on or after December 15, 2011, the Prior Payment Amount as of December 15, 2011, before holders of the 15.0% Senior Subordinated Notes are entitled to receive all or any portion of any such distribution or payment. Thereafter, any distribution to the holders of the 15.0% Senior Subordinated Notes and the 11.0% Senior Subordinated Notes is pro rata in accordance with otherwise applicable law and the terms of the Senior Subordinated Notes Indenture.

24. Atrium Corporation is a signatory to only one provision of the Senior Subordinated Notes Indenture, pursuant to which holders of the majority in principal amount of the 15.0% Senior Subordinated Notes are entitled to appoint one director and one observer to Atrium Corporation's Board of Directors, and holders of the majority in principal amount of the 11.0% Senior Subordinated Notes are entitled to appoint one observer to Atrium Corporation's Board of Directors.

**E.     The ACIH Notes**

25. ACIH, Inc. issued the ACIH Notes in December 2004. The ACIH Notes are governed by an indenture by and between ACIH, Inc., as issuer and U.S. National Bank Association as trustee dated as of December 28, 2004 (as amended from time to time, the "*ACIH Notes Indenture*"). Pursuant to the October 2008 restructuring, 97.4% of the ACIH Notes were exchanged for the 15.0% Senior Subordinated Notes and equity warrants. With respect to the unexchanged ACIH Notes, the ACIH Notes Indenture is still in effect; however, pursuant to the Ninth Supplemental Indenture, by and between ACIH, Inc. and U.S. National Bank Association, dated as of October 15, 2008, many operative provisions with respect to events of default and covenants for the ACIH Notes have been eliminated.

**The Debtors' Liquidity Needs and the DIP Budget**

26. The Debtors are one of the largest manufacturers and distributors of residential windows and patio doors in the United States. The Debtors' offer a comprehensive product line of aluminum and vinyl windows and patio doors, as well as other complementary building material products, to leading national homebuilders, distributors and home center retailers. A severe economic recession, which was triggered by a collapse in housing prices, a credit crunch and diminished levels of demand, has had a debilitating impact on the Debtors' businesses.

27.    The recession left a large inventory of houses, but deprived individuals of the resources to purchase them, thereby dampening housing demand.  As housing demand subsided, so did demand for the Debtors' products.  Economic insecurity has curtailed individuals' home remodeling plans, further hurting the Debtors' bottom line.  The depressed revenues from this economic slowdown impede the Debtors' ability to both service their debt obligations and invest in the capital and labor necessary for their businesses to succeed.

28.    To best assess the Debtors' funding needs during these chapter 11 cases, the Debtors have, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization within the timeframe contemplated under the Plan.

29.    As described in the Dermont Declaration, on or about August 10, 2009, the Debtors retained Moelis & Company LLC ("*Moelis*") as their financial advisor and investment banker.  Moelis – together with the Debtors' management team – analyzed the Debtors' cash needs to determine if there was a need for additional liquidity to support the Debtors' balance sheet restructuring initiatives.  More specifically, and considering the ongoing dialogue the Debtors had been engaged in with their senior secured lenders for many months, Moelis considered the incremental liquidity that would be necessary to maintain operations in connection with the filing of these chapter 11 cases and implementation of a swift and permanent de-leveraging.

30.    In undertaking this analysis, Moelis considered the Debtors' near-term financial projections, including, without limitation, demand for the Debtors' products and the cost to manufacture such products.  The Debtors' management also conferred with key operational

divisions to understand essential business metrics in both the near and long-term to help establish the financial projections that were necessary to adequately analyze future liquidity needs.

31.     As part of the Debtors' recent financial analysis and projections, the Debtors developed a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period.   This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials.

32.     Following, Moelis' review and analysis of the Debtors' financial situation, and in connection with ongoing discussions concerning the Debtors' overall de-leveraging efforts, the Debtors entered into extensive, arm's-length negotiations concerning the Debtors' potential incremental liquidity needs with the Prepetition Agent and an ad hoc group of the Prepetition Lenders.  The Prepetition Secured Lenders were an obvious source of incremental financing as the incumbent lenders who could provide financing, thereby alleviating a potential "priming fight."

33.     Additionally, the parties discussed and contemplated the use of cash collateral, with or without any additional financing, to fund operations during these chapter 11 cases. However, based on the Debtors' financial projections, as well as Moelis' analysis and discussions with the Prepetition Secured Lenders, it was determined that cash collateral alone was insufficient to fund operations and the Debtors' go-forward business plan.  Thus, to provide the Debtors with appropriate and necessary financing, the negotiation of adequate liquidity in the form of debtor in possession financing was critical to ensure that operations would continue uninterrupted during the Debtors' restructuring.

34.     Utilizing the 13-week cash flow forecast to project their cash needs during these chapter 11 cases, the Debtors believe that $15 million in liquidity availability is necessary for operations during the early stage of these chapter 11 cases. The proposed DIP Financing will provide the Debtors with immediate access of up to $15 million of a delayed draw term loan. The Debtors note, however, that the 13-week cash flow forecast on which this conclusion is based assumes that the Debtors will have continued access to the A/R Facility — which provides for a commitment of up to $60 million — on a postpetition basis. As noted above, the Debtors have filed the A/R Motion, which, upon approval, will permit the Debtors to continue the A/R Facility on a postpetition basis. Additionally, it is important to note that approval of the A/R Motion on an interim basis is a condition precedent to the Debtors' access to the DIP Financing.

35.     Ultimately, the Debtors rely on working capital financing to meet their cash needs, and the filing of these chapter 11 cases makes the need for such financing even greater. Indeed, immediate access to the DIP Facility and use of cash collateral will enable the Debtors to demonstrate to their vendors, suppliers, customers and employees that they have sufficient capital to ensure ongoing operations. Without access to the funds available under the DIP Facility, as well as continued access to the A/R Facility, the Debtors may not have the necessary liquidity to conduct their business as a going concern. Absent the ability to obtain postpetition financing, the Debtors may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest and it is likely the Debtors' restructuring would fail. Thus, the Debtors have an immediate need to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

## The Debtors' Efforts to Obtain Postpetition Financing

36.     In early December, in addition to ongoing discussions with the Prepetition Secured Lenders regarding potential debtor in possession financing, Moelis also approached a broad set of potential lenders, including "traditional lenders" (*e.g.*, money-center banks) and "non-traditional lenders" (*e.g.*, hedge funds). Because of the potential complexity of obtaining postpetition financing that would "prime" the Prepetition Secured Lenders, and the short timeframe in which the Debtors were likely to need access to such financing, Moelis chose to target a group of potential lenders that, in its professional judgment, would be most likely to provide postpetition financing under the specific circumstances and dynamics of these chapter 11 cases.

37.     Over the last several weeks, of the eight parties initially contacted six potential lenders signed confidentiality agreements and conducted initial diligence. Of those six parties, two – one bank and one hedge fund – indicated early on that they did not intend to submit a letter of intent or a term sheet with respect to postpetition financing.

38.     The Debtors ultimately received preliminary indications regarding pricing and terms for postpetition financing from three financing sources, as well as a proposal submitted by the Prepetition Agent and certain of the Prepetition Secured Lenders.

39.     The Debtors' management, together with Moelis, analyzed and considered each of the financing proposals. For various reasons, several of which are detailed below, the Debtors determined that the proposed DIP Financing was far superior to any of the other proposals. In fact, a review of the three other term sheets, when compared to the proposed DIP Financing, revealed that the proposed DIP Financing was the only viable financing alternative under the circumstances.

40.     *First*, the proposed DIP Financing contemplates continued access to the A/R Facility. Although the advancing agent and administrative agent under the A/R Facility – General Electric Capital Corporation – is a separate and distinct entity from the Prepetition Agent and the agent under the Proposed DIP Financing, the Debtors understood from early discussions with those parties that the Debtors would not have postpetition access to the A/R Facility if the Debtors pursued postpetition financing with a third party source.

41.     Notably, maintaining the A/R Facility minimizes the sizing requirements of the Debtors' postpetition financing needs, thereby minimizing administrative expenses in these chapter 11 cases. Moreover, absent an amendment to the terms of the A/R Facility to provide for its continuation postpetition, the securitization would terminate (by its express terms) and the Debtors would be left without an important source of liquidity, thereby necessitating a significant increase in liquidity needs and the size of any replacement financing facility. As a result, a competing postpetition financing facility would, absent the Debtors' continued access to the A/R Facility, need to be sized at approximately $100 million.

42.     *Second*, because the proposed DIP Financing is limited in size, the upfront costs, including the commitment and arrangement fees, are comparatively less than the fees associated with alternative sources of financing, including the financing proposals received by the Debtors as part of this process.

43.     *Third*, the proposed DIP Facility negates a potential "priming" fight, considering that the Debtors have reached a consensus with respect to adequate protection to be provided to the Prepetition Secured Lenders, whose prepetition liens are being primed by the proposed DIP Financing. An agreement on adequate protection was highly unlikely under the alternative forms of postpetition financing. In the first instance, none of the third party sources of financing were

willing to consider providing postpetition financing without obtaining first-priority priming liens on substantially all of the Debtors' assets. Moreover, all parties made clear to the Debtors and Moelis that they would not seek to provide postpetition financing on a priming basis without the consent of the Prepetition Secured Lenders. At the same time, the Prepetition Secureds indicated to the Debtors that they were not inclined to permit their prepetition liens to be primed on a consensual basis. Any uncertainty with respect to the Debtors' access to postpetition financing, however, would be detrimental to the Debtors' business operations and could impact the Debtors' expeditious exit from chapter 11. As a result, moving forward with a "priming" fight was not in the best interests of the Debtors' estates.

44.     Based on the foregoing considerations, the Debtors determined to proceed with negotiations with respect to the financing proposed by the Prepetition Secured Lenders. This is not to say, however, that the Debtors' discussions with the Prepetition Secured Lenders were not hard-fought. Indeed, over the course of the weeks and days immediately proceeding the commencement of these chapter 11 cases, the Debtors and the Prepetition Secured Lenders engaged in rigorous, arm's-length and good faith negotiations with respect to all aspects of the proposed DIP Financing, including the size and term of the facility, the cost of the facility and the events of default contemplated thereunder. Only after these discussions did the Debtors determine to proceed with the terms of the proposed DIP Financing.

### Summary of Proposed Postpetition Financing

45.     In accordance with the terms and conditions of the DIP Credit Agreement, the DIP Lenders have agreed to extend the DIP Facility in an aggregate amount of $40 million. On an interim basis, the DIP Lenders will provide the Debtors with access of up to $15 million of a delayed draw term loan, which will be used to pay costs and expenses associated these

chapter 11 cases and provide financing for working capital, letters of credit, capital expenditures and other general corporate purposes of the Debtors.

46. The following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[8]

| Provision | Summary Description |
|---|---|
| **Borrower**<br><br>Interim Order at ¶ (i); Agreement definition of "Borrower" | Atrium Companies, Inc. as "Borrower." |
| **Guarantors**<br><br>Interim Order at ¶ (i); Schedule 1.01(b) to Agreement | Each of the following Debtors: Atrium Corporation; ACIH Inc.; Aluminum Screen Manufacturers, Inc.; Atrium Door and Window Company – West Coast; Atrium Door and Window Company of Arizona; Atrium Door and Window Company of the Northeast; Atrium Door and Window Company of the Northwest; Atrium Door and Window Company of the Rockies; Atrium Enterprises Inc.; Atrium Extrusion Systems, Inc.; Atrium Florida, Inc.; Atrium Vinyl, Inc.; Atrium Windows and Doors of Ontario, Inc.; Champion Window, Inc.; North Star Manufacturing (London) Ltd.; R.G. Darby Company, Inc.; Superior Engineered Products Corporation; Thermal Industries, Inc.; and Total Trim, Inc. |
| **DIP Agent and Collateral Agent**<br><br>Interim Order at ¶ (i); Agreement definition of "Administrative Agent" and "Collateral Agent" | GE Business Financial Services Inc. |

---

[8]    This summary of the DIP Agreement is provided for the benefit of the Court and other parties in interest. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

| Provision | Summary Description |
|---|---|
| **Arranger and Bookrunner**<br><br>Interim Order at ¶ (i);<br>Agreement definition of<br>"Lead Arranger" | GE Capital Markets, Inc. |
| **DIP Lenders**<br><br>Interim Order at ¶ (i);<br>Agreement definition of<br>"Lenders" | GE Business Financial Services Inc. and a syndicate of financial institutions party to the DIP Credit Agreement. |
| **Committed Facilities**<br><br>Interim Order at ¶¶ (i), (vii),<br>2(c); Agreement definition<br>of "DIP Facility";<br>Agreement at § 2.01 | Aggregate $40 million senior secured priming and superpriority delayed draw term loan credit facility.<br><br>• Interim DIP Order: Authorizes loans up to $15 million in aggregate outstanding principal.<br><br>• Final Order: Remaining funds under the DIP Facility shall be made available. |
| **Borrowing Conditions**<br><br>Agreement at § 7.01 | In addition to customary borrowing conditions appropriate for debtor in possession financing agreements, including the Debtors' production of corporate documents, financial statements and certificates of good standing, accuracy of representations and absence of default, the effectiveness of the DIP Credit Agreement and obligations of the DIP Lenders to make Loans pursuant thereto are subject to the satisfaction of the conditions precedent that:<br><br>• The Interim Order is entered by the Court no later than five days after the Petition Date in form and substance satisfactory to the DIP Lenders.<br><br>• Entry or "making" of the CCAA Order by the CCAA Court.<br><br>• The Plan Support Agreement shall not have been breached by any of the Debtors and shall be in full force and effect.<br><br>• All accrued out-of-pocket fees and expenses of the DIP Lenders in connection with the Prepetition Secured Credit Agreement and the Credit Documents have paid to the extent invoiced.<br><br>• The First Day Orders shall have been entered. |

| Provision | Summary Description |
|---|---|
| | ▪ The DIP Lenders have approved the Debtors' initial Budget. |
| | ▪ The A/R Facility Amendment shall have been duly executed and delivered by the parties thereto and the Bankruptcy Court shall have entered the Interim A/R Facility Order. |
| | ▪ The Prepetition Secured Lenders shall have received payment in full of the cash interest payment due December 31, 2009, under the Prepetition Secured Credit Agreement. |
| | ▪ The Debtors shall have filed the Disclosure Statement and Plan with the Bankruptcy Court on the Petition Date. |
| | ▪ The Debtors shall have paid the Upfront Facility Fee. |
| **Maturity**<br><br>Agreement definition of "Initial Maturity Date" and "Outside Maturity Date"; Agreement at § 2.12 | The DIP Facility shall mature on the Initial Maturity Date of the DIP Credit Agreement, which is July, 20, 2010, unless extended to the Outside Maturity Date, which is October 20, 2010, to the extent that, among other things, the Majority Lenders determine that the Debtors are diligently pursuing the confirmation of the Plan in good faith. |
| **Use of Funds**<br><br>Interim Order at ¶ 2(h); Agreement at § 9.28 | The Debtors shall apply the proceeds of all Loans solely as follows: (i) to pay costs and expenses of the Transactions; (ii) to pay costs and expenses in connection with these chapter 11 cases in accordance with and as set forth in the Approved Budget; (iii) to pay Obligations under the DIP Credit Agreement as and when due and payable; (iv) to pay such prepetition obligations as the Bankruptcy Court may approve; (v) for working capital and other general corporate purposes of the Debtors not in contravention of any Requirement of Law and not in violation of the DIP Credit Agreement; and (vi) for Capital Expenditures to the extent set forth in the Approved Budget and to the extent Capital Expenditures do not exceed the Maximum Capital Expenditures applicable at that date as set forth in section 9.11 of the DIP Credit Agreement. |
| **Interest Rate**<br><br>Interim Order at ¶ 2(g); Agreement at § 3.02 | Interest shall be paid in cash on the unpaid principal amount of each Loan made for the period from and including the date of such Loan to but excluding the date such Loan shall be paid in full at the following rates *per annum*:<br><br>▪ during such periods as such Loan is an ABR Loan, the Alternate Base Rate (as in effect from time to time), *plus* |

| Provision | Summary Description |
|---|---|
| | the Applicable Margin; and |

- during such periods as such Loan is a LIBOR Loan, for each Interest Period relating thereto, the LIBOR Rate for such Loan for such Interest Period, *plus* the Applicable Margin.

"Alternate Base Rate" shall mean for any day, a rate per annum equal to the highest of (i) the rate last quoted by *The Wall Street Journal* as the "Prime Rate" in the United States or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent); (ii) the sum of 3% per annum and the Federal Funds Rate; and (iii) the sum of LIBOR calculated for each such day based on an Interest Period of three months determined two Business Days prior to such day, plus (y) the excess of the Applicable Margin for LIBOR Loans over the Applicable Margin for ABR Loans, in each instance, as of such day. Any change in the Base Rate due to a change in any of the foregoing shall be effective date of such change in the Federal Funds Rate or LIBOR for an Interest Period of three months.

"LIBOR Rate" shall mean, for any LIBOR Loan for any Interest Period therefor, a rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined by the Administrative Agent to be equal to the LIBOR Base Rate for such Loan for such Interest Period divided by 1 minus the Reserve Requirement (if any) for such Loan for such Interest Period.

"LIBOR Base Rate" shall mean, for each Interest Period, the higher of (i) 3.0% per annum or (ii) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR 01 Page as of 11:00 A.M. (London, England time) two Business Days prior to the first day in such Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by Administrative Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two Business Days prior to the first day in such Interest Period by major financial institutions reasonably

| Provision | Summary Description |
|---|---|
| | satisfactory to Agent in the London Interbank market for such Interest Period for the applicable principal amount on such date of determination. "Applicable Margin" shall mean 8.50% for Loans maintained as ABR Loans and 9.50% for Loans maintained as LIBOR Loans. |
| **Fees**<br><br>Interim Order at ¶ 2(g);<br>Agreement at § 2.05;<br>7.01(ii)(xix) | Debtors have agreed to pay the following fees:<br><br>- An Arranging Fee of $50,000 payable to the DIP Agent.<br>- An Agency Fee of $50,000 payable to the DIP Agent in advance upon entry of the Interim Order and every three months thereafter.<br>- An Upfront Facility Fee of $1,200,000, $600,000 of which shall be paid upon the Debtors' acceptance of the Delayed Draw Term Loan Commitments and $600,000 of which shall be paid on the Closing Date, to the DIP Agent for distribution to the DIP Lenders.<br>- An unused line fee equal to 1.0% per annum on the average unused daily balance of the DIP Facility, payable monthly in arrears to DIP Agent for prompt distribution to the DIP Lenders on a pro rata basis. |
| **DIP Budget**<br><br>Interim Order at ¶ 2(d)-(e);<br>Agreement definition of "Approved Budget" | The Debtors shall operate under a "rolling" 13-week budget which reflects on a line-item basis the Debtors' projected cumulative cash receipts, disbursements, unused availability under the DIP Facility and A/R Facility and unrestricted cash on hand on a weekly basis.<br><br>The Debtors shall provide a Variance Report, certified by the chief financial officer of the Borrower, to the DIP Agent, so as actually to be received on or prior to the last Business Day of each week commencing with the last Business Day of the fourth week after the Closing Date in form acceptable to the DIP Agent and the Majority DIP Lenders in their sole discretion, setting forth (i) the actual cash receipts, expenditures and disbursements for such immediately preceding calendar week on a line-item basis and the Aggregate Liquidity as of the end of such calendar week; (ii) the variance in dollar amounts of the actual expenditures and disbursements (excluding debt service, professional fees and Capital Expenditures) for each 4-week period from those reflected for the corresponding period in the Approved Budget; and (iii) the variance in dollar amounts of the actual expenditures and disbursements in respect of professional |

| Provision | Summary Description |
|---|---|
| | fees for each 4-week period from those reflected for the corresponding period in the Approved Budget. |
| **Use of Cash Collateral**<br><br>Interim Order at ¶ ¶ 1(iv), 3 | Subject to the terms and conditions of the Interim Order and the DIP Loan Documents, (i) the Debtors are authorized to use proceeds of DIP Loans from and after the Closing Date and (ii) the Debtors are authorized to use all Cash Collateral, and each Debtor shall be prohibited from at any time using proceeds of DIP Loans or Cash Collateral except in accordance with the terms and conditions of the DIP Orders and the DIP Loan Documents.<br><br>The term "Cash Collateral" means "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code), including, Cash Collateral in which the Prepetition Secured Parties and/or the DIP Lenders have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or otherwise. |
| **DIP Collateral**<br><br>Interim Order at ¶ 1(iv) | The term "DIP Collateral" means all collateral including, without limitation, all cash and cash equivalents (whether maintained with any of the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries (subject to the restriction set forth below), tax and other refunds, insurance proceeds, commercial tort claims, Avoidance Action Proceeds (as defined below and solely upon entry of the Final Order), rights under section 506(c) of the Bankruptcy Code (solely upon entry of the Final Order), all other Collateral and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing; *provided, however,* that notwithstanding any provision of the DIP Credit Agreement or in any DIP Loan Document to the contrary, no Debtor |

| Provision | Summary Description |
|---|---|
| | organized under U.S. law shall be required to pledge in excess of 65% of the capital stock of its direct foreign subsidiaries (other than North Star Manufacturing (London) Ltd., 100% of the capital stock of which shall be pledged) or any of the capital stock of its indirect foreign subsidiaries. |
| **DIP Liens**<br><br>Interim DIP Order at ¶ 2(j) | As security for the DIP Obligations, the Debtors' grant the following security interests and liens on all of the DIP Collateral and all such Liens granted to the DIP Agent as provided in the DIP Loan Documents as security for the DIP Obligations:<br><br>▪ pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral and, upon entry of the Final Order, proceeds ("*Avoidance Action Proceeds*") of solely the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("*Avoidance Actions*"), whether received by judgment, settlement or otherwise;<br><br>▪ pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, other than, in the case of clause (x) or (y), Liens which are expressly stated to be primed by the Liens to be granted to the DIP Agent (subject to such exception, the "*Prepetition Prior Liens*"); and<br><br>▪ pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral (including, Cash Collateral) that is senior and priming to (x) the Prepetition Liens and (y) any Liens that are junior to the Prepetition Liens, after giving |

| Provision | Summary Description |
|---|---|
| | effect to any intercreditor or subordination agreements (the Liens referenced in clauses (x) and (y), collectively, the "***Primed Liens***"); *provided, however,* that the Liens described in this subsection shall be junior to the Carve-Out and the Prepetition Prior Liens. |
| **DIP Lien Priority**<br><br>Interim DIP Order at ¶ 2(k); Agreement at § 2.13 | Notwithstanding anything to the contrary contained in the Interim Order or the other DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the ratable benefit of the DIP Lenders shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens, and to the extent provided in the provisions of the Interim Order and the DIP Loan Documents, shall also be subject to the Carve-Out and (ii) except as provided in sub-clause (i), are senior to all prepetition and postpetition Liens of any other person or entity (including, the Primed Liens and the Adequate Protection Replacement Liens). The DIP Liens and the DIP Super-Priority Claims (i) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code; (ii) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) any intercompany or affiliate Liens of the Debtors; and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed in these chapter 11 cases, upon the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing, and/or upon the dismissal of any of these chapter 11 cases. |

| Provision | Summary Description |
|---|---|
| **Superpriority Administrative Claims**<br><br>Interim Order at ¶ 2(m); Agreement at § 2.13 | Effective immediately upon entry of the Interim Order and the Initial CCAA Order, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out and the Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super-Priority Claims), unsecured claims and all other claims against the applicable Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment. |
| **Adequate Protection**<br><br>Interim Order at ¶ 4(a)-(b) | The holders of the Prepetition Secured Obligations will receive: (i) replacement liens on all assets of the Obligors, which shall be junior in priority only to the liens securing the DIP Facility, the Carve-Out and any Prior Liens; (ii) a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code that is junior in priority only to payment of the Carve-Out and to the superpriority administrative expense claim in respect of the DIP Facility; (iii) current cash payment of a portion of the interest due under the Prepetition Secured Credit Agreement equal to the LIBOR Rate (without giving effect to the 3.0% LIBOR floor contained therein) with all other interest due under the Prepetition Secured Credit Agreement being capitalized and added to the outstanding principal balance of the applicable Prepetition Secured Obligations; and (iv) current cash payment of all reasonable and documented fees, costs and expenses of one primary counsel and local counsel (as necessary) for each of the Prepetition Secured Agent and the ad-hoc group of Prepetition Secured Lenders constituting Majority Term Lenders and one financial advisor to be retained by the Prepetition Agent for the benefit of the Prepetition Lenders. |

| Provision | Summary Description |
|---|---|
| **Events of Default**<br><br>Interim Order at ¶ 2(f);<br>Agreement at § 10 | The DIP Credit Agreement contains a number of specific Events of Default, including:<br><br>- the failure to obtain the Final Order within 40 days after the Petition Date;<br><br>- the failure to obtain entry of a final securitization order substantially contemporaneously with the entry of the Final Order;<br><br>- violations of the terms and conditions of the Approved Budged;<br><br>- obtaining credit or the incurrence of Indebtedness, after the Petition Date that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the Prepetition Secured Agent and the Prepetition Secured Lenders or (ii) entitled to priority administrative status which is equal or senior to that granted to the Prepetition Secured Agent and Prepetition Secured Lenders herein, unless used to refinance the Prepetition Obligations in full;<br><br>- the entry of a final order by the Court, other than the Final Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $1,000,000 or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $1,000,000) which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;<br><br>- reversal, vacatur, or modification (without the express prior written consent of the Prepetition Secured Agent, in its sole discretion) of the Interim Order;<br><br>- dismissal of any of these chapter 11 cases or conversion of any of these chapter 11 cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person in any of these chapter 11 cases;<br><br>- upon written notice from the Prepetition Secured Agent, |

| Provision | Summary Description |
|---|---|
| | any material misrepresentations made by the Debtors or their agents, after the Petition Date, to the Prepetition Secured Agent or Prepetition Secured Lenders or their agents about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral; |
| | - upon written notice from the Prepetition Secured Agent, the material failure to make adequate protection payments or other payments to the Prepetition Secured Agent and Prepetition Secured Lenders pursuant to the Interim Order and DIP Credit Agreement when due and such failure shall remain unremedied for more than three Business Days after notice thereof; |
| | - the failure by the Debtors to perform, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under the DIP Orders and such failure shall continue unremedied for more than three Business Days after receipt by the Debtors of notice thereof; |
| | - the failure to obtain an order from the Court approving the Solicitation Materials (as defined in the Lock-up Agreement) and setting a hearing to confirm the Plan or a plan of reorganization incorporating a Higher and Better Bid (as defined in the Lock-up Agreement) within 40 days after the Petition Date, or as soon thereafter as the Court's schedule permits; |
| | - the failure to commence a hearing to consider confirmation of the Plan or a plan of reorganization incorporating a Higher and Better Bid within 40 days after the date that the Solicitation Materials are approved; |
| | - the Court's order confirming the Plan or any plan of reorganization incorporating a Higher and Better Bid shall not have been entered by the Court within 30 days after the date that the hearing to consider confirmation of the Plan or any plan of reorganization incorporating a Higher and Better Bid shall have commenced, or as soon thereafter as the Court's schedule permits, but in any event not later than 35 days after the date the hearing to consider confirmation of the Plan or any plan of reorganization incorporating a Higher and Better Bid shall have commenced; |

| Provision | Summary Description |
|---|---|
| | ▪ the effective date of the Plan or any plan of reorganization incorporating a Higher and Better Bid shall not have occurred within 20 days after the date that the Plan or any plan of reorganization incorporating a Higher and Better Bid is confirmed;<br><br>▪ any breach by the Debtors of their covenants and other undertakings in the DIP Credit Agreement or the Lock-up Agreement. |
| **Carve-Out**<br><br>Interim Order at ¶ 7 | The term "Carve-Out" means (i) all unpaid fees required to be paid in these chapter 11 cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. §1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) all reasonable unpaid fees, costs and disbursements of the Debtors' Professionals that are incurred prior to the delivery by the DIP Agent of a Carve-Out Trigger Notice, are allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise and remain unpaid after application of any retainers and any available funds remaining in the Debtors' estates for such creditors; (iii)(x) all reasonable unpaid fees, costs and disbursements of the Committee's Professionals and all reasonable unpaid expenses of the Committee Members that are incurred prior to the delivery by the DIP Agent of a Carve-Out Trigger Notice, are allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise and remain unpaid after application of any retainers and any available funds remaining in the Debtors' estates for such creditors and (y) in an aggregate amount not to exceed $250,000; (iv)(x) all reasonable unpaid fees, costs and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice are allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise and remain unpaid after application of any retainers and any available funds remaining in the Debtors' estates for such creditors and (y) in an aggregate amount not to exceed $1,000,000; (v)(x) all reasonable unpaid fees, costs and disbursements of the Committee Professionals and all reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice are allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise and remain unpaid after application of any retainers and any available funds remaining in the Debtors' estates for such creditors and (y) in an aggregate amount not to exceed $50,000; and (vi) the costs and |

| Provision | Summary Description |
|---|---|
| | administrative expenses not to exceed $150,000 in the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to any order of the Court following any conversion of any cases pursuant to section 1112 of the Bankruptcy Code.<br><br>The term *"Carve-Out Trigger Notice"* shall mean a written notice delivered by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, counsel for the Prepetition Secured Parties, and lead counsel to any Committee appointed in these chapter 11 cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents, expressly stating that the Carve-Out is invoked.<br><br>Each of the DIP Liens, DIP Super-Priority Claims, Prepetition Liens, Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate in all respects to payment of the Carve-Out. |
| **Debtor's Waivers and Releases**<br><br>Interim Order ¶ D(iv) | Subject to the reservation of rights set forth in paragraph 6 of the Interim Order , each Debtor and its estate shall be deemed to have forever waived, discharged and released the Prepetition Secured Parties of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment or other offset rights against any and all of the Prepetition Secured Party Releases, whether arising at law or in equity, with respect to the Prepetition Obligations and Prepetition Liens, including (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law and (ii) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Obligations, or the validity, enforceability, priority or non-avoidability of the Prepetition Liens securing the Prepetition Obligations. |

## Supporting Authority

### A. Financing Under Section 364 of the Bankruptcy Code

47.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a

lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[9] *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

48.     Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

49.     Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements.   Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, which focuses on the transaction as a whole. As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of

---

9   Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

   If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

> reason, irrespective of the inability of the debtor to obtain
> comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

50.     More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business; (b) is in the best interests of the Debtors' creditors and estates; (c) is an exercise of a debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other; and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).

51.     For these reasons, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

(i)     **Entry into the DIP Facility is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment**

47.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *Ames Dep't Stores*, 115 B.R. at 38 (noting

that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest").

48.     Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business planning activities. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

49.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

50.     The Debtors' decision to enter into the proposed DIP Facility indisputably satisfies this standard. This decision is the culmination of an intense, several month-long process targeted at procuring the best available financing under the circumstances. The Debtors weighed proposals from three potential sources of financing, each of whom made clear that they would not proceed with postpetition financing on a non-consensual priming basis. Additionally, the Prepetition Secured Lenders' offer to provide continued access to the A/R Facility during these chapter 11 cases mitigated the costs of any postpetition financing. Ultimately, the Debtors'

decision to enter into the DIP Facility was no decision at all – there was no other viable financing alternative.

51. Entry into the DIP Facility and securing financing thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest; therefore entry into the DIP Facility is an exercise of the Debtors' sound business judgment. Given the Debtors' significantly constrained liquidity position, the DIP Facility is of critical importance to operating the Debtors' business and preserving going concern value, especially following the commencement of these chapter 11 cases and the general uncertainty in the marketplace that will accompany this process.

52. Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay over 3,800 employees and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the Debtors' going concern value. Moreover, the Debtors' access to the DIP Facility will provide comfort and confidence to all parties in interest at this critical juncture. In short, the Debtors' access to the DIP Facility will ensure that the going concern value of their estates are preserved, thereby providing a greater recovery to the Debtors' stakeholders.

**(ii)    The Terms of the DIP Facility are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment**

53. It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *See, e.g., In re Snowshoe Co. Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is

not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames*, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

54.　　Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and 364(b) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

55.　　The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis. Moreover, as described above and in the Dermont Declaration, the Debtors' ability to obtain financing on even a superpriority secured basis was limited; both other potential sources of third party financing made clear that they would provide financing only on a senior secured *consensual* basis. At the same time, the Prepetition Secured Lenders were amenable to maintaining access to the A/R Facility, which minimized the size of the Debtors' postpetition financing needs. Accordingly, the Debtors submit that the terms of the DIP Credit

Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

56. Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

### a. The Scope of the Carve-Out is Appropriate

57. The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out. Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and a committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### b. The Payment of Fees to the DIP Lenders is Appropriate

58. The various fees and charges to be paid to the DIP Lenders, as expressly provided for in section 2.05 of the DIP Credit Agreement, are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

### B. The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code

59. Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

60. The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors, the DIP Agent and the DIP Lenders, and all of the DIP Facility obligations will be extended by the DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party in connection with the DIP Financing other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code, and the DIP Lenders should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 363(e).

**C.** **The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate**

61. As discussed above, the DIP Financing contemplates providing the DIP Lenders with priming liens on the liens granted to the Prepetition Secured Lenders under the Prepetition Secured Credit Agreement pursuant to section 364(d) of the Bankruptcy Code. Accordingly, the Debtors are required to show that the interests of the Prepetition Secured Lenders are "adequately protected." 11 U.S.C. § 364(d). Additionally, pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Prepetition Secured Lenders subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

62. What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

63. In this case, access to the DIP Financing – which necessitates granting the DIP Lenders' liens on a priming basis under section 364(d) of the Bankruptcy Code – is critical to the Debtors' ability to continue operations. As a result of such proposed priming, the Debtors intend to provide the Prepetition Secured Lenders with the following forms of adequate

41

protection. *First*, the Debtors propose to grant the Prepetition Secured Parties replacement liens on all DIP Collateral (including upon entry of the Final Order, the proceeds of certain avoidance actions) to the extent of any aggregate postpetition diminution in value of the prepetition interests of the Prepetition Secured Parties, subject and subordinate only to the liens granted to the DIP Lenders, the Prepetition Prior Liens and the Carve-Out.[10]

64.     *Second*, as set forth above and in the Interim Order, the Debtors will, solely to the extent of diminution in the value of the Prepetition Secured Parties' collateral, grant allowed superpriorirty administrative claims pursuant to section 507(b) of the Bankruptcy Code, junior only to the superpriority claims granted to the DIP Lenders and the Carve-Out.[11]

65.     *Third*, the Interim Order contemplates the payment of the costs and fees of the Prepetition Secured Agent as well as a portion of the interest accruing under the Prepetition Secured Credit Agreement and the fees, costs and expenses of one primary counsel and local counsel (as necessary) for the Prepetition Secured Agent and each of the Majority Term Lenders (as defined in the Prepetition Secured Credit Agreement) and one financial advisor to be retained by the Prepetition Secured Agent for the benefit of the Prepetition Secured Lenders.

66.     The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use Cash Collateral and access necessary liquidity under the DIP Financing. Accordingly, the adequate protection proposed herein and in

---

[10]     Importantly, the Interim Order provides that to the extent the effective date of the Plan occurs by the date set forth in the Debtors' prepetition lock-up agreement, the replacement liens granted to the Prepetition Secured Parties will be deemed satisfied without further consideration beyond the distributions to be provided under the Plan to the Prepetition Secured Parties.

[11]     As with the replacement liens, to the extent the effective date of the Plan occurs by the date set forth in the Debtors' prepetition lock-up agreement, the claims granted to the Prepetition Secured Parties will be deemed satisfied without further consideration beyond the distributions to be provided under the Plan to the Prepetition Secured Parties.

the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code. *See* 11 U.S.C. §§ 363(c), 364(d).

**D.    Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

67.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

68.    In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores* at 36.

69.    Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail herein and in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity to, among other things, provide comfort to their employees, customers and suppliers as well as to continue to operate their businesses, maintain key business relationships, make payroll and satisfy other working capital and operational needs. Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

70. Absent access to liquidity under the DIP Facility, the continued availability of cash under the A/R Facility and authorization to use Cash Collateral, the Debtors' trade creditors almost certainly will cease to provide goods and services to the Debtors, the Debtors will be unable to satisfy their payroll and other direct operating expenses necessary to run their businesses in the ordinary course. Thus availability of sufficient working capital and liquidity is vital to the preservation and maintenance of the value of the Debtors' estates.

71. The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district. *See, e.g., In re Taylor-Wharton Int'l LLC*, Case No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Center Inc.*, Case No. 09-13911 (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.*, Case No. 09-11424 (Bankr. D. Del. May 28, 2009); *In re AbitibiBowater Inc.*, Case No. 09-11296 (Bankr. D. Del. Apr. 20, 2009); *In re EZ Lube, LLC*, Case No. 08-13256 (Bankr. D. Del. Jan 14, 2009).

E.    **Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances**

72. Paragraphs 5 and 14 of the proposed Interim Order provide that the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to, among other things, permit the Debtors to grant various superpriority liens and claims and adequate protection liens; perform various obligations; incur various liabilities; permit the exercise of remedies by the Prepetition Secured Agent and the DIP Lenders following a default under the DIP Facility; and to allow the DIP Lenders to file and record financing statements, mortgages or other instruments to provide notice and evidence the grant and perfection of the liens.

73. Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under

the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed DIP Orders.

### Request For Final Hearing

74.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 40 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

75.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h). *See* Fed. R. Bankr. P. 6004(a), 6004(h).

### Notice

76.     The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) counsel to the agent for the Debtors' prepetition credit facility; (e) counsel to the ad hoc group of lenders under the Debtors' prepetition credit facility; (f) counsel to the agent under the Debtors' accounts receivable securitization facility; (g) counsel to Kenner & Company, Inc.; (h) the indenture trustee for each of the Debtors' outstanding bond issuances; (i) the monitor appointed in the CCAA Proceeding; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Delaware Secretary of State; (m) the Delaware Secretary of Treasury; and (n) counsel to any statutory committee appointed in these chapter 11 cases. In light of the nature

of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

77.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, for the reasons set forth herein, the First Day Declaration and in the Dermont Declaration, the Debtors respectfully request entry of the DIP Order (a) authorizing the Debtors to (i) enter into and perform under the DIP Credit Agreement and (ii) use Cash Collateral of the Prepetition Secured Lenders; (b) granting adequate protection to the Prepetition Secured Parties under the Prepetition Secured Credit Agreement; (c) setting a date for a hearing to consider entry of the Final Order no later than 40 days following the Petition Date; and (d) such other and further relief as may be appropriate.

| | |
|---|---|
| Dated: January 20, 2010<br>Wilmington, DE | /s/ Domenic E. Pacitti |

Domenic E. Pacitti (Bar No. 3989)
Michael Yurkewicz (Bar No. 4165)
KLEHR HARRISON HARVEY
BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193

- and -

Richard M. Cieri (*pro hac vice* pending)
Joshua A. Sussberg (*pro hac vice* pending)
Brian E. Schartz (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Counsel to the Debtors*
*and Debtors in Possession*