# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ATRIUM CORPORATION, *et al.*,[1] | ) | Case No. 10-10150 (BLS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## FIRST MODIFIED DISCLOSURE STATEMENT FOR
## THE FIRST MODIFIED JOINT PLAN OF REORGANIZATION
## OF ATRIUM CORPORATION AND ITS DEBTOR AFFILIATES
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Richard M. Cieri
Joshua A. Sussberg
Brian E. Schartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Domenic E. Pacitti
Michael Yurkewicz
KLEHR HARRISON HARVEY
BRANZBURG  LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

*Counsel to the Debtors and Debtors in Possession*

Dated: March 16, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company - West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042). The Debtors' main corporate address is 3890 W. Northwest Highway, Suite 500, Dallas, Texas 75220.

**TABLE OF CONTENTS**

Page

I.      EXECUTIVE SUMMARY ...................................................................................................2

II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT.................10

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN..........................................................................................................................11
        A.      What is Chapter 11?...............................................................................................11
        B.      Why are the Debtors sending me this Disclosure Statement? ....................................12
        C.      Am I entitled to vote on the Plan?  What will I receive from the Debtors if the Plan is
                consummated?........................................................................................................12
        D.      What happens to my recovery if the Plan is not confirmed or does not go effective? ..................13
        E.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective
                Date" and "Consummation?"...................................................................................13
        F.      Where is the cash required to fund the Plan coming from?.........................................13
        G.      Are there risks to owning an interest in Atrium Corporation upon emergence from
                bankruptcy?...........................................................................................................13
        H.      Is there potential litigation related to the Plan? ........................................................13
        I.      What are the contents of the solicitation packages to be sent to creditors who are eligible
                to vote on the Plan?...............................................................................................13
        J.      Will there be releases granted to parties in interest as part of the Plan? ......................14
        K.      What is the deadline to vote on the Plan? .................................................................14
        L.      How do I vote for or against the Plan?......................................................................14
        M.      Why is the Bankruptcy Court holding a Confirmation Hearing? .................................15
        N.      When is the Confirmation Hearing set to occur?........................................................16
        O.      What is the purpose of the Confirmation Hearing? ....................................................16
        P.      What role does the Bankruptcy Court play after the Confirmation Hearing?................16
        Q.      What is the effect of the Plan on the Debtors' ongoing business?................................16
        R.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors?........................................................................................16
        S.      What are the implications of the Plan for creditors of North Star Manufacturing (London)
                Ltd.? ....................................................................................................................17
        T.      Do the debtors recommend voting in favor of the Plan?.............................................17

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ...........17
        A.      Historical Overview................................................................................................17
        B.      The Debtors' Business Operations ...........................................................................17
        C.      The Debtors' Prepetition Organizational Structure ...................................................20
        D.      The Debtors' Prepetition Capital Structure...............................................................20

i

| V. | **EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**.....................24 |
| | A. | The Debtors' Substantial Funded Debt Burden...........................................................24 |
| | B. | Deterioration in Economic Conditions .....................................................................24 |
| | C. | The Debtors' Prepetition Restructuring Initiatives ....................................................24 |
| | D. | The Restructuring and Lock-Up Agreement ..............................................................25 |

| VI. | **INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF** ..........25 |

| VII. | **SIGNIFICANT DEVELOPMENTS SINCE THE PETITION DATE**.................................26 |
| | A. | Entry of Final Order of Relief in the Bankruptcy Court .............................................26 |
| | B. | Applications to Retain Professionals .......................................................................28 |
| | C. | The Creditors' Committee ......................................................................................28 |
| | D. | The Ad Hoc Group of Senior Secured Lenders..........................................................29 |
| | E. | Statement and Schedules........................................................................................29 |
| | F. | Stay Proceedings ..................................................................................................29 |
| | G. | Extension of DIP Deadline ....................................................................................31 |
| | H. | Overview of North Star and Developments in the CCAA Proceeding ..........................31 |
| | I. | Overview of the Debtors' Marketing Efforts in Connection with the New Value Alternative ............................................................................................................32 |
| | J. | Motion to Enter Into the Equity Purchase Agreement .................................................35 |
| | K. | Settlement with the Creditors' Committee .................................................................36 |

| VIII. | **ADDITIONAL DISCLOSURE REGARDING CLAIMS AND RECOVERIES** .................................37 |
| | A. | Additional Disclosure Regarding Treatment of Holders of 11.0% Senior Subordinated Notes and Holders of 15.0% Senior Subordinated Notes...........................................37 |
| | B. | Estimate of Known Litigation Claims ......................................................................37 |
| | C. | Overview of the Debtors' Insurance Policies.............................................................39 |
| | D. | Debtors' Estimate of Class 6A Qualified Unsecured Trade Claims ..............................42 |
| | E. | Additional Disclosure Regarding Class 6B General Unsecured Claims ........................42 |
| | F. | Additional Disclosure Regarding Intercompany Claims...............................................44 |
| | G. | Additional Disclosure Regarding Causes of Action ...................................................45 |

| IX. | **DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION**..............................................45 |
| | A. | Administrative Claims and Other Unclassified Claims ...............................................46 |
| | B. | Classification and Treatment of Claims and Interests..................................................47 |
| | C. | Means For Implementation of the Plan......................................................................59 |
| | D. | Treatment of Executory Contracts and Unexpired Leases ...........................................65 |
| | E. | Provisions Governing Distributions .........................................................................68 |
| | F. | Procedures For Resolving Contingent, Unliquidated and Disputed Claims...................72 |
| | G. | Settlement, Release, Injunction and Related Provisions ..............................................74 |

| | H. | Conditions Precedent to Confirmation and Consummation of the Plan | 77 |
|---|---|---|---|
| | I. | Modification, Revocation or Withdrawal of the Plan | 79 |
| | J. | Retention of Jurisdiction | 80 |
| **X.** | | **RISK FACTORS** | **81** |
| | A. | Risks Relating to Bankruptcy | 82 |
| | B. | Risks Related to the Reorganized Debtors' Business | 83 |
| | C. | Risks Related to Financial Information | 88 |
| **XI.** | | **SOLICITATION AND VOTING PROCEDURES** | **90** |
| | A. | Overview | 90 |
| | B. | Nominees | 91 |
| **XII.** | | **CONFIRMATION OF THE PLAN** | **93** |
| | A. | The Confirmation Hearing | 93 |
| | B. | Deadline to Object to Confirmation | 93 |
| | C. | Requirements for Confirmation of the Plan | 93 |
| | D. | Best Interests of Creditors/Liquidation Analysis | 94 |
| | E. | Feasibility | 94 |
| | F. | Acceptance by Impaired Classes | 94 |
| | G. | Confirmation Without Acceptance by All Impaired Classes | 95 |
| | H. | Valuation Of the Debtors | 96 |
| **XIII.** | | **CERTAIN SECURITIES LAW MATTERS** | **96** |
| | A. | Plan Securities | 96 |
| | B. | Issuance and Resale of Plan Securities Under the Plan | 97 |
| | C. | Listing of Plan Securities | 98 |
| **XIV.** | | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **98** |
| | A. | Introduction | 98 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | 99 |
| | C. | Certain U.S. Federal Income Tax Consequences to Holders of Claims and Interests | 101 |
| **XV.** | | **RECOMMENDATION** | **105** |

## EXHIBITS

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Disclosure Statement Order [TO COME]

EXHIBIT C        Liquidation Analysis

EXHIBIT D        Financial Projections

EXHIBIT E        Valuation Analysis

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

---

**[INSERT LETTER FROM COMMITTEE SUPPORTING VOTING ON THE PLAN]**

## I.     EXECUTIVE SUMMARY

Atrium Corporation and its debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"),[2] submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with the solicitation of acceptances with respect to the *First Modified Joint Plan of Reorganization of Atrium Corporation and its Debtors Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Plan***"), dated March 16, 2010.[3]   A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.  The Plan constitutes a separate chapter 11 plan for Atrium Corporation and each of its 19 affiliated Debtors.

**THE DEBTORS ARE VERY PLEASED THAT AFTER EXTENSIVE, GOOD FAITH NEGOTIATIONS, THE PLAN IS SUPPORTED BY THE SENIOR SECURED AGENT, THE AD HOC GROUP OF SENIOR SECURED LENDERS AND THE CREDITORS' COMMITTEE.[4]**

More specifically, the Plan provides for the reorganization of the Debtors as a going concern.  The Debtors have procured a binding investment commitment that produces significant recoveries for all stakeholders.  Notably, the Plan, as modified, incorporates a global settlement as among the Debtors, the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the official committee of unsecured creditors appointed in these chapter 11 cases (the "***Creditors' Committee***"), thereby resolving all of the Creditors' Committee's potential objections to this Disclosure Statement and the Plan and paving the way for the Debtors' expeditious emergence from chapter 11.

Among other things, the Plan contemplates one of two restructuring alternatives:

- *New Value Alternative.*  This restructuring option contemplates an equity investment from Atrium Window Holdings, LLC, a Delaware Limited Liability Company formed by Kenner & Company, Inc. ("***Kenner***"), the Debtors' current equity sponsor, and Golden Gate Private Equity, Inc. ("***Golden Gate Capital***" and, together with Kenner, the "***Plan Investor***") of up to $169,200,000 in exchange for 92.5% of Reorganized Atrium's New Common Stock (subject to dilution on account of the Management Equity Incentive Plan).  The New Value Alternative further contemplates that Reorganized Atrium will obtain new secured loans in an aggregate amount equal to at least $320,000,000.  The proceeds of the equity investment and new debt obligations will be applied to satisfy, in Cash, 95% of the Claims of Holders of Senior Secured Claims.  Holders of Senior Secured Claims will also receive their Pro Rata share of $7,500,000 in Cash.  As part of the settlement with the Creditors' Committee, the New Value Alternative further contemplates that Holders of the Senior Subordinated Notes Claims will receive an aggregate of 7.5% of the New Common Stock, with two-thirds going to Holders of the

---

[2]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company - West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042).

[3]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan will govern**.

[4]   One member of the Creditors' Committee, Corporate Property Associates 14, Inc. (d/b/a Delaware Frame (TX), LP, Windough (DE) LP and Windough Lot (DE) LP) (the "***Landlords***"), does not support the settlement incorporated in the Plan and objected to the Disclosure Statement.  The Landlords alledlgy hold Claims in Class 6B and believe the treatment afforded to such Class of Holders of Claims under the Plan is discriminatory.  The Debtors disagree.

11.0% Senior Subordinated Notes and one-third going to Holders of the 15.0% Senior Subordinated Notes.

- *Stand-Alone Alternative*.  If the New Value Alternative is not implemented for any reason whatsoever, the Plan provides for implementation of the Stand-Alone Alternative, which contemplates that Holders of Senior Secured Claims will receive, on a Pro Rata basis, a share of (a) a new first-priority senior secured term loan totaling $200,000,000 and (b) 96% of Reorganized Atrium's New Common Stock (subject to dilution on account of the Management Equity Incentive Plan).  Additionally, and as part of the global settlement with the Creditors' Committee, Holders of the Senior Secured Claims will provide the Holders of the Senior Subordinated Notes Claims with an aggregate of 4% of the New Common Stock, with two-thirds going to Holders of the 11.0% Senior Subordinated Notes and one-third going to Holders of the 15.0% Senior Subordinated Notes.

Any distribution to Holders of Senior Subordinated Notes Claims is contingent — in either restructuring scenario — on the Class of Holders of 11.0% Senior Subordinated Notes and the Class of Holders of 15.0% Senior Subordinated Notes voting to accept the Plan.  If this condition is not satisfied, the Holders of Senior Secured Claims will retain the recoveries afforded to Holders of Senior Subordinated Notes Claims.

Holders of Qualified Unsecured Trade Claims will receive payment in full in cash on account of such Claims following execution of a Qualified Vendor Support Agreement.  Moreover, Holders of Allowed Class 6B General Unsecured Claims will receive the lesser of (i) $0.04 on account of each dollar of its Allowed General Unsecured Claim and (ii) its Pro Rata share of $800,000, which amount will be held in a separate escrow account established on the Effective Date.

The New Value Alternative and the Plan Investor's investment is the product of an open and thorough marketing process conducted by Moelis & Company, LLC ("*Moelis*"), the Debtors' proposed financial advisor and investment banker, to ensure that the value of the Debtors' estates is maximized for the benefit of all stakeholders.  For more information regarding the marketing process, see the *Declaration of Frank H. Sellman in Support of the Debtors' (I) Disclosure Statement and (II) Motion for Entry of an Order (A) Authorizing the Debtors to Enter into the Equity Purchase Agreement with the Plan Investor in Connection with the Debtors' Proposed Joint Plan of Reorganization and (B) Approving Payment of a Termination Fee to the Plan Investor in Connection Therewith* (the "*Sellman Declaration*"), which was submitted to the Court on the date hereof  and is incorporated by reference herein.

To the extent there is additional value provided as part of the New Value Alternative, or to the extent the Plan is Confirmed pursuant to an Alternative Equity Purchase Agreement, the Debtors, the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee have reached an agreement regarding the sharing of any additional consideration.  *See* Article VII.I.

**THE DEBTORS, THE SENIOR SECURED AGENT, THE AD HOC GROUP OF SENIOR SECURED LENDERS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THESE ESTATES AND PROVIDES THE BEST RECOVERY TO CREDITORS.  AT THIS TIME, THE DEBTORS DO NOT BELIEVE THAT THERE IS A VIABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES OTHER THAN THROUGH CONFIRMATION OF THE PLAN OR ALTERNATIVE INVESTMENT PROPOSAL THAT PROVIDES INCREMENTAL VALUE OVER THAT PROVIDED IN THE PLAN.  THE DEBTORS, THE SENIOR SECURED AGENT, THE AD HOC GROUP OF SENIOR SECURED LENDERS AND THE CREDITORS' COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO ARTICLE III OF THE PLAN.[5]**

| | | SUMMARY OF EXPECTED RECOVERIES | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Interest** | **Projected Recovery Under the Plan[6]** |
| 1 | DIP Claims | Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each DIP Claim, each Holder of such DIP Claim shall receive a distribution in connection with one of the following alternatives:<br><br>Subject in all respects to the terms and conditions set forth in the Equity Purchase Agreement (or any Alternative Equity Purchase Agreement) and the occurrence of the Closing pursuant to the terms thereof, at the Closing the Plan Investor or Alternative Plan Investor, if applicable, shall pay or cause to be paid 100% of the amount of the DIP Claims as of the Closing Date after giving effect to the payment under section 4.04 of the Equity Purchase Agreement (or such comparable provision of any Alternative Equity Purchase Agreement); *or*<br><br>If (A) either the New Value Alternative or any Alternative New Money Investment is not effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of DIP Claims shall receive payment of the DIP Claims in full in Cash on the Effective Date. | 100% |
| 2 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court. | 100% |

---

[5]  The recoveries set forth in this table may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is scheduled by the Debtors as neither disputed, contingent nor unliquidated and not disputed; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (e) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed within the later of (i) 75 days after the applicable Claims Bar Date and (ii) 60 days after the Effective Date. Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been Filed, is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

[6]  Projected recoveries as of April 30, 2010.

| 3 | Other Secured Claims | Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered not Impaired.  In the event an Allowed Class 3 Other Secured Claim can also be classified as a Priority Tax Claim, such Claim shall (i) be paid in full, in Cash including the payment of interest under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; or (ii) retain any lien until such Claim is paid in full (it being understood that such Other Secured Claim may be paid in the ordinary course as and when it comes due, rather than on the Effective Date). | 100% |
|---|---|---|---|
| 4A | Senior Secured Claims[7] | In exchange for full and final satisfaction, settlement, release and discharge of each Allowed Senior Secured Claim, each Holder of such Allowed Senior Secured Claim shall receive a Pro Rata distribution as follows:<br><br>Subject to the occurrence of the Closing:  (A) the indefeasible payment of $7,500,000 in Cash; (B) the indefeasible payment of Cash equal to 95% of the amount of Senior Secured Revolver Claims and Senior Secured Term Claims as of the Closing Date; and (C) the indefeasible payment of Cash equal to 95% of the Senior Secured Revolver Interest Equivalent Claims and Senior Secured Term Interest Equivalent Claims (it being understood and acknowledged that interest shall have accrued at the default interest rate provided in the Senior Secured Credit Agreement) outstanding as of the Closing Date, all in accordance with the terms of the Equity Purchase Agreement, including section 5.07(a) thereof; _or_<br><br>If any Alternative Acquisition Proposal is approved, the Alternative Plan Investor shall indefeasibly pay or cause to be indefeasibly paid, in Cash, an amount no less than the aggregate amount provided in subclause (i) above; _provided_, _however_, that in the event the Cash made available to Holders of Allowed Class 4 Senior Secured Claims pursuant to any Alternative New Money Investment is greater than 98% of the aggregate amount of all Allowed Class 4 Senior Secured Claims outstanding as of the Closing, the Holders of the Allowed Class 4 Senior Secured Claims shall make available the full amount of the Senior Secured New Money Investment Gift before the Holders of Allowed Class 4 Senior Secured Claims are indefeasibly paid in full; _or_<br><br>If (A) neither the New Value Alternative nor any Alternative New Money Investment is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of the Senior Secured Claims and Swap Contract Claims shall receive (X) irrespective of whether interest on account of such loans under the revolving loan facility and the term loan facility under the Senior Secured Credit Agreement is Allowed or allowable under section 506(b) of the Bankruptcy Code, indefeasible payment in Cash in full of such Holder's Senior Secured Interest Claims; (Y) such Holder's Pro Rata share, after indefeasible payment in Cash in full of the Senior Secured Interest Claims, regardless of whether interest on account of loans under the revolving loan facility and the term loan facility under the Senior Secured Credit Agreement is Allowed or allowable under section 506(b) of the Bankruptcy Code, of (i) the New Senior Secured Term Loans and (ii) 96.0% of the New Common Stock issued on the Effective Date (subject to dilution on account of the Management Equity Incentive Plan).<br><br>In addition to the foregoing, the Debtors shall be required to indefeasibly pay no later than the Effective Date, all reasonable and documented fees, costs and expenses of the Senior Secured Agent, the DIP Agent and the Ad Hoc Group of Senior Secured Lenders, in each case, as provided in the Senior Secured Credit Agreement, the DIP Order and the DIP Credit Agreement, as applicable.<br><br>For the avoidance of doubt, nothing herein or otherwise shall be construed as or deemed to be a waiver by any Holder of Allowed Class 4A Senior Secured Claims of its right to recover 100% in Cash on account of its Senior Secured Claims. | _New Value Alternative_<br>96.9%<br><br>_Stand-Alone Alternative_<br>89.4% |

---

[7]   Includes $2.2 million in default interest.

| 4B | Swap Contract Claims | In exchange for full and final satisfaction, settlement, release and discharge of each Swap Contract Claim, each Holder of such Allowed Class 4B Swap Contract Claim shall receive a Pro Rata distribution as follows:<br><br>Subject in all respects to the terms and conditions set forth in the Equity Purchase Agreement and the occurrence of the Closing pursuant to the terms thereof, Cash equal to 100% of the Swap Contract Claims; _or_<br><br>If any Alternative Acquisition Proposal is approved, the Alternative Plan Investor shall pay or cause to be paid, Cash equal to 100% of the Swap Contract Claims; _or_<br><br>If (A) neither the New Value Alternative nor any Alternative New Money Investment is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of the Swap Contract Claims shall be treated in accordance with Article III.C.4(c)(iii) of the Plan. | _New Value Alternative_<br>100.0%<br><br>_Stand-Alone Alternative_<br>N/A[8] |

---

[8] Swap Contract Claims shall be treated as a separate Class under the New Value Alternative and any Alternative Acquisition Proposal; however, to the extent the Stand-Alone Alternative is implemented, Swap Contract Claims shall be treated as Class 4A Senior Secured Claims in accordance with Article III.C.4(c)(iii).

| 5A | 11.0% Senior Subordinated Notes Claims | In exchange for full and final satisfaction, settlement, release and discharge of each Allowed 11.0% Senior Subordinated Notes Claim, each Holder of such Allowed 11.0% Senior Subordinated Notes Claim shall receive a distribution as follows:<br><br>Subject to the occurrence of the Closing pursuant to the terms thereof, its Pro Rata share of the New Value Alternative 11.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan); *or*<br><br>If any Alternative Acquisition Proposal is approved, each Holder of an Allowed 11.0% Senior Subordinated Notes Claim shall receive (a) its Pro Rata share of the Alternative 11.0% Noteholder Distribution, (b) in the event the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii) of the Plan, Cash in an amount equal to its Pro Rata share of two-thirds of the Senior Secured New Money Investment Gift (after accounting for the adjustment described in Article III.C.10(b) of the Plan) and (c) in the event Holders of Allowed Class 4 Senior Secured Claims are indefeasibly paid, in full, in Cash, its ratable share of any Cash distribution including any thereof that, were it not for the Priority Rights, would have been payable to the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims (after accounting for the adjustment described in Article III.C.10(b) of the Plan), it being understood that any incremental recovery under Article III.C.6(b)(ii)(c) of the Plan shall not affect any recovery of the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims pursuant to Article III.C.7.(b)(ii)(a) and (b) of the Plan; *or*<br><br>If (A) neither the New Value Alternative nor any Alternative Acquisition Proposal is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, its Pro Rata share of the Stand-Alone Alternative 11.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan);<br><br>*provided*, *however*, that a distribution to Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims under subclauses (i), (ii) and (iii), above, is contingent on (A) Class 5A voting to accept the Plan and (B) 100% of the Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims agreeing to waive any and all Priority Rights; *provided further*, that if either or both of the foregoing conditions are not satisfied, the New Common Stock otherwise available for distribution to Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims shall, to the extent Holders of Allowed Senior Secured Claims have not received a 100% Cash recovery on account of their Claims, be distributed to Holders of Class 4A Allowed Senior Secured Claims, and the Holders of the 11.0% Senior Subordinated Notes Claims and 15.0% Senior Subordinated Notes Claims will not receive any distribution on account of Allowed 11.0% Senior Subordinated Notes Claims and Allowed 15.0% Senior Subordinated Notes Claims, as applicable; it being understood, however, that, provided Class 5A votes to accept the Plan, concurrent with such distribution to the Holders of Class 4A Allowed Senior Secured Claims as provided for immediately above, the Holders of Class 4A Allowed Senior Secured Claims shall distribute immediately and irrevocably as a gift from the Holders of Class 4A Allowed Senior Secured Claims to each Holder of a Class 5A Allowed 11.0% Senior Subordinated Notes Claims that voted to accept the Plan and agreed to waive any and all Priority Rights under the Senior Subordinated Notes Indenture the full amount of the available distribution to Holders of Class 5A Allowed 11.0% Senior Subordinated Notes Claims ratably to the Holders that voted to accept and waive any and all Priority Rights. | *New Value Alternative*<br>3.9% *<br><br>*Stand-Alone Alternative*<br>2.5% *<br><br><br>*\*This represents the aggregate recoveries for Holders of Senior Subordinated Notes Claims before implementation of the sharing agreements agreed to as part of the settlement with the Creditors Committee. See Article VII.I.* |

| 5B | 15.0 % Senior Subordinated Notes Claims | In exchange for full and final satisfaction, settlement, release and discharge of each Allowed 15.0% Senior Subordinated Notes Claims, each Holder of such Allowed 15.0% Senior Subordinated Notes Claims shall receive a distribution as follows: | *New Value Alternative*<br><br>3.9% *<br><br>*Stand-Alone Alternative*<br><br>2.5% *<br><br>*This represents the aggregate recoveries for Holders of Senior Subordinated Notes Claims before implementation of the sharing agreements agreed to as part of the settlement with the Creditors Committee. See Article VII.I.* |
|---|---|---|---|
| | | Subject to the occurrence of the Closing pursuant to the terms thereof, its Pro Rata share of the New Value Alternative 15.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan); *or* | |
| | | If any Alternative Acquisition Proposal is approved, each Holder of an Allowed 15.0% Senior Subordinated Notes Claim shall receive (a) its Pro Rata share of the Alternative 15.0% Noteholder Distribution, (b) in the event the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii), Cash in an amount equal to its Pro Rata share of one-third of the Senior Secured New Money Investment Gift (after accounting for the adjustment described in Article III.C.10(b) of the Plan) and (c) in the event Holders of Allowed Class 4A Senior Secured Claims are indefeasibly paid, in full, in Cash, no incremental distribution until Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims receive the full benefit of their Priority Rights and, thereafter its ratable share of any excess Cash distribution, it being understood that any payment that, were it not for the Priority Rights, would have been payable to the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims under Article III.C.7(b)(ii)(c) of the Plan shall instead be made to the Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims in accordance with Article III.C.6(b)(ii)(c) of the Plan; *or* | |
| | | If (A) neither the New Value Alternative nor any Alternative Acquisition Proposal is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, its Pro Rata share of the Stand-Alone Alternative 15.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan); | |
| | | *provided*, *however*, that a distribution to Holders of Allowed 15.0% Senior Subordinated Notes Claims under subclauses (i), (ii) and (iii), above, is contingent on (A) Class 5B voting to accept the Plan and (B) 100% of the Holders of Allowed 11.0% Senior Subordinated Notes Claims agreeing to waive any and all Priority Rights under the Senior Subordinated Notes Indenture; *provided further*, that if either or both of the foregoing conditions are not satisfied, the New Common Stock otherwise available for distribution to Holders of Allowed 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims shall, to the extent Holders of Allowed Senior Secured Claims have not received a 100% Cash recovery on account of their Claims, be distributed to the Holders of Class 4 Allowed Senior Secured Claims, and the Holders of the 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims will not receive any distribution on account of Allowed 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims, as applicable; it being understood, however, that, provided Class 5A and Class 5B vote to accept the Plan, concurrent with such distribution to the Holders of Class 4A Allowed Senior Secured Claims as provided for immediately above, the Holders of Class 4A Allowed Senior Secured Claims shall distribute immediately and irrevocably as a gift from the Holders of Class 4A Allowed Senior Secured Claims to each Holder of an Allowed 15.0% Senior Subordinated Notes Claims that voted to accept the Plan such Holder's Pro Rata share of such distribution. | |
| 5C | ACIH Notes Claims | In exchange for full and final satisfaction, settlement, release and discharge of each Allowed ACIH Notes Claims, each Holder of such Allowed ACIH Notes Claims shall receive, on the Effective Date, Cash in an amount equal to its Pro Rata share of 2.0% of the aggregate amount of all Allowed Class 5C ACIH Notes Claims, which amount shall not exceed an aggregate of $90,000. | • 2.0% |

| 6A | Qualified Unsecured Trade Claims | Except to the extent that a Holder of an Allowed Qualified Unsecured Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Qualified Unsecured Trade Claim, and subject to execution of, and continued performance under, a Qualified Vendor Support Agreement, each Holder of an Allowed Qualified Unsecured Trade Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Qualified Unsecured Trade Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Qualified Unsecured Trade Claim; *provided*, *however*, that Holders of Qualified Unsecured Trade Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims. | 100% |
|---|---|---|---|
| 6B | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive the lesser of (i) $0.04 on account of each dollar of its Allowed General Unsecured Claim, payable from the General Unsecured Claims Distribution Escrow Account and (ii) its Pro Rata share of the amount held in the General Unsecured Claims Distribution Escrow Account; *provided* that in the event (i) the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii) of the Plan or (ii) Holders of Allowed Class 4 Senior Secured Claims are paid, in full, in Cash, then, in each case, the distribution provided for under Article III.C.10(b) of the Plan shall be adjusted to ensure Holders of General Unsecured Claims receive a recovery proportionately comparable to that received by Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims under such circumstances. | • 4.0% |
| 6C | General Unsecured Claims of Atrium Corporation | Holders of General Unsecured Claims of Atrium Corporation shall not receive any distribution on account of such General Unsecured Claims of Atrium Corporation. On the Effective Date, all General Unsecured Claims of Atrium Corporation shall be discharged. | N/A |
| 6D | General Unsecured Claims of ACIH | Holders of General Unsecured Claims of ACIH shall not receive any distribution on account of such General Unsecured Claims of ACIH. On the Effective Date, all General Unsecured Claims of ACIH shall be discharged. | N/A |
| 7 | Section 510(b) Claims | Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. On the Effective Date, all Section 510(b) Claims shall be discharged. | N/A |
| 8 | Intercompany Claims | No distribution shall be made on account of Intercompany Claims. On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine is necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices. | N/A |
| 9 | Intercompany Interests | Intercompany Interests shall be Reinstated on the Effective Date. | N/A |
| 10 | Interests in Atrium Corporation | Holders of Interests in Atrium Corporation shall not receive any distribution on account of such Interests. On the Effective Date, all Interests in Atrium Corporation shall be cancelled and discharged. | N/A |

## II.        IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the joint chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court.  The Debtors believe that the Plan is in the best interests of all stakeholders.  The Debtors urge all Holders of Claims who are entitled to vote on the Plan to vote in favor of the Plan.

**All capitalized terms used but not defined herein will have the meanings provided to them in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan will govern.**

**Unless the context requires otherwise, the words "we," "our" and "us" refer to the Debtors.**

Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement in its entirety, including, without limitation, the Plan, which is annexed hereto as **Exhibit A**, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances with respect to, and Confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement.  Any information, representations or inducements made to obtain acceptance of the Plan, which are inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any Holder of a Claim entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly stated otherwise herein.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the chapter 11 cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to new accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the chapter 11 cases on the Debtors' operations, management and employees, and the risks associated with operating the businesses during the chapter 11 cases;

- customer response to the chapter 11 cases;

- inability to have claims discharged/settled during the chapter 11 cases;

- general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- ability to implement cost reduction and market share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- the financial condition of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters; and

- inability to implement the Debtors' business plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. WHAT IS CHAPTER 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's debts in accordance with the terms of the confirmed plan.

**B.      WHY ARE THE DEBTORS SENDING ME THIS DISCLOSURE STATEMENT?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      AM I ENTITLED TO VOTE ON THE PLAN? WHAT WILL I RECEIVE FROM THE DEBTORS IF THE PLAN IS CONSUMMATED?**

Your ability to vote and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold. A summary of the Classes of Claims and Interests (each, a category of Holders of Claims or Interests as set forth in Section VII of this Disclosure Statement and Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, which we refer to as a "*Class*") and each Class's voting status are set forth below.

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against, and Interests in, each of the Debtors.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | DIP Claims | Not Impaired | Deemed to Accept |
| 2 | Priority Non-Tax Claims | Not Impaired | Deemed to Accept |
| 3 | Other Secured Claims | Not Impaired | Deemed to Accept |
| 4A | Senior Secured Claims | Impaired | Entitled to Vote |
| 4B* | Swap Contract Claims | Impaired | Entitled to Vote |
| 5A | 11.0% Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 5B | 15.0% Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 5C | ACIH Notes Claims | Impaired | Entitled to Vote |
| 6A | Qualified Unsecured Trade Claims | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | General Unsecured Claims of Atrium Corporation | Impaired | Deemed to Reject |
| 6D | General Unsecured Claims of ACIH | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Not Impaired / Impaired | Deemed to Accept / Deemed to Reject |
| 9 | Intercompany Interests | Not Impaired | Deemed to Accept |
| 10 | Interests in Atrium Corporation | Impaired | Deemed to Reject |

* Swap Contract Claims shall be treated as a separate Class under the New Value Alternative and any Alternative Acquisition Proposal; however, to the extent the Stand-Alone Alternative is implemented, Swap Contract Claims shall be treated as Class 4A Senior Secured Claims in accordance with Article III.C.4(c)(iii).

**For more information about the treatment of Claims and Interests *see* "Description of the Joint Plan of Reorganization," which begins on page 26.**

**D.** **WHAT HAPPENS TO MY RECOVERY IF THE PLAN IS NOT CONFIRMED OR DOES NOT GO EFFECTIVE?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated under the Plan could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. It is possible that any alternative may or may not provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. Moreover, non-Confirmation of the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of this or of a liquidation scenario, see "Confirmation of the Plan" beginning on page 93, and the Liquidation Analysis attached as **Exhibit E** to this Disclosure Statement.

**E.** **IF THE PLAN PROVIDES THAT I GET A DISTRIBUTION, DO I GET IT UPON CONFIRMATION OR WHEN THE PLAN GOES EFFECTIVE, AND WHAT DO YOU MEAN WHEN YOU REFER TO "CONFIRMATION," "EFFECTIVE DATE" AND "CONSUMMATION?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be Consummated. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully Consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter. *See* "Solicitation and Voting Procedures," which begins on page 90, for a discussion of the conditions to Consummation.

**F.** **WHERE IS THE CASH REQUIRED TO FUND THE PLAN COMING FROM?**

As explained below, the Plan contemplates Consummation of either the New Value Alternative or the Stand-Alone Alternative. The New Value Alternative will provide Cash to the Reorganized Debtors in the form of the New Money Investment and the New Value Alternative Loans. Any Cash distribution contemplated under the Plan in connection with the New Value Alternative will be satisfied with Cash on hand or the New Money Investment. The Stand-Alone Alternative does not contemplate any new investment, but instead the conversion of Senior Secured Claims into the New Senior Secured Term Loans and 96% of the New Common Stock. Any distribution under the Plan in connection with the Stand Alone Alternative will be satisfied with Cash on hand. *See* "Description of the Joint Plan of Reorganization," which begins on page 26.

**G.** **ARE THERE RISKS TO OWNING AN INTEREST IN ATRIUM CORPORATION UPON EMERGENCE FROM BANKRUPTCY?**

Yes. Please see "Risk Factors," which begins on page 81.

**H.** **IS THERE POTENTIAL LITIGATION RELATED TO THE PLAN?**

Yes. In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims or Interests if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. For a more detailed discussion, see "Risk Factors — The Debtors May Not Be Able to Obtain Confirmation of the Plan," beginning on page 81.

**I.** **WHAT ARE THE CONTENTS OF THE SOLICITATION PACKAGES TO BE SENT TO CREDITORS WHO ARE ELIGIBLE TO VOTE ON THE PLAN?**

All parties in interest will receive notice of the Confirmation Hearing. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices to be sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are available for viewing by any party free of charge at: http://www.atriumrestructuring.com.

**J.      WILL THERE BE RELEASES GRANTED TO PARTIES IN INTEREST AS PART OF THE PLAN?**

Yes.  As of the Effective Date of the Plan, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the chapter 11 cases, proceedings in Canada pursuant to the Companies' Creditors Arrangement Act (the "*CCAA Proceedings*"), the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the chapter 11 cases and the CCAA Proceeding, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, including any documents compiled in connection with either the New Value Alternative or the Stand-Alone Alternative, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.

Holders entitled to vote to accept or reject the Plan will have the opportunity to "opt-out" of the release provisions included in the Plan as part of the Ballot or Note Ballot (each as defined below) submitted to the Debtors.

**K.      WHAT IS THE DEADLINE TO VOTE ON THE PLAN?**

4:00 p.m. (prevailing Eastern Time) on [_____].

**L.      HOW DO I VOTE FOR OR AGAINST THE PLAN?**

This Disclosure Statement, accompanied by a ballot ("*Ballot*"), note ballot ("*Note Ballot*") or master note ballot ("*Master Note Ballot*") to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan.  If you are a Holder of Claims or Interests in Classes 4A, 4B, 5A, 5B, 5C, 6A or 6B, you may vote for or against the Plan by completing the Ballot or Note Ballot and returning it in the envelope provided.

The Debtors, with the approval of the Bankruptcy Court, have engaged The Garden City Group, Inc. to serve as the voting agent for claims and generally oversee the voting process (the "*Voting and Claims Agent*").  The Voting and Claims Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

**BALLOTS**

Ballots and Master Ballots must be **actually received** by the Voting and Claims Agent by the voting deadline of 4:00 p.m. (prevailing Eastern Time) on [_____] at the following address:

*If sent by first class mail:*

The Garden City Group, Inc.
Balloting Agent for Atrium Corp., et al.
P.O. Box 9576
Dublin, Ohio 43017-4876

*If sent by hand delivery or overnight courier:*

The Garden City Group, Inc.
Balloting Agent for Atrium Corp., et al.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a Master Ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

**(866) 405-2137**

More detailed instructions regarding how to vote on the Plan are contained on the Ballots and Note Ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your Ballot or Master Note Ballot must be completed, signed and actually received by 4:00 p.m. (prevailing Eastern Time), on [_____].

Any Ballot or Note Ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each Holder of a Claim may cast only one Ballot or Note Ballot per each Claim held. By signing and returning a Ballot or Note Ballot, each Holder of a Claim in Classes 4A, 4B, 5A, 5B, 5C, 6A and 6B will certify to the Bankruptcy Court and the Debtors that no other Ballots or Note Ballots with respect to such Claim have been cast or, if any other Ballots or Note Ballots have been cast with respect to such Class of Claims, such earlier Ballots and Note Ballots are thereby superseded and revoked.

All Ballots and Note Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot or Note Ballot. For information regarding voting by nominees, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 90.

**M.      WHY IS THE BANKRUPTCY COURT HOLDING A CONFIRMATION HEARING?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

### N. WHEN IS THE CONFIRMATION HEARING SET TO OCCUR?

The Bankruptcy Court has scheduled the Confirmation Hearing for [_____] to take place at [_____] (prevailing Eastern Time) before the Honorable [Judge], United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, Third Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties in interest, by no later than [_____] at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**, they may not be considered by the Bankruptcy Court.

The Debtors will publish notice of the Confirmation Hearing, which will include the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The Wall Street Journal* to provide notification to those persons who may not receive direct notice by mail.

### O. WHAT IS THE PURPOSE OF THE CONFIRMATION HEARING?

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, and any creditor or interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### P. WHAT ROLE DOES THE BANKRUPTCY COURT PLAY AFTER THE CONFIRMATION HEARING?

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the chapter 11 cases and the Plan. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to Holders of Claims are accomplished pursuant to the Plan.

### Q. WHAT IS THE EFFECT OF THE PLAN ON THE DEBTORS' ONGOING BUSINESS?

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. The Debtors will continue to operate their business going forward and implement their business plan.

### R. WILL ANY PARTY HAVE SIGNIFICANT INFLUENCE OVER THE CORPORATE GOVERNANCE AND OPERATIONS OF THE REORGANIZED DEBTORS?

Yes. In the event that the New Value Alternative is implemented, the Plan Investor (or in the event an Alternative Acquisition Proposal is implemented, the Alternative Plan Investor) will hold 92.5% of the New Common Stock on account of the New Money Investment (or Alternative New Money Investment, if applicable) (subject to dilution on account of the Management Equity Incentive Plan). In connection with the New Value Alternative, the rights of the Holders of New Common Stock in Reorganized Atrium will be set forth in the New Stockholders Agreement.

Absent implementation of the New Value Alternative, the Stand-Alone Alternative contemplates that Holders of Senior Secured Claims will receive 96% of the New Common Stock. As part of the Stand-Alone Alternative, the Senior Secured Lenders will have the ability to appoint the members of the New Board of Atrium Corporation and its subsidiaries. As a result, in connection with the Stand-Alone Alternative, Reorganized Atrium will be controlled by the Senior Secured Lenders.

**S.      WHAT ARE THE IMPLICATIONS OF THE PLAN FOR CREDITORS OF NORTH STAR MANUFACTURING (LONDON) LTD.?**

In addition to being a Debtor in these chapter 11 cases, North Star Manufacturing (London) Ltd. ("**North Star**") has commenced CCAA Proceedings. Claims of creditors of North Star are being dealt with under the Plan in the same manner as Claims of creditors of the other Debtors. Similarly, creditors of North Star will vote on the Plan in the same manner as creditors of the other Debtors.

Notwithstanding the commencement and continuation of the CCAA Proceedings, to receive a portion of any distribution that may be available under the Plan, Holders of Claims against North Star must file Proofs of Claim in the chapter 11 cases. NO SEPARATE CLAIMS PROCESS IS CONTEMPLATED IN THE CCAA PROCEEDINGS FOR CREDITORS OF NORTH STAR.

**T.      DO THE DEBTORS RECOMMEND VOTING IN FAVOR OF THE PLAN?**

Yes. It is the Debtors' opinion and belief that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates refinancing and/or a significant deleveraging, is in the best interest of all creditors, equity holders and parties in interest. Any other alternative, including a sale of substantially all of the Debtors' assets or liquidation under chapter 7 of the Bankruptcy Code, would realize or recognize lesser value than the value to be afforded under the Plan. Thus, the Debtors recommend that Holders of Claims who are entitled to vote on the Plan vote to accept the Plan.

**IV.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW**

**A.      HISTORICAL OVERVIEW**

Founded in 1948 and based in Dallas, Texas, the Debtors are one of the largest manufacturers and distributors of residential windows and patio doors in the United States based on both units sold and revenues. Significantly, the Debtors are one of the few companies in the industry with a national presence.

The Debtors offer a comprehensive product line of aluminum and vinyl windows and patio doors, as well as other complementary building material products, to leading national homebuilders (including Pulte, D.R. Horton and Lennar), one-step distributors (including Norandex-Reynolds (Saint Gobain), McCoy's, BMC West and Ted Lansing) and leading home center retailers (including The Home Depot and Lowe's). The Debtors have built their businesses through market share gains, new product development and operational improvements that have resulted from vertical integration, operational efficiencies and savings from increasing scale. The Debtors have also selectively acquired businesses that strategically add distribution channels and vertical integration opportunities through new product offerings and entry into new geographic markets. The Debtors had approximately $531 million in net sales in 2009, and approximately $611.6 million in net sales in 2008.

**B.      THE DEBTORS' BUSINESS OPERATIONS**

*(i)      Sales and Marketing*

The Debtors' marketing strategy capitalizes on the complementary nature of their distribution channels. Specifically, the Debtors have a multi-channel distribution network that includes one-step, two-step and direct distribution, each as detailed below. This distribution strategy maximizes market penetration and reduces reliance upon any one distribution channel for the sale of products. Further, the Debtors' track record as a manufacturer and distributor of windows and patio doors for more than five decades has allowed them to develop long-standing relationships with key distributors. The Debtors continuously seek to secure the leading distributors in each market, but avoid over-dependence on any single customer. The Debtors also sell to major home center retailers who serve the important function of targeting the remodeling and replacement market segment.

The Debtors' key window and door distribution channels are summarized below:

- The Debtors derived approximately 50.1% of net sales in 2008 and 54.7% in the first eleventh months of 2009 from one-step distribution. One-step distribution involves the sale of the Debtors' windows and patio doors to home centers, lumberyards and retail distributors, which will then sell to homeowners, homebuilders and remodelers/contractors. Though lumberyards and retail distributors are not required to carry the Debtors' products on an exclusive basis, it is not unusual for them to do so.

- The Debtors derived approximately 2.1% of net sales in 2008 and 2.2% in the first eleventh months of 2009 from two-step distribution. Two-step distribution involves the sale of windows and patio doors to a wholesale distributor who then sells the products to home centers, lumberyards and retail distributors. These intermediaries in turn sell the windows and patio doors to homeowners, homebuilders and remodelers/contractors. Wholesale distributors tend to maintain product inventory to service the needs of their client base for small quantities. Two-step distribution is more common where customers generally do not require sufficient volume to purchase directly.

- The Debtors derived approximately 24.1% of net sales in 2008 and 34.1% in the first eleventh months of 2009 from direct distribution. Direct distribution involves the sale of the Debtors' windows and patio doors directly to homebuilders, multi-family builders and remodelers/contractors without the use of an intermediary. Selling direct increases the Debtors' profit margins while at the same time offering builders more favorable pricing. In some high value markets, this channel dominates market share, making direct sales necessary to compete.

Promotional efforts for window and patio door customers are focused on cooperative advertising programs that are offered to certain major customers. These programs generate exposure in customers' local media, including newspaper, radio and television, generating sales at individual locations. The Debtors also invest in in-store displays and kiosks and product knowledge classes for customers' employees to further generate awareness within the stores.

The Debtors market window and patio door products through a sales force consisting of approximately 150 company-employed salaried and commissioned sales representatives and approximately 15 independent commissioned sales representatives. Each division is supported by a sales manager, company sales representatives and, in some cases, independent sales representatives. The sales managers coordinate sales and marketing activities among both company-employed and independent sales representatives.

Customer service plays a key role in the marketing process. One to two week on-time delivery of market-to-order products, order fill rate, consistency of warranty and non-warranty service and flexibility in meeting changing customer requirements have made it possible to build a large and loyal customer base that includes companies such as Pulte, D.R. Horton and Lennar, three of the nation's largest home-builders, The Home Depot and Lowe's, the nation's largest home center retailers, and thousands of independent distributors.

The pricing and product offering strategy focuses on offering the consumer lower price points at acceptable margins. The Debtors execute this strategy in two steps: (a) by having an appropriately designed offering for each region and standardized components to simplify the overall offering and reduce inventory levels; and (b) by offering the market "good", "better" and "best" options within the product offering that provide customers a price point and product that meets their needs. Certain of the products in the offering have been redesigned (with particular emphasis on reducing product costs) to create an offering with three distinct price points. This promotes more "trading up" to higher quality products by the customer and displays a complete product line.

### (ii)  *The Debtors' Product Lines*

The Debtors have consolidated their brand names into the flagship Atrium® brand and the well-known regional brands of HR™, Champion™, Superior, Thermal™ and North Star®. Additionally, the Debtors utilize multi-branding to alleviate channel conflict using such other names as Ellison® and Masterview®. A full product line of windows and patio doors enables the Debtors to differentiate themselves from competitors, leverage multi-channel distribution systems and be well positioned to benefit from shifts in product preferences. Because regional product preferences exist for aluminum and vinyl windows and patio doors, the Debtors work to provide a broad product line that effectively serves their national customer base. In addition, the Debtors serve several of their significant customers through private brand labeling.

### (iii)  *Intellectual Property*

Various trademarks are owned and/or registered by the Debtors in the United States, Canada and Mexico, including the following: Atrium, Atrium Windows and Doors, Applause, Champion Window, DreamGlas, DreamSpace, The French Classic, Improving Your View of the World, Masterview, North Star, Park Avenue, Safe Harbor, Silent Guard and Weatherlok. Among the various pending trademark applications filed by the Debtors are the following: Atrium Wizard, Aspirations, Can Do Attitude, Dynasty, Install Atrium Instill Confidence and UltraGrain. In addition, the Debtors own several patents and patent applications concerning various aspects of window assembly and related processes. The Debtors are not aware of any circumstances that would have a material adverse effect on their ability to use their trademarks and patents. As long as the Debtors continue to renew trademarks when necessary, the trademark protection provided is perpetual. The patents will expire at various times over the next 20 years.

### (iv)  *Business Facilities*

The Debtors' principal executive office is located at 3890 West Northwest Highway, Suite 500, Dallas, Texas 75220. The Debtors operate 18 manufacturing facilities and maintain 37 distribution centers strategically located in 21 U.S. states and Canada. The Debtors also have an agreement with a manufacturing facility in Juarez, Mexico (which is neither owned nor leased by the Debtors). As discussed above, the Debtors distribute through multiple channels, allowing them to reach the greatest number of end-customers and provide nationwide service to those customers.

The Debtors operate on a vertically integrated basis by engaging in a range of activities, including:

- the extrusion of aluminum and vinyl lineals, which are utilized internally in fabrication operations and/or sold to third-parties;

- the manufacture of aluminum screens;

- the manufacture and assembly of window and patio door units, including the cutting and insulation of glass, the pre-hanging of doors and the sale of such units to homebuilders, multi-family builders, remodelers/contractors, home centers, lumberyards and retail distributors;

- a turn-key installation program for multi-family builders in which the Debtors supply and install many of their products, including interior/exterior doors, moldings, hardware, bath accessories and miscellaneous special products under the R.G. Darby brand.

## C.    THE DEBTORS' PREPETITION ORGANIZATIONAL STRUCTURE

The Debtors are privately-held and controlled by Kenner.   The following chart generally depicts the Debtors' prepetition organizational structure and summarizes those entities that are borrowers or guarantors with respect to some or all of the Debtors' outstanding indebtedness:[9]



## D.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

As of December 31, 2009, the Debtors have outstanding secured and unsecured indebtedness totaling approximately $655.9 million.   These obligations include: (a) $383.1 million outstanding under the Senior Secured Credit Agreement (defined below), which is secured by substantially all of the Debtors' assets; (b) $47.9 million outstanding under certain 11.0% unsecured notes due 2012 (the "***11.0% Senior Subordinated Notes***"); and (c) $220.3 million outstanding under certain 15.0% unsecured notes due 2012 (the "***15.0% Senior Subordinated Notes***" and, together with the 11.0% Senior Subordinated Notes, the "***Senior Subordinated Notes***").   Additionally, the Debtor ACIH, Inc. is obligated on $4.6 million outstanding under 11.5% unsecured notes due 2012 (the "***ACIH Notes***").

The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 31, 2009.   Further detail with respect to each debt obligation is provided below.

---

[9]    Atrium Ventanas de Mexico, Atrium Servicios de Mexico, Atrium Funding Corporation and Atrium Funding Corporation II are *not* Debtors in these chapter 11 cases.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of December 31, 2009 | Maturity Date | Security Status |
|---|---|---|---|---|
| Senior Secured Credit Agreement | Revolver: $46 million | Revolver: $34.1 million[10] | May 2011 | Secured |
| | Term Loan: $335 million | Term Loan: $349.0 million | May 2012 | Secured |
| 11.0% Senior Subordinated Notes | $42 million | $47.9 million | December 2012 | Unsecured |
| ACIH Notes | $174 million | $4.6 million[11] | December 2012 | Unsecured |
| 15.0% Senior Subordinated Notes | $186 million | $220.3 million | December 2012 | Unsecured |

*(i)*     ***The Senior Secured Credit Agreement***

On October 15, 2008, Atrium Companies, Inc., as credit agreement issuer, and each of the Debtors (other than Atrium Corporation) as guarantors, GE Business Financial Services, Inc., as agent, GE Capital Markets, Inc. and CIT Capital Securities LLC, as lead arrangers and bookrunners, and CIT Capital Securities LLC, as syndication agent, amended and restated the Old Credit Facility (the "***Senior Secured Credit Agreement***").  The Senior Secured Credit Agreement waived the Debtors' defaults under the prior credit facility, which consisted of a $370 million secured term loan and a $50 million secured revolving credit facility (together, the "***Old Credit Facility***"), while increasing the interest rate thereunder and establishing new financial covenants.

The Senior Secured Credit Agreement includes: (a) a revolving credit facility in the amount of approximately $46 million; (b) a $20 million sublimit for the issuance of letters of credit; (c) a $10 million sublimit for swing line loans; and (d) a term loan facility in the amount of approximately $335 million.  A total of approximately $383.1 million was outstanding under the Senior Secured Credit Agreement as of the Petition Date.

Each of the Debtors (other than Atrium Corporation) unconditionally guaranteed the obligations under the Senior Secured Credit Agreement.  In addition, the obligations under the Senior Secured Credit Agreement, and the obligations of the guarantors under the guarantees, are secured by substantially all of Debtors' assets.  Specifically, the Debtors granted the lenders under the Senior Secured Credit Agreement the following:

- a first priority perfected security interest in all of the capital stock of each of the Debtors (except Atrium Corporation and ACIH, Inc.); and

- a first priority perfected security interest in substantially all other present and future assets and properties, including accounts receivable, inventory, machinery, equipment, contracts, domestic intellectual property, license rights and general intangibles (other than the accounts receivable and other assets that are pledged to secure the A/R Facility, as defined below).

*(ii)*     ***The Swap Agreement***

On December 27, 2007, Atrium Companies, Inc. entered into a swap agreement with Merrill Lynch Capital Services (the "***Swap Contract***").  As of the Petition Date, approximately $4.6 million was due under the Swap Contract, inclusive of accrued and unpaid interest and certain fees, costs, expenses, charges and all other obligations

---

[10]   This includes approximately $12.4 million in issued and outstanding letters of credit.

[11]   In October 2008, the Company exchanged 97.45% of the ACIH Notes for the 15.0% Senior Subordinated Notes and equity warrants.

incurred in connection therewith as provided in the Swap Contract (the "***Swap Contract Claims***"). The Swap Contract Claims are secured by liens on and security interests in substantially all of the Debtors' assets. These liens and interests are of equal priority to the obligations under the Senior Secured Credit Agreement.

### *(v)* **The A/R Facility**

On December 28, 2007, Atrium Companies, Inc., and certain of its subsidiaries entered into an accounts receivable securitization facility for a five year term expiring on December 28, 2012 (the "***A/R Facility***").[12] Pursuant to the A/R Facility, each participating Debtor agreed to sell, on a non-recourse and ongoing basis, a pool of receivables comprising their entire trade receivable portfolio to Atrium Funding Corporation II (the "***SPV***") — a special purpose, bankruptcy-remote entity wholly-owned by Atrium Companies, Inc. Contemporaneously therewith, the SPV entered into an agreement with a group of financial institutions, with General Electric Capital Corporation acting as the administrative agent, pursuant to which the financial institutions agreed to fund advances to the SPV to enable the SPV to purchase receivables from the participating Debtors, subject to certain reserves and eligibility criteria. As a condition to the financial institutions' agreement to fund advances under the A/R Facility, the SPV agreed to assign and pledge all of its right, title and interest in and to the receivables to the administrative agent, for the benefit of the funding financial institutions. The SPV is not a Debtor in these chapter 11 cases.

The Debtors' net accounts receivable balance as of November 30, 2009 includes $12.7 million of retained interests in receivables that have been transferred to the A/R Facility and is net of the obligations of the SPV to the lenders under the A/R Facility. The Debtors filed a motion on the Petition Date to maintain the A/R Facility during the chapter 11 cases, which the Court granted on an interim basis on January 21, 2010 [Docket No. 56], and on a final basis on [_____] [Docket No. ___].

### *(vi)* **The Senior Subordinated Notes**

Atrium Companies, Inc. issued the 11.0% Senior Subordinated Notes and 15.0% Senior Subordinated Notes in October 2008. The Senior Subordinated Notes are governed by the indenture among Atrium Companies, Inc. and each of the other Debtors (except Atrium Corporation) as guarantors, and U.S. National Bank Association, as trustee, dated October 15, 2008 (the "***Senior Subordinated Notes Indenture***"). The Senior Subordinated Notes, which mature on December 15, 2012, are jointly and severally, absolutely and unconditionally guaranteed by each of the Debtors in these chapter 11 cases, except Atrium Corporation.

In the event of any distribution or payment that would otherwise be made in respect of the 11.0% Senior Subordinated Notes or the 15.0% Senior Subordinated Notes (other than regularly scheduled payments of interest, whether in the form of cash or payment-in-kind interest), including, without limitation, any distribution or payment that is made in connection with any refinancing or recapitalization of Atrium Companies, Inc., upon the sale of all or any part of the assets of Atrium Companies, Inc. or any of its subsidiaries or the winding up of their affairs (including pursuant to an event of liquidation under chapter 7 or chapter 11 of the United States Bankruptcy Code, state law, or otherwise), holders of the 11.0% Senior Subordinated Notes are entitled to receive, in the aggregate, (a) prior to December 15, 2011, an amount equal to 75% of the aggregate principal amount of, and unpaid interest on, the 11.0% Senior Subordinated Notes (the "***Prior Payment Amount***") and (b) on or after December 15, 2011, the Prior Payment Amount as of December 15, 2011, before holders of the 15.0% Senior Subordinated Notes are entitled to receive all or any portion of any such distribution or payment. Thereafter, any distribution to the holders of the 15.0% Senior Subordinated Notes and the 11.0% Senior Subordinated Notes is pro rata in accordance with otherwise applicable law and the terms of the Senior Subordinated Notes Indenture.

---

[12] The Debtor entities party to the A/R Facility are: Aluminum Screen Manufacturers, Inc., Atrium Door and Window Company - West Coast, Atrium Door and Window Company of Arizona, Atrium Door and Window Company of the Northeast, Atrium Door and Window Company of the Northwest, Atrium Door and Window Company of the Rockies, Atrium Extrusion Systems, Inc., Atrium Florida, Inc., Atrium Vinyl, Inc., Atrium Windows and Doors of Ontario, Inc., Superior Engineered Products Corporation, and Thermal Industries, Inc.

Atrium Corporation is a signatory to only one provision of the Senior Subordinated Notes Indenture, pursuant to which holders of the majority in principal amount of the 15.0% Senior Subordinated Notes are entitled to appoint one director and one observer to Atrium Corporation's Board of Directors, and holders of the majority in principal amount of the 11.0% Senior Subordinated Notes are entitled to appoint one observer to Atrium Corporation's Board of Directors.

### (vii)    *The ACIH Notes*

ACIH, Inc. issued the ACIH Notes in December 2004. The ACIH Notes are governed by an indenture between ACIH, Inc., as issuer and U.S. National Bank Association as trustee dated as of December 28, 2004 (as amended from time to time, the "***ACIH Notes Indenture***"). Pursuant to the October 2008 restructuring, 97.4% of the ACIH Notes were exchanged for the 15.0% Senior Subordinated Notes and ACIH Warrants (defined below). With respect to the unexchanged ACIH Notes, the ACIH Notes Indenture is still in effect; however, pursuant to a ninth supplemental indenture, between ACIH, Inc. and U.S. National Bank Association dated as of October 15, 2008, many operative provisions with respect to events of default and covenants for the ACIH Notes have been eliminated.

### (viii)    *Preferred Stock*

Atrium Corporation has three classes of preferred stock: Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, all of which are convertible into common stock (described below). For the Series A Preferred Stock, 55,656 shares are authorized and outstanding. All outstanding shares of Series A Preferred Stock were issued to KAT CP Coinvestment, LLC pursuant to a purchase agreement executed in March 2007. There are 478,087 authorized shares of Series B Preferred Stock, all of which are outstanding and held by KAT CP Coinvestment - Series B, LLC. There are 95,617 authorized shares of Series C Preferred Stock, of which 19,938 are outstanding. Highland Crusader Offshore Partners LP holds 13,118 of these shares and Highland Credit Opportunities CDO, Ltd. holds the remaining 6,820 shares.

The holders of Series B Preferred Stock own 50% of the capital stock of Atrium Corporation on a fully diluted basis. Upon the exercise of all of the ACIH Warrants, the issuance of the Series C Preferred Stock and the conversion thereof into common stock, holders of the ACIH Warrants would own 10% of the common stock of Atrium Corporation on a fully diluted basis.

The Series A Preferred Stock ranks senior to the common stock but ranks junior to the Series B Preferred Stock and Series C Preferred Stock with respect to dividend preference and ranking upon the liquidation, dissolution or winding up of Atrium Corporation. The Series B Preferred Stock and Series C Preferred Stock rank pari passu with each other in all respects (except that Atrium Corporation has the right to redeem the Series C Preferred Stock) and are senior to all other classes of Atrium Corporation's capital stock, including the Series A Preferred Stock.

### (ix)    *Warrants*

In connection with the Debtors' October 2008 restructuring, holders of the ACIH Notes were offered warrants entitling such holders to receive a specified number of fully paid and non-assessable shares of Series C Preferred Stock of Atrium Corporation (the "***ACIH Warrants***"). The ACIH Warrants, whose exercise price is subject to adjustment, entitle holders of the ACIH Warrants to purchase Series C Preferred Stock convertible, in the aggregate, into ten percent of the outstanding common stock of Atrium Corporation. As of the Petition Date, ACIH Warrants for the purchase of 75,679 shares of Series C Preferred Stock are outstanding.

### (x)    *Common Stock*

Atrium Corporation has 2,500,000 authorized shares of common stock. As of the Petition Date, 308,861.46 shares were outstanding. The largest shareholder is ATR Acquisition, LLC (a Kenner-affiliated entity) with 251,453.72 shares, followed by Kenner Equities IV, L.P. (also a Kenner-affiliated entity) with 41,176.47 shares and ML Global Private Equity Fund, L.P. with 10,646.279 shares. Several individuals affiliated with Atrium Corporation each hold a small number of shares.

## V. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

A number of factors have contributed to the Debtors' decision to commence these chapter 11 cases. Although the Debtors' business is operationally sound, the Debtors' substantial funded debt burden, together with the sustained downturn in the U.S. homebuilding and home improvement sector, has impaired the Debtors' ability to meet their debt obligations on a current basis.

### A. THE DEBTORS' SUBSTANTIAL FUNDED DEBT BURDEN

As of the Petition Date, the Debtors have $655.9 million in indebtedness, greater than 12 times the Debtors' estimated 2009 EBITDA. At this level of indebtedness, essentially all cash flow from operations must be dedicated to servicing debt, thereby straining operational flexibility and significantly restricting growth opportunities.

### B. DETERIORATION IN ECONOMIC CONDITIONS

A severe economic recession, which was triggered by a collapse in housing prices, a credit crunch and diminished levels of demand, has had a debilitating impact on the Debtors' businesses. The recession left a large inventory of houses, but deprived individuals of the resources to purchase them, thereby dampening housing demand. As housing demand subsided, so did demand for the Debtors' products. Economic insecurity has curtailed individuals' home remodeling plans, further hurting the Debtors' bottom line. The depressed revenues from this economic slowdown impede the Debtors' ability to both service their debt obligations and invest in the capital and labor necessary for their businesses to succeed.

The extent of the housing downturn illuminates the Debtors' difficulties. "Housing starts" (*i.e.*, the number of residential building construction projects that have begun during a particular time period) fell almost 13% from 2.07 million in 2005 to 1.8 million in 2006.[13] In addition, sales in connection with repair, renovation and remodeling weakened in the United States in 2006 compared with 2005. The housing market downturn in the United States intensified during 2007, with housing starts in 2007 falling almost 25% (from the 2006 rate) to 1.4 million, and continued during 2008, with housing starts in 2008 falling over 33% (from the 2007 rate) to approximately 904,000. Total single-family housing starts in 2009 are projected to further decline by 40% from 2008 levels. In total, housing starts have fallen from 2.07 million in 2005 to approximately 554,000 in 2009 — a precipitous decline of nearly 70%.

### C. THE DEBTORS' PREPETITION RESTRUCTURING INITIATIVES

In response to deteriorating economic conditions, in 2008 the Debtors restructured their debt obligations and began streamlining their operations.

#### (i) The 2008 Restructuring

Before October 2008, and in addition to obligations outstanding under the Old Credit Facility, the Debtors also had outstanding $174 million of ACIH Notes and $40 million of 12% senior subordinated notes due August 20, 2012 (the "***Old Senior Subordinated Notes***"). Further economic deterioration in 2008 prevented the Debtors from satisfying their obligations under the Old Credit Facility, the ACIH Notes and the Old Senior Subordinated Notes on a current basis.

To prevent their overleveraged balance sheet from jeopardizing ongoing business operations, the Debtors (i) amended the Old Credit Facility to increase the interest rate thereunder from LIBOR plus 3.75% to LIBOR plus 5.00% for the first two years and then LIBOR plus 9.50% thereafter; (ii) exchanged all of the Old Subordinated Notes for the 11.0% Senior Subordinated Notes; and (iii) exchanged 97.4% of the ACIH Notes for the 15.0% Senior

---

[13] "Housing starts" are considered a leading indicator in the United States housing market. The United States Census Bureau and the United States Department of Housing and Urban Development jointly publish a monthly report on housing starts entitled the *New Residential Construction Report*.

Subordinated Notes and the ACIH Warrants. In addition, Kenner agreed to make a $50 million investment ($40 million of which was used to pay down secured debt under the Old Credit Facility).

### (ii) *Cost Reduction Initiatives*

In direct response to the weakened U.S. housing and building products markets, and in connection with their balance sheet restructuring efforts, the Debtors have taken significant steps to reduce costs. These initiatives have included: internal operational restructuring and other efficiency initiatives; product rationalization; consolidation of manufacturing operations in North Texas; the closing of branches in Florida; the closure of a facility in Shelton, Connecticut; the consolidation of manufacturing facilities in Tolleson, Arizona and Anaheim, California; and the transfer of manufacturing capacity in Jacksonville, Florida to North Texas. Further, Superior Engineered Products Corporation, a Debtor based in Ontario, California, completed the sale of its non-core millwork division in December 2009, and the Debtor Atrium Florida, Inc. recently completed the sale of its hurricane shutter division.

As part of this operational restructuring, the Debtors have also reduced their workforce to better align their labor supply with the diminished demand resulting from the sustained downturn. Since 2006, headcount has been reduced from a peak of approximately 7,300 employees, on a pro forma basis, to 3,990 employees as of November 30, 2009.

In total, the forgoing cost-cutting initiatives generated approximately $34.8 million in savings in 2007, $35.0 million in 2008 and are expected to generate over $30 million in savings in 2009.

### D. THE RESTRUCTURING AND LOCK-UP AGREEMENT

The Debtors and certain senior secured lenders (the "**Consenting Lenders**") entered into the Lock-Up Agreement on January 20, 2010. The Lock-Up Agreement sought to ensure that the Debtors moved forward with the Plan process as expeditiously as possible, and at the same time bound the Consenting Lenders to support the Plan if the Debtors were successful in taking the steps necessary to meet the milestone deadlines included therein. Specifically, the Consenting Lenders agreed to vote their Senior Secured Claims in favor of the Plan and refrain from taking any actions that would interfere with, postpone or delay the implementation of the Plan, so long as the Debtors were pursuing the Plan on an agreed-upon timeline:

The Lock-Up Agreement further provided that the Debtors, along with its financial advisor, Moelis, would conduct a thorough marketing process to non-affiliate bidders in connection with the New Value Alternative and Stand-Alone Alternative. In connection therewith, Moelis was responsible for providing status reports of the marketing process to the Consenting Lenders. Additionally, the Lock-Up Agreement codified that the New Value Alternative was subject in all respects to higher and better offers.

Notwithstanding their agreement to support the Plan pursuant to the terms of the Lock-Up Agreement, in the event the Lock-Up Agreement terminated, and neither the New Value Alternative nor Stand-Alone Alternative was consummated, the Consenting Lenders reserved all of their rights to seek a 100% recovery on account of their Senior Secured Claims prior to the Debtors making any distribution to junior classes of creditors. It being understood and agreed that nothing in the Lock-Up Agreement, directly or indirectly, by implication or otherwise, is intended to waive any such rights.

The Consenting Lenders have indicated that they believe that the Lock-Up Agreement terminated by its own terms on March 16, 2010. Nonetheless, the Consenting Lenders support the Plan.

## VI. INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF

On the Petition Date, the Debtors filed several motions seeking authorization to pay certain prepetition claims and ensure that the Debtors' businesses are stabilized after the commencement of the chapter 11 cases. Among other things, these orders authorized the Debtors to: (a) obtain postpetition financing [Docket No. 57]; (b) pay and honor all prepetition obligations associated with employee obligations and continue to pay wages and honor employee benefit programs, within certain limitations imposed by the Bankruptcy Code [Docket No. 259]; (c) honor customer obligations and continue certain customer obligations and practices [Docket No. 52]; (d) pay sales, use,

gross receipts, franchise, business and other taxes incurred or collected by the Debtors from their customers [Docket No. 283]; (e) continue to operate the cash management system [Docket No. 46]; (f) pay critical vendors and service providers and 503(b)(9) claimants [Docket No. 256]; and (g) provide adequate assurance to utility providers and ensure that utility service will not be altered, refused or discontinued [Docket No. 306].

## VII.  SIGNIFICANT DEVELOPMENTS SINCE THE PETITION DATE

### A.  ENTRY OF FINAL ORDER OF RELIEF IN THE BANKRUPTCY COURT

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilize their operations and preserve and restore their relationships with vendors, customers, employees, landlords and utility providers.  To that end, the Debtors sought and obtained a number of Bankruptcy Court orders to minimize disruption to their operations and facilitate the administration of these chapter 11 cases.  To date, the Bankruptcy Court has entered final orders for relief with respect to the following motions briefly summarized below:

#### (i)  Motion for Joint Administration of the Chapter 11 Cases

On January 21 2010, the Bankruptcy Court entered a final order directing joint administration of each of the 20 Debtor's respective chapter 11 cases for procedural purposes only [Docket No. 58].

#### (ii)  Motions to Enter into the DIP Facility and Approval of the Accounts Receivable Facility

##### a.  The DIP Facility

On March [17], 2010, the Bankruptcy Court entered a final order authorizing the Debtors to enter into a $40 million senior secured priming and superpriority delayed draw term loan credit facility (the "*DIP Facility*"). The Debtors used the proceeds of the DIP Facility to provide working capital for, and for other general corporate purposes of, the Debtors, including the payment of certain costs and expenses associated with these chapter 11 cases.  In connection with their entry into the DIP Facility, the Debtors granted to the DIP Agent, for the benefit of itself and the other DIP Lenders, senior liens on substantially all of the Debtors' assets pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code and superpriority administrative claims to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code.  The DIP Order also provided adequate protection to the Holders of Senior Secured Claims under the Senior Secured Credit Agreement.

##### b.  The Accounts Receivable Facility

On March 17, 2010, the Bankruptcy Court authorized the Debtors to enter into an amendment and waiver to certain securitization agreements and the financing made available thereby on a final basis (the "*A/R Facility*"). The A/R Facility is a crucial source of liquidity for the Debtors, allowing them to quickly convert their receivables into cash, eliminating the risk of non-collection in waiting for accounts to mature and the attendant costs of engaging in collection efforts.

#### (iii)  Motion to Pay Employee Wages and Benefits

On February 22, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to (a) pay certain prepetition wages, salaries, unpaid bonuses and other compensation, reimbursable employee expenses, severance obligations and employee medical and similar benefits and (b) continue their workers' compensation program [Docket No. 259].  The order also authorized the Debtors to remit any outstanding payroll taxes or deductions to the appropriate third-party or taxing authority.  Finally, the order modified the automatic stay, allowing all workers' compensation claims, both pre- and postpetition to proceed in the appropriate judicial or administrative forum.

*(iv)*        **Motion to Pay Taxes and Fees**

On February 23, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay sales taxes, use taxes, franchise taxes, licensing and permit fees and Canadian taxes in the ordinary course of business, without regard to whether the taxes or fees accrued or arose before the Petition Date [Docket No. 283].

*(v)*        **Motion to Continue Prepetition Insurance Coverage**

On February 23, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to continue making payments related to prepetition insurance policies, to maintain financing of insurance premiums under agreements with financial providers entered into prepetition, to maintain funding for a letter of credit that covers the Debtors' deductibles under certain insurance policies and to maintain funding for insurance brokers that provide services related to the Debtors' various insurance policies [Docket No. 282].

*(vi)*        **Critical Vendors and 503(b)(9) Administrative Claims**

On February 22, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay the prepetition claims of certain critical vendors and the holders of certain administrative claims in accordance with a Court-approved procurement policy [Docket No. 256]. The Debtors sought authority to pay these Claims because of the substantial harm that would potentially be suffered in the event that certain vendors ceased providing goods and services. Additionally, because a large percentage of critical vendor claims were also entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and to alleviate the burden of dealing with 503(b)(9) claimants in a piecemeal fashion through motions filed with the Bankruptcy Court, the Debtors sought the authority to pay such administrative claims on their own initiative upon the execution of a vendor agreement, ensuring that critical vendors and 503(b)(9) claimants continue providing goods and services to the Debtors on customary trade terms. The order provides for a $7.5 million cap for the aggregate amount of payments made on account of critical vendor and 503(b)(9) claims. Additionally, the order requires that the Debtors obtain the consent of the Creditors' Committee (as defined below) before making any payment to a critical vendor or 503(b)(9) claimant in excess of $55,000 on an aggregate basis. To date, the Debtors have paid or agreed to pay a total of approximately $5.3 million on account of critical vendor and 503(b)(9) claims.

**(vii)**        **Motion to Prohibit Utilities from Terminating Service**

On February 25, 2010, the Bankruptcy Court entered a final order prohibiting the Debtors' utility providers from altering, refusing or discontinuing utility services to the Debtors solely on the basis of the commencement of these chapter 11 cases or a debt owed by the Debtors to such utility for services rendered before the order for relief that was not paid when due [Docket No. 306]. The order also required the Debtors to deposit $405,000 into an interest-bearing, newly created, segregated account to be held in escrow for the purpose of providing each utility provider adequate assurance of payment of its postpetition utility services to the Debtors.

*(viii)*        **Motion to Administer and Honor Customer Programs**

On January 21, 2010, the Bankruptcy Court entered an order authorizing the Debtors to maintain and administer customer-related programs, including warranty programs, rebate programs, allowance programs and payment terms discount programs as well as authorizing them to make payments to customers or otherwise honor accrued prepetition obligations incurred by the Debtors under their customer programs [Docket No. 52]. The Debtors believe that any failure to continue the customer programs and honor the related obligations could erode hard-earned brand loyalty and customer goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful reorganization. Additionally, in connection therewith, entered an order supplementing the first customer programs-related order authorizing the Debtors to remit certain customer overpayments in the ordinary course of business on March [17], 2010.

<p style="text-align:center"><em>(ix)</em>      **Motion to Establish Notification and Hearing Procedures with Respect to Certain Equity Securities**</p>

On February 23, 2010, the Bankruptcy Court entered a final order establishing procedures to restrict trading in certain of equity securities issued by the Debtors in order to protect the Debtors' ability to use certain related tax attributes to their benefit in future tax years [Docket No. 312].

<p style="text-align:center"><em>(x)</em>      **Motion to Pay Prepetition Claims of Shippers, Warehousemen, Processors and Lien Claimants**</p>

On February 23, 2010, the Bankruptcy Court entered a final order authorizing the Debtors to pay the prepetition claims of certain holders of possessory and statutory liens against certain of the Debtors' goods and property [Docket No. 284]. Additionally, the Debtor were also authorized to pay prepetition claims of logistics coordinators who work with the shippers and warehousemen to transport and store various goods and materials used in the Debtors' businesses. Without payment of such claims, it would be highly unlikely the Debtors will receive possession of certain goods and property, and, as such, any failure by the Debtors to satisfy such claims related to the shipping and transport of goods could have had a material adverse impact on the Debtors' businesses. The order established a $1,750,000 cap as the aggregate amount that could be paid on account of such lien Claims.

<p style="text-align:center"><em>(xi)</em>      **Motion to Implement Procedures to Administer Cross-Border Insolvency Proceeding**</p>

On February 25, 2010, the Bankruptcy Court entered a final order approving the implementation of customary cross-border protocol governing procedures for, among other things, court-to-court communications and obtaining approval for matters requiring approval by both this Court and the Canadian Court administering Debtor North Star Manufacturing (London) Ltd.'s CCAA Proceeding [Docket No. 297].

## B.      APPLICATIONS TO RETAIN PROFESSIONALS

To assist the Debtors in carrying out their duties as debtors in possession and to represent the Debtors' interests in these chapter 11 cases, the Debtors retained the following professionals: Kirkland & Ellis LLP as their bankruptcy counsel [Docket No. 300]; Klehr Harrison Harvey Branzburg LLP as their co-counsel [Docket No. **###**]; Moelis & Company LLC as financial advisor and investment banker [Docket No. **###**]; Deloitte & Touche LLP as independent auditors [Docket No. 301]; PricewaterhouseCoopers LLP as Tax Advisor [Docket No. 295]; Deloitte Financial Advisory Services LLP as bankruptcy administrative services provider [Docket No. 299]; and The Garden City Group as noticing, claims and balloting agent [Docket No. 47]. On February 25, 2010, the Bankruptcy Court entered a final order approving procedures for the payment of compensation for professional services rendered and reimbursement of expenses incurred by attorneys and other professionals who are required to file retention applications pursuant to sections 330 and 331 of the Bankruptcy Code [Docket No. 298].

In addition, on February 25, 2010, the Bankruptcy Court entered a final order approving procedures to retain and compensate certain professionals and professional service providers of the Debtors utilized in the ordinary course of business [Docket No. 294].

## C.      THE CREDITORS' COMMITTEE

On February 8, 2010, the U.S. Trustee appointed the following entities to Creditors' Committee pursuant to section 1102 of the Bankruptcy Code:

- U.S. Bank National Association, as Indenture Trustee for the 11.0% Senior Subordinated Notes;

- Wells Fargo Bank, N.A., as Successor Indenture Trustee for the 15.0% Senior Subordinated Notes;

- Ryder Truck Rental, Inc.;

- Corporate Property Associates 14, Inc.; and

- Tower-Square Capital Partners II, LP.

The Creditors' Committee retained Otterbourg, Steindler, Houston & Rosen, P.C. as lead co-counsel, Landis Rath & Cobb LLP as co-counsel and FTI Consulting, Inc. as financial advisor.

### D.    THE AD HOC GROUP OF SENIOR SECURED LENDERS

On February 19, 2010, the Ad Hoc Group of Senior Secured Lenders, comprised of an informal group of fund and investment advisors and managers of certain funds that, in some cases, hold both Senior Secured Claims and 15.0% Senior Subordinated Notes Claims, filed a verified statement pursuant to Bankruptcy Rule 2019 identifying the respective names, addresses and claim amounts of each of the members of the Ad Hoc Group of Senior Secured Lenders. The members of the Ad Hoc Group of Senior Secured Lenders include the following:

- Highland Capital Management, L.P., which holds (i) an aggregate principle amount of term loans under the Senior Secured Credit Agreement totaling $93,998,827.63 and (ii) an aggregate principal amount of the 15.0% Senior Subordinated Notes totaling $45,937,563.70;

- Capital Research and Management Company, which holds (i) an aggregate principal amount of term loans under the Senior Secured Credit Agreement totaling $64,541,364.27 and (ii) an aggregate principal amount of the 15.0% Senior Subordinated Notes totaling $65,532,206.00; and

- D.E. Shaw Laminar Portfolios, L.L.C. , which holds an aggregate principal amount of term loans under the Senior Secured Credit Agreement totaling $34,514,635.85.

### E.    STATEMENT AND SCHEDULES

On January 19, 2010, each of the 20 Debtors filed their statements of financial affairs and schedules of assets and liabilities (collectively, the "***Schedules and Statements***"). The Schedules and Statements represent a diligent effort by the Debtors and their professionals to comprehensively and accurately disclose all manner of information including all known creditors and claims against the Debtors (both secured and unsecured), the nature and value of the Debtors' assets, the identities of board members and other insiders and distributions made thereto, all executory contracts to which the Debtors are a party, any known pending litigation, the identities of individuals with access to the Debtors' financial information and existing bank accounts and related balances.

### F.    STAY PROCEEDINGS

As described in section VIII.B.(x).b. of this Disclosure Statement, the Debtors are subject to various prepetition litigation claims and lawsuits. The Debtors are vigorously defending themselves in each of these matters. Additionally, in certain instances, the Debtors have taken action during the course of the chapter 11 cases to extend the automatic stay provided in section 362 of the Bankruptcy Code to extend the stay to the litigation Claims described below.

#### (i)    *General Liability/Construction Defect Litigation*

##### a.    Property Damage Cases.

Certain of the Debtors are defendants (or third-party defendants) in approximately 125 lawsuits in various jurisdictions in the United States in which homeowners have alleged defects in their homes resulting from, among other things, defects associated with the Debtors' products (collectively, the "***Property Damage Cases***"). In some of the Property Damage Cases, the Debtors had previously entered into contracts with certain contractors (the "***Contractor Co-Defendants***") for their use of the Debtors' products in the residential developments at issue. These contracts included indemnification provisions which, although the phrasing of the provisions varies among

contractors, provide for indemnification against, among other things, claims for property damage against the contractors.

The Debtors have reserved all rights as to the scope and applicability of these indemnification provisions under the particular circumstances in which they have been, or will be, invoked. In light of these indemnification provisions, however, the Debtors have sought to extend the automatic stay provided in section 362 of the Bankruptcy Code in certain of these actions to apply to the Contractor Co-Defendants insofar as claims were being asserted in the suits relating to the Debtors' products, which could potentially implicate the indemnification provisions in the contracts. Specifically, the Debtors have sought to extend the automatic stay to the Contractor Co-Defendants in the following actions: *Adams, et al. v. Del Webb Communities, Inc.*, Case No. CV2008-008310 (arbitration pending in Arizona); *Zelkind, et al. v. Del Webb Communities, Inc. et al.*, Case No. 2008-CV-008310 (Super. Ct., Maricopa County, Ariz.); *Del Webb Communities, Inc., et al. v. Atrium Door & Window Company of Arizona*, Case No. CV2008-003089 (Super. Ct. Ariz., Maricopa County, Ariz.); *Barbarino, et. al v. D.R. Horton, Inc., et al.*, Case No. A546015 (Dist. Ct., Clark County, Nev.); *Bear Valley Park Condominium Association, Inc. v. BVPC, LLC, et al.*, Case No. 2008CV335 (Dist. Ct., Denver County, Colo.); *Lakeview Estates Condominium Association, Inc., v. Fairfield Homes at Lakeview, LLC, et al.*, Case No. 08CV2373 (Dist. Ct., Jefferson County, Colo.); *Mason, et al. v. Beazer Home Sales Arizona, Inc., et al.*, Case No. CV2008-007719 (Super. Ct., Maricopa County, Ariz.); and *Trails at Parkfield Lake Condominium Association v. Memphis Street, LLC, et al.*, Case No. 2008CV5166 (Dist. Ct., Denver County, Colo.). On February 5, 2010, the Bankruptcy Court entered a temporary restraining order enjoining litigation against the Contractor Co-Defendants until a hearing on the preliminary injunction could be held. A hearing on the preliminary injunction is scheduled for March 17, 2010.

### b. Personal Injury Cases.

Certain of the Debtors are defendants (or third-party defendants) in approximately two lawsuits in various jurisdictions in the United States in which individuals have alleged that, among other things, defects in the design and/or function of the Debtors' products have resulted in personal injuries to themselves or to others on whose behalf they have filed suit (together, the "***Personal Injury Cases***"). The Personal Injury Cases include the case *Nicholas, et al. v. GS Summit, LP*, et al., Case No. 2009-CV-2873 (Dist. Ct., Denver, Colo.). The plaintiffs in the *Nicholas* suit have filed a motion to lift the automatic stay for the purpose of allowing the Movants to prosecute the suit against the Debtors and satisfy any judgment the Movants obtain against the Debtors with the proceeds of available insurance policies and/or assets of third parties. That motion has been adjourned by agreement of the parties to an April 5, 2010 hearing date.

### (ii) Cases Involving Atrium Employees as Defendants

The Debtors and/or certain of their current or former employees (the "***Employee Co-Defendants***") are defendants in eight lawsuits asserting various causes of action relating to the actions carried out in the scope and course of the Employee Co-Defendants' employment with the Debtors (the "***Employee Lawsuits***"). The Employee Lawsuits include: *Sheniqua R. Daniels-Rose and Corey R. Rose v. America C. Marshall and Salem Leasing Corporation*, Case No. CC-09-0971-A (Dallas County Tex. Ct., No. 1); *Dick G. Evans Transportation, Inc., v. Lakisha Lashown McCray, et al.*, Case No. RIC496226 (Super. Ct., Riverside County Cal.); *Zenith Insurance Company v. Steven Michael Dowdy, et al.*, Case No. RIC511702 (Super. Ct., Riverside County, Cal.); *Elvaine Morgan v. Atrium Windows & Doors, Inc. and William James Darby*, Case No. 001362 (Cir. Ct. of the 19th Judicial Cir. for St. Lucie County, Fla.); *Carlos H. Ramirez v. Atrium Door & Window Company - West Coast, et al.*, Case No. 30-2009 00297012 (Super. Ct., Orange County, Cal.); *Ring King I, LLC v. Atrium Companies, Inc. and Harrell D. King*, Case No. 08 CVS 5130 (Gen. Ct. of Justice, Super. Ct. Div., County of New Hanover, N. C.); *Elvira Serrano v. Michele M. Lang and Cesar R. Crespo, et al.*, Case No. KC055758 (Super. Ct., Los Angeles County, Cal.); *Roger Stull v. Atrium Companies, Inc. and Elbert Kimble*, Case No. 08AW-CV00425 (Cir. Ct. of Andrews County, Mo.).

Although the Debtors do not have written agreements with the Employee Co-Defendants, they have — consistent with their usual practice as to their employees — agreed to defend and indemnify the Employee Co-Defendants as to the Employee Lawsuits and the allegations as to acts taken in the course of their employment. In each of the Employee Lawsuits, the Debtors carry liability insurance policies that cover their Employee Co-

Defendants as insureds, provide for a legal defense and, subject to certain terms and conditions, exclusions and policy limits, cover losses stemming from any judgment against the Employee Co-Defendants.

In light of these agreements to defend and indemnify the Employee Co-Defendants, the Debtors have sought to extend the automatic stay applicable to the Debtors in these actions to apply to the Employee Co-Defendants.

## G. EXTENSION OF DIP DEADLINE

Pursuant to the Bankruptcy Court's interim order approving the DIP Facility [Docket No. 51], the Debtors' failure to obtain a final order approving their entry into the DIP Facility or gain entry of an order approving certain solicitation materials and a hearing date to confirm the Plan within 40 days of the Petition Date constituted an event of default under the DIP Facility. At the request of the Creditors' Committee, and in an effort to allow the marketing process to be completed on the timetable established by Moelis, as described in section VI of this Disclosure Statement, the Debtors obtained the consent of the Senior Secured Agent and a majority of the DIP Lenders under the DIP Facility to extend the milestones. Specifically, pursuant to Amendment No. 1 to the DIP Facility, the Senior Secured Agent and DIP Lenders agreed that the Debtors would be afforded 55 days from the Petition Date to obtain entry of a final order approving their entry into the DIP Facility and approval of this Disclosure Statement. The Senior Secured Agent and DIP Lenders subsequently agreed, pursuant to Amendment No. 2 to the DIP Facility, that the Debtors would be afforded 58 days from the Petition Date to obtain entry of a final order approving their entry into the DIP Facility and approval of this Disclosure Statement to accommodate the marketing process.

## H. OVERVIEW OF NORTH STAR AND DEVELOPMENTS IN THE CCAA PROCEEDING

The Debtor North Star is based in Ontario, Canada. North Star produces a complete line of energy-efficient vinyl windows and patio doors. Approximately 70% of North Star's product goes to the replacement and remodelling market, and the remaining 30% is directed at new construction projects. North Star sells approximately 95% of its volume to dealers in Canada, with the remaining 5% of its product being sold to dealers in the United States and Mexico. North Star manufactures exclusively in Ontario and sells to dealers across Canada. On the Petition Date, the Debtor North Star applied for and was granted an order (the "*Initial Order*") by the Canadian Court, thus commencing the CCAA Proceeding. Among other things, the Initial Order authorized North Star to: (i) guarantee the credit facility under the terms and conditions in the DIP Credit Agreement (as defined in the Initial Order); (ii) pay all outstanding and future wages, compensation and benefits incurred in the ordinary course and consistent with existing policies and arrangements; (iii) pay any amounts owing in respect of North Star's customer programs, whether incurred before or after the Petition Date; and (iv) pay all reasonable expenses incurred in carrying on its business in the ordinary course, whether incurred before, on or after the Petition Date, including for goods and services supplied to North Star.

As a Debtor in these chapter 11 cases, North Star is also subject to certain limitations imposed by the Bankruptcy Code and the Bankruptcy Court. Pursuant to the Initial Order the Canadian Court also granted a stay of proceedings with respect to North Star, appointed Ernst & Young Inc. as Court-appointed Monitor of North Star and approved the Cross Border Protocol. Under the Cross Border Protocol and the Initial Order, North Star is authorized and directed to pay the accounts of its Canadian counsel, the Monitor, and the Monitor's counsel. On February 19, 2010, the Canadian Court granted an order that extended the Stay Period (as defined in the Initial Order) to April 16, 2010, and removed certain restrictions on the priorities of the Charges granted in the Initial Order.

North Star has scheduled a hearing on March 22, 2010 before the Canadian Court for a motion for: (i) an order recognizing and implementing in Canada the Bankruptcy Court's order approving this Disclosure Statement and the Disclosure Statement Order; (ii) an order relieving North Star from any obligation to file a plan of compromise or arrangement in Canada under the CCAA unless and until the Plan is rejected by vote pursuant to the procedures under the Disclosure Statement Order or confirmation of the Plan is refused by the Bankruptcy Court; and (iii) scheduling a hearing in the Canadian Court for an order recognizing and implementing in Canada the Confirmation Order if entered by the Bankruptcy Court.

# I. OVERVIEW OF THE DEBTORS' MARKETING EFFORTS IN CONNECTION WITH THE NEW VALUE ALTERNATIVE[14]

Moelis was responsible for conducting a market check with respect to the New Value Alternative. The New Value Alternative — and its contemplated investment from the Plan Investor — is subject in all respects to higher and better offers. To that end, Moelis ran an open marketing process to ensure that the value of the Debtors' estates are maximized for the benefit of all stakeholders. The New Value Alternative is the product of a marketing process that started well before the Petition Date.

Consistent with the covenant in the Debtors' DIP Credit Facility, Moelis, working closely with the Debtors' management team, conducted this marketing process in a manner that would encompass the universe of interested parties. We wanted to include all such interested parties so that any proposals ultimately received reflected the highest and best offers available in the marketplace. Importantly, advisors to the Debtors' key creditor constituencies — the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and Creditors' Committee — were involved with, and actively participated in, the marketing process.

Moelis commenced its marketing process in December 2009. At that time, Moelis contacted eighteen (18) potential buyers to determine their level of interest in the Debtors' businesses. Eleven (11) of these potential buyers signed confidentiality agreements and thereafter received a confidential information package that included company overview materials, the Debtors' projections and access to an electronic dataroom containing additional information about the Debtors' businesses. Four (4) of these potential buyers ultimately submitted non-binding initial indications of interest.

Among the four third-party indications of interest and the joint proposal made by the Plan Investor (the "**Plan Investor Initial Proposal**"), the Debtors and their advisors determined that the Plan Investor Initial Proposal reflected the highest and otherwise best offer in terms of enterprise value and level of certainty at that time. The Plan Investor Initial Proposal (*i.e.*, the New Value Alternative) was thereafter incorporated in the plan of reorganization filed on the Petition Date.

### (i) Interested Parties Received Substantial Information

After the Petition Date, Moelis continued its efforts to market the Debtors' businesses in connection with the New Value Alternative as contemplated in the Plan Investor Initial Proposal and incorporated in the Plan. To that end, following the filing of these chapter 11 cases and the Debtors' public announcement regarding the details of the New Value Alternative, Moelis contacted twenty-two (22) additional third parties.

The Debtors continued to share confidential information about their businesses with interested parties, subject to execution of appropriate confidentiality agreements.[15] The confidential information included company overview materials, the Debtors' projections and access to an electronic dataroom containing extensive information about the Debtors' businesses. The electronic dataroom contained over 1,100 documents covering the following broad due diligence topics: (a) General Information and Corporate Organization; (b) Key Contracts, Agreements and Real Estate; (c) Employees, Benefits and Contracts; (d) Intellectual Property; (e) Credit Documents; (f) Insurance; (g) Financial Data; (h) Tax Matters; (i) Litigation Matters; (j) Environmental Matters; and (k) Information Technology.

Interested parties were given the opportunity to submit follow-up diligence requests and obtain additional information. Similarly, interested parties that had follow-up questions based on the information provided to them were given the opportunity to have discussions with the Debtors' management team as well as their attorneys, auditors, tax accountants, environmental consultants and financial advisors. Those interested parties who wished to

---

[14] Additional details regarding the marketing process can be found in the Sellman Declaration.

[15] The confidential nature of this process precludes the Debtors from disclosing specific parties' identities.

further explore a potential investment were given the opportunity to meet with management and conduct in-person tours at the Debtors' operating facilities.

In total, Moelis contacted forty (40) potential buyers (twenty-two (22) of which were contacted after the Petition Date). These potential buyers encompassed a broad group that included both financial sponsors and strategic buyers with interest in the building products sector (particularly in the Debtors' market) and the financial wherewithal to consummate such a transaction. Of the forty (40) potential buyers, twenty-nine (29) were financial sponsors and eleven (11) were strategic buyers.

Of the forty (40) potential buyers that Moelis contacted, twenty-seven (27) entered into confidentiality agreements with the Debtors and received confidential information packages that included company overview materials and the Debtors' financial projections. The other 13 potential buyers declined to participate in the process and did not enter into confidentiality agreements with the Debtors. The twenty-seven (27) parties who received confidential information packages were also provided access to an electronic dataroom. After an initial review of the Debtors' confidential information, twenty-two (22) potential buyers declined to participate further in the process.

Ultimately, four potential buyers including the Plan Investor moved beyond the initial phases of due diligence to engage in open dialogue and meetings with the Debtors' management team and in certain cases, their attorneys, auditors, tax accountants, environmental consultants and financial advisors. The information provided at these meetings included discussions regarding historical financial results and financial projections, products and markets, competitors, customers, vendors, employees, facilities, information technology and litigation matters. The four potential buyers who attended management presentations also attended facility tours at the Debtors' operating plants. All of the management presentations concluded with question and answer sessions during which potential buyers had the opportunity to ask specific questions. Meetings and conference calls with the Debtors' attorneys, auditors, tax accountants, environmental consultants and financial advisors were subsequently arranged with the four potential investors as requested. In addition, members of the Debtors' management team participated in over 40 follow-up due diligence conference calls and meetings with the four potential investors and their advisors to facilitate additional diligence.

On January 28, 2010, Moelis distributed process letters to all of the interested parties involved as of that date. Potential investors who expressed initial interest thereafter received a process letter upon executing a confidentiality agreement. To facilitate the marketing process within the deadlines set forth in the plan of reorganization the Debtors filed on the Petition Date (the "*Original Plan*") and the DIP Credit Facility, each potential investor was asked to submit a binding proposal in advance of the New Value Alternative Deadline. On February 12, 2010, Moelis circulated an initial draft of the equity purchase agreement (the "*Draft EPA*") to each interested party involved as of that date. Ultimately, four parties expressed serious interest in making an investment under the Plan, including the Plan Investor.

Of the four parties (including the Plan Investor) who expressed significant interest in the Debtors after the Petition Date, two made a determination not to submit binding proposals as set forth in the process letter.

One of the potential investors, a strategic investor (the "*Strategic Investor*") who ultimately submitted a formal proposal, was contacted by Moelis in late February. The Strategic Investor had previously conducted diligence in October 2009, in connection with efforts to potentially partner with Kenner and invest together in the Debtors' businesses. Nonetheless, the Strategic Investor did not begin independent diligence until February 22, 2010, when it was provided with overview materials, financial projections and access to the data room. The Strategic Investor subsequently received a management presentation on February 25, 2010, and thereafter participated in several site tours and diligence calls in the approximately 2 weeks leading up to the bid deadline.

### (ii) The Debtors Received Commitment Letters

On March 6, 2010, the Debtors received equity and debt commitment letters from the Plan Investor (the "*Plan Investor Proposal*"), as contemplated under the Plan, as well as an alternative proposal from the Strategic Investor (the "*Alternative Proposal*" and, together with the Plan Investor Proposal, the "*Proposals*"). The Alternative Proposal did not contain a financing contingency, but did contain customary conditions including a need for further due diligence. Each of the Proposals included revised versions of the Draft EPA (the "*Plan Investor*

*EPA*" and the "*Alternative EPA*," respectively). Moelis distributed copies of each Proposal to the advisors for the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee.

Both of the Proposals, as originally submitted, matched the terms of the New Value Alternative — 95% recovery for Holders of Senior Secured Claims, 7.5% of Reorganized Atrium's equity to the noteholders (or estimated equivalent value) and a *de minimis* cash distribution for the Holders of General Unsecured Claims. There were, however, significant differences with respect to the Draft EPAs submitted by each potential investor. The Plan Investor Proposal involved no diligence conditions and included a financing contingency with respect to the proposed New Value Alternative Loans. The Alternative Proposal, on the other hand, had no financing contingency, but included additional due diligence requirements and other conditions that would need to be satisfied before closing. Before negotiating specific contract terms, however, the Strategic Investor indicated that it would increase its offer by approximately $6.5 million.

### *(iii)* Negotiations of the Proposed Terms

Following the Debtors' and Moelis' initial review of the Proposals, on the morning of March 8, 2010, members of the Debtors' management team, advisors to the Debtors, advisors to the Creditors' Committee, counsel to the Senior Secured Agent and counsel to the Ad Hoc Group of Senior Secured Lenders met at the New York offices of Kirkland & Ellis LLP ("*K&E*") to discuss, analyze and ultimately negotiate the terms of the Proposals. These meetings continued for nearly five days (although the Strategic Investor only participated during three of those days), culminating on March 12, 2010.

Over the course of those meetings, the parties engaged in spirited and competitive negotiations concerning both deal terms and price. Specifically, the Debtors' advisors — with the participation of the advisors to the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee — led various negotiating sessions with both potential investors. At the same time, the Debtors, the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee engaged in negotiations and discussions seeking to achieve consensus and gain support for the Plan, including any potential investment alternatives and the Stand-Alone Alternative.

With respect to the investors, important changes and developments came about over the nearly five days of meetings. First, the Plan Investor increased the equity component of the Plan Investor Proposal from $125 million to $169.2 million while agreeing to fix the noteholder recovery at 7.5%, without dilution for the additional infusion of $44.2 million in equity. Second, the Plan Investor made several material changes to the Plan Investor EPA, which included: (a) a waiver of any and all financing contingencies; (b) an increase of the "reverse" break-up fee (*i.e.*, the amount that the Plan Investor would be responsible for in the event the agreement terminated under certain situations) to $30 million from $4 million; (c) the elimination of a contemplated "work fee" that would be payable to the Plan Investor; (d) a tightening of the events under which the Termination Fee would be payable; and (e) modifications to the equity and debt commitments.

The parties also continued discussions with the Strategic Investor concerning the Alternative Proposal. One of the Debtors' primary concerns with respect to the Alternative Proposal was whether the Strategic Investor would be able to move forward with a firm commitment on deal terms substantially similar to the Plan Investor Proposal on the timeline necessitated under the plan of reorganization the Debtors filed on the Original Plan and DIP Credit Facility. To that end, on March 9, 2010, the Debtors presented a revised form of the Alternative EPA that substantially conformed to the Plan Investor Proposal with respect to various aspects of the transaction, including modifications to the representations and warranties required by the Debtors and limitations on the Strategic Investor's ability to use further due diligence as a condition of closing the transaction. During this time, the Debtors responded to various additional requests for information in an attempt to satisfy the Strategic Investor's due diligence requirements. The Strategic Investor had previously indicated that it would increase its bid by approximately $6.5 million, and there was an indication that additional value could possibly be provided, before beginning negotiations on the Alternative EPA.

On March 10, 2010, the Debtors, counsel to the Senior Secured Agent, counsel to the Ad Hoc Group of Senior Secured Lenders and the advisors to the Creditors' Committee met with counsel and the advisors to the Strategic Investor and discussed the remaining key issues with respect to the Alternative Proposal. Indeed, the Strategic Investor informed the parties, including the Debtors' advisors, on March 10th that it intended to negotiate

and sign a version of the Alternative EPA that day. The parties ultimately were unable to reach agreement. Specifically, following discussions and negotiations throughout the course of the day, the Strategic Investor and advisors to the Debtors, counsel to the Senior Secured Agent, counsel to the Ad Hoc Group of Senior Secured Lenders and the advisors to the Creditors' Committee reconvened in the early evening to discuss the Strategic Investor's current thoughts and next steps. During this meeting, the Strategic Investor indicated certain conditions and issues that would need to be resolved before it could enter into a binding agreement, including procurement of new Phase I environmental reports with respect to seven of the Debtors' properties (because the Strategic Investor believed previous reports were outdated). Further, the Strategic Investor indicated it needed further access to management, Moelis and the Debtors' auditors.

Ultimately, the parties advised the Strategic Investor that certain aspects of the Alternative Proposal made the offer less attractive than the revised Plan Investor Proposal. At the same time, the parties advised the Strategic Investor that they would be willing to continue considering the Alternative Proposal and further negotiate the terms of the Alternative EPA, at a higher price. The Strategic Investor indicated that it had to include certain contingencies and therefore had made its highest and best offer based on the information then available to it, both in terms of consideration and certainty of closing. The Strategic Investor and its advisors left the meetings at K&E shortly thereafter.

After counsel to the Strategic Investor left the meetings at K&E, the Debtors — after consulting with counsel to the Senior Secured Agent, counsel to the Ad Hoc Group of Senior Secured Lenders and the advisors to the Creditors' Committee — approached the Plan Investor and advised them that the Plan Investor Proposal was not the highest. Later that night, the Plan Investor subsequently increased the Plan Investor Proposal by $7.5 million and the parties collectively determined that the Plan Investor Proposal (as modified during the meetings) at that time presented the best offer for the purchase of the New Common Stock. The parties proceeded to negotiate and finalize the terms of the Plan Investor EPA, which negotiations lasted through the night on both March 10th and March 11th, ultimately concluding on March 12th.

On the evening of March 11th, the Debtors' advisors explained to the Strategic Investor that they intended to move forward with the Plan Investor Proposal pursuant to the terms of the Plan Investor EPA.

At 4:53 p.m. prevailing Eastern Time on March 12, 2010, and before executing the Plan Investor EPA, the Debtors received a revised proposal from the Strategic Investor. The revised proposal, which was non-binding, included incremental value to the proposal that was accepted from the Plan Investor and eliminated previously included conditions regarding environmental and intellectual property due diligence and a working capital adjustment mechanism, thereby substantially increasing deal certainty. The revised proposal indicated that the Strategic Investor stood ready to negotiate and finalize the Alternative EPA. After several hours of conference calls among the Debtors' advisors, the Debtors' management, counsel to the Senior Secured Agent, counsel to the Ad Hoc Group of Senior Secured Lenders and the advisors to the Creditors' Committee, it was determined that the appropriate course of action was to execute and move forward with the Plan Investor Proposal, which had been heavily negotiated over the several preceding days. The parties made this decision after evaluating the risk of losing a firm offer from the Plan Investor against the potential incremental benefit of reaching a firm deal with the Strategic Investor. The Debtors' advisors also had conversations with the Plan Investor to explain that the Debtors had received the revised proposal from the Strategic Investor. On March 12, 2010, at approximately 9:16 p.m. prevailing Eastern Time, the Debtors released their signature page to the Plan Investor EPA.

Cognizant of the terms included in the Plan Investor EPA regarding solicitation and alternative proposals, the Debtors' advisors have explained the current circumstances to the Strategic Investor's advisors and the Debtors' intended go-forward process. Specifically, the Debtors have advised the Strategic Investor that the Plan Investor EPA will be publicly available no later than March 16, 2010. Moreover, consistent with the Debtors' fiduciary duty to maximize value for all stakeholders, the Debtors have made clear that they intend to move forward with the highest and best proposal available, whether it be the Plan Investor Proposal, Alternative Proposal or some other proposal.

## J.     MOTION TO ENTER INTO THE EQUITY PURCHASE AGREEMENT

On March 16, 2010, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to enter Into the Equity Purchase Agreement with New Money Investors in Connection with the Debtors'*

*Proposed Joint Plan of Reorganization and (B) Approving Payment of a Termination Fee to New Money Investors in Connection Therewith* (the "**EPA Motion**"). Among other things, the EPA Motion seeks approval of a $12.3 million "termination fee" and certain other "bid" protections detailed in the EPA. The goal of the marketing process under the New Value Alternative was to capture the universe of parties who may be interested in investing in the Debtors so that the highest and best offer ultimately received reflected the highest and best offer the market allowed. The Debtors have determined that the Plan Investor Plan Proposal was the best offer available in the market. A hearing to consider the EPA Motion is scheduled for March 22, 2010 at 10:30 a.m. (prevailing ET).

### K.    SETTLEMENT WITH THE CREDITORS' COMMITTEE

The Debtors, the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee have agreed to the terms of the Creditors' Committee Settlement, as incorporated in the Plan, are as follows:

- In connection with the New Value Alternative, the Holders of the 11.0% Senior Subordinated Notes and the Holders of the 15.0% Senior Subordinated Notes will receive an aggregate of 7.5% of the New Common Stock, with two-thirds going to Holders of the 11.0% Senior Subordinated Notes and one-third going to Holders of the 15.0% Senior Subordinated Notes. Holders of Allowed Class 6B General Unsecured Claims will receive the lesser of (i) $0.04 on account of each dollar of its Allowed General Unsecured Claim and (ii) its Pro Rata share of $800,000 that will be held in a separate escrow account established on the Effective Date.

- To the extent there is additional value provided as part of the New Value Alternative or in connection with any alternative investment proposal, Holders of 11.0% Senior Subordinated Notes and Holders of 15.0% Senior Subordinated Notes will share in an aggregate amount of $10,750,000 shared 2/3 and 1/3 among such Classes, respectively. Additionally, once the Holders of the Senior Secured Claims receive a recovery of 98% of such claims, any additional value will be shared 90%/10% between the Holders of the Senior Secured Claims and Holders of 11.0% Senior Subordinated Notes and Holders of 15.0% Senior Subordinated Notes, respectively. The 10% portion is split with two-thirds going to the Holders of 11.0% Senior Subordinated Notes and one-third going to the Holders of 15.0% Senior Subordinated Notes until the Holders of the Senior Secured Claims receive a 100% recovery; after which, any value is split will be distributed in accordance with contractual and absolute priorities.

- In connection with the Stand-Alone Alternative, the Holders of the Senior Secured Claims will provide the Holders of the Senior Subordinated Notes claims with 4% of the New Common Stock, with two-thirds going to Holders of the 11.0% Senior Subordinated Notes and one-thid going to Holders of the 15.0% Senior Subordinated Notes.

- The Plan will provide for the following in connection with either restructuring alternative:

  - Holders of the ACIH Notes will receive a recovery of 2%, in cash, on account of such Claims, which amount shall not exceed an aggregate cap of $90,000;

  - fees and expenses of the Senior Subordinated Notes Trustees shall be paid up to a total of $300,000, with the ability to retain any "charging lien" provided under the terms of the Senior Subordinated Notes Indenture; and

- the formation of a Post-Confirmation Committee, whose professional fees and expenses will be paid by the Debtors' estates, up to an aggregate cap of $100,000.

## VIII. ADDITIONAL DISCLOSURE REGARDING CLAIMS AND RECOVERIES

### A. ADDITIONAL DISCLOSURE REGARDING TREATMENT OF HOLDERS OF 11.0% SENIOR SUBORDINATED NOTES AND HOLDERS OF 15.0% SENIOR SUBORDINATED NOTES

Certain members of the Ad Hoc Group of Senior Secured Lenders, with whom the Debtors negotiated the Plan, are Holders of both Senior Secured Claims and the 15.0% Senior Subordinated Notes Claims. Specifically, (A) Highland Capital Management, L.P. holds (i) an aggregate principle amount of term loans under the Senior Secured Credit Agreement totaling $93,998,827.63 and (ii) an aggregate principal amount of the 15.0% Senior Subordinated Notes totaling $45,937,563.70; and (B) Capital Research Management Company holds (i) an aggregate principal amount of term loans under the Senior Secured Credit Agreement totaling $64,541,364.27 and (ii) an aggregate principal amount of the 15.0% Senior Subordinated Notes totaling $65,532,206.00. As a result of these cross-holdings, a good faith objection to the Plan may be raised.

The Holders of the Senior Secured Claims have determined to "gift" a recovery to certain junior creditors, including Holders of the 11.0% Senior Subordinated Notes and the Holders of the 15.0% Senior Subordinated Notes. As a condition precedent to providing such recovery to Holders of the Senior Subordinated Notes, however, the Holders of the Senior Secured Claims have required that (a) Class 5A vote to accept the Plan and (b) 100% of the Holders of the Allowed 11.0% Senior Subordinated Notes Claims agree to waive any and all Priority Rights under the Senior Subordinated Notes Indenture. If either or both of these conditions are not satisfied, the "gift" offered by the Holders of the Senior Secured Claims will not be provided and the distributions that otherwise would have been received by the Holders of Senior Subordinated Notes Claims will instead be distributed to Holders of Secured Claims in accordance with section 1129(b)(2)(A) of the Bankruptcy Code

Certain parties in interest have requested that the Debtors note that the Priority Rights provided under the Senior Subordinated Notes Indenture may be enforceable under section 510(a) of the Bankruptcy Code. As a practical matter, however, the Debtors believe that the valuation of the Debtors on a going concern basis suggest that enforcement of the Priority Rights pursuant to Section 510(a) of the Bankruptcy Code would, absent the agreement by the Senior Secured Lenders to provide a "gift" to Holders of the Senior Subordinated Notes, yield significantly less recoveries for such Holders, if any.

The Debtors note that any distributions to Holders of Class 5A 11.0% Senior Subordinated Notes Claims and Class 5B 15.0% Senior Subordinated Notes Claims may be subject to the payment of fees and expenses owed to the Senior Subordinated Notes Indenture Trustees pursuant to the Senior Subordinated Notes Indenture, including the ability of the Senior Subordinated Notes Indenture Trustees to assert a "charging lien" pursuant to sections 5.06 and 6.07 thereof. Should the Senior Subordinated Notes Indenture Trustees be required to exercise their charging lien rights, the Trustees may not be able to sell all or any portion of the New Common Stock in order to satisfy their fees and expenses or a low market price could adversely affect the recoveries of Holders of Class 5A 11.0% Senior Subordinated Notes Claims and Class 5B 15.0% Senior Subordinated Notes Claims.

### B. ESTIMATE OF KNOWN LITIGATION CLAIMS

The following estimate of known unsecured, contingent, disputed and unliquidated litigation Claims asserted and currently pending against the Debtors is based upon historical information with respect to amounts spent to resolve similar Claims over the past three years. Generally, the three largest categories of pending litigation Claims against the Debtors include: (1) general liability and construction defect Claims, including indemnity Claims asserted against the Debtors by their customers as a result of alleged construction defects; (2) auto liability Claims; and (3) Claims arising out of the Debtors' employment practices. Additional disclosure with respect to certain of these ongoing litigation Claims is provided in section VII.F of this Disclosure Statement.

**The Debtors are providing these estimates for informational purposes only based upon historical estimates. Actual Allowed Claims based on litigation Claims asserted against the Debtors may differ materially from the estimates provided herein. The Debtors can make no guarantee that such Claims will be Allowed in amounts equal to the estimates provided herein; nor can the Debtors guarantee that such Claims will be not Allowed in amounts greater than the estimates provided herein. The Debtors are providing this information without prejudice to any of their rights in connection with any Claim, including the right to object to such Claim on any ground whatsoever. The estimates provided herein do not account for insurance proceeds that may be available with respect to a particular Claim.**

All pending litigation against the Debtors is presently stayed as a result of section 362 of the Bankruptcy Code. Claims assertable against the Debtors in connection with any pending litigation will be treated in accordance with the Plan. Specifically, all litigation Claims will be afforded the same treatment as Holders of Class 6B General Unsecured Claims under the Plan. Additionally, Article VI.K. of the Plan provides that no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to any such applicable insurance policy.[16] Additional disclosure with respect to the Debtors' insurance coverage is provided in section VIII.C of this Disclosure Statement.

The following provides historical perspective concerning costs associated with litigating and ultimately resolving these types of litigation Claims.

- Over the past three years, the Debtors have spent approximately $10.4 million in resolving approximately 232 general liability/construction defect Claims. This averages to approximately $45,000 on account of each general liability/construction defect Claim.

- Over the past three years, the Debtors have spent approximately $1.81 million in resolving approximately 382 auto Claims. This averages to approximately $4,700 spent for each resolved auto Claim.

- Over the past three years, the Debtors have spent approximately $1.02 million in resolving approximately 28 employment Claims. This averages to approximately $36,400 spent for each resolved employment Claim.

Currently, the Debtors estimate that there are approximately 145 general liability/construction defect Claims pending against the Debtors, approximately seven auto Claims pending against the Debtors and approximately eight employment cases pending against the Debtors. Using the historical information detailed above, the Debtors estimate the following with regard to the pending unsecured, contingent and unliquidated Claims asserted against the Debtors:

- approximately 145 general liability/construction defect cases
  @ $45,000 per Claim     =     $6,525,000

- approximately seven auto cases @ $4,700 per Claim     =     $32,900

- approximately eight employment cases @ $36,400 per Claim     =     $291,200

                                      **ESTIMATED TOTAL**     **$6,849,100**

---

[16] Such insurance policies will remain effective after Confirmation of the Plan.

## C. OVERVIEW OF THE DEBTORS' INSURANCE POLICIES

Article VI.K. of the Plan requires, among other things, that no distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. What follows is a brief summary of the Debtors' current and historical insurance coverage. Additional information regarding the Debtors' insurance policies is available in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtor to (A) Continue Prepetition Insurance Coverage; (B) Maintain Funding of Insurance Premiums; (C) Maintain Funding for an Insurance Letter of Credit; and (D) Maintain Funding for Insurance Brokers* [Docket No. 13], which was approved by the Bankruptcy Court on a final basis on February 23, 2010 [Docket No 282].

**This summary is not an exhaustive description of all of the Debtors' insurance coverage, but, instead, focuses on coverage under the Debtors' current and historical Commercial General Liability and Business Automobile policies. The descriptions provided herein are for informational purposes only and in no way shall constitute a waiver of any of the Debtors' rights with respect to such policies. Actual recoveries available to claimants under the Debtors' insurance policies may vary materially from the descriptions provided herein and the Debtors cannot guarantee that proceeds under the insurance policies, if any, will be available to their creditors.**

### a. Current Commercial General Liability Coverage.

#### 1. Overview.

The Debtors' current Commercial General Liability ("***CGL***") coverage provides for maximum aggregate limits of $52 million. The primary CGL policy is provided by Zurich and has a per occurrence limit of $1 million and a general aggregate limit of $2 million, and a products/operations limit of $2 million. The Debtors also have in a place a current Commercial Umbrella Liability policy, which provides an additional $35 million in coverage. Additionally, an excess umbrella policy with ACE USA provides another $15 million in excess coverage.

#### 2. Self-Insured Retention Levels Under the Current CGL Policy.

The current CGL policy has a $1 million self-insured retention ("***SIR***") per occurrence, meaning that the Debtors are responsible for the payment of all damages as they are incurred for each occurrence until the Debtors have paid damages equal the SIR amount of $1 million. The Debtors note that the SIR amount expressly excludes amounts paid in defense costs. Only amounts paid as covered damages or in a settlement authorized by the insurer will exhaust the SIR. Additionally, the Debtors are responsible for all defense costs under the policy even after the exhaustion of the per occurrence SIR.

#### 3. Coverage Provided By the Current CGL Policy.

The current CGL policy provides coverage for the following:

- *Bodily Injury and Property Damage.* Damages resulting from bodily injury or property damage that occurs during the policy period and anywhere in the world, other than a country or jurisdiction that is subject to trade or other economic sanctions by the U.S.

  This coverage is limited. For example, it does not include (a) bodily injury or property damage expected or intended from the standpoint of the insured and (b) property damage to the Debtors' products. **The Debtors note that this list of exclusions is not exhaustive, but, rather, is intended to illustrate certain key exclusions**.

- *Personal and Advertising Injury Liability.* Damages/injury resulting from the following offenses: false arrest, detention or imprisonment; malicious prosecution; wrongful eviction from or wrongful entry into a room, dwelling or premises; oral or written publication of material that libels or slanders a person or organization or disparages a person's or

organization's goods, products or services; oral or written publication of material that violates a person's right of privacy; the use of another's advertising idea in the company's advertisement; or infringing upon another's copyright, trade dress or slogan in the company's advertisement.

For coverage to apply, the offense that causes the alleged injury must have been committed during the policy period and anywhere in the world, other than a country or jurisdiction that is subject to trade or other economic sanctions by the U.S.

This coverage is limited. For example, it does not cover: (a) loss from a personal or advertising injury that was caused by or at the direction of an insured with knowledge that the act would violate the rights of another and would constitute a "personal and advertising injury"; (b) loss from a personal or advertising injury arising of the oral or written publication of material, if published by or at the direction of an insured with knowledge that the material was false; and (c) any personal and advertising injury that arises out of a criminal act committed by or at the request of an insured. **The Debtors note that this list of exclusions is not exhaustive, but, rather, is intended to illustrate certain key exclusions.**

- *Medical Payments Coverage.* Medical expenses for bodily injuries caused by an accident that occurs (a) on premises owned by the company; (b) on pathways next to premises owned by the company; or (c) because of the Debtors' operations.

  To be covered, the accident must take place during the policy period and must occur anywhere in the world, other than a country or jurisdiction that is subject to trade or other economic sanctions by the U.S. To be covered, the medical expenses must be incurred and reported to Zurich within one year of the date of the accident, and the injured person must submit to an examination by a physician of Zurich's choosing, as often as Zurich reasonably requires.

  This coverage is limited. For example, it does not cover: (a) expenses for bodily injury to any insured, except for people volunteering work to the Debtors; (b) expenses for bodily injury to any person hired to do work for the company, or any tenant of any insured; and (c) expenses for bodily injury to a person injured on premises that the Debtors own or lease, if the person normally occupies such space. **The Debtors note that this list of exclusions is not exhaustive, but, rather, is intended to illustrate certain key exclusions**.

### 4. Umbrella and Excess Coverage.

The Debtors also maintain umbrella and excess liability insurance for the period beginning April 1, 2009 and ending April 1, 2010. Those polices are issued by Zurich and ACE USA, respectively. The umbrella policy provided by Zurich provides an additional $35 million in coverage and the ACE policy provides an additional $15 million in coverage. Neither policy has a retention or deductible.

### 5. Historic Commercial General Liability Coverage.

The Debtors have, in the past, maintained several CGL policies, as follows:

- For the 2007-08 and 2008-09 policy years, CGL coverage with Zurich on terms substantially similar to the current CGL policy. Specifically, these policies include a $1 million SIR and required the Debtors to pay all defense costs.

- For the policy periods 2004-05, 2005-06 and 2006-07, CGL coverage with Zurich on terms substantially similar to the current CGL policy. The SIR on these policies, however, was $500,000. These policies required the Debtors to pay all defense costs.

- For the 2003-04 policy period, CGL coverage with Zurich, with a $250,000 deductible.

- For the policy periods 1999-2000, 2000-01, 2001-02, and 2002-03, CGL coverage with Zurich with a $100,000 deductible.

Additionally, the Debtors note that all of the primary layer CGL policies issued by Zurich from 1999-2000 policy period through the 2003-04 policy period have been exhausted. The Debtors also had excess CGL coverage from 1999 to 2009, with various limits and issuers depending on the applicable policy year.

### b. Current Auto Liability Coverage.

#### 1. Overview.

The Debtors maintain an Auto Liability Coverage ("**ALC**") policy with Zurich for the policy period beginning April 1, 2009 and ending April 1, 2010. The ALC policy has a $5 million combined limit per accident or loss on its liability coverage section, and it covers the actual cash value or cost of repair, whichever is lower, on its comprehensive, specified causes, and collision physical damage coverage sections. The policy provides occurrence-based coverage, meaning that the policy only provides coverage for accidents and losses that occur during the policy period.

#### 2. Liability Coverage Provided by the ALC Policy.

The ALC policy provides coverage for all sums the insured is liable to pay as damages for bodily injury or property damage caused by an accident resulting from the ownership, maintenance or use of a covered automobile. Liability coverage also includes sums the insured must legally pay as covered pollution costs or expenses caused by an accident resulting from the ownership, maintenance or use of a covered automobile. A $500,000 per accident deductible applies to losses falling within the policy's liability coverage section.

#### 3. Physical Damage Coverage.

The ALC policy provides coverage to automobiles that the Debtors' own or hire under three separate sections: Comprehensive; Specified Causes of Loss; and Collision.

The ALC policy's comprehensive coverage section pays for loss to a covered automobile, up to the actual cash value of the vehicle and minus the deductible, for any cause, except for (a) a covered automobile's collision with another object or (b) the covered automobile's overturn. A $200,000 deductible applies to losses under the policy's comprehensive coverage section.

The ALC policy's collision coverage pays for any loss to a covered auto resulting from the auto's collision with another object or its overturn. A $200,000 deductible applies to losses under the policy's collision coverage section.

#### 4. Additional and State-Specific Coverage.

The Debtors' current ACL policy also has several coverage sections that differ as to their policy limits by state, including Personal Injury Protection, Auto Medical Payments and Uninsured and Underinsured Motorists. Each of these coverage sections has a $500,000 deductible.

#### 5. Historic Auto Liability Coverage.

Historically, the Debtors have maintained Business Automobile Insurance on similar terms to their current ACL policy with Zurich. For the policy period April 1, 2008 to April 1, 2009, the Debtors maintained an auto policy with a $5 million per-loss limit and a $500,000 deductible. From April 1, 2005 to April 1, 2008, the Debtors maintained policies that also had $5 million limits per loss, but the 2005-08 policies all had a lower deductible amount of $250,000.

#### D. DEBTORS' ESTIMATE OF CLASS 6A QUALIFIED UNSECURED TRADE CLAIMS

As described in the Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, The Debtors To Pay Or Honor Prepetition Obligations Of (A) Certain Critical Vendors And (B) Holders Of Administrative Claims Under Section 503(b)(9) Of The Bankruptcy Code (the "**Vendors Motion**") [Docket No. 9], in the ordinary course of business, the Debtors rely on certain vendors and suppliers that are critical to the Debtors' business operations. Absent payment of prepetition claims to these vendors and suppliers, it was possible that the goods and services provided by these vendors and suppliers would not have been available to the Debtors, thereby interrupting the Debtors' supply chain and significantly impairing operational stability to the detriment of all parties in interest. Additionally, many of the Debtors' suppliers, customers and vendors, who provided the Debtors with goods before these chapter 11 cases were filed, were likely entitled to administrative status as provided for under section 503(b)(9) of the Bankruptcy Code on account of goods delivered to the Debtors within the 20-day period before the Petition Date. To ensure that the Debtors maintained access to key goods and services during the chapter 11 cases and to avoid the expense and time associated with numerous motions and applications to agree upon individual creditors' 503(b)(9) administrative claims, the Debtors sought authority from the Bankruptcy Court to pay, in their discretion, up to a total of $7.5 million to certain vendors and suppliers. The Bankruptcy Court entered a final order granting the Vendors Motion on February 22, 2010 (the "**Vendors Order**") [Docket No. 282]. As of the date hereof, the Debtors have paid a total of approximately $2.4 million to such vendors and suppliers pursuant to the terms of the Vendors Order.

Following satisfaction of Claims contemplated under the Vendor Order, the Debtors estimate that the total amount of Allowed Class 6A Qualified Unsecured Trade Claims is approximately $350,000. The Debtors believe that these creditors provide important ongoing services and goods to their operations and thus payment of their claims, which represents only a small percentage of all unsecured claims, is appropriate. These creditors, as with those creditors paid pursuant to the Vendor Order, will be required to enter into a Qualified Vendor Support Agreement before receiving payment as contemplated under the Plan.

#### E. ADDITIONAL DISCLOSURE REGARDING CLASS 6B GENERAL UNSECURED CLAIMS

##### (i) *Debtors' Estimate of Class 6B General Unsecured claims*

As discussed in section VII.D of this Disclosure Statement, each of the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on February 19, 2010. In connection with the Debtors' review of their books and records as of the Petition Date, the Debtors have undertaken an estimate of the various prepetition Claims that may be asserted pending the establishment of a bar date in these chapter 11 cases (pursuant to which all Holders of Claims arising before the Petition Date will be required to submit written proof of such Claims). **The following summary is preliminary in nature and is provided for illustrative purposes only. The aggregate amount of actual Allowed Claims ultimately asserted against the Debtors may be materially greater than the estimates provided herein.**

The Debtors believe a reasonable estimate of the total amount of Allowed Class 6B General Unsecured Claims is approximately $17 million.

Specifically, Class 6B under the Plan is comprised of Holders of General Unsecured Claims against the Debtors (except Atrium Corporation and ACIH, Inc.), including Claims of: (a) vendors or suppliers with whom the Debtors have no ongoing business relationship; (b) counter-parties to Executory Contracts or Unexpired Leases that have been rejected or will be rejected under the Plan (subject to applicable restrictions on such Claims arising under section 502(b)(6) of the Bankruptcy Code or otherwise); (c) litigants that have asserted Claims against a Debtor in any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor related thereto; and (d) any Holder of an Unsecured Claim not otherwise included in a separate Class under the Plan. Additionally, pursuant to the *Order Authorizing, But Not Directing, The Debtors To Maintain And Administer Customer Programs And Honor Prepetition Obligations Related Thereto* [Docket No. 190] (the "*Customer Programs Order*"), the Debtors have the authority, in their discretion, to honor certain customer programs in the ordinary course of business. These programs include warranty

programs, rebate programs, allowance programs and payment terms discount programs. To the extent a party has a Claim that has not been paid or otherwise satisfied pursuant to the authority granted under the Customer Programs Order, such party will be afforded notice of the bar date ultimately set in these chapter 11 cases. To the extent any Claim is filed in connection therewith and ultimately Allowed, such Claims will be treated as Class 6B General Unsecured Claims and may be entitled to receive a distribution under the applicable provisions of the Plan.

In determining the estimated amount of General Unsecured Claims, the Debtors have made the following assumptions:

- litigation-related, contingent, disputed and unliquidated claims will not be greater than a total of approximately $[$6.85 million]. Additional disclosure with respect to these types of claims is provided in section VIII.B.(x).b of this Disclosure Statement;

- the Debtors will pay the full amount available to General Unsecured Creditors under the various "First-Day Orders" entered by the Bankruptcy Court;

- the Debtors' estimate of rejection damages with respect to any Unexpired Leases or Executory Contracts that have been rejected in the course of these chapter 11 cases or that will be rejected pursuant to the terms of the Plan; and

- providers of utility services will not have unsecured claims on account of deposits provided prepetition and/or postpetition, in accordance with section 366 of the Bankruptcy Code.

Delaware Frame (TX), LP, Windough (DE) LP and Windough Lot (DE) LP (collectively, the "**Landlords**"), filed a limited objection to this Disclosure Statement [Docket No. 332], followed by an amended and restated objection to this Disclosure Statement [Docket No. 372] (together, the "**Objection**"). The gist of the Objection is that the Landlords believe that Holders of Claims in Class 6B are discriminated against under the Plan. The Debtors vehemently disagree. As will be demonstrated at the Confirmation Hearing, the aggregate percentage recovery for Holders of Senior Subordinated Notes Claims in Classes 5A and 5B (*i.e.*, 3.9%), as determined by reference to the valuation prepared by Moelis and attached hereto as **Exhibit E**, is actually less than the projected recovery for Holders of General Unsecured Claims in Class 6B (*i.e.*, 4%). Moreover, no unfair discrimination exists vis-à-vis Holders of Qualified Unsecured Trade Claims in Class 6A, since such Holders are required to execute a Qualified Vendor Support Agreement and agree to provide the Debtors with services and/or goods on a customary go-forward basis before receiving a distribution under the Plan.

The Landlords' dispute the Debtors' estimate ($17 million) for the total amount of Allowed Class 6B Claims and believe such estimate -- and the assumptions underlying the estimate -- is inaccurate. The Debtors disagree and believe that the foregoing summary appropriately estimates Claims in Class 6B. Moreover, the Cash distribution available to Holders of Class 6B Claims -- $800,000 -- has built in cushion of $3 million in an effort to help ensure that the overall percentage recovery for Holders of Class 6B Claims is equivalent to that afforded the Holders of the Senior Subordinated Notes Claims. Moreover, and aside from being wrong, the suggestion in the Objection that "[t]he Debtors have essentially no economic incentive to achieve these claims estimates" ignores the fact that the settlement with the Creditors' Committee contemplates the appointment of the Post-Confirmation Committee to, among other things, ensure that Claims are resolved quickly and appropriately.

Finally, the Objection suggests the possibility that the guarantees held by the Holders of 15% Senior Subordinated Notes Claims may be avoided as fraudulent transfers and, if so, the Landlords argue the Claims based on the 15% Senior Subordinated Notes Claims would be structurally subordinated to virtually all Class 6B Claims. Setting aside the merits of any action to avoid the guarantees provided to the Holders of the 15% Senior Subordinated Notes in connection with the 2008 Restructuring, including the very real possibility that valid defenses to such fraudulent claims may exist, the Debtors believe the value of their estates renders any such litigation meaningless. Specifically, because there is not sufficient value to afford the Holders of Senior Secured Claims a recovery in full in cash on account of their Claims, all distributable value under the Plan – unless otherwise agreed to by the Holders of Senior Secured Claims – is required to be distributed to the Holders of Senior Secured Claims pursuant to section 1129 of the Bankruptcy Code. Thus, the only recovery provided to junior classes of creditor is because the Holders of Senior Secured Claims have, in an effort to broker peace, agreed to "gift" a portion of their

recovery to Holders of General Unsecured Claims. To the extent litigation is commenced to avoid the guarantees of Holders of the 15% Senior Subordinated Notes issued in connection with 2008 Restructuring, the Debtors believe it is unlikely that Holders of the Senior Secured Claims would agree to gift a portion of their recovery to Holders of General Unsecured Claims. As a result, the costs and expense associated with any such litigation likely outweighs any corresponding benefit in avoiding the guarantee Claims of the Holders of the 15.0% Senior Subordinated Notes. Thus, not only do the Debtors believe this is not a valid objection to the Disclosure Statement, but the Debtors seriously question whether any party could satisfactorily meet the standard required to achieve standing to prosecute such fraudulent conveyance claims during these chapter 11 cases.

### F.    ADDITIONAL DISCLOSURE REGARDING INTERCOMPANY CLAIMS

As described in the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System; (B) Honor Certain Prepetition Obligations Related to the Cash Management System; (C) Maintain Existing Business Forms; and (D) Grant Claims and Perform Under Certain Intercompany Arrangements and Historical Practices* entered on January 21, 2010 [Docket No. 7], in the ordinary course of business, certain of the Debtors maintain business relationships with each other, resulting in intercompany claims ("**Intercompany Claims**"). The Plan provides that Intercompany Claims may be reinstated or cancelled. This section provides additional disclosure with respect to the Debtors' various Intercompany Claims.

The Debtors' Intercompany Claims fall into two general categories: (a) Intercompany Claims that arise on account of the Debtors' cash management system, such as payment of payroll and various tax strategies (the "**Financial Intercompany Claims**") and (b) Intercompany Claims that arise on account of the Debtors' business operations, such as the purchase of window components (the "**Operational Intercompany Claims**").

The Debtors intend to reinstate prepetition Intercompany Claims. The Debtors engage in transactions that give rise to Intercompany Claims as part of the ordinary course of their businesses and have obtained the authority to continue such transactions postpetition pursuant to the *Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System; (B) Honor Certain Prepetition Obligations Related to the Cash Management System; (C) Maintain Existing Business Forms; and (D) Grant Claims and Perform Under Certain Intercompany Arrangements and Historical Practices* entered on January 21, 2010 [Docket No. 46]. Impairing prepetition Intercompany Claims would obfuscate the Debtors' intercompany accounts and cancelling Intercompany Claims would saddle the Debtors with a detrimental tax burden.

### a.    Financial Intercompany Claims

The Financial Intercompany Claims are purely financial in nature. They consist of Intercompany Claims resulting from, for example, Atrium Companies, Inc. sweeping excess cash from its subsidiaries' bank accounts or paying for insurance policies on behalf of these entities. Additionally, Financial Intercompany Claims arise from tax strategies such as sweeping cash from North Star's accounts so as to minimize its Canadian tax burden in light of the fact that the Debtors must pay U.S. taxes on North Star's income. Also included within Financial Intercompany Claims are two intercompany notes, as follows:

- In 2002, Atrium Companies, Inc. instituted an internal leveraging strategy designed to reflect the operating costs of certain Debtor affiliates. This strategy provided for Atrium Companies, Inc. to transfer debt carried on its financial statements to the records of participating Debtor affiliates. Pursuant to this strategy, the Debtors Atrium Door and Window Company of the Northeast, R.G. Darby Company, Inc., Thermal Industries, Inc. and Total Trim, Inc. declared a dividend to Atrium Companies, Inc. based on those Debtors' external debt-to-equity ratios. In lieu of a cash payment dividend, each participating Debtor issued Atrium Companies, Inc. a promissory note, which carries a stated interest rate of 11% per annum.

- On March 8, 2007, North Star issued a promissory note to Atrium Companies, Inc. in the principal amount of $60 million Canadian dollars at an interest rate of 12% per annum. This note is due on June 12, 2012.

### b. Operational Intercompany Claims

The Operational Intercompany Claims result from the Debtors' vertically integrated operations. For example, the Debtor Aluminum Screen Manufacturers, Inc. ("**ASM**") manufactures only aluminum screens. Because several of the other Debtors require aluminum screens to create completed windows that will be sold to customers, these Debtors purchase products from ASM, resulting in an Operational Intercompany Claim to ASM owed by the purchasing Debtor. The Debtors are required to keep track of such transactions to ensure that intercompany transactions are eliminated in consolidation in accordance with GAAP.

### G.     ADDITIONAL DISCLOSURE REGARDING CAUSES OF ACTION

Certain parties in interest believe that the Debtors may possess valuable causes of action arising from the out-of-court restructuring of the Debtors' balance sheet conducted in October 2008 (the "**2008 Restructuring**"). In connection with the 2008 Restructuring, ACIH, Inc. exchanged 97.4% of the ACIH Notes, which were only obligations of ACIH, Inc., for the 15.0% Senior Subordinated Notes, which became obligations of Atrium Companies, Inc. and each of the other Debtors (other than Atrium Corporation). Certain parties believe that the obligations incurred by the Debtors other than ACIH, Inc. in connection with the 2008 Restructuring may be subject to avoidance as a constructive fraudulent transfer under section 548 of the Bankruptcy Code. If such a fraudulent conveyance claim was ultimately successful, the effect would be to avoid the guarantees of the Debtors other than ACIH, Inc. with respect to the 15.0% Senior Subordinated Notes. As a result, Holders of the 15% Senior Subordinated Notes would only have Claims assertable against ACIH, Inc.

Setting aside the merits of any action to avoid the guarantees provided to the Holders of the 15% Senior Subordinated Notes in connection with the 2008 Restructuring, including the valid defenses to such claims that may exist, the Debtors believe the value of their estates renders any such litigation meaningless. Specifically, because there is not sufficient value to afford the Holders of Senior Secured Claims a recovery in full in cash on account of their Claims, all distributable value under the Plan – unless otherwise agreed to by the Holders of Senior Secured Claims – is required to be distributed to the Holders of Senior Secured Claims pursuant to section 1129 of the Bankruptcy Code. Thus, the Holders of Senior Secured Claims may "gift" a portion of their recovery to Holders of General Unsecured Claims. To the extent litigation is commenced to avoid the guarantees of Holders of the 15% Senior Subordinated Notes issued in connection with 2008 Restructuring, the Debtors believe it is unlikely that Holders of the Senior Secured Claims would agree to gift a portion of their recovery to Holders of General Unsecured Claims. As a result, the costs and expense associated with any such litigation likely outweighs any corresponding benefit in avoiding the guarantee Claims of the Holders of the 15.0% Senior Subordinated Notes.

## IX.     DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION[17]

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

---

[17] The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein. The Plan itself controls the actual treatment of Claims against and Interests in the Debtors and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims and Interests and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document will control. Capitalized terms used but not defined in Section VII of this Disclosure Statement have the meaning ascribed to such terms in the Plan.

The Plan constitutes a separate chapter 11 plan for Atrium Corporation and each of its Debtor affiliates. Except for unclassified Claims and Interests, all Claims against, and Interests in, a particular Debtor are placed in Classes for each of the Debtors.

## A. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### (i) *Administrative Claims*

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (a) on or as soon as reasonably practicable after the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however,* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

### (ii) *Professional Compensation*

#### a. Fee Claims

Professionals asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date; *provided, however,* any such final application may include amounts incurred in connection with preparing such final application, attending any hearing (or hearings) on such application, responding to any objections to such final application or appeals of the Confirmation Order; *provided further,* that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professional Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 50 days after the Effective Date. Upon the Bankruptcy Court's approval of a Fee Claim, the Professional who Filed such Fee Claim will be compensated pursuant to Article IV. R. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. For greater certainty, the Canadian Professionals (as that term is defined in the Cross-Border Protocol) are not required to file and serve applications in respect of any Fee Claims.

### b. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors or the Creditors' Committee shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

### (iii) Administrative Claim Bar Date

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 10 days before the Effective Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.

### (iv) Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim also is Secured, such Claim shall, to the extent it is Allowed, be treated as a Class 3 Other Secured Claim if such Claim is not otherwise paid in full pursuant to Article II.B of the Plan.

### (v) Statutory Fees

On the Distribution Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Effective Date, Reorganized Atrium shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a final decree in each Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## B. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### (i) Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Interests in, the Debtors. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

### (ii) Summary of Classification

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained herein, the classifications set forth in Classes 1 to 10 shall be deemed to apply to each Debtor, as

applicable. Atrium Corporation is not obligated under the Senior Secured Credit Agreement and the Senior Subordinated Notes and, therefore, Atrium Corporation does not have a Class 4A, Class 4B, Class 5A or a Class 5B. In addition, General Unsecured Claims against Atrium Corporation and ACIH, Inc. are classified separately in Classes 6C and 6D, respectively.

The following chart summarizes the classification of Claims against, and Interests in, the Debtors pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | DIP Claims | Not Impaired | Deemed to Accept |
| 2 | Priority Non-Tax Claims | Not Impaired | Deemed to Accept |
| 3 | Other Secured Claims | Not Impaired | Deemed to Accept |
| 4A | Senior Secured Claims | Impaired | Entitled to Vote |
| 4B[18] | Swap Contract Claims | Impaired | Entitled to Vote |
| 5A | 11.0% Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 5B | 15.0% Senior Subordinated Notes Claims | Impaired | Entitled to Vote |
| 5C | ACIH Notes Claims | Impaired | Entitled to Vote |
| 6A | Qualified Unsecured Trade Claims | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | General Unsecured Claims of Atrium Corporation | Impaired | Deemed to Reject |
| 6D | General Unsecured Claims of ACIH | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Not Impaired / Impaired | Deemed to Accept / Deemed to Reject |
| 9 | Intercompany Interests | Not Impaired | Deemed to Accept |
| 10 | Interests in Atrium Corporation | Impaired | Deemed to Reject |

### (iii)     Treatment of Claims and Interests

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

### a.     Class 1 – DIP Claims

- *Classification*:  Class 1 consists of all DIP Claims.

- *Treatment*:  Except to the extent that a Holder of a DIP Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each DIP Claim, each Holder of such DIP Claim shall receive a distribution in connection with one of the following alternatives:

  - Subject in all respects to the terms and conditions set forth in the Equity Purchase Agreement (or any Alternative Equity Purchase Agreement) and the occurrence of the Closing pursuant to the terms thereof, at the Closing the Plan Investor or Alternative Plan Investor, if applicable, shall pay or cause to be paid 100% of the amount of the DIP Claims as of the Closing Date after giving effect to the payment under

---

18   Swap Contract Claims shall be treated as a separate Class under the New Value Alternative and any Alternative Acquisition Proposal; however, to the extent the Stand-Alone Alternative is implemented, Swap Contract Claims shall be treated as Class 4A Senior Secured Claims in accordance with Article III.C.4(c)(iii).

section 4.04 of the Equity Purchase Agreement or such comparable provision of any Alternative Equity Purchase Agreement); *or*

- If (A) either the New Value Alternative or any Alternative New Money Investment is not effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of DIP Claims shall receive payment of the DIP Claims in full in Cash on the Effective Date.

- *Voting*:  Class 1 is not Impaired by the Plan and each Holder of a Class 1 DIP Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 DIP Claims are not entitled to vote to accept or reject the Plan.

**b.      Class 2 - Priority Non-Tax Claims**

- *Classification*:  Class 2 consists of all Priority Non-Tax Claims.

- *Treatment*:  Except to the extent that a Holder of an Allowed Priority-Non Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

- *Voting*:  Class 2 is not Impaired by the Plan and each Holder of a Class 2 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

**c.      Class 3 - Other Secured Claims**

- *Classification:*  Class 3 consists of all Other Secured Claims.

- *Treatment:*  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered not Impaired.  In the event an Allowed Class 3 Other Secured Claim can also be classified as a Priority Tax Claim, such Claim shall (i) be paid in full, in Cash including the payment of interest under section 506(b) of the Bankruptcy Code and/or section 511 of the Bankruptcy Code, if any; or (ii) retain any lien until such Claim is paid in full (it being understood

that such Other Secured Claim may be paid in the ordinary course as and when it comes due, rather than on the Effective Date).

- *Voting:* Class 3 is not Impaired by the Plan and each Holder of a Class 3 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

### d. Class 4A - Senior Secured Claims

- *Classification:* Class 4A consists of all Senior Secured Claims.

- *Allowance:* The Senior Secured Claims shall be Allowed and deemed to be Allowed Claims.

- *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of each Allowed Senior Secured Claim, each Holder of such Allowed Senior Secured Claim shall receive a Pro Rata distribution as follows:

  - Subject to the occurrence of the Closing: (A) the indefeasible payment of $7,500,000 in Cash; (B) the indefeasible payment of Cash equal to 95% of the amount of Senior Secured Revolver Claims and Senior Secured Term Claims as of the Closing Date; and (C) the indefeasible payment of Cash equal to 95% of the Senior Secured Revolver Interest Equivalent Claims and Senior Secured Term Interest Equivalent Claims (it being understood and acknowledged that interest shall have accrued at the default interest rate provided in the Senior Secured Credit Agreement) outstanding as of the Closing Date, all in accordance with the terms of the Equity Purchase Agreement, including section 5.07(a) thereof; <u>or</u>

  - If any Alternative Acquisition Proposal is approved, the Alternative Plan Investor shall indefeasibly pay or cause to be indefeasibly paid, in Cash, an amount no less than the aggregate amount provided in subclause (i) above; *provided*, *however*, that in the event the Cash made available to Holders of Allowed Class 4 Senior Secured Claims pursuant to any Alternative New Money Investment is greater than 98% of the aggregate amount of all Allowed Class 4 Senior Secured Claims outstanding as of the Closing, the Holders of the Allowed Class 4 Senior Secured Claims shall make available the full amount of the Senior Secured New Money Investment Gift before the Holders of Allowed Class 4 Senior Secured Claims are indefeasibly paid in full; <u>or</u>

  - If (A) neither the New Value Alternative nor any Alternative New Money Investment is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of the Senior Secured Claims and Swap Contract Claims shall receive (X) irrespective of whether interest on account of such loans under the revolving loan facility and the term loan facility under the Senior Secured Credit Agreement is Allowed or allowable under section 506(b) of the Bankruptcy Code, indefeasible payment in Cash in full of such

Holder's Senior Secured Interest Claims; (Y) such Holder's Pro Rata share, after indefeasible payment in Cash in full of the Senior Secured Interest Claims, regardless of whether interest on account of loans under the revolving loan facility and the term loan facility under the Senior Secured Credit Agreement is Allowed or allowable under section 506(b) of the Bankruptcy Code, of (i) the New Senior Secured Term Loans and (ii) 96.0% of the New Common Stock issued on the Effective Date (subject to dilution on account of the Management Equity Incentive Plan);

In addition to the foregoing, the Debtors shall be required to indefeasibly pay no later than the Effective Date, all reasonable and documented fees, costs and expenses of the Senior Secured Agent, the DIP Agent and the Ad Hoc Group of Senior Secured Lenders, in each case, as provided in the Senior Secured Credit Agreement, the DIP Order and the DIP Credit Agreement, as applicable.

For the avoidance of doubt, nothing herein or otherwise shall be construed as or deemed to be a waiver by any Holder of Allowed Class 4A Senior Secured Claims of its right to recover 100% in Cash on account of its Senior Secured Claims.

- *Voting*: Class 4A is Impaired by the Plan. Therefore, Holders of Class 4A Senior Secured Claims are entitled to vote to accept or reject the Plan.

e. **Class 4B - Swap Contract Claims**

- *Classification:* In the event either the New Value Alternative or any Alternative Acquisition Proposal is effectuated, Class 4B consists of all Swap Contract Claims.

- *Allowance:* The Swap Contract Claims shall be Allowed and deemed to be Allowed Claims.

- *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of each Swap Contract Claim, each Holder of such Allowed Class 4B Swap Contract Claim shall receive a Pro Rata distribution as follows:

  - Subject in all respects to the terms and conditions set forth in the Equity Purchase Agreement and the occurrence of the Closing pursuant to the terms thereof, Cash equal to 100% of the Swap Contract Claims; *or*

  - If any Alternative Acquisition Proposal is approved, the Alternative Plan Investor shall pay or cause to be paid, Cash equal to 100% of the Swap Contract Claims; *or*

  - If (A) neither the New Value Alternative nor any Alternative New Money Investment is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, Holders of the Swap Contract Claims shall be treated in accordance with Article III.C.4(c)(iii) of the Plan.

- *Voting*: Class 4B is Impaired by the Plan. Therefore, Holders of Class 4B Swap Contract Claims are entitled to vote to accept or reject the Plan.

**f.      Class 5A - 11.0% Senior Subordinated Notes Claims**

- *Classification:* Class 5A consists of all 11.0% Senior Subordinated Notes Claims.

- *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of each Allowed 11.0% Senior Subordinated Notes Claim, each Holder of such Allowed 11.0% Senior Subordinated Notes Claim shall receive a distribution as follows:

  - Subject to the occurrence of the Closing pursuant to the terms thereof, its Pro Rata share of the New Value Alternative 11.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan); *or*

  - If any Alternative Acquisition Proposal is approved, each Holder of an Allowed 11.0% Senior Subordinated Notes Claim shall receive (a) its Pro Rata share of the Alternative 11.0% Noteholder Distribution, (b) in the event the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii) of the Plan, Cash in an amount equal to its Pro Rata share of two-thirds of the Senior Secured New Money Investment Gift (after accounting for the adjustment described in Article III.C.10(b) of the Plan) and (c) in the event Holders of Allowed Class 4 Senior Secured Claims are indefeasibly paid, in full, in Cash, its ratable share of any Cash distribution including any thereof that, were it not for the Priority Rights, would have been payable to the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims (after accounting for the adjustment described in Article III.C.10(b)), it being understood that any incremental recovery under this Article III.C.6(b)(ii)(c) shall not affect any recovery of the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims pursuant to Article III.C.7.(b)(ii)(a) and (b); *or*

  - If (A) neither the New Value Alternative nor any Alternative Acquisition Proposal is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, its Pro Rata share of the Stand-Alone Alternative 11.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan);

    *provided*, *however*, that a distribution to Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims under subclauses (i), (ii) and (iii), above, is contingent on (A) Class 5A voting to accept the Plan and (B) 100% of the Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims agreeing to waive any and all Priority Rights; *provided further*, that if either or both of the foregoing conditions are not satisfied, the New Common Stock otherwise available for distribution to Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior

Subordinated Notes Claims shall, to the extent Holders of Allowed Senior Secured Claims have not received a 100% Cash recovery on account of their Claims, be distributed to Holders of Class 4A Allowed Senior Secured Claims, and the Holders of the 11.0% Senior Subordinated Notes Claims and 15.0% Senior Subordinated Notes Claims will not receive any distribution on account of Allowed 11.0% Senior Subordinated Notes Claims and Allowed 15.0% Senior Subordinated Notes Claims, as applicable; it being understood, however, that, provided Class 5A votes to accept the Plan, concurrent with such distribution to the Holders of Class 4A Allowed Senior Secured Claims as provided for immediately above, the Holders of Class 4A Allowed Senior Secured Claims shall distribute immediately and irrevocably as a gift from the Holders of Class 4A Allowed Senior Secured Claims to each Holder of a Class 5A Allowed 11.0% Senior Subordinated Notes Claims that voted to accept the Plan and agreed to waive any and all Priority Rights under the Senior Subordinated Notes Indenture the full amount of the available distribution to Holders of Class 5A Allowed 11.0% Senior Subordinated Notes Claims ratably to the Holders that voted to accept and waive any and all Priority Rights.

**Additional disclosure with respect to Holders of Class 5A 11.0% Senior Subordinated Notes Claims is provided in section VIII.A entitled "Additional Disclosure Regarding Treatment of Holders of 11.0% Senior Subordinated Notes and Holders of 15.0% Senior Subordinated Notes."**

- *Voting:* Class 5A is Impaired. Therefore, Holders of Class 5A 11.0% Senior Subordinated Notes Claims are entitled to vote to accept or reject the Plan.

**g.** **Class 5B - 15.0% Senior Subordinated Notes Claims**

- *Classification:* Class 5B consists of all 15.0% Senior Subordinated Notes Claims.

- *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of each Allowed 15.0% Senior Subordinated Notes Claims, each Holder of such Allowed 15.0% Senior Subordinated Notes Claims shall receive a distribution as follows:

  - Subject to the occurrence of the Closing pursuant to the terms thereof, its Pro Rata share of the New Value Alternative 15.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan); *or*

  - If any Alternative Acquisition Proposal is approved, each Holder of an Allowed 15.0% Senior Subordinated Notes Claim shall receive (a) its Pro Rata share of the Alternative 15.0% Noteholder Distribution, (b) in the event the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii) of the Plan, Cash in an amount equal to its Pro Rata share of one-third of the Senior Secured New Money Investment Gift (after accounting for the adjustment described in Article III.C.10(b) of the Plan) and (c) in the event Holders of Allowed Class 4 Senior Secured Claims are indefeasibly paid, in full, in Cash, no incremental distribution until the Holders of Allowed

Class 5A 11.0% Senior Subordinated Notes Claims receive the full benefit of their Priority Rights and, thereafter its ratable share of any excess Cash distribution, it being understood that any payment that, were it not for the Priority Rights, would have been payable to the Holders of Allowed Class 5B 15.0% Senior Subordinated Notes Claims under this Article III.C.7(b)(ii)(c) shall instead be made to the Holders of Allowed Class 5A 11.0% Senior Subordinated Notes Claims in accordance with Article III.C.6(b)(ii)(c); *or*

- If (A) neither the New Value Alternative nor any Alternative Acquisition Proposal is effectuated for any reason whatsoever, including termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be, and (B) the Stand-Alone Alternative is implemented, its Pro Rata share of the Stand-Alone Alternative 15.0% Noteholder New Common Stock Distribution (subject to dilution on account of the Management Equity Incentive Plan);

  *provided*, *however*, that a distribution to Holders of Allowed 15.0% Senior Subordinated Notes Claims under subclauses (i), (ii) and (iii), above, is contingent on (A) Class 5B voting to accept the Plan and (B) 100% of the Holders of Allowed 11.0% Senior Subordinated Notes Claims agreeing to waive any and all Priority Rights under the Senior Subordinated Notes Indenture; *provided further*, that if either or both of the foregoing conditions are not satisfied, the New Common Stock otherwise available for distribution to Holders of Allowed 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims shall, to the extent Holders of Allowed Senior Secured Claims have not received a 100% Cash recovery on account of their Claims, be distributed to the Holders of Class 4 Allowed Senior Secured Claims, and the Holders of the 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims will not receive any distribution on account of Allowed 15.0% Senior Subordinated Notes Claims and Allowed 11.0% Senior Subordinated Notes Claims, as applicable; it being understood, however, that, provided Class 5A and Class 5B vote to accept the Plan, concurrent with such distribution to the Holders of Class 4A Allowed Senior Secured Claims as provided for immediately above, the Holders of Class 4A Allowed Senior Secured Claims shall distribute immediately and irrevocably as a gift from the Holders of Class 4A Allowed Senior Secured Claims to each Holder of an Allowed 15.0% Senior Subordinated Notes Claims that voted to accept the Plan such Holder's Pro Rata share of such distribution.

**Additional disclosure with respect to Holders of Class 5A 11.0% Senior Subordinated Notes Claims is provided in section VIII.A entitled "Additional Disclosure Regarding Treatment of Holders of 11.0% Senior Subordinated Notes and Holders of 15.0% Senior Subordinated Notes."**

- *Voting:* Class 5B is Impaired. Therefore, Holders of Class 5B 15.0% Senior Subordinated Notes Claims are entitled to vote to accept or reject the Plan.

**h.** **Class 5C - ACIH Notes Claims**

- *Classification:* Class 5C consists of all ACIH Notes Claims.

- *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of each Allowed ACIH Notes Claims, each Holder of such Allowed ACIH Notes Claims shall receive, on the Effective Date, Cash in an amount equal to its Pro Rata share of 2.0% of the aggregate amount of all Allowed Class 5C ACIH Notes Claims, which amount shall not exceed an aggregate of $90,000.

- *Voting:* Class 5C is Impaired. Therefore, Holders of Class 5C ACIH Notes Claims are entitled to vote to accept or reject the Plan.

**i.** **Class 6A - Qualified Unsecured Trade Claims**

- *Classification:* Class 6A consists of all Qualified Unsecured Trade Claims.

- *Treatment:* Except to the extent that a Holder of an Allowed Qualified Unsecured Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Qualified Unsecured Trade Claim, and subject to execution of, and continued performance under, a Qualified Vendor Support Agreement, each Holder of an Allowed Qualified Unsecured Trade Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Qualified Unsecured Trade Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Qualified Unsecured Trade Claim; *provided, however*, that Holders of Qualified Unsecured Trade Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims. Holders of Allowed Qualified Unsecured Trade Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived.

- *Voting:* Class 6A is Impaired by the Plan. Therefore, Holders of Class 6A Claims are entitled to vote to accept or reject the Plan.

  **Additional disclosure with respect to Holders of Class 6A Qualified Unsecured Trade Claims is provided in section VIII.D entitled "Debtors' Estimate of Class 6A Qualified Unsecured Trade Claims."**

**j.** **Class 6B - General Unsecured Claims**

- *Classification:* Class 6B consists of all General Unsecured Claims.

- *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive the lesser of (i) $0.04 on account of each dollar of its Allowed General Unsecured Claim, payable from the General Unsecured

Claims Distribution Escrow Account and (ii) its Pro Rata share of the amount held in the General Unsecured Claims Distribution Escrow Account; *provided* that in the event (i) the Senior Secured New Money Investment Gift is made available pursuant to Article III.C.4(c)(ii) of the Plan or (ii) Holders of Allowed Class 4 Senior Secured Claims are paid, in full, in Cash, then, in each case, the distribution provided for under Article III.C.10(b) of the Plan shall be adjusted to ensure Holders of General Unsecured Claims receive a recovery proportionately comparable to that received by Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims under such circumstances.

- *Voting:* Class 6B is Impaired by the Plan. Therefore, Holders of Class 6B Claims are entitled to vote to accept or reject the Plan.

   **Additional disclosure with respect to Holders of Class 6B General Unsecured Claims is provided in section VIII.E entitled "Additional Disclosure Regarding Class 6B General Unsecured Claims"**

**k.      Class 6C - General Unsecured Claims of Atrium Corporation**

- *Classification:* Class 6C consists of all General Unsecured Claims of Atrium Corporation.

- *Treatment:* Holders of General Unsecured Claims of Atrium Corporation shall not receive any distribution on account of such General Unsecured Claims of Atrium Corporation. On the Effective Date, all General Unsecured Claims of Atrium Corporation shall be discharged.

- *Voting:* Class 6C is Impaired and Holders of Class 6C General Unsecured Claims of Atrium Corporation are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6C General Unsecured Claims of Atrium Corporation are not entitled to vote to accept or reject the Plan.

**l.      Class 6D - General Unsecured Claims of ACIH**

- *Classification:* Class 6D consists of all General Unsecured Claims of ACIH.

- *Treatment:* Holders of General Unsecured Claims of ACIH shall not receive any distribution on account of such General Unsecured Claims of ACIH. On the Effective Date, all General Unsecured Claims of ACIH shall be discharged.

- *Voting:* Class 6D is Impaired and Holders of Class 6D General Unsecured Claims of ACIH are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6D General Unsecured Claims of ACIH are not entitled to vote to accept or reject the Plan.

**m.      Class 7 - Section 510(b) Claims**

- *Classification:* Class 7 consists of all Section 510(b) Claims against the Debtors.

- *Treatment*: Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. On the Effective Date, all Section 510(b) Claims shall be discharged.

- *Voting:* Class 7 is Impaired and Holders of Class 7 Section 510(b) Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**n.      Class 8 - Intercompany Claims**

- *Classification:* Class 8 consists of all Intercompany Claims.

- *Treatment:* No distribution shall be made on account of Intercompany Claims. On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

- *Voting:* Holders of Class 8 Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, as applicable. Holders of Class 8 Intercompany Claims are not entitled to vote to accept or reject the Plan.

     **Additional disclosure with respect to Intercompany Claims is provided in section 0 entitled "Additional Disclosure Regarding Intercompany Claims."**

**o.      Class 9 - Intercompany Interests**

- *Classification:* Class 9 consists of all Intercompany Interests.

- *Treatment*: Intercompany Interests shall be Reinstated on the Effective Date.

- *Voting*: Class 9 is not Impaired by the Plan and Holders of Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

**p.      Class 10 - Interests in Atrium Corporation**

- *Classification:* Class 10 consists of all Interests in Atrium Corporation.

- *Treatment:* Holders of Interests in Atrium Corporation shall not receive any distribution on account of such Interests. On the Effective Date, all Interests in Atrium Corporation shall be cancelled and discharged.

- *Voting:* Class 10 is Impaired and Holders of Class 10 Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests are not entitled to vote to accept or reject the Plan.

### (iv)   Special Provision Governing Claims that are Not Impaired

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.

### (v)   Acceptance or Rejection of the Plan

#### a.   Voting Classes

Classes 4A, 4B (only to the extent the New Value Alternative or any Alternative Acquisition Proposal is consummated), 5A, 5B, 5C, 6A and 6B are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

#### b.   Presumed Acceptance of the Plan

Classes 1, 2, 3 and 9 are not Impaired under the Plan. The Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

#### c.   Presumed Rejection of Plan

Classes 6C, 6D, 7 and 10 are Impaired and shall receive no distribution under the Plan. The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

#### d.   Intercompany Claims.

Class 8 is either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, as applicable. The Holders in such Class are not entitled to vote to accept or reject the Plan.

### (vi)   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### (vii)   Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.[19]

---

[19]   [To be discussed.]

### C. MEANS FOR IMPLEMENTATION OF THE PLAN

#### (i) *The New Value Alternative and the Stand-Alone Alternative*

The Plan provides for potential implementation of one of two restructuring alternatives: (1) the New Value Alternative; and (2) the Stand-Alone Alternative. The Debtors will continue to seek Confirmation in accordance with both the New Value Alternative and the Stand-Alone Alternative. To the extent the New Value Alternative (or any Alternative Acquisition Proposal) is not effectuated for any reason whatsoever, the Debtors will seek Confirmation (and distributions to Holders of Claims) in accordance with the Stand-Alone Alternative.

#### (ii) *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan (and, to the extent applicable, the Equity Purchase Agreement or the Alternative Equity Purchase Agreement) and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (4) the execution and delivery of the Exit Facility Loan Documents; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

#### (iii) *Existing Letters of Credit*

On the Effective Date, all Existing Letters of Credit shall be replaced or otherwise addressed as part of the Exit Facility.

#### (iv) *The A/R Facility*

Solely to the extent the New Value Alternative (or any Alternative Acquisition Proposal) is implemented, at the Closing, the Debtors shall pay Cash equal to 100% of the balance outstanding under the A/R Facility as of the Closing Date.

To the extent the Stand-Alone Alternative is implemented, on the Effective Date, either: (1) the Debtors shall pay, in Cash, an amount equal to 100% of the balance outstanding under the A/R Facility as of the Closing Date; or (2) at the option of the A/R Agent, the A/R Facility may be extended or replaced pursuant to documentation in form and substance reasonably acceptable to the A/R Agent.

#### (v) *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

##### a. The New Value Alternative Loans

In the event the Closing occurs, Allowed Senior Secured Claims shall be satisfied with proceeds received on account of the New Value Alternative Loans (or financing, if any, contemplated under any Alternative Acquisition Proposal) and proceeds from the Purchase Price (or any Alternative Investment Purchase Price) or other funds paid or cause to be paid by the Plan Investor (or the Alternative Plan Investor).

Subject to, and upon the occurrence of, the Effective Date, if any, in connection with the New Value Alternative, and without further notice to or order or other approval of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity

(including the boards of directors of the Debtors), except for the Confirmation Order and as otherwise required by the Exit Facility Loan Documents or any Alternative Commitment Letters, the Reorganized Debtors shall, and are authorized to, enter into and perform and receive the proceeds of the New Value Alternative Loans, and to execute and deliver the New Value Alternative Loan Documents, in each case consistent with the terms of the Plan and the Debt Commitment Letters or otherwise on terms and conditions acceptable to the New Value Alternative Agents.

Confirmation of the Plan, if any, in connection with the New Value Alternative, shall be deemed (a) approval of the New Value Alternative Loans and the New Value Alternative Loan Documents, and all transactions contemplated thereby, including, without limitation, any supplemental or additional syndication of the New Value Alternative Loans, and all actions to be take, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein and (b) authorization of the Reorganized Debtors to enter into and execute the New Value Alternative Loan Documents and such other documents as the New Value Alternative Agents and/or New Value Alternative Lenders may require to effectuate the New Value Alternative Loans, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate the New Value Alternative Loans with the prior written consent of the New Value Alternative Agent.

The New Value Alternative Loan Documents, if and when executed, shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Value Alternative Loan Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, if any, in connection with the New Value Alternative, all of the Liens and security interests to be granted in accordance with the New Value Alternative Loan Documents (a) shall be deemed to be approved, (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Value Alternative Loan Documents, (c) shall be deemed perfected on such Effective Date, subject only to such Liens and security interests as may be permitted under the New Value Alternative Loan Documents and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non bankruptcy law. The Reorganized Debtors and the persons and entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

b.      The New Senior Secured Term Loans

In the event that (a) neither the New Value Alternative nor any Alternative Acquisition Proposal is effectuated for any reason whatsoever, including the failure of the Closing to occur or the termination of the Equity Purchase Agreement or Alternative Equity Purchase Agreement, as applicable, pursuant to the terms thereof, and (b) the Stand-Alone Alternative is implemented, the Reorganized Debtors shall enter into the New Senior Secured Term Loans. Confirmation shall, if applicable, be deemed approval of the New Senior Secured Term Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute documentation with respect to the New Senior Secured Term Loans, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such New Senior Secured Term Loans.

c.      Issuance and Distribution of New Common Stock

The issuance of the New Common Stock by Reorganized Atrium, including options or other equity awards, if any, in connection with the Management Equity Incentive Plan, is authorized without the need for any further

corporate action and without any further action by the Holders. 200,000,000 shares shall be authorized under the New Certificate of Incorporation of Reorganized Atrium. On the Effective Date, an initial number of shares of New Common Stock shall be issued and distributed as follows:

In the event the Closing occurs and subject to the conditions set forth in Article III.C.5(b) and Article III.C.6(b) of the Plan, an aggregate of 1,500,000 shares of New Common Stock will be issued to the Holders of Claims in Class 5A and Class 5B, subject to dilution with respect to any shares issued pursuant to the Management Equity Incentive Plan.

In the event that (a) the New Value Alternative (or any Alternative Acquisition Proposal) is not effectuated for any reason whatsoever, including the failure of any Closing to occur or the termination of the Equity Purchase Agreement or the Alternative Equity Purchase Agreement and (b) the Stand-Alone Alternative is effectuated, an aggregate 19,200,000 shares of New Common Stock will be issued to (a) Holders of Claims in Class 4A and (b) subject to the conditions set forth in Article III.C.5(b) and Article III.C.6(b) of the Plan, 800,000 shares of New Common Stock will be issued to the Holders of Claims in Class 5A and Class 5B, in each case subject to the election by such Holder to received either full voting or limited-voting New Common Stock or both. The percentage represented by such shares of New Common Stock will be subject to dilution with respect to any shares issued pursuant to the Management Equity Incentive Plan. If any such Holder desires to receive any portion of such New Common Stock to be comprised of the limited-voting class thereof, such Holder shall have submitted to the Debtors at least seven days before the Effective Date its irrevocable notice specifying the amount of New Common Stock to be comprised of the limited-voting class thereof. If a Holder does not provide such notice to the Debtors as described in the preceding sentence, such Holder shall be deemed to have requested all of its New Common Stock to be comprised of the full voting class thereof.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Distributions of New Common Stock, if any, to Holders of Allowed Senior Secured Claims shall be made to the Senior Secured Agent for further distributions in accordance with the terms of the Plan.

Distributions of New Common Stock, if any, to Holders of Allowed 11.0% Senior Subordinated Notes Claims and 15.0% Senior Subordinated Notes Claims shall be made by the Disbursing Agent to the respective Senior Subordinated Notes Indenture Trustees. The Disbursing Agent will serve without bond and may employ or contract with other entities to assist in or make the distributions required under the Plan.

Upon the Effective Date, and in connection with implementation of the New Value Alternative or the Stand-Alone Alternative, Reorganized Atrium shall be deemed to enter into the New Stockholders Agreement with each Entity that is to be a counter-party thereto and the New Stockholders Agreement shall be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby.

The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

*(vi)* **[Reserved]**

*(vii)* **Corporate Existence**

Except as otherwise provided in the Plan, the Equity Purchase Agreement (or, if applicable, the Alternative Equity Purchase Agreement) or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of

a corporation, limited liability company, partnership or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law).

### (viii)     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Equity Purchase Agreement (or, if applicable, the Alternative Equity Purchase Agreement) or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances, except for Liens securing the New Value Alternative Loans or the New Senior Secured Term Loans, as the case may be.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (ix)     *Cancellation of Existing Securities*

Except as otherwise provided in the Plan, the Equity Purchase Agreement (or, if applicable, the Alternative Equity Purchase Agreement) or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the Senior Secured Credit Agreement, the Senior Subordinated Notes Indenture, the ACIH Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided, however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (a) allowing Holders of Senior Secured Claims, the Senior Secured Agent, Holders of 11.0% Senior Subordinated Notes Claims (if applicable) and Holders of 15.0% Senior Subordinated Notes Claims (if applicable) to receive distributions under the Plan as provided herein, (b) allowing the Senior Secured Agent, if applicable, to make distributions under the Plan as provided herein and (c) allowing the Senior Secured Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan and the DIP Order, and directly from each of the Holders of Senior Secured Claims in accordance with the terms of Senior Secured Credit Agreement; *provided, further*, that the Senior Subordinated Notes Indenture shall be preserved to the extent necessary to maintain any charging lien rights of the Senior Subordinated Notes Indenture Trustees pursuant to the applicable provisions of the Senior Subordinated Notes Indenture; *provided*, *further*, *however*, that the immediately preceding two provisos shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  Any reasonable and documented fees and expenses of the Senior Subordinated Notes Indenture Trustees remaining unpaid as of the Confirmation Date shall be paid in full, in Cash, on the Effective Date, or within ten days after receipt by Reorganized Atrium of invoices therefor in an aggregate amount not to exceed $300,000, less any amounts previously paid by the Debtors on account of such fees and expenses before the Effective Date; *provided, however*, that any dispute over the reasonableness of such fees and expenses shall be determined by the Bankruptcy Court.  On and after the Effective Date, all duties and responsibilities of the Senior Secured Agent under the Senior Secured Credit Agreement and the Senior Subordinated Notes Indenture Trustees under the Senior

Subordinated Notes Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

### (x) Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) entry into and performance under the Equity Purchase Agreement or the Alternative Equity Purchase Agreement, as the case may be; (3) selection of the directors and officers for the Reorganized Debtors; (4) the distribution of the New Common Stock; (5) implementation of the restructuring transactions contemplated by Article IV.B of the Plan, as required to effectuate the New Value Alternative, any Alternative Acquisition Proposal or the Stand-Alone Alternative, as applicable; (6) adoption of the Management Equity Incentive Plan; (7) the execution and entry into the New Value Alternative Loans or the New Senior Secured Term Loans, as the case may be; (8) the execution and delivery of the Exit Facility Loan Documents; and (9) all other actions contemplated by the Plan, including the adoption of the New Certificate of Incorporation and the New By-Laws (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Value Alternative Loans, New Senior Secured Term Loans or the Exit Facility Loan Documents, as the case may be, and any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### (xi) New Certificate of Incorporation and New By-Laws

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states, provinces or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

### (xii) Directors and Officers of the Reorganized Debtors and Reorganized Atrium

As of the Effective Date, the term of the current members of the board of directors of Atrium Corporation shall expire, and the initial boards of directors, including the New Atrium Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor. On the Effective Date, the New Atrium Board shall be increased to seven directors.

If the Stand-Alone Plan is implemented, the New Atrium Board shall consist of seven directors, one of whom shall be the Chief Executive Officer of the Company and the remaining six of whom shall be appointed in a manner reasonably acceptable to the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Atrium Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after

the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws and other constituent documents of the Reorganized Debtors.

### (xiii)     *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and Reorganized Atrium, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, applicable exit facility loan documentation and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

### (xiv)     *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any Security, or the making delivery, filing, or recording of any instrument of transfer under, or in connection with, the Plan (including, for this purpose, in connection with the organizational documents relating to the Reorganized Debtors, the Exit Facility Loan Documents, and the other documents relating to the transactions described in Article IV. hereof) shall not be taxed under any law imposing a recording tax, stamp tax, transfer tax, or similar tax. Furthermore, and without limiting the foregoing, any transfers from a Debtor to a Reorganized Debtor or to any other Person pursuant to the Plan, as contemplated by the Plan or pursuant to any agreement regarding the transfer of title to or ownership of any of the Debtors' property in the United States, shall not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### (xv)     *Employee and Retiree Benefits*

All employment, retirement, indemnification and other agreements or arrangements in place as of the Effective Date (and included in schedules 2.15(e) and 4.01(b) of the Equity Purchase Agreement or comparable schedules to any Alternative Equity Purchase Agreement) with the Debtors' officers, directors or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such Persons, or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees identified as key leaders, top level managers or sales leaders, or indemnification arrangements with directors of non-Debtor subsidiaries, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs and plans; *provided, however*, that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### (xvi)     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any

Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

### (xvii)    The Post-Confirmation Committee

Following entry of the Confirmation Order, the Creditors' Committee, in consultation with the Debtors, shall appoint the members of the Post-Confirmation Committee. The Post-Confirmation Committee shall be established for the sole purpose of reviewing and consulting with the Debtors regarding objections to Claims pursuant to Article VII and overseeing distributions to all Holders of General Unsecured Claims. All reasonable and documented fees, expenses and costs of the Post-Confirmation Committee and its counsel shall be paid by the Debtors, up to an aggregate amount not to exceed $100,000 without application or submission to the Bankruptcy Court; it being understood that the Bankruptcy Court shall retain jurisdiction with respect to any disputes that may arise with respect to the Post-Confirmation Committee. The Post-Confirmation Committee shall be dissolved upon the closing of the Chapter 11 Cases.

### (xviii)    The Fee Escrow Account

On the Effective Date, at the option of the Plan Investor, the Plan Investor shall (1) provide to the Holders of Fee Claims a standby letter of credit (issued by a commercially reasonable financial institution and in form and substance reasonably acceptable to the Debtors) in an amount equal to all Fee Claims outstanding as of the Effective Date (including unbilled and estimated amounts, if applicable), (2) establish and fund the Fee Claims Escrow Account in an amount equal to all Fee Claims outstanding as of the Effective Date (including unbilled and estimated amounts, if applicable) or (3) enter into an agreement with any relevant Holder of Fee Claims acceptable to such Holder. Amounts held in the Fee Claims Escrow Account shall not constitute property of the Plan Investor or the Reorganized Debtors. The Fee Claims Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Fee Claims Escrow Account following (1) payment to all Holders of Fee Claims under the Plan and (2) the closing of the Chapter 11 Cases pursuant to Article XII.L, such remaining amount, if any, shall be returned to the Reorganized Debtors.

### D.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (i)    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed in accordance with the provisions and requirements of section 365 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that (1) were previously assumed or rejected by the Debtors, (2) are identified on the Rejected Executory Contract and Unexpired Lease List, (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective

date of such rejection is after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of the Executory Contracts or Unexpired Leases listed on the Rejected Executory Contract and Unexpired Lease List pursuant to section 365(a) of the Bankruptcy Code. The Plan Investor or Alternative Plan Investor, as applicable, shall reserve the right to amend the Rejected Executory Contract and Unexpired Leases List up to five days before the Confirmation Hearing. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

### (ii) *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed on the later of (1) 30 days after the service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or (2) the Claims Bar Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims, General Unsecured Claims of Atrium Corporation or General Unsecured Claims of ACIH and shall be treated in accordance with Article III.C.9, Article III.C.10 or Article III.C.11 of the Plan, as applicable.

**All Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII of the Plan.**

### (iii) *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith, and resolution of disputes by the Bankruptcy Court Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect

to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

### (iv) *Insurance Policies*

All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments.

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtors may obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors' and officers' liability insurance policy for the current and former directors, officers and managers for such terms or periods of time, and placed with such insurers to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order.

### (v) *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### (vi) *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### (vii) *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### (viii) *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable

thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### E. PROVISIONS GOVERNING DISTRIBUTIONS

#### (i) *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Debtors, in consultation with the Post-Confirmation Committee, may make partial distributions to Holders of Allowed Class 6B Claim at mutually-agreed upon times following the Effective Date.

Distributions on account of Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

#### (ii) *General Unsecured Claims Distribution Escrow Account*

On or as reasonably practicable after the Effective Date, the Debtors shall establish and fund the General Unsecured Claims Distribution Escrow Account, which shall be an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 6B General Unsecured Claims and funded in the amount of $800,000. Cash held in the General Unsecured Claims Escrow Account shall not constitute property of the Debtors or the Reorganized Debtors. Distributions from the General Unsecured Claims Distribution Escrow Account to Holders of Allowed Class 6B General Unsecured Claims shall be made in accordance with the provisions governing distribution set forth in Article VII. The General Unsecured Claims Distribution Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the General Unsecured Claims Distribution Escrow Account following (1) payment to all Holders of Allowed Class 6B General Unsecured Claims under the Plan and (2) the closing of the Chapter 11 Cases pursuant to Article XII.L, such remaining amount, if any, shall be redistributed. In the event (1) the Senior Secured New Money Investment Gift is made available to Article III.C.4(c)(ii) or (2) Holders of Allowed Class 4A Senior Secured Claims are paid, in full, in Cash, then in each case, the amount held in the General Unsecured Claims Distribution Escrow Account shall be adjusted to ensure that Holders of General Unsecured Claims receive a recovery proportionately comparable to that received by Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims under such circumstances.

#### (iii) *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

#### (iv) *Rights and Powers of Disbursing Agent*

##### a. Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby;

(c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court or the Canadian Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### b. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### (v) *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

### a. Delivery of Distributions

#### 1. Delivery of Distributions to Senior Secured Agent

Except as otherwise provided in the Plan, all distributions to Holders of Senior Secured Claims shall be governed by the Senior Secured Credit Agreement and shall be deemed completed when made to the Senior Secured Agent, who shall be deemed to be the Holder of all Senior Secured Claims for purposes of distributions to be made hereunder. The Senior Secured Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Senior Secured Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article IV.J of the Plan, the Senior Secured Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Senior Secured Claims.

#### 2. Delivery of Distributions to Senior Subordinated Notes Indenture Trustees

To the extent of any distributions in accordance with Article III.C.5 and Article III.C.6 of the Plan, all distributions to Holders of 11.0% Senior Subordinated Notes Claims and Holders of 15.0% Senior Subordinated Notes Claims shall be governed by the Senior Subordinated Notes Indenture and shall be deemed completed when made to the Senior Subordinated Notes Indenture Trustees, who shall be deemed to be the Holders of 11.0% Senior Subordinated Notes Claims and Holders of 15.0% Senior Subordinated Notes Claims, respectively, for purposes of distributions to be made hereunder. The Senior Subordinated Notes Indenture Trustees shall hold or direct such distributions for the benefit of the Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in Article IV.I of the Plan, the Senior Subordinated Notes Indenture Trustees shall (1) arrange to deliver such distributions to or on behalf of such Holders of Allowed 11.0% Senior Subordinated Notes Claims and Holders of Allowed 15.0% Senior Subordinated Notes Claims and (2) may exercise its charging liens against any such distributions.

#### 3. Delivery of Distributions to ACIH Notes Indenture Trustee

All distributions to Holders of ACIH Notes Claims shall be governed by the ACIH Notes Indenture and shall be deemed completed when made to the ACIH Notes Indenture Trustee. The ACIH Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Class 5C ACIH Notes Claims. As soon as practicable, the ACIH notes Indenture Trustee shall (1) arrange to deliver such distributions to or on behalf of such Holders of Allowed Class 5C ACIH Notes Claims and (2) may exercise its charging liens against any such distributions.

#### 4. Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the applicable Disbursing Agent, as appropriate: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of

address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to Article VI.H of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

### b. Minimum Distributions

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### c. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of Article VI.E.3 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been disallowed)without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

### (vi) *Manner of Payment*

- All distributions of the New Common Stock under the Plan shall be made by the Disbursing Agent on behalf of Reorganized Atrium.

- All distributions of the proceeds of the New Value Alternative Loans or the New Senior Secured Term Loans, as the case may be, to the Holders of Claims under the Plan shall be made by the Disbursing Agent on behalf of Reorganized Atrium.

- All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

- At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### (vii) *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock as contemplated by Article III.B of the Plan under either the New Value Alternative or the Stand-Alone Alternative, as the case may be, shall be exempt from, among other things, the registration requirements of

section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Stockholders Agreement and Reorganized Atrium's New Certificate of Incorporation and, only in connection with implementation of the Stand-Alone Alternative, the New Stockholders Agreement.

### (viii)     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

### (ix)     *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### (x)     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the DIP Order, Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### (xi)     *Setoffs and Recoupment*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

### (xii)     *Claims Paid or Payable by Third Parties*

### a.     **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the

Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### b. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### c. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### F. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

#### (i) Allowance of Claims

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

#### (ii) Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements and compromises without any further notice to or action, order or approval by the Bankruptcy Court; *provided, however,* that the Debtors shall not settle or compromise any Disputed Claim in the settled or compromised aggregate amount of $100,000 without the consent of the Post-Confirmation Committee.

#### (iii) Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### (iv) Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### (v) Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (1) the date that is 60 days after the applicable Claims Bar Date with respect to such Claim, (2) 80 days after the Effective Date and (3) such later date as may be fixed by the Bankruptcy Court.

### (vi) Disallowance of Claims or Interests

Any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code and as to which an adversary proceeding has been commenced, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

### (vii) Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

### (viii) No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### (ix) Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder

is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

### G. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

#### (i) *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders, and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

#### (ii) *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases or the CCAA Proceeding shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

#### (iii) *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

#### (iv) *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious

reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are, solely in their capacity as a Released Party, deemed released and discharged by the Debtors, the Reorganized Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the CCAA Proceeding, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases or the CCAA Proceeding, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Exit Facility Loan Documents or related agreements, instruments or other documents, including any documents compiled in connection with the New Value Alternative or the Stand-Alone Alternative, or other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence.

Each of the Released Parties afforded value to the Debtors and aided in the reorganization process. The Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Plan reflects the settlement and resolution of several complex issues, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan. Indeed, the release provisions in the Plan were a critical component of obtaining the Lock-Up Agreement and a prearranged plan of reorganization that the Debtors' believe maximizes recoveries to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their businesses to compete effectively post-emergence. Absent the prearranged bankruptcy filing and expeditious implementation of the Plan (which preserves trade relationships and, therefore, enterprise value), the Debtors could face a longer, costlier and uncertain chapter 11 process that could lead to significant business interruption and damage.

### (v) *Releases by Holders*

As of the Effective Date of the Plan, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties, solely in their capacity as a Released Party, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the CCAA Proceeding, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases or the CCAA Proceeding, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Exit Facility Loan Documents or related agreements, instruments or other documents, including any documents compiled in connection with either the New Value Alternative or the Stand-Alone Alternative, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence.

Holders entitled to vote to accept or reject the Plan will have the opportunity to "opt-out" of the releases described in this section on such Holder's Ballot or Note Ballot.

*(vi)*     ***Exculpation***

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*(vii)*     ***Injunction***

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII OF THE PLAN, THE RELEASING PARTIES THEREUNDER SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII OF THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE VIII.B OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.F OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY

RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### (viii) *Setoff and Recoupment*

Except with respect to Claims or payments allowed in or provided for under the Plan, the Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but the failure to do so shall not constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against such claimant.

### (ix) *Subordination Rights Under the Senior Subordinated Notes*

Subject in all respects to Article III.C.5 and Article III.C.6 of the Plan, any distributions under the Plan to Holders of 11.0% Senior Subordinated Notes Claims and 15.0% Senior Subordinated Notes Claims shall be received and retained free from any obligations to hold or transfer the same to any other creditor, and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. The Subordination Rights shall be waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to Property distributed under the Plan to Holders of 11.0% Senior Subordinated Notes Claims and Holders of 15.0% Senior Subordinated Notes Claims, in each case other than as provided in the Plan.

### (x) *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## H. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### (i) *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that all provisions, terms and conditions hereof are approved in the Confirmation Order, which shall be reasonably acceptable to: (a) the Debtors; (b) the Senior Secured Agent; (c) the Ad Hoc Group of Senior Secured Lenders; (d) the Creditors' Committee; and (e) to the extent the New Value Alternative or Alternative Acquisition Proposal is implemented, the Plan Investor or Alternative Plan Investor, as applicable.

### (ii) *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order (a) shall have been duly entered and not subject to any stay and (b) shall include a finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

- Any amendments or modifications to the Plan, if any, shall be reasonably acceptable to: (a) the Debtors; (b) the Senior Secured Agent; (c) the Ad Hoc Group of Senior Secured Lenders; (d) to the extent affecting the rights of unsecured creditors, the Creditors' Committee; and (e) to the extent the New Value Alternative or Alternative Acquisition Proposal is implemented, the Plan Investor or Alternative Plan Investor, as applicable.

- The Plan Supplement, including any amendments, modifications or supplements thereto shall be acceptable to: (a) the Debtors; (b) the Senior Secured Agent; (c) the Ad Hoc Group of Senior Secured Lenders; (d) to the extent affecting the rights of unsecured creditors, the Creditors' Committee; and (e) to the extent the New Value Alternative or Alternative Acquisition Proposal is implemented, the Plan Investor or Alternative Plan Investor, as applicable; *provided*, *however*, that all approvals shall be in accordance with Article I.A.119 hereof.

- Solely in connection with the Stand-Alone Alternative, the aggregate amount of (a) Administrative Claims (excluding Fee Claims) shall not exceed $8,000,000, (b) Priority Non-Tax Claims shall not exceed $5,000,000 and (c) Other Secured Claims shall not exceed $5,000,000.

- Solely in connection with the Stand-Alone Alternative, the termination of the Equity Purchase Agreement or Alternative Equity Purchase Agreement, as applicable, pursuant to the terms thereof and the implementation of the Stand-Alone Alternative.

- All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

- With respect to the New Value Alternative or Alternative Acquisition Proposal, as applicable, (a) each of the conditions set forth in Article V and Article VI of the Equity Purchase Agreement (or comparable provisions of any Alternative Equity Purchase Agreement) have been satisfied or otherwise waived pursuant to the terms thereof on or before the Closing Date, and (b) the Equity Purchase Agreement (or any Alternative Equity Purchase Agreement) shall not have terminated in accordance with the terms thereof on or before the Closing Date.

- With respect to the New Value Alternative or Alternative Acquisition Proposal, as applicable, the Debtors shall indefeasibly pay the DIP Claims as provided herein immediately before the Effective Date; it being understood that such payment shall be made from all of the Cash of the Debtors and/or a portion of the proceeds received at Closing.

- The Debtors shall (a) to the extent the New Value Alternative (or any Alternative Acquisition Proposal) is implemented and the Closing Date shall have occurred, enter into the New Value Alternative Loan Documents (or financing, if any, contemplated under any such Alternative Acquisition Proposal) and all conditions precedent to funding under the New Value Alternative Loans (or financing, if any, contemplated under any such Alternative Acquisition Proposal) shall have been satisfied or waived within 3 business days after the date of entry of the Confirmation Order, and pay, subject to Section 4.08 of the Equity Purchase Agreement (or any comparable provision of any Alternative Equity Purchase Agreement), without the need to file a fee application with the Bankruptcy Court, all reasonable fees and expenses of the New Value Alternative Agents and the New Value Alternative Lenders, including, without limitation, the reasonable fees and expenses of counsel to the New Value Alternative Agents and the Plan Investor (or all reasonable fees and expenses of the agent and lenders with respect to financing, if any, under any such Alternative Acquisition Proposal, including, without limitation, the reasonable fees and expenses of counsel to any such agent); or (b) to the extent the Stand-Alone Alternative is implemented, enter into the New Senior Secured Loan Agreements and all conditions precedent to funding under the New Senior Secured Term Loans shall have been satisfied or waived, including the condition that such Loans are rated at least B2 by Moody's and B by S&P, in each case as of the Effective Date.

- Solely to the extent the Stand-Alone Alternative is implemented, either (a) the Receivables Purchase Agreements shall be extended, without any fee or charge, on the same terms and conditions as amended as of the Petition Date to the maturity date of the Exit Facility or (b) a replacement receivables facility shall be implemented on terms and conditions reasonable acceptable to Holders of a majority of the Senior Secured Claims.

- The CCAA Implementation Order shall have been issued in a form and substance reasonably satisfactory to: (a) the Debtors; (b) the Senior Secured Agent; (c) the Ad Hoc Group of Senior Secured Lenders; (d) the Creditors' Committee; and (e) to the extent that the New Value Alternative or Alternative Acquisition Proposal is implemented, the Plan Investor or Alternative Plan Investor, as applicable.

- To the extent the Stand-Alone Alternative is implemented, Reorganized Atrium shall have entered into the New Stockholders Agreement in form and substance reasonably satisfactory to the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders.

### (iii)   *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX of the Plan may be waived only by the Person whom is entitled to satisfaction of such condition (it being understood that the condition contained in Article IX.B.4. of the Plan may be waived only by the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### (iv)   *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and except as provided by the terms of the Equity Purchase Agreement nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Debtors, any Holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### (i)   *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 as well as those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X of the Plan.

### (ii)   *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### (iii)  *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder or any other Entity.

## J.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to:  (a) the Equity Purchase Agreement (or any Alternative Equity Purchase Agreement), including payment of the Termination Fee and the Reverse Termination Fee; (b) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V of the Plan, to the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

- resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.L.1 of the Plan;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement or the Confirmation Order;

- enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan, including under Article VIII of the Plan;

- enforce all orders previously entered by the Bankruptcy Court; and

- hear any other matter not inconsistent with the Bankruptcy Code.

## X.     RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, before voting to accept or reject the Plan. Although there are many risk factors, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

## A. RISKS RELATING TO BANKRUPTCY

### (i) The Debtors may not be able to obtain confirmation of the Plan

To emerge successfully from chapter 11 as a viable business, the Debtors, like any debtor, must obtain approval of a plan of reorganization, and thereafter confirm and successfully implement the Plan. This process requires the Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan; (b) solicit and obtain creditor acceptances of the proposed plan; and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an "impaired" class of claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) a debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by a bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims or Interests ultimately would receive on account of their Claims or Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the Debtors' creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive period under section 1121 of the Bankruptcy Code during which only the Debtors may propose and solicit votes on a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy, there can be no assurance that the Debtors will successfully reorganize or of when this reorganization will occur.

### (ii) The conditions precedent to the Effective Date of the Plan may not occur

As more fully set forth in the Plan, which is attached hereto as **Exhibit A**, the Effective Date is subject to a number of conditions precedent. If these conditions precedent are not met or waived, the Effective Date will not occur.

### (iii) Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be

comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### (iv) *The Debtors may object to the amount or classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

## B.     RISKS RELATED TO THE REORGANIZED DEBTORS' BUSINESS

### (i) *The recent financial crisis and current uncertainty in global economic conditions could have a material negative effect on the Debtors' business, liquidity, results of operations and financial condition*

The recent financial crisis affecting the banking system and financial markets and the current uncertainty in global economic conditions have resulted in tight credit markets, illiquid financial markets and extremely volatile credit, equity and fixed income markets. Because both the Debtors and their customers depend on access to capital markets, limited or expensive access to capital could make it more difficult for these companies to do business with the Debtors, or to do business generally, which could adversely affect the Debtors' businesses.

### (ii) *Downward trends in the housing sector and in general economic conditions could result in decreased demand for the Debtors' products and negatively impact financial performance*

Trends in the housing sector directly impact the Debtors' financial performance because demand in the window and door manufacturing and distribution industry is influenced by new home construction activity and home improvement, including remodeling and replacement projects. For the year ended December 31, 2008 and the eleventh months ended November 30, 2009, the Debtors estimate that approximately 60% and 52%, respectively, of their window sales were related to new home construction. While demographic trends are favorable for the long-term growth of residential new construction, economic conditions remain difficult in a number of the Debtors' markets and it is very difficult to predict the extent and duration of the current ongoing downturn in the U.S. housing market, as well as its potential adverse impact on operating results. According to the National Association of Home Builders, total housing starts declined 25% in 2007 and an additional 33% in 2008 due to excessive inventories of homes and less attractive mortgage terms, with full-year 2008 single family housing starts declining to 616,000 from 1.036 million in 2007 (or 40.5%), and from 1.719 million in 2005 (or 64.1%). Single-family housing starts for the new construction market were 427,000 for the first nine months of 2009. Total 2009 single-family housing starts are projected to be 445,200, a further decline of 40% from 2008 levels, before showing improvement in 2010 of some 35%. Multi-family housing starts are projected to drop by more than 58% in 2009 and an additional 22% in 2010. The home improvement market has also been affected by the current economic environment. Remodel and replacement projects have declined by 13% in both 2008 and 2009. Projections for 2010 range from a further drop of 4% to an increase of 5%. The window and door market, however, appears to be trending better than the overall remodel and replacement market due to a number of factors, including federal stimulus programs.

The Debtors' business is subject to seasonality, which could adversely affect financial conditions to the extent the Debtors need more funds during periods of slower sales activity. Markets for building-related products are seasonal, particularly in the Northeast, Midwest, Rocky Mountain and Northwest regions of the U.S. and in Canada. Historically, the Debtors' business has experienced increased sales in the second and third quarters of the year due to increased construction during those periods. This is partially offset because interior construction and repair increases during the winter months and the first and fourth quarters of the year have historically been peak seasons for the Debtors' door products, particularly interior doors. Because much of the Debtors' overhead and expenses are fixed throughout the year, the Debtors' operating profits tend to be lower in the first and fourth quarters. These seasonal trends may cause reductions in profit margins and impact the Debtors' financial condition to the extent more funds are needed during periods of slower sales activity in the future.

***Increases in interest rates and the reduced availability of financing for home improvements, as well as decreases in home values, may cause the Debtors' remodeling and replacement sales and profitability to decrease***

In general, demand for home improvement products may be adversely affected by the state of the national economy and housing market, increases in interest rates, decreases in home values and the reduced availability of financing. If interest rates increase and consequently, the ability of prospective buyers to finance purchases of home improvement products is adversely affected, or if home values continue to decrease, then the Debtors' remodeling and replacement business may be materially adversely affected. For the year ended December 31, 2008 and the eleven months ended November 30, 2009, the Debtors estimate that approximately 40% and 48%, respectively, of their window sales were related to remodeling and replacement.

      (iv) ***The Debtors' operate in a highly competitive business environment, including competitors who may have greater resources and operating flexibility than the Debtors. These competitors could gain greater market share and cause the Debtors to lose customers and could put pressure on the price of their products, reducing profit margins***

The major geographic markets for the Debtors' products and services are highly competitive. In recent years, competition has intensified and continues to increase further during the economic downturn. Home center retailers are increasing their purchases of products directly from manufacturers, particularly low-cost suppliers in Asia, for sale as private label and house brand merchandise. Also, home center retailers, which have historically concentrated their sales efforts on retail consumers and remodelers, are increasingly turning their marketing efforts directly toward professional contractors and installers. The Debtors believe that competition in their industries is based largely on price, product and service quality, brand reputation, customer service and product features. Although the relative importance of these factors varies among customers and product categories, price is often a primary factor. The Debtors compete with other national and regional manufacturers in their markets. Some of the Debtors' principal competitors may be less highly-leveraged and have greater financial resources and thus may be better able to withstand changes in conditions within the industries in which the Debtors operate due to their greater operating and financial flexibility. These competitors could gain greater market share and cause the Debtors to lose customers.

As a result of the competitive environment in the markets in which the Debtors operate, the Debtors face, and will continue to face, product pricing pressures from competitors as well as from large customers. Thus, the Debtors may experience reductions in their profit margins on sales or may be unable to pass future raw material price or labor cost increases on to their customers, which would also reduce profit margins.

      (v) ***The Debtors rely on key customers and may encounter conflicts within and between their distribution channels***

Sales of the Debtors' home improvement and building products to home center retailers are substantial. The Debtors' top ten customers together accounted for approximately 24.5% and 29.6% of net sales for the year ended December 31, 2008 and the eleventh months ended November 30, 2009, respectively. Because the Debtors do not have long-term contracts with any customers other than with The Home Depot for Florida, Texas and the Gulf Coast, and with Lowe's in the Southeast, many customers may not continue to purchase the Debtors' products. Furthermore, during downturns in the Debtors' markets, declines in the financial condition and creditworthiness of significant customers may impact the volume of business, the credit risk involved and terms of doing business with them, including the Debtors' ability to sell receivables to the A/R Facility.

The loss of, or a significant adverse change in, the Debtors' relationship with any major customer could have a material adverse impact and could affect the mix of the growth in sales as between organic growth and acquisition growth. The loss of, or a reduction in orders from, significant customers, losses arising from customer disputes regarding shipments, fees, merchandise condition or related matters or the inability to collect accounts receivable from any major retail customer could have a material adverse effect on the Debtors. Additionally, revenue from customers that have accounted for significant revenue in past periods, individually or as a group, may not continue, or if continued, may not reach or exceed historical levels in any period.

*(vi)*     *Continued consolidation of customers could adversely affect the Debtors' business*

Though large customers can offer efficiencies and unique market opportunities, consolidation increases their size and importance. These larger customers can make significant changes in their volume of purchases and/or seek price reductions. Furthermore, consolidation could adversely affect margins and profitability, particularly if the Debtors were to lose a significant customer. Given current market conditions, there exists the possibility for further consolidation among customers. If such further consolidation occurs, there is no assurance that the Debtors would be able to retain such customers, who may elect to buy from the acquiring company's existing window suppliers, or that the Debtors will be able to maintain existing profit margins.

*(vii)*     *Fluctuations in the price and availability of raw materials could have a material adverse effect on the Debtors' business, results of operations and financial condition*

The Debtors purchase aluminum, vinyl, glass, sealants and other raw materials from various suppliers. These commodity raw materials are subject to periods of rapid and significant fluctuations in price. In particular, aluminum and PVC resin have been subject to rapid price increases over the past several years. Historically, the total cost of raw materials comprises approximately 40% to 45% of the Debtors' total revenue. The Debtors have only a few long-term contracts with raw material suppliers. In the event that severe shortages of these materials occur, the Debtors may experience increases in the cost of, or delay in the shipment of, products, which may result in lower margins on the sales of products. In addition, the Debtors saw a significant increase in the prices of the raw materials used from 2006 to 2008, including diesel and gas, and then more moderated increases during the eleventh months of 2009. If prices of raw materials continue to escalate, the Debtors may be unable to pass these increased prices on to customers. Moreover, sharp increases in raw material prices are more difficult to pass through to customers in a short period of time and may negatively impact short-term financial performance.

*(viii)*     *Increases in fuel and energy costs could adversely affect results of operations and financial condition*

The price of fuel and energy impacts the prices the Debtors' suppliers charge for their products as well as the Debtors' manufacturing and transportation costs. The price of fuel and energy is unpredictable and fluctuates based on events outside the Debtors' control, including geopolitical developments, supply and demand for oil and gas, actions by oil and gas producers, war and unrest in oil producing countries, regional production patterns, limits on refining capacities, natural disasters and environmental concerns. In many cases, the Debtors are not able to pass along the full extent of increases in fuel and energy costs to customers through price increases or are delayed in the ability to pass along such costs. Recent increases in fuel and energy prices have adversely affected operating expense and net income and further increases could adversely affect results of operations and financial condition.

*(ix)*     *The Debtors' ability to pursue acquisitions is limited, and the Debtors may not be able to identify attractive acquisition candidates or realize the intended benefits of acquisitions*

Historically, part of the Debtors' business strategy has been to capitalize on the fragmented market for window and patio door manufacturers by making selective strategic acquisitions. Given current market conditions and the Debtors' projected future liquidity position, the Debtors will not likely be able to pursue this acquisition strategy in the near term. As a result, revenues, which in the past have been significantly driven by new acquisitions, may decrease or not increase as significantly as in the past.

*(x)*     *The Debtors rely upon regular deliveries of raw materials and finished goods. Any interruption of such deliveries could adversely affect profitability or revenues*

The Debtors' dependency upon regular deliveries from particular suppliers means that interruptions or stoppages in deliveries could adversely affect operations until arrangements with alternate suppliers could be made. If any suppliers were unable to deliver materials for an extended period of time, as a result of financial difficulties, catastrophic events affecting their facilities or other factors beyond the Debtors' control, or if the Debtors were unable to negotiate acceptable terms for the supply of materials with these or alternative suppliers, the Debtors' business could suffer. The Debtors may not be able to find acceptable alternatives, and any such alternatives could

result in increased costs. Even if acceptable alternatives are found, the process of locating and securing such alternatives might be disruptive to the Debtors' business. Extended unavailability of necessary raw materials or other supplies could cause the Debtors to cease manufacturing one or more products for a period of time, which would likely result in an immediate loss of customers and market share.

### *(xi)* *The Debtors are exposed to currency exchange rate risks*

The Debtors sell products in the United States and Canada. In addition, the Debtors' Canadian subsidiary, North Star, purchases significant raw materials in the U.S. Because the Debtors do not expect to hedge foreign currency transactions in the next twelve months, a change in the relative value of the U.S. and Canadian currencies could adversely impact financial performance, particularly that of the Canadian subsidiary. The exchange rate between the U.S. and Canadian currencies has fluctuated significantly in recent years and may continue to do so in the future.

### *(xii)* *The Debtors have been, and may in the future be, subject to significant compliance costs as well as claims and liabilities under environmental, health and safety laws and regulations*

The Debtors' past and present operations and assets are subject to certain federal, state and local environmental laws and regulations pertaining to the discharge of materials into the environment, the handling and disposal of wastes, including solid and hazardous wastes, or otherwise relating to health, safety and protection of the environment. The applicable environmental laws and regulations and changes thereto, may require the Debtors to make material expenditures with respect to ongoing compliance with, or remediation under, these laws and regulations. However, the Debtors' efforts to comply with environmental requirements do not remove the risk that the Debtors may be held liable, or incur fines or penalties, and that the amount of liability, fines or penalties may be material, for, among other things, the release of hazardous substances occurring on or emanating from current or formerly owned or operated properties or any associated offsite disposal location or for contamination discovered at any of the Debtors' properties from activities conducted by previous occupants.

The nature of the Debtors' past and present operations and assets expose them to the risk of claims under these environmental, health and safety laws and regulations. The Debtors' have been subject to such claims in the course of their operations, and have made expenditures to address these known conditions in a manner consistent with applicable laws and regulations. The discovery of presently unknown environmental conditions, changes in environmental, health and safety laws and regulations or other unanticipated events may give rise to claims that may involve material expenditures or liabilities.

### *(xiii)* *The occurrence of natural disasters and weather fluctuations could adversely affect the Debtors' operating expenses and reduce revenues and cash flows*

Weather patterns can have a material impact on the Debtors' business and financial performance. The climates and geology of many of the states in which the Debtors operate, including Florida, Texas and California, present increased risk of natural disasters. To the extent that hurricanes, tornados, severe storms, earthquakes, droughts, floods, wildfires or other natural disasters or similar events occur, the Debtors' operations could be negatively impacted, which may result in losses. Any of these events could increase operating expenses, impair cash flows and reduce revenues, which could, in turn, negatively affect the market price of the Debtors' securities.

### *(xiv)* *The Debtors' business will suffer if certain key officers or employees discontinue employment with them or if the Debtors are unable to recruit and retain highly skilled staff*

The success of the Debtors' business is materially dependent upon the skills, experience and efforts of their President and Chief Executive Officer, Gregory T. Faherty, and certain other key officers and employees. The loss of Mr. Faherty or other key personnel could have a material adverse effect on the Debtors' business, operating results or financial condition. While the Debtors have noncompetition agreements with Mr. Faherty and certain other key officers and employees, a court could find such agreements unenforceable under applicable state law. The Debtors do not customarily maintain key-man life insurance policies on any members of management. The Debtors'

business also depends on their ability to continue to recruit, train and retain skilled employees, particularly skilled sales personnel. The loss of the services of any key personnel, or the inability to hire new personnel with the requisite skills, could impair the Debtors' ability to develop new products or enhance existing products, sell products to customers or manage the business effectively.

### (xv) *Increases in labor costs, potential labor disputes and work stoppages at the Debtors' facilities or the facilities of the Debtors' suppliers could disrupt operations and prevent the Debtors from delivering products to customers on a timely basis, which could cause loss of business or customers. In addition, increases in labor costs could increase operating expenses, which could reduce profit margins*

The Debtors' business is labor intensive, and, as a result, financial performance is affected by the availability of qualified personnel and the cost of labor. As of November 30, 2009, the Debtors employed approximately 3,990 employees, excluding contract employees, of whom approximately 700, or 17.4%, were covered by a three-year collective bargaining agreement that expires in May 2010. If the Debtors are unable to enter into a new satisfactory labor agreement or if workers were to strike, engage in a work stoppage or other slowdown, the Debtors could experience a significant disruption of their operations, possibly causing the Debtors to fail to deliver products to customers on a timely basis, and the Debtors may lose business or customers. This could increase operating expenses, which could reduce profit margins. In addition, the non-unionized labor force may become subject to labor union organizing efforts, which could cause the Debtors to incur additional labor costs and increase the related risks that they face.

Some of the Debtors' direct or indirect suppliers and customers have unionized workforces. Strikes, work stoppages or slowdowns experienced by these suppliers could result in slowdowns or closures of facilities where components of the Debtors' products are manufactured. Any interruption in the production or delivery of the Debtors' products could reduce sales, increase costs and have a material adverse affect on the Debtors.

### (xvi) *The Debtors are exposed to product liability and construction defect claims*

The Debtors are regularly exposed to product liability and construction defect claims relating to the alleged performance of the Debtors' products, the performance of a product in which any of the Debtors' products was a component part and/or the installation by the Debtors of such products.

Increasingly, homebuilders, including the Debtors' customers, are subject to construction defect and home warranty claims in the ordinary course of their business. The Debtors' contractual arrangements with these customers typically include the agreement to indemnify them against liability for the performance of the Debtors' products or services or the performance of other products that the Debtors' install. These claims frequently result in lawsuits against the homebuilders and many of their subcontractors, including the Debtors, and require defense costs even when such products or services are not the principal basis for the claims.

The Debtors cannot assure you that product liability and construction defect claims will not be brought against them in the future, either by an injured customer of an end-product manufacturer who used one of the Debtors' products as a component or by a direct purchaser from the Debtors. One or more of these claims could come in the form of a class-action lawsuit, which can be expensive to defend, adjudicate or resolve. In addition, indemnification from the Debtors' customers or coverage under insurance policies may not be adequate to cover future product liability claims against the Debtors.

Moreover, liability insurance is expensive, difficult to maintain and may be unobtainable in the future on acceptable terms. The amount and scope of any insurance coverage may be inadequate if a product liability claim is successfully asserted against the Debtors. The Debtors maintain significant self-insured retention levels on their commercial general liability policy. Furthermore, if any significant claims are made against the Debtors, their business may be adversely affected by any resulting negative publicity.

*(xvii)* ***The Debtors have significant goodwill and other intangible assets, the future impairment of which could materially adversely affect Debtors***

As of September 30, 2009, the Debtors' reported goodwill and other intangible assets were approximately $149.3 million, which represented approximately 41.7% of the Debtors' total assets. The amount of goodwill the Debtors report can be impacted by business and market conditions. Valuation of intangible assets requires the Debtors to make subjective and complex judgments about matters that are inherently uncertain. When there is a change in such conditions or judgments, the Debtors may be required to write down goodwill or other intangible assets. The macroeconomic factors affecting the housing and building materials industries, in addition to the operating performance of some of the Debtors' reporting units, has in the past and may in the future result in the impairment to the carrying value of intangible assets for customer relationships and trade names. For the year ended December 31, 2008, the Debtors recorded an impairment charge of $472.1 million to adjust the customer relationship and trade name intangible assets to their fair value. There could be additional impairments to goodwill or intangible assets in 2009 and, because of the significance of goodwill and other intangible assets, any future additional impairments could be significant and could have a material adverse effect on the Debtors.

*(xviii)* ***Manufacturing or assembly realignments may result in a decrease in the Debtors' near-term earnings***

The Debtors' continually review manufacturing and assembly operations and sourcing capabilities. In September 2008, the Debtors consolidated manufacturing facilities in Tolleson, Arizona and Anaheim, California and, in December 2008, the Debtors transferred manufacturing capacity in Jacksonville, Florida to its north Texas facility. Effects of periodic manufacturing realignments and cost savings programs could result in a decrease in near-term earnings until the expected cost reductions are achieved. These programs may include the consolidation and integration of facilities, functions, systems and procedures. Certain products may also be shifted from one manufacturing or assembly facility to another. Such actions may not be accomplished as quickly as anticipated and the expected cost reductions may not be achieved.

*(xix)* ***Changes in consumer preferences could adversely affect the Debtors' business***

The Debtors' business in general is subject to changing consumer trends, demands and preferences. The Debtors' continued success depends largely on the introduction and acceptance by their customers of new product lines that respond to such trends, demands and preferences. Trends within the industry change from time-to-time and the Debtors' failure to anticipate, identify or react to changes in these trends could lead to, among other things, rejection of a new product line, reduced demand and price reductions for their products and could materially adversely affect the Debtors.

*(xx)* ***The Debtors may not be successful in implementing their business plan and may not achieve the financial projections set forth in this Disclosure Statement***

If the Debtors do not successfully implement their business plan, their financial condition and results of operations will likely fall short of the projections set forth in **Exhibit D** to this Disclosure Statement.

The Debtors cannot predict which, if any, of these or other factors might have a significant effect in the future on the building products industry generally, or the window and door business specifically, nor can the Debtors predict what effect, if any, the occurrence of these or other events might have on the Debtors' operations.

**C.      RISKS RELATED TO FINANCIAL INFORMATION**

*(i)*      ***The financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed***

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such

financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

> *(ii)* ***Financial projections and other forward looking statements are not assured and are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary materially from the projections***

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be materially different from the Projections. Specifically, the Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the Reorganized Debtors' ability to maintain or increase revenues and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) consumer preferences continuing to support the execution of the Debtors' business plan.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized or that actual results will not vary materially from the projections.

The Debtors note that their actual performance since the Petition Date may result in different net debt balances than those presented in the April 30, 2010 projected balance sheet provided as part of **Exhibit D**. The Debtors' management does not expect actual net debt balance amounts under the Stand-Alone Alternative to be materially different than what is presented here.

> *(iii)* ***This Disclosure Statement contains forward looking statements***

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 that reflect the Debtors' current views with respect to future events. Forward looking statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof, other variations thereon or comparable terminology.

All forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in these forward looking statements, many of which are beyond the control of the Debtors. The Liquidation Analysis (defined below and set forth in **Exhibit C** of this Disclosure Statement), financial projections (set forth in **Exhibit D** of this Disclosure Statement) and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims or Interests may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

> *(iv)* ***No legal or tax advice is provided by this Disclosure Statement***

This Disclosure Statement is not legal advice to any person. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

*(v)* ***No admissions made***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors); nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims, Interests or any other parties in interest.

*(vi)* ***Failure to identify litigation claims or projected objections***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Causes of Action or objections to Claims.

*(vii)* ***Information was provided by the Debtors and was relied upon by the Debtors' advisors***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

*(viii)* ***No representations outside the Disclosure Statement are authorized***

No representations concerning or relating to the Debtors, the chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors, counsel to the Committee and the Office of the United States Trustee for the District of Delaware.

## XI.    SOLICITATION AND VOTING PROCEDURES

### A.    OVERVIEW

This Disclosure Statement, accompanied by a ballot ("***Ballot***"), note ballot ("***Note Ballot***") or master note ballot ("***Master Note Ballot***") to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. Only the Holders of Claims in Classes 4A, 4B, 5A, 5B, 5C, 6A and 6B are entitled to vote for or against the Plan and may do so by completing the Ballot or Note Ballot, as appropriate, and returning it in the envelope provided. Forms of the Ballots, Note Ballots and Master Ballots are annexed as **Exhibit 4** to **Exhibit B**, **Exhibit 5A** to **Exhibit B**, **Exhibit 5B** to **Exhibit B**, **Exhibit 5C** to **Exhibit B** and **Exhibit 6** to **Exhibit B** attached hereto, respectively, and contain detailed instructions on how Holders of Claims can vote for or against the Plan. Additionally, a discussion of the procedures used to tabulate the votes cast for or against the Plan can be found in **Exhibit B**, attached hereto.

The Debtors, with the approval of the Bankruptcy Court, have engaged The Garden City Group, Inc. to serve as the voting agent for claims and generally oversee the voting process (the "***Voting and Claims Agent***"). The Voting and Claims Agent will, among other things, answer questions, provide additional copies of all solicitation materials and generally oversee the solicitation process. The Voting and Claims Agent will also process and tabulate ballots and file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 4:00 p.m. (prevailing Eastern Time), on [_____] (the "*Voting Deadline*").**

| **BALLOTS** |
|---|
| Ballots and Master Ballots must be **actually received** by the Voting and Claims Agent by the Voting Deadline of 4:00 p.m. (prevailing Eastern Time) on [_____] at the following address: |
| *If sent by first class mail:* |
| The Garden City Group, Inc. Balloting Agent for Atrium Corp., et al. P.O. Box 9576 Dublin, Ohio 43017-4876 |
| *If sent by hand delivery or overnight courier:* |
| The Garden City Group, Inc. Balloting Agent for Atrium Corp., et al. 5151 Blazer Parkway, Suite A Dublin, Ohio 43017 |
| If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a Master Ballot before the Voting Deadline. |
| If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number: |
| **(866) 405-2137** |

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS AND MASTER BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN. FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 4:00 P.M. (EASTERN TIME), ON [_____].**

**EACH HOLDER OF A CLAIM MAY CAST ONLY ONE BALLOT PER EACH CLAIM. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 4A, 4B, 5A, 5B, 5C, 6A AND 6B WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO THE CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO THE CLAIM, THE EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

**B. NOMINEES**

With respect to Claims of Class 5A, Class 5B and Class 5C, the Debtors will deliver Note Ballots and Master Ballots to nominees (each, a "***Nominee***").

The Nominees should deliver the Note Ballot and other documents relating to the Plan, including this Disclosure Statement, to the beneficial owners (each, a "***Beneficial Owner***") for which they serve as Nominee.

The Nominee should forward the solicitation materials to each Beneficial Owner and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may return the completed Note Ballot to the Nominee. Upon receipt of the Note Ballots, the Nominee will summarize the individual votes of its respective Beneficial Owners on the appropriate Master Ballot and then return the Master Ballot to the Voting and Claims Agent before the Voting Deadline.

If a Master Ballot is received after the Voting Deadline, the votes and elections on the Master Ballot will not be counted. A Master Ballot should be sent to the Voting and Claims Agent by the envelope provided, or by first class mail, overnight courier or personal delivery. In all cases, sufficient time should be allowed to assure timely delivery. No Ballot should be sent to the Debtors, the Debtors' financial or legal advisors, the Senior Secured Agent or the trustee under the Senior Subordinated Notes Indenture, but only to the Voting and Claims Agent as set forth above.

Nominees must provide appropriate information for each of the items on the Master Ballot including identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will be certifying to the Debtors and the Bankruptcy Court, among other things, that:

- it has received a copy of this Disclosure Statement and other solicitation materials attached to this Disclosure Statement, and it has delivered the same to the Beneficial Owners such Nominee represents;

- it has received a completed and signed Note Ballot from each Beneficial Owner whose vote is reflected on the Master Ballot;

- it is a bank, broker or other Nominee (or agent thereof) that holds the securities being voted on behalf of the Beneficial Owners identified on such Master Ballot;

- it has properly disclosed (a) the number of Beneficial Owners, (b) the amount of securities owned by each Beneficial Owner, (c) each Beneficial Owner's respective vote, if any, concerning the Plan and (d) the customer account, serial number and/or identification number for each such Beneficial Owner;

- each Beneficial Owner has certified to the Nominee that the Beneficial Owner has not submitted any other Ballots for the Claims held in other accounts or other names, or, if it has submitted another Ballot held in other accounts or names, that the Beneficial Owner has certified to the Nominee that such Beneficial Owner has cast the same vote for such Claims, and the undersigned has identified the other accounts or owner and the other Ballots;

- it has been authorized by each such Beneficial Owner to vote on the Plan; and

- it will maintain the original Note Ballot returned by each Beneficial Owner (whether properly completed or defective) for one year after the Voting Deadline (or such other date as is set by subsequent Bankruptcy Court order) for disclosure to the Bankruptcy Court or the Debtor, if so ordered.

Each Master Ballot must be returned in sufficient time so that it is **actually received** by the Voting and Claims Agent by no later than 4:00 p.m. (prevailing Eastern Time) on the date of the Voting Deadline.

## XII.    CONFIRMATION OF THE PLAN

### A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for [_____] at [Time] a.m. (prevailing Eastern Time) before the Honorable Judge [_____], United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, Third Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### B.    DEADLINE TO OBJECT TO CONFIRMATION

Objections to the Confirmation must be filed and served at or before 4:00 p.m. (prevailing Eastern Time) on [_____] in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. **Unless objections to Confirmation are timely served and Filed, they may not be considered by the Bankruptcy Court.**

### C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims, or if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims and Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied with or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation is reasonable or (ii) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

### D.     BEST INTERESTS OF CREDITORS/LIQUIDATION ANALYSIS

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, a bankruptcy court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code, the Debtors, together with their retained advisors, prepared the liquidation analysis attached hereto as **Exhibit C** to this Disclosure Statement (the "*Liquidation Analysis*"). Based on the Liquidation Analysis, the Debtors believe that Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

### E.     FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, together with their retained advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the projections attached to this Disclosure Statement as **Exhibit D**.  Based upon the Projections, the Debtors believe that they will be a viable operation following the chapter 11 cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### F.     ACCEPTANCE BY IMPAIRED CLASSES

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan.  A class that is not "impaired"

under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

## G. CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

### (i) No Unfair Discrimination

Often referred to as the "vertical test," this test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (ii) Fair and Equitable Test

Often referred to as the "horizontal test," this test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, this test sets different standards depending upon the type of claims or interests in such class:

- Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount

of such claim; or (b) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property, subject to the applicability of the "new value" exception.

- Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (a) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that Interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek Confirmation of the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. Specifically, to the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to Confirmation of the Plan, including to amend or modify the Plan to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## H.    VALUATION OF THE DEBTORS

Moelis has advised the Debtors with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated mid-point of the reorganization value of the Reorganized Debtors was assumed to be approximately $420.0 million as of an assumed Effective Date of April 30, 2010. This estimated reorganization value includes (i) excess cash and (ii) consideration of a tax net operating loss carry-forward. Moelis' estimate of an enterprise value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan. The valuation analysis is attached hereto as **Exhibit E**.

**THE ASSUMED REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF APRIL 30, 2010, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF JANUARY 19, 2010.    IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

## XIII.    CERTAIN SECURITIES LAW MATTERS

## A.    PLAN SECURITIES

The Plan provides for the Debtors to issue either the New Value Alternative Loans or the New Senior Secured Term Loans to Holders of Allowed Claims in Classes 4A and 4B and the New Common Stock to Holders of Allowed Claims in Classes 4A, 4B, 5A and 5B (collectively, the "***Plan Securities***").

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by

the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

## B. ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

### (i) Exemptions from Registration Requirements of the Securities Act

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. Regulation D is a non-exclusive safe harbor promulgated by the SEC under the Securities Act related to, among others, section 4(2) of the Securities Act. By virtue of section 18 of the Securities Act, section 4(2) of the Securities Act also provides that any applicable state Blue Sky Law requirements shall not apply to such offer or sale.

In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.

Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code and section 4(2) of the Securities Act to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law.

### (ii) Resale of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control" as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Plan Securities by entities deemed to be "underwriters" (which definition includes "controlling persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Debtors do not presently intend to make publicly available the requisite current information regarding the Debtors, and as a result, Rule 144 of the Securities Act will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities in compliance with the federal and state securities laws. The Plan Securities may be subject to certain transfer and other restrictions pursuant to the New Stockholders Agreement and the New Certificate of Incorporation. On the Effective Date, Reorganized Atrium will enter into a registration rights agreement.

### C. LISTING OF PLAN SECURITIES

The Debtors will not be obligated to list the Plan Securities on a national securities exchange.

## XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. INTRODUCTION

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and certain Holders of Claims and Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), the U.S. Treasury Regulations promulgated thereunder (the "*Regulations*"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "*IRS*"), all as in effect on the date hereof. Changes in such rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not apply to Holders of Claims or Interests that are not "U.S. persons" (as such phrase is defined in the Tax Code). This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to

the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or Interests or who will hold the New Common Stock or New Senior Secured Term Loans as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which Atrium is a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

B.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND THE REORGANIZED DEBTORS**

(i)      *Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, and (y) the fair market value (or, in the case of the New Senior Secured Term Loans, the Issue Price (defined below)) of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) net-operating losses ("***NOLs***") and NOL carryforwards; (b) general business and minimum tax credit carryovers; (c) capital loss carryovers; (d) tax basis in assets; and (e) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

The Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-

tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group. Because the Plan provides that Holders of certain Allowed Claims will receive New Common Stock and possibly New Senior Secured Term Loans, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and the issue price of any New Senior Secured Term Loans exchanged therefor. This value cannot be known with certainty until after the Effective Date. However, as a result of Confirmation, the Debtors expect that there will be material reductions in NOLs, NOL carryforwards and other tax attributes including, potentially, the Reorganized Debtors' tax basis in their assets.

### (ii)    Limitation of NOL Carry Forwards and Other Tax Attributes

The Reorganized Debtors may have NOL carryovers and other tax attributes at emergence. The amount of such NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: (a) the amount of tax losses incurred by the Debtors in 2009 and 2010; (b) the issue price of the New Senior Secured Term Loans (if any), and value of the New Common Stock; and (c) the amount of COD Income incurred by the Debtors in connection with Confirmation. The Debtors anticipate that subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon Confirmation.

Following Confirmation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers and, possibly, certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "**Pre-Change Losses**") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. Under the New Value Alternative, the issuance of the New Common Stock pursuant to the Plan may or may not result in an "ownership change" of the Reorganized Debtors for these purposes. The rules of section 382 are complicated, but as a general matter the New Value Alternative should not result in an "ownership change" if holders of existing Atrium equity who have held their equity for at least three years as of the Effective Date end up owning at least 50% of the New Common Stock on the Effective Date. In contrast, the Debtors anticipate that under the Stand-Alone Alternative, the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes. If the Debtors do undergo an "ownership change," the Debtors' use of their NOL carryovers and other Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (iii)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (a) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### (iv)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the

three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**"). Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

While it is not certain, it is doubtful at this point that if the Debtors undergo an "ownership change" the Debtors will elect to utilize the 382(l)(5) Exception. In the event that the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of any remaining NOLs after the Effective Date would be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date. With respect to any ownership change after the Effective Date, NOLs and other tax attributes attributable to the period prior to the Effective Date are treated as Pre-Change Losses for the latter ownership change as well, with the result that such NOLs will be subject to the smaller of the earlier annual limitation and any later annual limitations.

### (v) *Alternative Minimum Tax*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Reorganized Debtors to owe a modest amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

### C. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS

### (i) *Consequences to Holders of Class 1, 3, 5C, 6A and 6B Claims*

Pursuant to the Plan, Holders of Allowed Class 1 DIP Claims, Class 3 Other Secured Claims, Class 4B Swap Contract Claims (only if either the New Value Alternative or Alternative New Money Investment is effectuated), Class 5C ACIH Notes Claims, Class 6A Qualified Unsecured Trade Claims and Class 6B General Unsecured Claims will either receive Cash or collateral in full payment of their Claims or have their Claims reinstated and rendered unimpaired. A Holder who receives Cash or collateral in exchange for its Claim pursuant to

the Plan generally will recognize income, gain, or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash (or the value of any collateral) received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below.

### (ii) Consequences to Holders of Class 4A, 5A and 5B Claims

Pursuant to the Plan, in full satisfaction and discharge of their Claims, Holders of Allowed Class 4A Senior Secured Claims will receive Cash, New Common Stock, and (under the Stand-Alone Alternative) the New Senior Secured Term Loans. Holders of Allowed Class 5A 11.0% Senior Subordinated Note Claims and Allowed Class 5B 15.0% Senior Subordinated Note Claims will receive New Common Stock and (under the New Value Alternative, if the Senior Secured New Money Investment Gift is made available or Holders of Allowed Class 4 Senior Secured Claims are paid in full in Cash), Cash. The U.S. federal income tax consequences of the Plan to such Holders of Claims will depend, in part, on whether the Claims surrendered, and/or any New Senior Term Loans received constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Senior Secured Revolver had an initial term of approximately two years and eight months, the Senior Secured Term Loan had an initial term of approximately three years and eight months, and the Senior Subordinated Notes had an initial term of approximately four years and two months. The Debtors expect to take the position that the neither the Senior Secured Claims nor the Senior Subordinated Note Claims are "securities."

Under this position, a Holder should be treated as exchanging its Claims for Cash, New Common Stock and, if applicable, New Senior Secured Term Loans in a fully taxable exchange. Such Holder should recognize gain or loss on the relevant exchange equal to the difference between (a) the Holder's tax basis in the Claims surrendered by the Holder in such exchange and (b) the amount of any Cash received plus the fair market value of any New Common Stock on the Effective Date plus the issue price of the New Senior Secured Term Loans (which, if neither such Allowed Claims nor the New Senior Secured Term Loans are "publicly traded" for United Stated federal income tax purposes, will equal the stated principal amount of the New Senior Secured Term Loans, or if either is publicly traded, will equal the fair market value of the New Senior Secured Term Loans (as of the date they are distributed to the Holder) (the "**Issue Price**") received in such exchange that is not allocable to accrued interest. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) received in such exchange and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. A Holder's tax basis in the New Common Stock should equal its fair market value as of the Effective Date and a Holder's tax basis in the New Senior Secured Term Loans should equal their Issue Price. A Holder's holding period for the New Common Stock and New Senior Secured Term Loans should begin on the day following the Effective Date.

Holders of Class 4A, Class 5A and Class 5B Claims should also consult their tax advisors regarding whether such Claims or the New Senior Secured Term Loans could be treated as "securities" for U.S. federal income tax purposes. If a Holder's Claims are so treated, the exchange of such Claims for New Common Stock and/or New Senior Secured Term Loans could be treated as a tax-free recapitalization under the Tax Code, in which case a Holder could recognize gain, but not loss, on the exchange and would generally take a "carryover" basis in the New Common Stock as well as in the New Senior Secured Term Loans if they are treated as securities.

### (iii)  Accrued Interest.

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income (to the extent not already taken into income by the Holder).  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Atrium.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### (iv)  Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

### (v)  Limitation on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, capital losses may only be used to offset capital gains.  A corporate Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, but may carry over unused capital losses for the five years following the capital loss year.

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding (currently at a rate of 28%). Backup withholding of taxes will generally apply to Payments in respect of an Allowed Claim under the Plan if the Holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XV.     RECOMMENDATION

Atrium Corporation and its debtor affiliates submit that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

Dated:  March 16, 2010

<div style="margin-left: 40%;">

Respectfully submitted,

ATRIUM CORPORATION, on behalf of itself and each of the other Debtors

By:     _____
Name:  Gregory T. Faherty
Title:    President and Chief Executive Officer

</div>

'

COUNSEL:

_____
Domenic E. Pacitti (Bar No. 3989)
Michael Yurkewicz (Bar No. 4165)
KLEHR HARRISON HARVEY
BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 426-1189

- and -

Richard M. Cieri (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
(212) 446-4800

*Counsel to the Debtors and Debtors in Possession*

<u>**Exhibit A**</u>

**Plan of Reorganization**

## **Exhibit B**

**Disclosure Statement Order**

[To Come]

**<u>Exhibit C</u>**

**Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accept the plan of reorganization or (b) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain under the plan or reorganization if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This is referred to as the "best interests" test. To make these findings, a bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To demonstrate compliance with the "best interests" test, the Debtors estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation (the "*Liquidation Analysis*"). The Liquidation Analysis was prepared by the Debtors with assistance from their financial advisors and represents the Debtors' best estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis assumes that the Debtors' chapter 11 cases are converted into liquidations under chapter 7 as of the Petition Date. The Debtors' management does not believe that including more historical information or projected information would cause the result of this analysis to vary significantly. The Liquidation Analysis, however, is subject to any changes due to the Debtors' continued operation subsequent to the reference date.

**The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors, and, as discussed below, upon assumptions that could be subject to change. Thus, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the Liquidation Analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual proceeds from such liquidation could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth above, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated from the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Liquidation Analysis has been prepared solely for the purposes of estimating the proceeds that would be available if the Debtors liquidated under chapter 7 of the Bankruptcy Code and does not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plan. Nothing contained in the Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis, as required by the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code.**

The Liquidation Analysis was performed on a consolidated basis. In estimating the amount of proceeds available under a hypothetical chapter 7 liquidation, the Debtors estimated the cash proceeds that might be realized from the liquidation of the Debtors' assets based on the book value of assets as set forth on the Debtors' consolidated balance sheet dated as of November 30, 2009. These values have not been subject to any review, compilation or audit by any independent accounting firm. Subject to the qualifications, assumptions and schedules herein, the Debtors estimate that the range of gross proceeds, net of wind-down costs, trustee fees and professional fees will not be adequate to satisfy the Holders of Claims under the Senior Secured Credit Agreement in full. The assumptions and schedules supporting these results are set forth herein.

Based on the Liquidation Analysis, the Debtors believe that Holders of Claims in Class 4, Class 5A, Class 5B, Class 6A and Class 6B under the Plan will recover more value as a result of Confirmation of the proposed Plan than through a hypothetical chapter 7 liquidation.

**General Assumptions**

In chapter 7, a trustee (the "***Chapter 7 Trustee***") is appointed to manage a debtor's affairs and conduct a liquidation. Accordingly, the Liquidation Analysis assumes that the Debtors would be forced to liquidate and would do so on an expedited, but orderly basis under the supervision of the Chapter 7 trustee. The Debtors would be forced to cease substantially all operations shortly after the Petition Date and use their cash position to liquidate their assets and pay priority claims. The likely consequences of the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code include the following:

- The Debtors' workforce consists of specialized employees who are crucial to the operation of the businesses. With the Debtors facing certain liquidation, those employees would quickly leave the Debtors to the extent there were employment opportunities elsewhere. The loss of these employees would make an orderly liquidation significantly more difficult and would render the possibility of continuing operations in an effort to complete a going concern sale highly remote, if not impossible.

- The Debtors' revenues are primarily derived from sales of building product supplies to the residential market, a highly competitive environment. A chapter 7 liquidation would erode the value of the Debtors' brands, making it highly unlikely that many of the Debtors' customers could be maintained by a Chapter 7 Trustee for any period of time.

- The Debtors' customers are generally medium-sized businesses who are being disproportionately affected by the economic downturn and are having a difficult time paying outstanding bills. The Debtors may, as a result, experience high levels of uncollectible accounts receivable.

- The Liquidation Analysis assumes that the holders of secured debt obligations have perfected security interests in substantially all of the assets of the Debtors' estates that must be satisfied in accordance with the priorities set forth in the Bankruptcy Code and in accordance with applicable non-bankruptcy law.

- The Debtors assume an expedited but orderly wind-down of their businesses to maximize recovery values. While the Debtors assume the majority of the wind-down would be done in approximately 90 days, the complete liquidation would be expected to take six months.

- Recoveries do not reflect any potential negative impact on the distributable value available to the Debtors' creditors on account of any potential unknown and contingent liabilities, including, but not limited to, environmental obligations and litigation claims.

The table below summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Debtors' estates under chapter 7 of the Bankruptcy Code. Additional assumptions with respect to the Liquidation Analysis are provided below.

**Atrium Companies, Inc.**

**Chapter 7 Liquidation Analysis**

| (US$000's) | Notes | Book Value as of 11/30/2009 (unaudited) | Estimated Recovery Percentage | | Estimated Liquidation | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| Cash and Equivalents | 1 | $27,560 | 100% | 100% | $27,560 | $27,560 |
| Accounts Receivable, net | 2 | 18,750 | 55% | 70% | 10,236 | 13,110 |
| Inventory | 3 | 38,097 | 33% | 50% | 12,682 | 19,080 |
| Prepaid Expenses and Other Current Assets | 4 | 4,469 | 1% | 12% | 53 | 521 |
| Property, Plant & Equipment, net | 5 | 88,878 | 34% | 46% | 29,879 | 40,730 |
| Goodwill and Other Intangibles, net | 6 | 148,547 | 0% | 2% | 0 | 2,587 |
| Deferred Tax Assets | 7 | 2,508 | 0% | 0% | 0 | 0 |
| Other Non-Current Assets | 8 | 18,682 | 1% | 4% | 248 | 829 |
| Gross Proceeds Available for Distribution | | $347,491 | 23% | 30% | $80,658 | $104,417 |
| Less: | | | | | | |
| Trustee Fees | 9 | | 100% | 100% | ($1,593) | ($2,306) |
| Professional Fees | 10 | | 100% | 100% | (398) | (576) |
| Net Wind-down Costs | 11 | | 100% | 100% | (9,060) | (18,120) |
| Total Chapter 7 Administrative Claims | | | 100% | 100% | ($11,051) | ($21,002) |
| Net Proceeds Available for Distribution | | | | | $69,607 | $83,415 |
| Secured Claims [(1)] | | | | | | |
| Sr. Secured Credit Facility | 12 | $383,106 | 18% | 22% | $68,783 | $82,427 |
| Swap Liability | 12 | 4,590 | 18% | 22% | 824 | 988 |
| Total Secured Claims | | $387,696 | 18% | 22% | $69,607 | $83,415 |
| Proceeds Available for Unsecured Claims | | | | | $0 | $0 |
| Unsecured Claims [(1)] | | | | | | |
| Senior Subordinated Notes | 13 | $273,352 | 0% | 0% | $0 | $0 |
| Other Unsecured Claims | 14 | 27,303 | 0% | 0% | 0 | 0 |
| Total Unsecured Claims | | $300,655 | 0% | 0% | $0 | $0 |
| Proceeds Available for Distribution to Equity | 15 | | 0% | 0% | $0 | $0 |

*(1) Reflect amounts outstanding as of 12/31/10. Accrued interest excluded from the Senior Credit Facility amount as all interest due was paid as of the Petition Date*

## Specific Assumptions

### Note 1

The Debtors' actual cash balance as of November 30, 2009 was $27.6 million. Cash and equivalents consist of all cash and liquid investments with maturities of three months or less, in bank accounts.

### Note 2

Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collectability. An estimated recovery percentage has been applied to balances based on the trade accounts receivable aging as of November 30, 2009. Accounts aged over 90 days are assumed to have *de minimis* liquidation value. The Debtors' net accounts receivable balance as of November 30, 2009 includes $12.7 million of retained interests in receivables that have been transferred to the SPV in connection with the A/R Facility and is net of the obligations of the SPV to the lenders under the A/R Facility. The estimated recovery percentages assume that in a liquidation the accounts receivable receipts associated with such receivables would be first applied to settle the outstanding obligations under agreements that govern the A/R Facility, and the residual amounts collected would be

proceeds available to the Debtors. Based on management's estimates of collectability, the aggregate estimated recovery range is 55% to 70% of net accounts receivable.

*Note 3*

Inventory costs include direct materials, labor and manufacturing overhead. The Debtors assume that the liquidation of inventory assets will occur through the sale of specific products to competitors, vendors and on the secondary market. Inventory assets are primarily categorized as raw materials, work-in-progress, finished goods and other inventories. An estimated recovery percentage has been applied by categorization which results in an aggregate estimated recovery range of 33% to 50% of total net inventory.

**Atrium Companies, Inc.**
**Inventory Recovery Analysis**

(US$000's)

| Inventory Categories | Book Value as of 11/30/09 (unaudited) | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|
| Raw Materials | $26,197 | 30% | 50% | $7,859 | $13,098 |
| Work in Process | 1,818 | 0% | 10% | 0 | 182 |
| Finished Goods | 9,458 | 50% | 60% | 4,729 | 5,675 |
| Other | 625 | 15% | 20% | 94 | 125 |
| Net Inventory | $38,097 | 33% | 50% | $12,682 | $19,080 |

*Note 4*

Prepaid expenses and other current assets consist primarily of prepaid insurance, prepaid rent and non-trade accounts receivable. The Debtors assume the vast majority of prepaid expenses consisting of pre-paid insurance, will not be refunded and rent expense will continue to be incurred during the post-petition period. The Debtors do not believe they will be successful in collecting a high percentage of the outstanding non-trade receivables balance. Prepaid expenses and other current assets are assumed to have a recovery range of 1% to 12% in a liquidation, which will be primarily related to limited collections of non-trade receivables and potential refunds on certain prepaid expenses.

*Note 5*

Property, plant and equipment primarily consists of owned assets such as land, buildings, building improvements, machinery and equipment, dies, furniture and fixtures and data processing equipment and software. A large portion of these items are significantly depreciated and may not result in significant liquidation value. The Debtors have applied an estimated recovery percentage by asset categorization as outlined below. Total proceeds are estimated at 34% to 46% on a net basis.

(US$000's)

| Property, Plant and Equipment Categories | Notes | Book Value as of 11/30/09 (unaudited) | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| Land, Buildings and Building Improvements | A | $26,262 | 52% | 72% | $13,584 | $18,837 |
| Leasehold Improvements | B | 2,029 | 0% | 0% | 0 | 0 |
| Vehicles | C | 2,672 | 49% | 59% | 1,302 | 1,569 |
| Office Furniture and Equipment, Computers and Software | D | 5,211 | 5% | 15% | 266 | 787 |
| Tooling, Machinery and Equipment | E | 48,109 | 31% | 41% | 14,727 | 19,538 |
| Construction in Progress | F | 4,595 | 0% | 0% | 0 | 0 |
| Property, Plant and Equipment, Net | | $88,878 | 34% | 46% | $29,879 | $40,730 |

*Note: Recovery percentages assume no recovery on $1.4 million of assets held under capital leases as the related assets would revert back to the lessor*

A. Land, buildings and building improvements consist of real property owned by the Debtors. These assets were subject to valuation appraisals as of December 31, 2008, and the Debtors used the appraisals of these assets as of December 31, 2008 to estimate recovery proceeds available in a liquidation. Specifically, the Debtors applied adjustments to the valuations that considered the change in real estate market conditions, the additional depreciation of the land, buildings and building improvements and the selling costs associated with the sale of these assets in a liquidation.

B. There is no recovery assumed for leasehold improvements since such improvements will revert to the lessor upon discontinuation of the leases.

C. Vehicles consist of automobiles, pick-up trucks, tractors and trailers. Assets within this category were subject to valuation appraisals as of December 31, 2008, and the Debtors used the appraisals of the assets as of December 31, 2008 to estimate the recovery proceeds available in a liquidation. Specifically, the Debtors applied adjustments to the valuations that considered the change in the market for used vehicle sales, additional depreciation and the selling costs associated with sale of the assets in a liquidation.

D. Office furniture and equipment, computers and software assets are not expected to yield substantial recoveries due to an abundance of supply of office furniture and computer equipment in the secondary market, obsolescence and the specialized nature of the software assets included within this category.

E. Tooling, machinery and equipment assets represent the Debtors' largest property, plant and equipment category. Due to the highly-specialized nature of these assets, the Debtors believe the potential universe of buyers is very narrow and is primarily comprised of competing companies. Additionally, because of excess capacity within the industry, the Debtors believe the recoveries associated with these assets in a liquidation will be depressed relative to the book values as of November 30, 2009.

F. The Debtors believe that construction-in-progress assets are of little value to a third-party and are not estimated to provide any recovery proceeds in a liquidation.

### Note 6
Goodwill and other intangible assets consist of goodwill and intangible assets primarily related to customer relationships and trademarks. The value attributable to customer relationships and trademarks will be significantly impaired in a liquidation. Accordingly, the Debtors estimate that goodwill and other intangible assets will provide 0% to 2% recovery value to the Debtors.

### Note 7
The Debtors estimate that deferred tax assets have no value in a liquidation.

*Note 8*

Other non-current assets consist primarily of deposits, debt issuance costs and samples and displays. The Debtors estimate that there will be no residual value associated with debt issuance costs and samples and displays. Recoveries of deposits will be limited because it is likely that vendors will offset deposits against their receivables from the Debtors. Other non-current assets are assumed to have a 1% to 4% recovery value in a liquidation based on limited recoveries of certain deposits.

*Note 9*

Fees to the Chapter 7 Trustee are estimated to be 3.0% of total liquidated proceeds net of cash on hand.

*Note 10*

The costs associated with the Chapter 7 Trustee's legal counsel and professional advisor are estimated to be 25% of the fees paid to the Chapter 7 Trustee.

*Note 11*

Wind-down costs include general and administrative ("*G&A*") expenses, severance and retention. G&A costs mainly include the retention of the accounts receivable department and key management. G&A is estimated to be between 5% and 10% of 2008 annual G&A. Severance costs are estimated to be between $5.0 million to $10.0 million.

*Note 12*

As of the Petition Date, the Debtors had three outstanding secured debt obligations consisting of the following amounts[1]: (1) $34.1 million in principal under the revolving facility under the Senior Secured Credit Agreement; (2) $349.0 million in principal under the term loan facility under the Senior Secured Credit Agreement; and (3) $4.6 million due under the Swap Contract.

*Note 13*

As of the Petition Date, the Debtors had three outstanding subordinated debt obligations consisting of the following principal amounts: (1) $4.6 million of ACIH Notes;[2] (2) $47.9 million of 11.0% Senior Subordinated Notes; and (3) $220.3 million of 15.0% Senior Subordinated Notes. The Debtors calculated accrued interest in the amount of $0.6 million through the Petition Date.

*Note 14*

Prepetition non-priority unsecured claims excluding the claims of the obligations noted in Note 13 are estimated to approximate $11.8 million as of the Petition Date. The Debtors' estimate lease rejection claims of $15.5 million in a chapter 7 liquidation. In addition, no assumption has been made with respect to contract rejection damages claims as they are unknown.

*Note 15*

Holders of Interests in the Debtors (other than Holders of Intercompany Interests), including Holders of the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Common Stock and the ACIH Warrants are not estimated to receive any recoveries in the event of a liquidation under chapter 7 of the Bankruptcy Code.

---

[1] Does not include accrued interest; accrued interest under the Senior Secured Credit Agreement has been paid as of the Petition Date

[2] Only ACIH, Inc. is obligated on the ACIH Notes.

**Exhibit D**

**Financial Projections**

For purposes of evaluating the Plan pursuant to the "feasibility" requirement set forth in section 1129(a)(11) of the Bankruptcy Code, the Debtors prepared the following financial projections ("**Projections**"), which reflect estimates of the Debtors' expected consolidated financial position, results of operations and cash flows for the years 2010 through 2014 (the "**Projection Period**"). The Projections reflect the Debtors' judgment, as of the date of this Disclosure Statement, of expected future operating and business conditions, which are subject to change.

The Projections were prepared in good faith by the Debtors and their advisors based upon assumptions believed to be reasonable at the time of preparation. The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections. Although the Debtors are of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) changes in demand for the Debtors' products in various end markets; (b) applicable laws and regulations; (c) interest rates and inflation; (d) business combinations among the Debtors' competitors, suppliers and customers; (e) availability and cost of raw materials; and (f) energy and labor and other related factors affecting the Debtors' businesses. Despite the Debtors' efforts to foresee and plan for the effects of changes in these circumstances, the Debtors cannot predict their impact with certainty. Consequently, actual financial results could vary significantly from the Projections. Additional assumptions underlying the Projections are provided below. The Projections have not been prepared to comply with the guidelines established with respect to Projections by the Securities and Exchange Commission or the American Institute of Certified Public Accountants ("**AICPA**"), are not presented in accordance with Generally Accepted Accounting Principles ("**GAAP**") and have not been audited or review by independent accountants.

The reorganization will be accounted for in accordance with "fresh start" accounting rules as per the AICPA's Statement of Position 90-7 ("**SOP 90-7**"). The reorganization accounting and the associated "fresh start" adjustments, however, have not been audited or reviewed by independent accountants and may be subject to revision following a formal audit and review by independent accountants.

**THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED UPON CONFIRMATION OF THE PLAN. IN ADDITION, THE DEBTORS DO NOT INTEND TO DISCLOSE UPDATES TO OR TO SUPPLEMENT THE PROJECTIONS FOLLOWING THE EFFECTIVE DATE OF THE PLAN.**

**THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS AND THE ASSOCIATED RISK FACTORS, SHOULD BE CAREFULLY REVIEWED WHEN EVALUATING THE PLAN. THESE ASSUMPTIONS INCLUDE:**

- The Projections are based upon the assumption that the Plan will be Confirmed and that initial distributions under the Plan will take place as of April 30, 2010.

- The following Projections are included herein:

  - Projected consolidated balance sheets of the Reorganized Debtors as of the Effective Date, which reflect the projected accounting effects of the Plan's Consummation and of fresh start accounting as promulgated by SOP 90-7, and as of December 31 for each of the years during the Projection Period.

  - Projected consolidated statements of income of the Reorganized Debtors for the eight-month period ending December 31, 2010 and each of the years during the Projection Period.

  - Projected consolidated statements of cash flow of the Reorganized Debtors for the eight-month period ending December 31, 2010 and each of the years during the Projection Period.

**ALTHOUGH THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY OF THE PROJECTIONS WILL BE REALIZED.**

## A.    GENERAL ASSUMPTIONS

### (i)    Industry Overview

The U.S. window and patio door industry is approximately a $10 - $11 billion industry comprised of numerous small, regional producers as well as a smaller number of national producers.  Many of the companies, both small and large, are privately held.

The residential window and patio door industry peaked in 2005, driven by an unprecedented rise in homebuilding, with shipments of 70.5 million and 5.2 million units, respectively.  Vinyl windows and patio doors accounted for 58% and 38% of this demand, respectively; wood windows and patio doors accounted for 27% and 29%, respectively; aluminum windows and patio doors accounted for 12% and 14%, respectively; and, all other, including steel, fiberglass, and composite windows and patio doors accounted for less than 3% and 19%, respectively.  Industry experts predict that vinyl and wood will continue to hold the dominant market share in patio doors while vinyl and fiberglass windows will continue to gain market share at the expense of wood and aluminum.

Demand for window and patio door products is driven by a number of factors that generally influence new residential construction and remodeling and replacement ("**R&R**") spending.  According to the Joint Center for Housing Studies of Harvard University, in 2008, new housing starts in the United States totaled approximately 906,000 units, of which approximately 622,000 units were single-family homes and approximately 284,000 thousand units were multi-family homes.  Since then, new home construction has experienced a steep decline driven by the weak economy.  According to the U.S. Census Bureau, housing starts decreased to a seasonally adjusted annual rate of 479,000 in April 2009, the lowest level in 50 years. However, this number had increased to 555,000 as of December 2009 and industry forecasts point to a significantly improved new residential construction market in the coming years.

The R&R market for both windows and patio doors is larger than the new home construction market.  In 2005, the peak of the residential new construction market, R&R windows represented 52% of the total windows shipped.  In 2009, R&R windows have grown to represent more than 70% of the residential window opportunity.  The same trends hold true for patio doors as well.  According to the U.S. Census Bureau, expenditures for maintenance, repairs and improvements increased from $47.1 billion in 1980 to $236.7 billion in 2007.  Because R&R projects are less discretionary, R&R spending has historically been less cyclical than spending driven by new home construction. Annual expenditures for residential improvements in the future are expected to benefit from growth in household formation, favorable demographics, existing home sales and aging of the housing stock.

The window and patio door industry has experienced consolidation over the last several years with a large portion occurring in the vinyl windows and doors sector.  Consolidation has been spurred by expanding demand for vinyl windows and increasing technological requirements, which drive producers to seek operating efficiencies and economies of scale via acquisitions.  This consolidation trend favors companies like the Debtors, with nationwide capabilities to service large home centers and home builders, strong brand names, the ability to provide a complete product line and economies of scale in manufacturing, distributing and marketing.

The window and patio door industry is dominated by twelve manufacturers (including wood) that account for approximately 70% of shipments.  The remaining 30%, however, is accounted for by many local and regional manufacturers.  Because windows break easily and are costly to ship, the manufacturing facilities tend to be located within 500 miles of their markets or closer.  For the same reason as above, shipments of finished windows and patio doors from Europe or Asia are insignificant.

The Debtors' role in the window and patio door industry is focused on vinyl and aluminum products.  The Debtors have a national presence with nine fabrication facilities strategically located throughout the United States and Canada.  The Debtors are vertically integrated, providing vinyl and aluminum extrusions, as well as aluminum screens to their fabrication operations.

### (ii)    Major Assumption Underlying Projections for the Fiscal Year Ending 2010

The Debtors' current business plan (the "**Business Plan**") incorporates assumptions related to certain economic and business conditions for the fiscal year ending 2010.  These assumptions are based upon historic growth and industry experience, projected industry supply/demand/capacity indicators and the estimated directions

of specific markets.  The Debtors have incorporated the impact of the most recent data received from customers and suppliers wherever possible.

- **Market Demand:**

  - The Debtors created the sales plan component of the Business Plan on a customer-by-customer basis, taking into account (i) known customer demand through management's discussions with customers regarding their forecasts; (ii) management's judgment based on those discussions; and (iii) recent sales trends in the market.

  - The Debtors used key market indicators for new construction windows and R&R windows to estimate future market growth.  New construction growth is strongly correlated with housing starts, with key estimates coming from studies compiled by the National Association of Home Builders, the National Association of Realtors, the Harvard Joint Center for Housing Studies, Fannie Mae, Freddie Mac and others.  Likewise, R&R window growth is also correlated with home remodeling projects and is projected from studies completed by Harvard Joint Center for Housing Studies and the American Architectural Manufacturers Association/Window & Door Manufacturers Association 2008–2009 U.S. National Statistical Review and Forecast.

  - Based on a range of estimates from industry associations and other market research, the Debtors utilized an estimate of approximately 716,000 housing starts in their projections for the 2010 fiscal year.  This results in a market opportunity for windows of approximately 660,000 due to an assumed lag in timing from when a house is started and the time windows are actually installed. Management also assumed that the expected positive effect of the anticipated improvements in the new construction and R&R markets is expected to be offset by the impact of the chapter 11 cases in 2010.

  - Modest share growth assumptions were made for specific customer accounts and programs attained midway through 2009 and certain accounts expected to be gained in 2010.

- **Net Sales:**

  - The Debtors calculated net sales based upon units shipped, multiplied by standard sales prices.  Projected sales prices reflect management's best estimates based on recent experience and expected trends.

- **Cost of Good Sold**

  - The cost of good sold ("*COGS*") includes anticipated vinyl and aluminum material costs, hardware costs and utility costs based on a detailed review by manufacturing location and purchasing department.  There are presently no hedges or forward commitments in place.  Significant changes in the costs of certain key goods, such as natural gas, PVC, resin and aluminum can have a tangible effect on the Debtors' margins.  Management has projected COGS to be 65.1% of net sales in 2010 vs. 65.4% of net sales in 2009.

  - Annual wage increases of between 2.0% and 3.0% are projected for all hourly plant labor based on projections provided by the Debtors'

management and terms detailed in collective-bargaining agreements covering union employees at two of the Debtors' facilities.

- Overall cost projections are based upon the goal of improving operating margin by maintaining consistent product quality and enhancing operational productivity to.

- **Delivery:**

  - Delivery expense was determined based upon expected unit sales, shipping routes, cubing, number of stops and projected fuel costs. The Debtors' management has projected delivery expense to be 6.6% of net sales in 2010 vs. 6.6% of net sales in 2009.

- **Selling, General and Administrative Expenses:**

  - Selling, general and administrative ("*SG&A*") expenses were budgeted by each of the Debtor's department managers on a line-by-line basis. SG&A expense projections are based on the goal of maintaining consistent product quality. Management has projected SG&A expense to be 17.7% of net sales in 2010 vs. 17.6% of net sales in 2009.

- **Provision for Income Taxes:**

  - As discussed further in Section XIII Certain United States Federal Income Tax Consequences of the Plan, the issuance under the Plan of the New Common Stock, along with the cancellation of existing Interests through the Plan, may cause an ownership change to occur with respect to the Reorganized Debtors as of the Effective Date. As a result, section 382 of the Internal Revenue Code ("*IRC*") may apply to limit the Reorganized Debtors' use of their consolidated net operating losses ("*NOLs*") after the Effective Date. Additionally, the Reorganized Debtors' ability to use any remaining capital loss carry-forwards and tax credits may be limited. However, the analysis of the Debtors' NOLs indicates that the Reorganized Debtors will have NOL carry-forwards subject to an annual utilization limit, resulting in a partial offset of taxable income from operations during the Projected Period. As a result, the Debtors have estimated their provision for income taxes over the Projection Period based on applicable federal corporate income tax rates, net of applicable NOLs.

  - The Debtors are expected to only incur U.S. state and Canadian income taxes for the fiscal year ending 2010

- **Capital Expenditures:**

  - Projected capital expenditures are based upon a detailed plant-level review of critical required capital expenditures, the timing and extent of necessary replacements and refurbishments, the scheduled timing of future product line requirements, machine modifications to handle product mix and the redistribution of equipment based upon capacity utilization contemplated in the Business Plan.

- **Market Demand:**

  - Volume shipped is expected to grow in conjunction with housing starts for the Debtors' new construction business, and with the general remodeling growth for the Debtors' R&R windows.

  - Additional share growth volume was added over the projection period for new business opportunities based upon a reasonable, risk-adjusted likelihood of receiving incremental volume from active discussions with, and indications from, customers.

  - Based on a range of estimates from industry associations and Wall Street research, the Debtors' management utilized an estimate of approximately 1,000,000 housing starts in its 2011 projections. This results in a market opportunity for windows of approximately 900,000 due to the lag in the timing from when a house is actually started and the time windows are actually installed. Management's estimates of the market opportunity for windows in 2012 through 2014 are 1,050,000, 1,200,000 and 1,300,000 total housing starts, respectively.

- **Net Sales & Preliminary Price Increases:**

  - Pricing and materials costs were held constant with 2010 for the Projection Period. Management's assumption is that material price inflation would be offset by price increases and/or a shift to higher margin products, preventing degradation of operating margin.

- **COGS:**

  - COGS are projected as a function of seasonal production schedules and cost of inventory used. Management has projected COGS, as percentage of net sales, of 65.6%, 65.5%, 65.3% and 65.2% in 2011, 2012, 2013 and 2014, respectively. This compares to the 2010 COGS estimate of 65.1% of net sales.

  - Vinyl, aluminum, and hardware cost increases are assumed to be offset by a shift in demand to higher priced vinyl and energy-efficient products, allowing the Debtors to maintain consistent COGS as a percent of sales. Inflation pressures are expected to be moderate at 2% - 3% in 2010 and for the duration of the forecast.

  - Annual wage increases of approximately three percent are projected for all hourly plant labor based on projections provided by management and terms detailed in the collective bargaining agreements.

- **Delivery:**

  - Delivery expense improvements are expected as the volume of goods shipped increases, cubing rates improve, the number of units delivered per stop increases and the overall number of stops per truck declines. Management has projected delivery expenses of 6.3%, 6.1%, 6.0% and 5.9% of net sales in 2011, 2012, 2013 and 2014, respectively. This compares to the 2010 estimate of 6.6% of net sales.

- **SG&A Expenses:**

  - SG&A expenses are expected to increase on a dollar basis due to (1) salary increases in the three percent range and (2) infrastructure requirements to meet the significant increase in product demand forecasted in these Projections. However, SG&A expenses will decrease significantly on a percentage of sales basis from 17.7% to 15.0% over the Projection Period as improving market conditions raise revenues, allowing the Debtors to more effectively leverage their cost base.

- **Provision for Income Tax:**

  - The Debtors assume that there will be adequate NOLs, after consideration of section 382 limits, to offset any applicable US federal income taxes through fiscal year 2012. In fiscal years 2013 and 2014 the Debtors expect a portion of the US Federal income tax liability will be offset by NOLs. The Debtors are expected to incur applicable state and Canadian income taxes in all fiscal years included in the Projection Period.

- **Capital Expenditures:**

  - Projected capital expenditures are based upon a plant-level review of critical required capital expenditure, the timing and extent of future growth and product line change requirements. The Debtors will evaluate the relocation of assets as utilization rates change by facility at different rates.

## B. OTHER SIGNIFICANT ASSUMPTIONS

### (i) Debt

The Plan contemplates a restructured capital structure for Reorganized Atrium consisting of (i) a $[60] million revolving credit facility (with a $[15] million sub-limit for letters of credit) maturing in [2015] and bearing interest at LIBOR plus an applicable margin calculated from leverage-based grid; and (ii) $[200] million senior secured term loan maturing in [2016] and bearing interest at LIBOR plus an applicable margin calculated from leverage-based grid. The revolving credit facility will be used to finance certain emergence costs and to finance seasonal working capital needs on an ongoing basis.

### (ii) Common Stock

Up to 20,000,000 shares (of a certain number of shares authorized) of New Common Stock will be issued pursuant to the Plan.

### (iii) Cash

The Projections assume that interest of 2.0% will be earned on surplus cash balances. A revolving credit facility is assumed to be necessary to enable Reorganized Atrium to fund part of the distributions under the Plan and, if necessary, working capital and operating needs. For these purposes, approximately $36 million in borrowings will be required as of the Effective Date under this facility, and repayments of these borrowings is expected to be made on an ongoing basis subject to available cash.

### (iv) Property, Plant, And Equipment

To adjust net property, plant, and equipment to an estimate of its fair value in accordance with SOP 90-7, The Debtors plan to review their property, plant and equipment in detail with the assistance of an appraisal company. The Debtors have not yet hired an appraisal company to undertake this task.

# Balance Sheet

| ($ in millions) | Projected 4/30/2010 | Reorganization Adjustments | Pro Forma 4/30/2010 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Cash | $5.8 | $4.2 | $10.0 | $5.0 | $9.2 | $15.4 | $23.9 | $34.9 |
| Restricted Cash | 3.4 | (2.5) | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| Total Cash and Cash Equivalents | 9.2 | 1.7 | 10.9 | 5.9 | 10.1 | 16.3 | 24.9 | 35.8 |
| Accounts Receivable, Net | 8.1 | | 8.1 | 9.1 | 12.1 | 13.6 | 15.1 | 16.3 |
| Retained Interest in Transferred Receivable | 16.6 | | 16.6 | 14.9 | 18.9 | 21.1 | 23.5 | 25.4 |
| Inventory | 49.4 | | 49.4 | 42.5 | 49.5 | 54.9 | 61.2 | 65.9 |
| Prepaid Expenses and Other Current Assets | 4.0 | | 4.0 | 3.2 | 5.0 | 10.2 | 11.3 | 12.2 |
| Deferred Tax Asset | 2.5 | | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Total current assets | $89.9 | $1.7 | $91.6 | $78.2 | $98.1 | $118.6 | $138.5 | $158.1 |
| PP&E | 88.0 | | 88.0 | 85.2 | 86.2 | 86.2 | 85.2 | 83.2 |
| Goodwill | 62.7 | - | 62.7 | 62.7 | 62.7 | 62.7 | 62.7 | 62.7 |
| Intangible Assets | 83.4 | 153.6 | 237.1 | 233.8 | 228.8 | 223.8 | 218.9 | 213.9 |
| Other Assets | 18.7 | (1.1) | 17.6 | 16.8 | 15.7 | 14.6 | 13.5 | 12.4 |
| Total Assets | $342.7 | $154.2 | $497.0 | $476.7 | $491.5 | $505.9 | $518.7 | $530.3 |
| | | | | | | | | |
| Pre-Petition Accounts Payable | $5.5 | ($5.5) | | | | | | |
| Post-Petition Accounts Payable | 12.3 | | 12.3 | 17.8 | 33.0 | 39.7 | 44.2 | 47.6 |
| Accrued Interest Expense | 15.7 | (15.7) | - | - | - | - | - | - |
| Other Current Liabilities | 48.8 | | 48.8 | 49.6 | 50.1 | 53.3 | 57.2 | 59.8 |
| Total current liabilities | $82.2 | ($21.2) | $61.1 | $67.4 | $83.1 | $93.0 | $101.4 | $107.4 |
| PRE-PETITION DEBT | | | | | | | | |
| Revolving Credit Facility | 34.5 | (34.5) | - | - | - | - | - | - |
| Term Loan B | 353.1 | (353.1) | - | - | - | - | - | - |
| Pre-Petition Senior Secured Debt | $387.6 | ($387.6) | - | - | - | - | - | - |
| Pre-Petiton Unsecured Debt | 272.8 | (272.8) | - | - | - | - | - | - |
| Total Pre-Petition Debt | $660.4 | ($660.4) | - | - | - | - | - | - |
| DIP Facility | $27.0 | ($27.0) | - | - | - | - | - | - |
| EXIT / ROLLOVER DEBT | | | | | | | | |
| Exit Revolving Credit Facility | - | $36.0 | $36.0 | $0.6 | | | | |
| Exit Term Loan B | - | 200.0 | 200.0 | 200.0 | 185.8 | 167.2 | 141.5 | 108.6 |
| Total Senior Secured Debt | - | $236.0 | $236.0 | $200.6 | $185.8 | $167.2 | $141.5 | $108.6 |
| Total New Debt | - | $236.0 | $236.0 | $200.6 | $185.8 | $167.2 | $141.5 | $108.6 |
| Other Long Term Liabilities | 31.1 | | 31.1 | 31.1 | 31.1 | 31.1 | 31.1 | 31.1 |
| Total Long Term Liabilities | $718.5 | ($451.4) | $267.1 | $231.6 | $216.9 | $198.3 | $172.6 | $139.7 |
| Total Liabilities | $800.7 | ($472.5) | $328.1 | $299.1 | $300.0 | $291.2 | $273.9 | $247.1 |
| Common Shareholder's Equity | ($457.9) | $626.8 | $168.8 | $177.6 | $191.5 | $214.7 | $244.8 | $283.2 |
| Total Liabilities and Equity | $342.7 | $154.2 | $497.0 | $476.7 | $491.5 | $505.9 | $518.7 | $530.3 |

*Note: Assumes the DIP facility is replaced with a $[60] million revolving credit facility*

The Debtors' actual financial performance since the Petition Date may result in different net debt balances than those presented in the April 30, 2010 projected balance sheet provided herein. The Debtors' management team does not expect actual net debt amounts under the Stand-Alone Alternative to be materially different than what is presented herein.

## Income Statement

| ($ in millions) | 5/1/2010 - 12/31/2010 | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| Net Sales | $387.6 | $527.0 | $624.1 | $694.7 | $772.9 | $834.8 |
| COGS (excl. D&A) | (248.3) | (343.2) | (409.6) | (455.1) | (504.4) | (544.0) |
| Gross Profit | $139.3 | $183.8 | $214.6 | $239.6 | $268.5 | $290.8 |
| Operating Expenses | (94.5) | (146.7) | (147.9) | (158.5) | (171.3) | (180.8) |
| EBITDA | $44.8 | $37.1 | $66.7 | $81.0 | $97.3 | $110.0 |
| % Margin | 11.6% | 7.0% | 10.7% | 11.7% | 12.6% | 13.2% |
| Professional Fees and Other Adjusments | 5.8 | 15.9 | 1.5 | 1.6 | 1.5 | 1.4 |
| Adjusted EBITDA | $50.6 | $53.0 | $68.2 | $82.7 | $98.8 | $111.4 |
| % Margin | 13.1% | 10.0% | 10.9% | 11.9% | 12.8% | 13.3% |
| Depreciation & Amortization | (18.6) | (28.0) | (29.0) | (30.0) | (31.0) | (32.0) |
| EBIT | $26.1 | $9.1 | $37.7 | $51.1 | $66.3 | $78.1 |
| % Margin | 6.7% | 1.7% | 6.0% | 7.4% | 8.6% | 9.4% |
| Cash Interest Expense, Net | (13.5) | (27.1) | (18.0) | (18.4) | (17.0) | (15.8) |
| PIK Interest Expense | - | (4.5) | - | - | - | - |
| Amortization of Deferred Financing Fees | (0.7) | (9.6) | (1.1) | (1.1) | (1.1) | (1.1) |
| EBT | $11.9 | ($32.1) | $18.6 | $31.5 | $48.2 | $61.1 |
| Taxes | (3.2) | (4.8) | (4.9) | (8.6) | (18.4) | (23.0) |
| Net Income | $8.7 | ($36.9) | $13.7 | $22.9 | $29.9 | $38.1 |

## Cash Flow Statement

| ($ in millions) | 5/1/2010 - 12/31/2010 | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Operating Activities** | | | | | | |
| Net Income | $8.7 | ($36.9) | $13.7 | $22.9 | $29.9 | $38.1 |
| Depreciation & Amortization | 18.6 | 28.0 | 29.0 | 30.0 | 31.0 | 32.0 |
| Amortization of Deferred Fees | 0.7 | 1.8 | 1.1 | 1.1 | 1.1 | 1.1 |
| Other | 0.0 | (0.2) | 0.2 | 0.2 | 0.3 | 0.3 |
| *Working Capital* | | | | | | |
| Accounts Receivable, Net | (0.9) | (4.0) | (3.1) | (1.4) | (1.5) | (1.2) |
| Retained Interest in Transferred Receivable | 1.7 | (3.2) | (4.0) | (2.3) | (2.4) | (1.9) |
| Inventory | 6.9 | (2.6) | (7.0) | (5.4) | (6.3) | (4.7) |
| Prepaid Expenses and Other Current Assets | 0.8 | (0.3) | (1.8) | (5.2) | (1.1) | (0.9) |
| Pre-Petition Accounts Payable | - | (7.5) | - | - | - | - |
| Post-Petition Accounts Payable | 5.5 | 17.8 | 15.2 | 6.7 | 4.5 | 3.4 |
| Accrued Expenses and Other Liabilities | 2.0 | 2.6 | 3.8 | 4.1 | 4.8 | 3.6 |
| Accrued Bonuses | (1.2) | 0.2 | (3.3) | (0.9) | (0.9) | (0.9) |
| Total Change in Working Capital | 14.9 | 3.0 | (0.1) | (4.4) | (2.9) | (2.6) |
| PIK Interest | - | 4.5 | - | - | - | - |
| Change in Accrued Interest | - | 2.8 | - | - | - | - |
| Cash from Operating Activities | $43.0 | $2.9 | $43.9 | $49.8 | $59.3 | $68.9 |
| **Investing Activities** | | | | | | |
| Capex | ($12.5) | ($20.0) | ($25.0) | ($25.0) | ($25.0) | ($25.0) |
| Cash from Investing Activities | ($12.5) | ($20.0) | ($25.0) | ($25.0) | ($25.0) | ($25.0) |
| **Financing Activities** | | | | | | |
| Drawdown / (Repayment) of Exit Revolver | (35.4) | 0.6 | (0.6) | - | - | - |
| Change in Exit Term Loan B | - | - | (14.2) | (18.6) | (25.7) | (32.9) |
| Cash from Financing Activities | ($35.4) | $0.6 | ($14.7) | ($18.6) | ($25.7) | ($32.9) |
| Total Cash Flow | ($5.0) | ($16.5) | $4.2 | $6.2 | $8.6 | $11.0 |
| Beginning Cash | 10.0 | 21.5 | 5.0 | 9.2 | 15.4 | 23.9 |
| Ending Cash | 5.0 | 5.0 | 9.2 | 15.4 | 23.9 | 34.9 |

**Valuation Analysis**

## REORGANIZATION VALUE OF THE REORGANIZED DEBTORS

Moelis & Company, LLC ("**Moelis & Company**") has advised the Debtors with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated mid-point of the reorganization value of the Reorganized Debtors was assumed to be approximately $420.0 million as of an assumed Effective Date of April 30, 2010. This estimated reorganization value includes (i) excess cash and (ii) consideration of a tax net operating loss carry-forward. Moelis & Company's estimate of an enterprise value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ASSUMED REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF APRIL 30, 2010, REFLECTS WORK PERFORMED BY MOELIS & COMPANY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS & COMPANY AS OF JANUARY 19, 2010. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS & COMPANY'S CONCLUSIONS, MOELIS & COMPANY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

Based upon the assumed mid-point of the reorganization value of the Reorganized Debtors of approximately $420.0 million and an assumed total net debt of $251.2 million (including $200.0 million in a New Term Loan B, an estimated $36.0 million of debt outstanding under a New Revolving Credit Facility and $25.2 million outstanding under the A/R Facility, net of $10.0 million of cash as of the Effective Date), Moelis & Company has estimated the equity value for the Reorganized Debtors to be approximately $168 million.

The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the Projections, access to adequate exit financing, the continuing leadership of the existing management team, market conditions as of January 19, 2010 continuing through the assumed Effective Date of April 30, 2010 and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projections prepared by the Debtors' management and included in the Financial Appendix as **Exhibit D** to this Disclosure Statement, Moelis & Company assumed that such Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Moelis & Company's estimate of reorganization value assumes that the Debtors' Projections will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecast by the Debtors' management are materially better than the Debtors' recent historical results. As a result, to the extent that estimate of enterprise value is dependent upon the Reorganized Debtors performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projections, such performance may have a material impact on the Projections and on the estimated value derived therefrom.

IN ESTIMATING THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, MOELIS & COMPANY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO MOELIS & COMPANY BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESSES AND THEIR PROSPECTS;

- MET WITH CERTAIN MEMBERS OF THE DEBTORS' SENIOR MANAGEMENT TO DISCUSS THE DEBTORS' OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT MOELIS & COMPANY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESSES OF THE DEBTORS;

- CONSIDERED RELEVANT COMPARABLE PRECEDENT TRANSACTIONS;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESSES; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH MOELIS & COMPANY CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESSES, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS & COMPANY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUE THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATE OF THE REORGANIZATION VALUE PREPARED BY MOELIS & COMPANY REPRESENTS THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. THE ESTIMATE WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE ESTIMATE REFLECTS COMPUTATIONS OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF

THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUE OR AN ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNT SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE THE ESTIMATE IS INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS & COMPANY NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THE ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

## Valuation Methodology

Moelis & Company performed a variety of analyses and considered a variety of factors in preparing the valuation of the Debtors. Moelis & Company primarily relied on three valuation methodologies: comparable public company analysis, discounted cash flow analysis and precedent transactions analysis. Moelis & Company placed different weights on each of these analyses and made judgments as to the relative significance of each analysis in determining the Debtors' indicated enterprise value. Moelis & Company's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Debtors' enterprise value.

In preparing its valuation estimate, Moelis & Company performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Moelis & Company's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

**Comparable Public Company Analysis.** A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and

cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, location of markets, growth prospects, maturity of businesses, market presence, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies in the building products sector were deemed generally comparable to the Debtors in some or all of the factors described above: American Woodmark Corp., Gibraltar Industries, Inc., Masco Corp., Mohawk Industries Inc., Owens Corning, PGT, Inc., Quanex Building Products Corp., Simpson Manufacturing Co., Inc., and Trex Co. Inc. Moelis & Company excluded several building products companies that were deemed not comparable because of size, specific product comparability and/or status of comparable companies. Moelis & Company analyzed the current trading value for the comparable companies as a multiple of projected fiscal years 2009, 2010 and 2011 earnings before interest, taxes, depreciation and amortization ("***EBITDA***"). These multiples were then applied to the Debtors' projected EBITDA for the twelve months ending December 31, 2009, 2010 and 2011, respectively, to determine the enterprise value.

**Precedent Transactions Analysis.** Precedent transactions analysis estimates value by examining public merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtors. These transaction multiples are calculated based on the purchase price (including any net debt assumed) paid to acquire companies that are comparable to the Debtors. Moelis & Company specifically focused on prices paid as a multiple of EBITDA in determining a value for the Debtors. These multiples are then applied to the Debtors' key operating statistics to determine the total enterprise value or value to a potential strategic buyer.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Other aspects of value that manifest itself in a precedent transaction analysis include the following:

• Circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (*e.g.*, an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

• The market environment is not identical for transactions occurring at different periods of time.

• Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (*e.g.*, a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Because the precedent transaction analysis explains other aspects of value besides the inherent value of a company, there are limitations as to its use in the Debtors' valuation.

**Discounted Cash Flow Approach.** The discounted cash flow ("*DCF*") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Moelis & Company's discounted cash flow valuation is based on the business plan Projections of the Debtors' operating results. Moelis & Company discounted the projected cash flows using the Debtors' estimated weighted average cost of capital and calculated the terminal value of the Debtors using the perpetuity growth methodology.

This approach relies on a company's ability to project future cash flows with some degree of accuracy. Because the Debtors' Projections reflect significant assumptions made by their management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis & Company cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Projections.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY MOELIS & COMPANY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS & COMPANY'S VALUATION ANALYSIS.