IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ATRIUM CORPORATION, *et al.*,[1] | ) | Case No. 10-10150 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Hearing Date: March 22, 2010 at 10:30 a.m. (ET) (Requested) |
| | ) | Objection Deadline: March 19, 2010 at 12:00 p.m. (ET) (Reqested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(A) AUTHORIZING THE DEBTORS TO ENTER INTO
THE EQUITY PURCHASE AGREEMENT WITH PLAN INVESTOR
IN CONNECTION WITH THE DEBTORS' PROPOSED FIRST MODIFIED
JOINT PLAN OF REORGANIZATION AND (B) APPROVING PAYMENT OF A
TERMINATION FEE TO PLAN INVESTOR IN CONNECTION THEREWITH**

Atrium Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"),[2] respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company – West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042). The Debtors' main corporate address is 3890 W. Northwest Highway, Suite 500, Dallas, Texas 75220.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' restructuring, are set forth in greater detail in the *Declaration of Gregory T. Faherty, President and Chief Executive Officer of Atrium Corporation, in Support of First Day Motions* [Docket No. 4], filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") on January 20, 2010 (the "*Petition Date*"). Simultaneously with the commencement of these chapter 11 cases, Debtor North Star Manufacturing (London) Ltd. sought relief under the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Ontario, Canada (the "*CCAA Proceeding*").

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 363(b) and 503(b) of the Bankruptcy Code, Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rule 9013-1(a) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

## Introduction

4. The Debtors have procured a binding investment commitment that produces significant recoveries for all stakeholders and brokers consensus among their major creditor constituencies. Notably, the Creditors' Committee, the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders have voiced their support for the Debtors' revised chapter 11 plan of reorganization (the "*Plan*"),[3] which has been filed contemporaneously herewith. Now, with their sights set on accomplishing the restructuring goals that were articulated on the very first day of these chapter 11 cases, the Debtors take the next step in effectuating their deleveraging and ultimately emerging from chapter 11.

5. As explained in the declarations of Frank H. Sellman and Jared J. Dermont (investment bankers at Moelis & Company LLC ("*Moelis*"), the Debtors' proposed financial advisor and investment banker), each of which was filed contemporaneously herewith (and

---

[3] The Debtors filed an original version of the Plan on the Petition Date [Docket No. 23] (the "*Original Plan*"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

incorporated by reference herein) in support of the relief requested in this motion (the "*Sellman Declaration*" and the "*Dermont Declaration*," respectively), the Debtors have reached an agreement to effectuate their restructuring through an equity investment to be provided by Kenner and Company, Inc. and Golden Gate Capital ("*Kenner*" and "*Golden Gate*," respectively, and, together, the "*Plan Investor*"). Following Moelis' efforts to broadly market the Debtors' business beginning in December 2009, the Debtors, together with the advisors to the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee received, analyzed and negotiated with two parties that submitted binding proposals to sponsor the Debtors' chapter 11 plan. Ultimately, it was determined that the Plan Investor's proposal was the best available to maximize recoveries for the Debtors' stakeholders.

6. Specifically, and as set forth in Equity Purchase Agreement, dated as of March 12, 2010, by and between Atrium Corporation, as seller, and Atrium Window Holdings, LLC, as purchaser (the "*EPA*," a copy of which is annexed as **Exhibit 1** to **Exhibit A** attached hereto), the Plan Investor will invest up to $169.2 million in exchange for 92.5% of the New Common Stock of Reorganized Atrium. The Debtors will use the proceeds of this investment, along with the proceeds of up to $320 million in new debt commitments (the "*New Debt Commitments*") provided by the Plan Investor (for a total consideration of $489.2 million) to satisfy the payments provided for under the Plan, including, but not limited to, payment of: (a) 95% of the Claims of the Senior Secured Lenders in cash (as well as an additional payment of $7.5 million to be shared by the Holders of Senior Secured Term Claims and Senior Secured Revolver Claims on a pro rata basis) including default interest; (b) 100% of the Swap Contract Claims; (c) 100% of the DIP Claims; (d) 100% of the anticipated administrative and priority claims; (e) a distribution to unsecured noteholders 7.5% of the New Common Stock in

6

Reorganized Atrium; and (f) a cash distribution to general unsecured creditors equal to the projected recovery for the noteholders. The EPA and the Plan are supported by the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders and the Creditors' Committee.

7. To ensure an expedited emergence from chapter 11, the Debtors seek approval of the EPA and authorization to provide the Plan Investor with a termination fee in the event a subsequent proposal is offered and accepted. The transactions contemplated in the EPA itself are incorporated in the Plan. Thus, consummation of the EPA is dependent upon confirmation of the Plan.

## Relief Requested

8. By this motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors enter into the EPA in connection with the Plan and (b) approving the payment of a termination fee to the Plan Investor, subject to the terms and conditions set forth in the EPA, in the amount of $12.3 million (the "*Termination Fee*").

## The EPA

9. As explained in the Sellman Declaration, the goal of the marketing process with respect to New Value Alternative was to capture the universe of parties who may be interested in investing in the Debtors so that the highest and best offer ultimately received reflected the highest and best offer the market allowed. The Debtors have determined that the Plan Investor's offer is the best available at this time, subject to receipt of a superior proposal from the Strategic Investor or some other party, all as explained in the Sellman Declaration. The EPA, which is a product of negotiations among the Debtors, the Senior Secured Agent, the Ad Hoc Group of Senior Secured Lenders, the Creditors' Committee and the Plan Investor, provides the

7

K&E 16437330.9
PHIL1 927897-1

contractual framework to implement the transactions contemplated under the Plan. The material provisions of the EPA are summarized in the chart attached hereto as **Exhibit B**.

### Provisions to be Highlighted Pursuant to Local Rule 6004-1(b)(iv)

10. By this motion, the Debtors are seeking to enter into the EPA to effectuate the New Value Alternative as contemplated under the Plan. As there will be no transfer of assets until the Plan has been confirmed, entering into the EPA will not involve a sale of property of the Debtors' estates. Out of an abundance of caution, however, the Debtors are complying with the requirements of Local Rule 6004-1(b)(iv), which requires the Debtors to highlight certain facts and provisions relating to a sale of estate assets. *See* Del. L.R. Proc. 6004-1(b)(iv). Although the Debtors have already highlighted certain key provisions of the EPA in the summary attached hereto, and would intend to present necessary evidence at any hearing on confirmation of the Plan to approve the transactions embodied in the EPA, the Debtors believe that disclosure with respect to each of the highlighted provisions below is necessary and justified under the circumstances.

- **Local Rule 6004-1(b)(iv)(A) – *Sale to Insider*.** Kenner is an "insider" of the Debtors as that term is defined in section 101(31)(E) of the Bankruptcy Code; Kenner holds a majority of the Interests in Atrium Corporation. Nonetheless, and as set forth in the Sellman Declaration, the Debtors have engaged in a thorough marketing process beginning in December 2009, which included Moelis contacting 40 potential third-party investors to determine if there was interest in acquiring the Debtors. As such, while an alternative investor may make a higher and better proposal, the Debtors submit that the marketing process has been conducted fairly and has ensured that Kenner has not exerted undue leverage nor enjoyed an unfair advantage in its successful bid (along with its co-investor, Golden Gate) to acquire 92.5% of the equity in Reorganized Atrium. In addition, as reflected in the Equity Commitment Letter annexed to the EPA, Kenner will hold a minority 25%

8

interest in Reorganized Atrium; Golden Gate will hold the majority (75%) of the New Common Stock.

- **Local Rule 6004-1(b)(iv)(D) –** *Private Sale/No Competitive Bidding*. As discussed in the Sellman Declaration, the Debtors have conducted a thorough search to identify potential bidders and conducted an open process to identify the best proposal. Thus, the Debtors believe that they have conducted a public marketing process and that no further disclosure is required, except in connection with a higher and better proposal from the Strategic Investor or any other alternative investor.

- **Local Rule 6004-1(b)(iv)(O) –** *Relief from Bankruptcy Rule 6004(h)*. The Debtors are seeking a waiver of the 14-day stay period under Bankruptcy Rules 6004(h). Pursuant to Local Rule 6004-1(b)(iv), the business justification for the waiver of the 14-day stay under Bankruptcy Rule 6004(h) is set forth below.

### Supporting Authority

**A.    Entry into the EPA is a Reasonable Exercise of the Debtors' Sound Business Judgment**

11.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b)(1) of the Bankruptcy Code, a court generally should approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (same).

9

12. Once the Debtors have articulated a valid business purpose for use of estate property, a presumption arises that the Debtors' decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

13. In this case, the Debtors have determined, after a several-month-long marketing process and consultation along the way with their creditor constituencies, to enter into the EPA, which represents the best opportunity under the circumstances and at this time to maximize value for all stakeholders. Moreover, swift consummation of the New Value Alternative in accordance with the terms set forth in the Plan and EPA will afford the Debtors the ability to efficiently and effectively restructure their significant indebtedness, providing the Debtors with the foundation to truly focus on what matters — increasing profitability.

14. Accordingly, the Debtors, in their sound business judgment, believe that entry into the EPA — which provides the committed financial support necessary to achieve the Debtors' business goals and will implement the New Value Alternative — is in the best interests

K&E 16437330.9
PHIL1 927897-1

of their estates and respectfully request that the Court approve the proposed transaction pursuant to section 363(b) of the Bankruptcy Code.[4]

**B. The Termination Fee is Appropriate**

15. The Third Circuit Court of Appeals recently clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. Specifically, in *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010), the Third Circuit noted that "[t]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." (*quoting In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999)). In *O'Brien*, the Third Circuit held that a request for approval of a break-up fee and expense reimbursement is governed by the administrative expense provisions in section 503(b) of the Bankruptcy Code. Accordingly, to be approved, bidding incentives such as the Termination Fee must provide a benefit to a debtor's estate. 181 F.3d at 533; *see also Reliant*, 594 F.3d at 206.

16. The *O'Brien* opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit

---

[4] Moreover, the transaction contemplated by the EPA is the type intended to be governed by section 363(b) of the Bankruptcy Code and thus, the required initial waiting period after the HSR Act filing shall end on the 15th day after the date of receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification by the Debtors and the Plan Investor in accordance with section 363(b)(2)(B) of the Bankruptcy Code. In accordance with the terms of the EPA, the Debtors and the Plan Investor anticipate immediately, but no later than 15 Business Days after the date of execution of the EPA, making any filings required under the HSR Act.

11

a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* Further, in *Reliant* the Third Circuit recognized that a break-up fee may preserve value in one of two ways. First, the opportunity to obtain a break-up fee may induce a bidder to make its bid before the Bankruptcy Court orders the auction to be held. 594 F.3d at 206. Second, the provision for a break-up fee may induce a bidder to adhere to its bid after the Court orders the conducting of an auction. *Id.* The court in *Reliant* further held that "a break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee." *Id.*

17. The Debtors have been advised that the Termination Fee is a necessary inducement for the Plan Investor to enter into the EPA and to adhere to the terms of the EPA. The Plan Investor is set to incur substantial expenses and expend significant resources during the multi-week solicitation and confirmation process. Moreover, the EPA is expressly conditioned on obtaining approval of the Termination Fee. In fact, the Plan Investor has the explicit right to terminate the EPA if an order approving the Termination Fee, among other things, has not been entered on an expedited basis. *See* EPA § 7.01(k). Similarly, the Plan Investor's bank facility commitment from UBS is expressly conditioned on the entry of an order approving the Termination Fee and UBS has a similar right to terminate its commitment to lend if an order approving the Termination Fee is not entered by April 5, 2010. UBS is also entitled to a portion of the Termination Fee, if it becomes payable, as a reimbursement of its expenses. Furthermore, upon exercise of the Plan Investor's right to terminate the EPA, it is not obligated to pay the Reverse Termination Fee. *See* EPA § 8.07(a).

K&E 16437330.9
PHIL1 927897-1

18. Accordingly, unlike the initial offer in *Reliant*, the EPA is expressly conditioned upon approval of the Termination Fee, and allowing the Termination Fee would induce the Plan Investor to adhere to its bid, and in turn induce UBS to adhere to its commitment. Absent approval of the Termination Fee, the viability of the New Value Alternative, as sponsored by the Plan Investor, would be jeopardized.

19. After Moelis contacted 40 parties to determine interest, several parties conducted extensive diligence, ultimately culminating in two proposals that were higher and better than the New Value Alternative as originally proposed under the Plan. Through consultation and negotiations with the Plan Investor and the key creditor constituencies in these cases, it was determined that the EPA was the best proposal available at this time.

20. The Termination Fee is necessary and appropriate consideration under the circumstances and reflects the value that the availability of the New Value Alternative provides to the Debtors' estates. The Plan Investor's efforts and commitments have clearly set a floor for third parties who wish to make an offer under the Plan's New Value Alternative. Moreover, the Plan Investor's willingness to proceed with the New Value Alternative, which will involve the incurrence of substantial financing fees and out-of-pocket costs through the hearing to consider confirmation of the Plan, necessitates certain protections with respect to any potential "overbids."

21. Further, the Termination Fee is an actual and necessary cost of preserving and maximizing the value of the Debtors' estates and enhancing creditor recoveries by providing an effective means to secure the commitment to infuse up to $169.2 million of cash and approximately $320 million in funded debt at exit, at a fraction (approximately 2.8%) of the approximately $439.1 million in total value that the Debtors will receive under the EPA provided

13

K&E 16437330.9
PHIL1 927897-1

that the Closing occurs on April 30, 2010. Thus, under the "administrative expense" standard enunciated in *O'Brien* and *Reliant*, and to ensure that the New Value Alternative remains a viable restructuring alternative, the Termination Fee should be approved.

22. Indeed, the Termination Fee, which is approximately 2.8% of the total value received by creditors under the EPA, is well within the range of termination fees approved by this and other courts. *See, e.g., In re Nortel Networks, Inc.*, Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (authorizing break-up fee of 3.68%); *In re Wickes Holdings, LLC*, Case No. 08-10212 (Bankr. D. Del. Feb. 19, 2008) (authorizing termination fee of up to 3%); *In re Radnor Holdings*, Case No. 06-10110 (Bankr. D. Del. Sept. 22, 2006) (permitting an aggregate fee and expense reimbursement of 3%); *In re Ameriserve Food Distrib., Inc.*, Case No. 00-00358 (Bankr. D. Del. Jan. 31, 2000) (approving termination fee of 3.6%); *see also In re GT Brands Holdings LLC*, Case No. 05-15167 (Bankr. S.D.N.Y. July 28, 2005) (approving termination fee equal to 3.13%).

23. Furthermore, courts in this district have routinely approved the payment of fees and expenses to other parties who prevailed in a competitive process to provide financing or other services to a debtor but who refuse to start work until they get assurance that their expenses will be covered. *See, e.g. In re Freedom Commc'ns Holdings, Inc.*, Case No. 09-13046 (BLS) (Bankr. D. Del. Jan. 28, 2010) (authorizing the debtors to pay work and commitment fees and reimburse reasonable out-of-pocket expenses and to provide customary indemnification to potential lenders, administrative agents and their related parties in connection with a potential exit financing facility prior to due diligence and without execution of a commitment letter); *In re Pliant Corp.*, Case No. 09-10443 (Bankr. D. Del. May 14, 2009) (authorizing the debtors to pay the fees of potential lenders or potential lending syndicate members with respect to their non-

14

binding proposals to provide debtors with exit financing); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Mar. 4, 2009) (authorizing the debtors to use estate funds to pay exit lender a non-refundable $1,000,000 structuring fee) *In re Meridian Auto. Sys.-Composites Operations, Inc.*, Case No. 05-11168 (Bankr. D. Del. June 14, 2006) (authorizing the debtors to pay certain due diligence fees and out-of-pocket expenses of potential lenders in connection with securing exit financing).

### C. Relief from the Fourteen-Day Waiting Period Under Bankruptcy Rule 6004(h) is Appropriate

24. Bankruptcy Rule 6004(h) provides, in relevant part, that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

25. The Debtors firmly believe that cause exists to modify the stay period required under Bankruptcy Rule 6004(h) for the following reasons. First, the Debtors are required to obtain approval of the relief sought in this motion, including the Termination Fee, by April 5, 2010. Second, prompt entry into the EPA is critical to (a) satisfaction of the requirements and milestones under the DIP Order and Lock-Up Agreement and (b) the Debtors' efforts to preserve and maximize the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay period required under Bankruptcy Rule 6004(h).

### Notice

26. The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Creditors' Committee; (c) counsel to the DIP Agent; (d) counsel to the Senior Secured Agent; (e) counsel to the Ad Hoc Group of Senior Secured Lenders; (f) counsel to the agent under the Debtors' accounts receivable securitization facility; (g) counsel to the Plan Investor; (h) the indenture trustees for each of the

15

Debtors' outstanding bond issuances; (i) the monitor appointed in the CCAA Proceeding; and (j) those parties who have formally appeared and requested service in these cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

27.   No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Sellman and Dermont Declarations, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to enter into the EPA in connection with the Plan, (b) pay the Termination Fee to the Plan Investor pursuant to the terms and conditions set forth in the EPA and (c) granting such other and further relief as the Court may deem appropriate.

Dated: March 16, 2010
       Wilmington, DE

/s/ *Domenic E. Pacitti*
Domenic E. Pacitti (Bar No. 3989)
Michael Yurkewicz (Bar No. 4165)
KLEHR HARRISON HARVEY
BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
Telephone:   (302) 426-1189
Facsimile:   (302) 426-9193

- and -

Richard M. Cieri (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Debtors
and Debtors in Possession*