**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ATRIUM CORPORATION, *et al.*,[1] | ) | Case No. 10-10150 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket No. ___** |

**ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO
THE EQUITY PURCHASE AGREEMENT WITH PLAN INVESTOR
IN CONNECTION WITH THE DEBTORS' PROPOSED JOINT
PLAN OF REORGANIZATION AND (B) APPROVING PAYMENT OF A
TERMINATION FEE TO PLAN INVESTOR IN CONNECTION THEREWITH**

Upon the motion (the "***Motion***")[2] of the Debtors for entry of an order (this "***Order***"), pursuant to sections 363(b) and 503(b) of the Bankruptcy Code and Rule 9013-1(a) of the Local Rules, authorizing, but not directing, the Debtors to enter into the EPA with the Plan Investor and approving the Termination Fee provided for therein, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. §§ 157(b)(2); and venue

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Atrium Corporation (4598); ACIH, Inc. (7822); Aluminum Screen Manufacturers, Inc. (6750); Atrium Companies, Inc. (2488); Atrium Door and Window Company – West Coast (2008); Atrium Door and Window Company of Arizona (2044); Atrium Door and Window Company of the Northeast (5384); Atrium Door and Window Company of the Northwest (3049); Atrium Door and Window Company of the Rockies (2007); Atrium Enterprises Inc. (6531); Atrium Extrusion Systems, Inc. (5765); Atrium Florida, Inc. (4562); Atrium Vinyl, Inc. (0120); Atrium Windows and Doors of Ontario, Inc. (0609); Champion Window, Inc. (1143); North Star Manufacturing (London) Ltd. (6148); R.G. Darby Company, Inc. (1046); Superior Engineered Products Corporation (4609); Thermal Industries, Inc. (3452); and Total Trim, Inc. (8042).  The Debtors' main corporate address is 3890 W. Northwest Highway, Suite 500, Dallas, Texas 75220.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the Motion being adequate and appropriate under the particular circumstances; and a hearing

having been held to consider the relief requested in the Motion (the "*Hearing*"); and upon the

Sellman Declaration and the Dermont Declaration, the record of the Hearing and all proceedings

had before the Court; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest,

and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and any objections to the requested relief having been withdrawn or overruled on

the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED:

1.      The Motion is granted to the extent provided herein.

2.      The Debtors are authorized to enter into the EPA, a copy of which is attached

hereto as **Exhibit 1** and incorporated by reference herein.

3.      The Debtors are authorized to use estate funds to pay a Termination Fee, if

applicable, as set forth in the EPA.

4.      The proposed transaction under the EPA is governed by section 363(b) of the

Bankruptcy Code and the waiting period set forth in section 363(b)(2)(B) thereof relating to any

filings required under the HSR Act is applicable.

5.      The Debtors are authorized to take all actions necessary or appropriate to

effectuate the relief granted pursuant to this order in accordance with the Motion and to

implement the EPA.

6.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062,

9014 or otherwise, this Order shall be immediately effective and enforceable upon its entry.

K&E 16437330.9

PHIL1 927897-1

7.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Date: _____, 2010
          Wilmington, DE                              _____
                                                      Honorable Brendan L. Shannon
                                                      United States Bankruptcy Judge

K&E 16437330.9

PHIL1 927897-1

**Exhibit 1** to **Exhibit A**

**Equity Purchase Agreement**

**EQUITY PURCHASE AGREEMENT**

**between**

**ATRIUM CORPORATION**

**and**

**ATRIUM WINDOW HOLDINGS, LLC**

**Dated as of March 12, 2010**

## EQUITY PURCHASE AGREEMENT

THIS EQUITY PURCHASE AGREEMENT dated as of March 12, 2010 (this "Agreement") is entered into by and between Atrium Corporation, a Delaware corporation (the "Company"), and Atrium Window Holdings, LLC, a Delaware limited liability company (the "Plan Investor").  Capitalized terms used herein but not otherwise defined herein shall have the respective meanings set forth in Section 8.16 of this Agreement or the Plan (as defined herein).

WITNESSETH

WHEREAS, on January 20, 2010, the Company and certain of its affiliates, as debtors and debtors in possession, filed the Joint Plan of Reorganization of Atrium Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, a copy of which is attached hereto as Exhibit A (as amended from time to time, the "Plan")and the Disclosure Statement with respect to the Plan with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 10-10150 (BLS);

WHEREAS, the Company is currently operating the Business and managing its properties as debtor in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to the New Value Alternative of the Plan, the undersigned Plan Investor, as an integral part of the Plan, has agreed to acquire from the Company 92.5% of the New Common Stock issued and outstanding as of the Effective Date (the "New Money Shares") in exchange for the Purchase Price (as defined below); and

WHEREAS, subject to the terms and conditions hereof, the Company desires to issue and sell to the Plan Investor and the Plan Investor desires to subscribe for and purchase (or to cause one or more of its designees to purchase) from the Company, the New Money Shares.

NOW THEREFORE, in consideration of these premises and the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

ARTICLE I
THE COMMON SHARES

SECTION 1.01  New Certificate of Incorporation.  The Company shall adopt and file with the Secretary of State of the State of Delaware, on or before the Closing Date, an Amended and Restated Certificate of Incorporation in the form as approved by the Plan Investor (the "New Certificate of Incorporation").

SECTION 1.02  Authorization of New Money Shares.  Subject to entry of the Confirmation Order and the Approvals, the Company has duly authorized the sale and issuance, pursuant to the terms and conditions of this Agreement, of the New Money Shares.  The New Money Shares shall have the rights, preferences, privileges and restrictions set forth in the New Certificate of Incorporation.

SECTION 1.03  Issuance, Sale and Delivery of the New Money Shares.  Subject to the terms and conditions of this Agreement, the Company agrees to issue and sell to the Plan Investor, and the Plan Investor hereby agrees to purchase from the Company at the Closing, the New Money Shares for an aggregate cash purchase price equal to $169,200,000 (the "Purchase Price").

SECTION 1.04  Closing.  The closing of the sale and purchase of the New Money Shares (the "Closing") shall take place at the offices of Kirkland & Ellis LLP at 601 Lexington Avenue, New York, NY on the Effective Date, which date also shall be a Business Day following the date on which the conditions specified in Article V and Article VI have either been satisfied or waived by the party for whose benefit such conditions exist, or at such other location, date and time as may be agreed upon between the Plan Investor and the Company; provided that, subject to Section 5.07(a), the Plan Investor shall be permitted to extend the date of Closing by written notice to the Company until not later than May 31, 2010 (the "Closing Date").  At the Closing, the Company shall issue and deliver to the Plan Investor a stock certificate or certificates in definitive form, registered in the name of the Plan Investor, representing the New Money Shares being purchased by the Plan Investor at the Closing.  As payment in full for the New Money Shares being purchased by it at the Closing, and against delivery of the stock certificate or certificates therefor as aforesaid, on the Closing Date the Plan Investor shall transfer the aforesaid Purchase Price in immediately available funds to the account of the Company by wire transfer in accordance with the wire transfer instructions as set forth on Exhibit B hereto.

SECTION 1.05  Use of Proceeds.  The net proceeds received by the Company in exchange for the New Money Shares issued to the Plan Investor shall be used for the purposes set forth in the Plan.

SECTION 1.06  Plan Payments.  Subject to Section 7.01(l) and the terms of the Plan, at the Closing, the Plan Investor shall pay or cause to be paid the following amounts:

(a)  $7,500,000 in cash to the Senior Secured Agent for prompt pro rata distribution to the holders of Senior Secured Revolver Claims and Senior Secured Term Claims, plus

(b)  Cash equal to 95% of the amount of Senior Secured Revolver Claims and Senior Secured Term Claims outstanding as of the Closing Date, plus

(c)  Cash equal to 95% of the Senior Secured Revolver Interest Equivalent Claims and Senior Secured Term Interest Equivalent Claims (it being understood and acknowledged that interest shall have accrued at the default interest rate provided in the Senior Secured Credit Agreement) outstanding as of the Closing Date, plus

(d)  Cash equal to 100% of the Swap Contract Claims; provided that the aggregate of the amounts referred to in clauses (b) through (d) of this Section 1.06 shall not exceed the sum of (i) $385,077,750.25 and (ii) the amount of interest that accrues as provided in the proviso to Section 5.07(a), plus

(e)     Cash equal to 100% of the balance under the A/R Facility as of the Closing Date, _provided_ that, for this purpose, such balance shall not exceed the applicable amount set forth on Schedule 1.06(e), plus

(f)     100% of the amount of DIP Claims as of the Closing Date after giving effect to the payment required by Section 4.04, _provided_ that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(f), plus

(g)     100% of the amount of Administrative Claims and Priority Claims as of the Closing Date, _provided_ that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(g), plus

(h)     All other amounts, including unbilled and accrued amounts, necessary to consummate the Plan, _provided_ that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(h).

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Plan Investor as of the date hereof and as of Closing Date that:

SECTION 2.01  Organization and Authority.  The Company and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of organization and, subject to the applicable bankruptcy and insolvency law, has full corporate power and authority to own its properties and to conduct its business as presently conducted and as proposed to be conducted by it and to enter into and perform this Agreement, to carry out the transactions contemplated by this Agreement and to issue, sell and deliver the New Money Shares to be sold and delivered to the Plan Investor at the Closing.  The Company and each of its Subsidiaries is duly qualified to do business as a foreign corporation, limited liability company or limited partnership, as applicable, in every jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect.

SECTION 2.02  Sale, Issuance and Delivery of New Money Shares; Other Shares Issued at Closing.  The issuance, sale and delivery of the New Money Shares at the Closing has been duly authorized by all necessary corporate action on the part of the Company (subject to entry of the Confirmation Order and the Approvals).  The New Money Shares when so issued and delivered at the Closing against delivery by the Plan Investor to the Company of the Purchase Price, will be duly and validly issued, fully paid and non-assessable, free from all Liens (other than those created by the Plan Investor), will not be subject to any preemptive or similar rights, and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and under applicable state and federal securities laws.  As of the Closing, the only issued and outstanding Equity Interests (and rights to acquire Equity Interests) of the Company shall be the New Money Shares issued to the Plan Investor at the Per Share Purchase Price and shares of New Common Stock (which shares shall constitute 7.5% of the New Money Shares issued and outstanding as of the Effective Date) issued to the Holders of 11.0% Senior

Subordinated Notes and 15.0% Senior Subordinated Notes pursuant to the Plan on the Effective Date.

SECTION 2.03 <u>Authority for Agreement; Effect of Transactions</u>.

(a)     The execution, delivery and performance by the Company of this Agreement and the New Certificate of Incorporation, and the consummation by the Company of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action, subject to entry of the Confirmation Order and the Approvals.  This Agreement has been duly executed and delivered by the Company and, subject to entry of the Confirmation Order and the Approvals, constitute valid and binding obligations of the Company enforceable in accordance with their respective terms.

(b)     The execution of and performance of the transactions contemplated by this Agreement and compliance with their provisions by the Company will not (i) violate any provision of law or regulation applicable to the Company and its Subsidiaries or any of their respective assets, (ii) result in the creation of any Lien upon any of the property of the Company or any of its Subsidiaries, (iii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default under, or require a consent or waiver under, the Company's New Certificate of Incorporation or New By-Laws (each as in effect on the Effective Date), (iv) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default under, or require a consent or waiver under, any credit agreement, indenture, lease, agreement or other instrument to which the Company or any of its Subsidiaries is a party or by which it or any of their respective properties are bound, or any decree, judgment, license, permit, order, statute, rule or regulation applicable to the Company or any of its Subsidiaries, except, in the case of clause (i) and (iv), for such violations, consents, breaches or defaults as would not reasonably be expected to have a Material Adverse Effect.

SECTION 2.04 <u>No Solicitation or Advertisement</u>.  Neither the Company nor any Person acting on its behalf has engaged, in connection with the offering of the New Money Shares, in any form of general solicitation or general advertising within the meaning of Rule 502(c) under the Securities Act.

SECTION 2.05 <u>Securities Act Registration</u>.  Assuming the correctness of the representations and warranties of the Plan Investor contained herein, the offer, sale and delivery of the New Money Shares hereunder is exempt from the registration requirements under the Securities Act and applicable state securities or Blue Sky laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

SECTION 2.06 <u>Governmental Consents</u>.  No material consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except (i) the filing of the New Certificate of Incorporation with the Secretary of State of the State of Delaware, (ii) the Approvals and (iii) any required filing under applicable federal or state securities laws.

SECTION 2.07   [*Reserved*]

SECTION 2.08   Shares, etc.

(a)      Schedule 2.08(a) attached hereto correctly specifies as to each of the Company and its Subsidiaries (immediately prior to giving effect to the consummation of the transactions contemplated by the Plan on the Effective Date) (i) the number and type of its authorized Equity Interests and the number of Equity Interests outstanding and (ii) the name of each record and beneficial holder of such Equity Interests, together with the number (and percentage) of Equity Interests held by such holder.  All of the outstanding Equity Interests of the Company and its Subsidiaries are duly authorized, validly issued, fully paid and non-assessable and all of such securities have been (or will have been) offered, issued and sold by the issuers thereof in accordance with all applicable laws.  Except as set forth on Schedule 2.08(a) attached hereto, the outstanding Equity Interests of each of the Subsidiaries are owned by Company and its Subsidiaries, free of any Lien.  Except as set forth on Schedule 2.08(a) attached hereto, the Company is not a party to any proxy, voting agreement, voting trust, shareholders agreement or similar agreement or restriction.

(b)      Except as contemplated by this Agreement and as set forth on Schedule 2.08(b) attached hereto, (i) there are no outstanding rights, options, warrants or agreements for the purchase from, or sale or issuance by, any of the Company and its Subsidiaries of any of its Equity Interests or securities convertible into or exercisable or exchangeable for such Equity Interests; (ii) there are no agreements on the part of any of the Company and its Subsidiaries to issue, sell or distribute any of its securities or assets (other than the sale of assets in the ordinary course of business); (iii) none of the Company and its Subsidiaries has any obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its securities or any interest therein or to pay any dividend or make any distribution in respect thereof and (iv) no Person is entitled to any rights with respect to the registration of any securities of any of the Company and its Subsidiaries under the Securities Act (or the securities laws of any other jurisdiction).

SECTION 2.09   Financial Statements.  The Plan Investor has been furnished the qualified financial statements referred to on Schedule 2.09(a) attached hereto, which financial statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and present fairly in all material respects the financial position and the results of operations and cash flows of the Person(s) purported to be covered thereby as at the respective dates and for the respective periods indicated in conformity with GAAP (subject, in the case of any unaudited financial statements, to normal, year-end and audit adjustments and the omission of footnote disclosure).

SECTION 2.10   Tax Returns and Payments.  Each of the Company and its Subsidiaries has filed all material Tax returns required by law to be filed and has paid all Taxes levied upon any of its Properties, assets, income, receipts, franchises or sales other than those not yet due, those not substantial in the aggregate being contested in good faith and by proper proceedings and against which adequate reserves are being maintained in accordance with GAAP and those returns the failure of which to be filed would not reasonably be expected to result in a Material Adverse Effect.  Neither the Company nor its Subsidiaries are currently subject to any Federal or

state income Tax audits for any taxable period ending prior to the Closing Date, except as set forth on <u>Schedule 2.10</u>, and except for those that would not reasonably be expected to result in a Material Adverse Effect.  Except as set forth in <u>Schedule 2.10</u>, none of the Company and its Subsidiaries has executed any waiver or waivers that would have the effect of extending the applicable statute of limitations in respect of any Tax liabilities.  The charges, accruals and reserves in the financial statements of the Company and its Subsidiaries referred to on <u>Schedule 2.09(a)</u> attached hereto in respect of Taxes for the fiscal periods covered thereby are adequate in accordance with GAAP, and there are no known unpaid assessments for material additional taxes for any fiscal period or any basis therefor.  There are no written unpaid assessments for material additional Taxes for any fiscal period (except those being contested in good faith for which adequate reserves have been made in accordance with GAAP) therefore.

SECTION 2.11  <u>Contracts</u>.  Except as set forth on <u>Schedule 2.11(a)</u> or with respect to any Contract that the Company assumes pursuant to Section 365 of the Bankruptcy Code as of the Effective Date, none of the Company and its Subsidiaries is in default under any material contract or agreement to which it is a party or by which it is bound, nor, to the Company's knowledge, does any condition exist that, with notice or lapse of time or both, would constitute such default, excluding in any case such defaults that are not reasonably likely to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that pursuant to Section 365 of the Bankruptcy Codes, the Company and/or its Subsidiaries has rejected, and intends to reject, certain executory contracts and unexpired leases of non-material Real Property and the rejection of any such agreement shall not be considered inconsistent with the representation herein.  <u>Schedule 2.11(b)</u> accurately and completely lists (x) all material agreements, if any, among any officers, directors, Affiliates or stockholders (or any of their Affiliates other than any of the Company and its Subsidiaries) of the Company, on the one hand, and any of the Company and its Subsidiaries, on the other hand, in effect on the date hereof and (y) all material agreements which are in effect on the date hereof in connection with the conduct of the Business of the Company and the Operating Company.

SECTION 2.12  <u>Title to Properties; Liens; Leases</u>.  Each of the Company and its Subsidiaries has good title to all of its respective material Properties, including, without limitation, the Properties reflected in the balance sheet of the Operating Company dated December 31, 2009, referred to on <u>Schedule 2.09(a)</u> attached hereto, except Properties disposed of since such date in the ordinary course of business, free and clear of all Liens except Liens disclosed on <u>Schedule 2.12</u>.

SECTION 2.13  <u>Litigation</u>.  Except for the Chapter 11 Cases and the related CCAA Proceeding and any motion, application, pleading or order filed in connection therewith, there is no Proceeding pending against, or to the knowledge of the Company, threatened in writing against or affecting, the Company or its Subsidiaries or any of its respective Properties before any Governmental Authority that (a) has a reasonable likelihood of being adversely determined and that, if determined or resolved adversely to such Company or its Subsidiaries in accordance with the plaintiff's demands, is reasonably likely to have (individually or in the aggregate) a Material Adverse Effect or (b) questions the validity of any of this Agreement or any action taken pursuant hereto or thereto or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that (c) if determined in a manner adverse to the Company would reasonably result, either individually or in the aggregate, in any Material Adverse Effect.

SECTION 2.14  Compliance with Law.  None of the Company and its Subsidiaries is in violation of or in default under any term of its Organizational Documents or of any contract, agreement, document, instrument, judgment, decree, order, law, statute, rule or regulation applicable to it or any of its Properties, in any way which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.  Without limiting the generality of the foregoing:

(a)    each of the Company and its Subsidiaries is, and in the last two years has been, in compliance with (and neither it nor, to the knowledge of the Company, any of their respective predecessors in interest has received any written notice to the contrary) and there is no Environmental Claim against or any judgment, decree or order binding upon or applicable to any of the Company and its Subsidiaries or any of their respective Properties under or on account of any Environmental Laws, except where the same has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect;

(b)    none of the Company and its Subsidiaries nor, to the knowledge of the Company, any other Person, has ever caused or permitted any Hazardous Materials to be disposed of on or under any real Property owned or leased by any of the Company and its Subsidiaries in any manner not permitted by all applicable Laws, except for any disposals that have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect; and

(c)    to the knowledge of the Company, all Hazardous Materials used or generated by any of the Company and its Subsidiaries (including any Persons or businesses merged into or otherwise acquired by any of the Company and its Subsidiaries) have been transported for treatment, recycling and/or disposal, as well as treated, recycled and/or disposed of, in compliance with all applicable Laws and regulations, except for any non-compliance that has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect.

SECTION 2.15  ERISA.

(a)    Each of the Company and its Subsidiaries and each ERISA Affiliate have operated and administered each Benefit Plan in compliance with all applicable laws except for such instances of noncompliance which have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect.  Other than such liabilities or Liens as have not resulted in, and would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, (i) none of the Company or its Subsidiaries has incurred any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in Section 3 of ERISA), and no ERISA Affiliate has incurred any liability pursuant to Part 3 or Part 6 of Subtitle B of Title I of ERISA or Title IV of ERISA, and (ii) no event, transaction or condition has occurred or exists that would reasonably be expected to result in the incurrence of any such liability by any of the Company or its Subsidiaries or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of any of the Company and its Subsidiaries or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to such penalty or excise Tax provisions or to Section 401(a)(29) or 412 of the Code.

(b)     None of the Company or its Subsidiaries has ever maintained or has ever had any obligation to contribute to any Benefit Plan that is subject to Part 3 of Subtitle B of Title I or Title IV of ERISA or Section 401(a)(29) or 412 of the Code. No condition exists that presents a material risk to any of the Company and its Subsidiaries of liability in an amount that would reasonably be expected to result in a Material Adverse Effect as a result of a termination or funding waiver with respect to any Benefit Plan.

(c)     None of the Company or its Subsidiaries or any ERISA Affiliate has incurred or is reasonably expected to incur withdrawal liabilities under Section 4201 or 4204 of ERISA in respect of Multiemployer Plans that individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect. None of the Company or its Subsidiaries nor any ERISA Affiliate has failed to make any required contributions to Multiemployer Plans, other than failures that individually or in the aggregate have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect. To the Company's knowledge, no Multiemployer Plan is, or is reasonably expected to be, insolvent, in reorganization or terminated within the meaning of Title IV of ERISA.

(d)     None of the Company or its Subsidiaries has any postretirement welfare benefit obligation (determined in accordance with Financial Accounting Standards Board of directors Statement No. 106, without regard to liabilities attributable to continuation coverage mandated by Section 4980B of the Code) in an amount that would reasonably be expected to result in a Material Adverse Effect.

(e)     Except as set forth on <u>Schedule 2.15 (e)</u>, there has been no plan, fund or similar program established or maintained outside of the United States of America by any of the Company and its Subsidiaries or to which contributions are, or within the preceding five years have been, made or required to be made by any of the Company and its Subsidiaries (or any of their respective predecessors-in-interest) for the benefit of its employees or former employees residing outside of the United States of America.

SECTION 2.16  <u>Proprietary Rights; Licenses</u>.  Each of the Company and its Subsidiaries has all Proprietary Rights and Licenses as are necessary for the conduct of their respective businesses as now conducted and as proposed to be conducted, except where the failure to have any such Proprietary Right and/or License has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect. Except for any instance that has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect, each such Proprietary Right and License is in full force and effect, all material obligations with respect thereto have been fulfilled and performed and, to the knowledge of the Company, there is no infringement thereon by any other Person. No default in the performance or observance by any of the Company and its Subsidiaries (or any of their predecessors in interest) of their obligations thereunder has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any Proprietary Right or License which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

SECTION 2.17  <u>Government Regulation</u>.  None of the Company and its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act or the Investment Company Act of 1940, each as amended.

SECTION 2.18  <u>Foreign Assets Control Regulation, etc</u>.  Neither the sale of the New Money Shares hereunder nor the use of the proceeds thereof by the Company or its Subsidiaries will violate the regulations enforced by the Office of Foreign Assets Control of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive orders relating thereto.  Without limiting the foregoing, none of the Company and its Subsidiaries (a) is, or will become, a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or (b) engages or will engage in any dealings or transactions with any such Person.  Each of the Company and its Subsidiaries is in compliance, in all material respects, with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, as amended, and the rules and regulations promulgated thereunder.  No part of the proceeds from the sale of the New Money Shares hereunder will be used by the Company or its Subsidiaries, directly or indirectly, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 2.19  <u>Brokers; Schedule of Fees and Expenses</u>.  No broker, investment banker, financial advisor or other Person, other than Moelis & Company and FTI Consulting, Inc., the fees and expenses of which will be paid by the Company under the Plan, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company.  The Company has furnished to the Plan Investor true and complete copies of all agreements between the Company and Moelis & Company, the Official Committee of Unsecured Creditors and FTI Consulting, Inc. approved or sought to be approved by the Bankruptcy Court relating to the transactions contemplated hereby.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE PLAN INVESTOR

The Plan Investor represents and warrants to the Company that:

SECTION 3.01  <u>Organization and Authority</u>.  The Plan Investor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  The Plan Investor has now, and will have at the Closing, all requisite power to enter into this Agreement and the transactions contemplated hereby and to perform its obligations under the terms of this Agreement.

SECTION 3.02  <u>Validity</u>.  This Agreement, when executed and delivered by the Plan Investor and each of the other parties thereto, will constitute a valid and legally binding obligation of the Plan Investor, enforceable in accordance with its terms, subject as to enforcement of remedies to applicable bankruptcy, insolvency, reorganization or similar laws affecting generally the enforcement of creditors' rights and subject to a court's discretionary authority with respect to the granting of a decree ordering specific performance or other equitable remedies.

SECTION 3.03  <u>Purchase Entirely for Own Account</u>.  The Plan Investor hereby confirms that the New Money Shares to be purchased by the Plan Investor hereunder will be acquired for

investment for the Plan Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof.

SECTION 3.04  Reliance Upon Plan Investor's Representations.  The Plan Investor understands that the New Money Shares are being offered and sold to it in reliance upon specific exemptions from the registration requirements of the Securities Act and the rules and regulations promulgated thereunder and that the Company is relying upon the truth and accuracy of, and the Plan Investor's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Plan Investor set forth herein in order to determine the availability of such exemptions and the eligibility of the Plan Investor to acquire the New Money Shares.

SECTION 3.05  Restricted Securities.  The Plan Investor understands that the New Money Shares may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or pursuant to an exemption therefrom, and that in the absence of an effective registration statement covering the New Money Shares or an available exemption from registration under the Securities Act, the New Money Shares must be held indefinitely.  The Plan Investor understands that no public market now exists for any of the New Common Stock, and that the Company has made no assurances that a public market will ever exist for the New Money Shares.

SECTION 3.06  Economic Risk: Sophistication.  The Plan Investor is able to bear the economic risk of an investment in the New Money Shares acquired by it pursuant to this Agreement and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the proposed investment and therefore has the capacity to protect its own interests in connection with such purchase.

SECTION 3.07  Accredited Investor.  The Plan Investor meets the criteria of an "accredited investor" as defined in Rule 501(a) of Regulation D adopted under the Securities Act.

SECTION 3.08  Legend.  The Plan Investor understands that certificates representing the New Money Shares may bear one or all of the following legends:

(a)  "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b)  Any legend required by the securities laws of any state to the extent such laws are applicable to the New Money Shares represented by the certificate so legended.

If any of the New Money Shares are (i) freely tradeable pursuant to Rule 144(b)(1) of the Securities Act or (ii) sold pursuant to an effective registration statement under the Securities Act,

the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such securities without the legends required by this <u>Section 3.08</u> endorsed thereon.

SECTION 3.09  <u>Equity and Debt Commitments</u>.  The Plan Investor has obtained, and is the recipient of, those certain equity commitment letters attached hereto as <u>Exhibit C</u> (the "<u>Equity Commitment Letters</u>") and those certain debt commitment letters attached hereto as <u>Exhibit D</u> (the "<u>Debt Commitment Letters</u>").  Each Equity Commitment Letter and Debt Commitment Letter is in full force and effect as of the date of this Agreement and there are no other conditions to the funding under the Equity Commitment Letters or Debt Commitment Letters other than those set forth or referred to, respectively, in each such Equity Commitment Letter or Debt Commitment Letter, as the case may be.  The Company and the Senior Secured Agent (in its capacity as administrative agent under the Senior Secured Credit Agreement) are third party beneficiaries under the Equity Commitment Letters on the terms and conditions provided therein.

ARTICLE IV

ADDITIONAL AGREEMENTS

SECTION 4.01  <u>Conduct of the Business Prior to the Closing; Contracts</u>.

(a)     The Company covenants and agrees that, except as described in <u>Schedule 4.01(a)</u>, as required by Law or the Bankruptcy Court, as otherwise contemplated by this Agreement and the Plan or as consented to in writing by the Plan Investor (which consent shall not be unreasonably withheld), between the date hereof and the time of the Closing, the Company and each Subsidiary shall conduct itself only in the ordinary course of its business and in a reasonable manner consistent in nature, scope and magnitude with its past practice, and will only take actions usually taken in the ordinary course of its business, taking into account the pendency of the Chapter 11 Cases.

(b)     <u>Contracts</u>.

(i)     As soon as practicable after the date hereof, the Company shall provide the Plan Investor with a list of Contracts that have been assumed or rejected in connection with the Chapter 11 Cases prior to the date hereof.  The Plan Investor acknowledges that any assumptions and rejections occurring prior to the date hereof, including any automatic rejections occurring as a result of the operation of the Bankruptcy Code, are final.

(ii)     In accordance with the Plan, the Company shall prepare a schedule of all prepetition Contracts that the Company proposes to assume (the "<u>Assumption Schedule</u>") and such Contracts shall be assumed on the Effective Date pursuant to the Plan.  As soon as practicable after the entry of the order approving the Disclosure Statement but in no event later than April 2, 2010, the Company shall provide the Plan Investor with a draft Assumption Schedule.  The Company shall reasonably consult and cooperate with the Plan Investor, and consider in good faith the views of the Plan Investor, with respect to the inclusion or exclusion of Contracts on the Assumption Schedule.

(c)     At any time and from time to time, the Plan Investor may, by written notice to the Company, notify the Company that it wishes to include or exclude specific Contracts from the Assumption Schedule.  The Company and the Plan Investor shall use their respective commercially reasonable efforts to agree on the final list of Contracts included in the Assumption Schedule; provided, however, that if the Company and the Plan Investor do not agree on the final list of Contracts, then the Plan Investor's decision shall prevail; provided, further, however, that the agreements listed on Schedule 4.01(b) attached hereto shall be assumed as of the Effective Date.

SECTION 4.02  Access to Information.

(a)     From the date hereof until the Closing, upon reasonable notice, the Company shall cause its officers, directors, employees, agents, representatives, accountants and counsel, and shall cause the Subsidiaries and each of the Subsidiaries' officers, directors, employees, agents, representatives, accountants and counsel to: (i) afford the officers, key employees, agents, accountants, counsel, financing sources and representatives of the Plan Investor reasonable access, during normal business hours, to the offices, properties, plants, other facilities, books and records of the Company and each Subsidiary and to those officers, directors, key employees, agents, accountants and counsel of the Company and of each Subsidiary who have any knowledge relating to the Company, any Subsidiary or the Business, (ii) promptly prepare and provide all customary financial and other customary and reasonable available written information as the Plan Investor may reasonably request with respect to the Company and/or the Debtors, and the transactions contemplated by this Agreement and any debt financing to be entered into in connection with the Plan, including but not limited to financial projections (the "Projections") relating to the foregoing, (iii) host, with the Plan Investor, meetings with financing sources to be arranged in connection with the Plan at a mutually convenient location and time, (iv) assist the Plan Investor in the preparation of one or more confidential information memoranda reasonably satisfactory to the Plan Investor and other customary marketing materials to be used in connection with debt financing and (v) furnish to the officers, employees, agents, accountants, counsel, financing sources and representatives of the Plan Investor such additional financial and operating data and other information regarding the assets, properties, liabilities and goodwill of the Company, the Subsidiaries and the Business (or legible copies thereof) as the Plan Investor may from time to time reasonably request; provided, however, that the Company may restrict the foregoing access and the disclosure of information to the extent that (A) in the reasonable judgment of the Company, any Law applicable to the Company requires the Company or any Subsidiary to restrict or prohibit access to any such properties or information, (B) in the reasonable judgment of the Company, the information is subject to confidentiality obligations to a third party, (C) such disclosure would result in disclosure of any trade secrets of third parties or (D) disclosure of any such information or document could result in the loss of attorney-client privilege; provided, however, that with respect to clauses (A) through (D) of this Section 4.02(a), the Company shall use all reasonable efforts (without any obligation to make any payments) (x) to obtain the required consent of such third party to provide such access or disclosure or (y) to develop an alternative to providing such information so as to address such matters that is reasonably acceptable to the Plan Investor and the Company.

(b)     The Plan Investor shall provide the Company with reasonable access to information regarding the Plan Investor and its Affiliates for inclusion in Company materials and

filings relating to this Agreement or the transactions contemplated hereby (including the Disclosure Statement) if the Company requests such information and the inclusion of the requested Plan Investor (and Affiliate) information is required to be included in such materials or filings by applicable Law or the Bankruptcy Code.

(c)     The Company shall use commercially reasonable efforts to provide the Plan Investor with all information and data reasonably necessary for the Plan Investor to make a determination with respect to its termination rights set forth in Section 7.01(l) at least three (3) Business Days prior to the applicable Scheduled Closing Date (as defined below); provided, however, that in no event shall such information and data be delivered less than five (5) Business Days prior to May 31, 2010.

SECTION 4.03  Confidentiality.  Except as permitted by Section 4.06 or as required by Law, the Bankruptcy Court, in connection with the Chapter 11 Cases, or any other court or governmental agency and subject to any requirements of legal process or applicable Law, neither the Plan Investor nor the Company, will, without the prior written consent of the Plan Investor or the Company, as applicable, disclose to any Person (other than to their respective affiliates, potential investors and financing sources, agents and those in a confidential relationship with the Plan Investor or the Company, as applicable, such as accountants and legal counsel, and in the case of the Plan Investor, (i) to sponsored funds and their respective members and/or limited partners, (ii) to certain other potential investors and (iii) to potential financing sources in connection with the New Value Alternative Loans or as otherwise required for any financing related to the transactions contemplated hereby) any confidential information provided to them and exchanged between them in connection with this Agreement and the consummation of the transactions contemplated hereby and thereby and each party agrees to keep confidential any confidential information obtained by it from the other party in connection with its investigations or otherwise in connection with these transactions and to use such confidential information only for the purposes of these transactions.  The foregoing shall not limit a party's use or disclosure of any information disclosed by the other party that (a) was in the public domain at the time it was disclosed or has entered the public domain through no fault of the recipient (b) was known to the recipient at the time the information was received, (c) is used or disclosed with the prior written approval of the disclosing party, or (d) was independently developed by the recipient without any use of the disclosing party's confidential information.

SECTION 4.04  Payment of DIP Claims.  The Company and the Plan Investor acknowledge and agree that the Company shall indefeasibly pay the DIP Claims immediately prior to the Closing in an amount equal to all of the cash of the Company.

SECTION 4.05  Bankruptcy Matters.

(a)     In consideration of the Plan Investor's efforts to date in connection with the transactions contemplated by this Agreement and the Plan, and its anticipated continued efforts during the period between the Disclosure Statement Hearing and the Effective Date, and recognizing that, in connection with the transactions contemplated hereby and in the Plan, the Plan Investor and its equity investors are incurring substantial fees, costs and expenses, including, without limitation, commitment fees, reasonable fees and expenses of counsel and other expenses, if (i) this Agreement is terminated pursuant to Section 7.01(m), then the Debtors

shall pay the Plan Investor within ten (10) Business Days after such termination an amount equal to $12,300,000 and (ii) (A) this Agreement is terminated pursuant to <u>Sections 7.01(f)</u>, <u>7.01(i)(2)</u>, <u>(i)(3)</u> or <u>(i)(4)</u>, <u>7.01(j)</u> or <u>7.01(l)</u> and (B) within nine (9) months after such termination the Company consummates a Designated Acquisition Proposal, then, within ten (10) Business Days of such consummation, the Company and the Debtors shall pay or reimburse the Plan Investor solely out of the proceeds of the consummated Designated Acquisition Proposal an amount equal to $12,300,000 and, in each of the cases described in subclauses (i) and (ii) above, the Plan Investor will apply these amounts to cover, among other things, any expenses incurred on or after January 20, 2010 in connection with its status as Plan Investor and the transactions contemplated hereby and the preparation, negotiation, execution and delivery of this Agreement, including in each case, without limitation, the commitment fees of prospective financing sources, fees and expenses of counsel, together with any out-of-pocket costs and expenses of the Plan Investor incurred in connection with the enforcement of any of its rights and remedies hereunder (collectively, the "<u>Termination Fee</u>").  The payment obligation in subclause (i) shall constitute an administrative expense of the Debtors in the Chapter 11 Cases under section 503 of the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein or in any other document, the Company shall cause the payment of the Termination Fee pursuant to subclause (ii) above to be paid pursuant to such Acquisition Proposal by the party providing the consideration in such Acquisition Proposal directly to the Plan Investor.  For the avoidance of doubt, in no event shall the Company be obligated to pay to the Plan Investor more than one Termination Fee under this Agreement.

(b)      The Company and the Debtors agree, subject to the entry of an order of the Bankruptcy Court approving this Agreement, to pay or reimburse the Plan Investor, promptly upon demand the amount of the filing fee incurred by the Plan Investor in connection with the filing made by it or its equity investors pursuant to the HSR Act in connection with the transactions contemplated by this Agreement.

(c)      The Debtors shall, on or before March 16, 2010, seek an order of the Bankruptcy Court on an expedited basis (the "<u>Plan Investor Termination Fee Order</u>"), in form and substance reasonably satisfactory to the Plan Investor, (i) authorizing the Debtors to pay the Termination Fee, if applicable, in accordance with <u>clause (a)</u> hereof, and (ii) authorizing the Debtors to execute this Agreement, and shall use its best efforts to cause the hearing on its motion to occur as soon as possible, and in no event shall the Plan Investor Termination Fee Order be entered later than April 5, 2010.

(d)      The Company shall use all reasonable efforts to obtain, and to consult with the Plan Investor to secure, the prompt entry of the Confirmation Order as soon as practicable following the date hereof and to consummate the transactions contemplated by this Agreement.

SECTION 4.06  <u>Non-Solicitation</u>.

(a)      The Company agrees that from and after the date hereof and through and including the conclusion of the hearing regarding the approval of the Plan Investor Termination Fee Order, neither it nor any of its Affiliates nor any of their respective directors or officers shall, and that it shall direct its and their respective key employees and representatives (including any investment banker, attorney or accountant retained by it or any of its Affiliates) (collectively, its

"Representatives") not to, directly or indirectly, engage or continue to negotiate with any Person with respect to any potential Acquisition Proposal or acquisition of any of the material assets of the Company outside the ordinary course of business, including by providing access to the Data Room, management of the Company or the Company's professionals.

(b)     From and after the conclusion of the hearing to approve the Plan Investor Termination Fee Order, none of the Company or any of its Representatives will be precluded from providing information to, or discussing and negotiating with, any Person that has after the conclusion of the hearing to approve the Termination Fee notified the Company in writing that it is considering making, or has made in writing, a bona fide Acquisition Proposal so long as the Company and its Representatives are not in violation of this Section 4.06. In addition, so long as the Company and its Representatives are not in violation of this Section 4.06, none of the Company or any of its Representatives will be precluded from executing an agreement after the conclusion of the hearing to approve the Termination Fee providing for an Acquisition Proposal or recommending any such Acquisition Proposal to the creditors of the Company, if (i) in the good faith opinion of the board of directors of the Company (the "Board of Directors") (after consultation with its financial advisors and outside legal counsel) such Acquisition Proposal provides a higher transaction value or is otherwise more favorable to the Company and its creditors than the transactions contemplated by this Agreement (it being understood and agreed that any such Acquisition Proposal must include aggregate consideration at least equal to the sum of (x) the Purchase Price, (y) the Termination Fee and (z) $3 million, in order to qualify as having a higher transaction value or be deemed more favorable to the Company and its creditors than the transaction contemplated hereby) and (ii) the Board of Directors believes in good faith (after consultation with outside legal counsel) that the failure to authorize such actions would be inconsistent with its fiduciary duties under any applicable law, including the Bankruptcy Code. No Person considering making an Acquisition Proposal shall be provided non-public information by the Company unless such Person has executed a customary confidentiality agreement with the Company; provided that such confidentiality agreement shall not prohibit the Company from delivering any notice required by this Section 4.06.

(c)     The Company shall promptly inform the Plan Investor of any Acquisition Proposal and shall provide any information that the Plan Investor shall request regarding any such Acquisition Proposal.

SECTION 4.07  Further Action. The Company shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement to which it is a party and consummate and make effective the transactions contemplated hereby and thereby.

SECTION 4.08  Reimbursement.  In the event the Closing has occurred, the Company shall reimburse the Plan Investor and each of its equity investors for and in respect of all documented fees, costs and expenses incurred by such persons arising from or in connection with their participation in the Chapter 11 Cases (including the New Value Alternative and the transactions contemplated by this Agreement), including without limitation commitment fees of prospective financing sources, reasonable fees and expenses of counsel and other expenses;

provided, however, that no such reimbursement shall be permitted to the extent that the making of such reimbursement would render the Plan unfeasible.

SECTION 4.09  HSR Act and Other Antitrust Laws.  No later than fifteen (15) Business Days after the date of the execution hereof, the Plan Investor and the Company will each make any filings required under the HSR Act and other foreign antitrust laws in connection with the transactions contemplated hereby. Each party hereto will cooperate with the other party hereto in accomplishing such filings and will keep the other party apprised of the status of any inquires made by any Governmental Authority with respect to this Agreement or the transactions contemplated hereby. Unless otherwise agreed by the Plan Investor, the Closing of the transactions contemplated hereby is expressly conditioned upon the waiting period relating to any such filings having duly expired or been duly terminated by the appropriate Governmental Authorities without the commencement of any Proceeding by any such Governmental Authority to restrain or postpone the transactions contemplated hereby. Each of the parties hereto shall use its commercially reasonable efforts to cause the waiting period under the HSR Act and other foreign antitrust laws to expire or be terminated, and to otherwise obtain all regulatory approvals in connection with any other antitrust approvals, as promptly as possible after the execution of this Agreement.

SECTION 4.10  Fees and Expenses.  Except as otherwise provided in this Agreement, all fees and expenses incurred in connection with the transactions contemplated hereby will be paid by the party incurring such fees or expenses, whether or not the Closing is consummated.

SECTION 4.11  Public Announcements.  Each of the Plan Investor and the Company will consult with each other before issuing, and, to the extent reasonably feasible, provide each other the opportunity to review and comment upon, any press release or other public statements with respect to the transactions contemplated hereby.  Neither the Plan Investor nor the Company will issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable law or pursuant to any requirement of any national securities exchange.

SECTION 4.12  Resignation of Directors of the Company.  As to each person serving as a member of the Board of Directors of the Company immediately prior to the Closing, either (a) the Company will cause each such member to execute and deliver a letter prior to the Closing, which will not be revoked or amended prior to the Closing, effectuating his or her resignation as a member of the Board of Directors of the Company effective immediately prior to the Closing or (b) the Plan will effectuate the reinstatement, removal or replacement of such person as a member of the Board of Directors of the Company effective immediately prior to the Closing.

SECTION 4.13  Audited Financial Statements.  On or before March 31, 2010, the Company shall deliver to the Plan Investor the qualified audited consolidated balance sheet of the Company and its Subsidiaries as of the end of the fiscal period ending December 31, 2009 and the qualified audited consolidated statement of operations and cash flows of the Company and its Subsidiaries for such fiscal year audited by Deloitte & Touche LLP, the Company's independent registered public accounting firm, which shall be prepared in a manner consistent in all material respects with the unaudited financial statements referred to on Schedule 2.09(a).

SECTION 4.14  Observers at Board Meetings.  The Plan Investor shall be entitled to designate one (1) observer (the "Observer") who shall be permitted (but not required) to attend and participate in meetings of the board of directors of the Company (the "Board") and any meetings of any committees (including audit committees) thereof and, subject to the provisions hereof, shall be entitled to receive all notices, reports and other material sent to the directors (including committee members) of the Company.  Notwithstanding the foregoing, the Company shall have the right to withhold from the Observer written materials and other information, including portions of the minutes of meetings of the Board or any committees thereof, and exclude the Observer from any meeting of the Board or any committee thereof, if the Board determines, in its reasonable discretion, that the Observer's access to such information (i) could jeopardize any privilege or result in (a) a breach by the Company of its obligations under any agreement, arrangement or understanding or (b) a violation of any applicable law or (ii) is necessary or appropriate in furtherance of discharging the Board's fiduciary duties to the Company.  For purposes of attending any meeting of the Board, the Observer shall not be permitted to vote on any matter and shall not participate in any action of the Board or any such committees.  In addition, if the Board or any committee thereof (or their respective Representatives) is considering or discussing (i) any matter relating to this Agreement, (ii) an Acquisition Proposal or (iii) any other matter that involves a conflict of interest between the Company and the Plan Investor or any of its Affiliates, then the Company may withhold from the Observer the written materials and other information relating to such transaction and the Observer shall excuse himself or herself from any portion of a meeting in which such matters are discussed or considered.

ARTICLE V
CONDITIONS TO THE OBLIGATIONS
OF THE PLAN INVESTOR

The obligation of the Plan Investor to purchase the New Money Shares at the Closing is subject to the fulfillment, or the written waiver (to the extent permitted by Law) by the Plan Investor, of each of the following conditions on or before the Closing Date:

SECTION 5.01  Representations and Warranties to be True and Correct.  The representations and warranties contained in Article II shall be true, complete and correct in all respects (without giving effect to any "Material Adverse Effect" or "materiality" qualifier contained therein) on and as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of such date (or to the extent any such representation or warranty, by its terms, is made as of a specific date or time, on and as of such specific date or time), except where the failure of any such representation or warranty to be so true and correct would not, individually or in the aggregate, result in, or reasonably be expected to result in, a Material Adverse Effect on and as of such specific date or time.

SECTION 5.02  Performance.  The Company shall have substantially performed and materially complied with all covenants, agreements and obligations contained herein required to be performed or complied with by it prior to or at the Closing Date.

SECTION 5.03  All Proceedings to be Satisfactory.  All corporate and other proceedings to be taken by the Company in connection with the transactions contemplated hereby and all

documents incident thereto shall be reasonably satisfactory in form and substance to the Plan Investor and its counsel, and the Plan Investor and its counsel shall have received all such counterpart originals or certified or other copies of such documents as they reasonably may request.

SECTION 5.04  Effectiveness of New Certificate of Incorporation.  The New Certificate of Incorporation of the Company shall have been made effective by filing such New Certificate of Incorporation with the Secretary of State of the State of Delaware and the Plan Investor shall have received a filed copy of such New Certificate of Incorporation.  The New Certificate of Incorporation shall continue to be in full force and effect as of the Closing Date.

SECTION 5.05  No Order.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated hereby illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated hereby.

SECTION 5.06  Consent and Approvals.  All material governmental and third party consents and approvals (including, without limitation, to the extent applicable, the expiration or termination of any waiting period under the HSR Act or any foreign antitrust law) necessary in connection with the offer and sale of the New Money Shares, the consummation of the transactions contemplated hereby, the execution and filing where applicable, of the new Organizational Documents of the Company and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect.

SECTION 5.07  Bankruptcy-Related Conditions.

(a)       The Bankruptcy Court shall have entered the Confirmation Order, which Order shall be reasonably satisfactory to the Plan Investor and shall, without limitation, confirm the Plan, which Plan shall provide for (i) the payment of $7,500,000 in cash to the Senior Secured Agent for prompt pro rata distribution to the holders of Senior Secured Revolver Claims and Senior Secured Term Claims, and (ii) the payment to each Holder of a Senior Secured Revolver Claim or a Senior Secured Term Claim of an amount equal to ninety-five percent (95%) of the sum of (A) the principal amount of such Holder's Senior Secured Revolver Claim or Senior Secured Term Claim and (B) interest on such Claim, calculated at the default contract rate, through the earlier to occur of (x) the Effective Date and (y) April 30, 2010, provided that interest shall also accrue at the default contract rate during the period that the Plan Investor has extended the Closing Date pursuant to Section 1.04 or has extended the date by which the Confirmation Order must be entered pursuant to Section 7.01(d), and shall authorize the Debtors to execute this Agreement and authorize and approve the transactions contemplated herein and therein, and such Confirmation Order shall be a Final Order.  Notwithstanding the foregoing, to the extent that any of the Company's conditions set forth in Sections 5.01, 5.02, 5.05, 5.06, 5.07 or 5.08 has not been satisfied as of April 30, 2010, then no interest shall accrue thereafter for so long that any such condition remains unsatisfied or not waived, up to a maximum of ten (10) days of no such interest accrual.

(b)     No material amendment, modification, supplement or waiver shall have been made to any or all of the Plan, the related Disclosure Statement and other solicitation materials, the Plan Supplement, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of the Plan Investor, Senior Secured Agent and Ad Hoc Group of Senior Secured Lenders.

(c)     The Plan (as supplemented by the Plan Supplement) shall have become, or simultaneously with the issuance of the New Money Shares will become, effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior written consent of the Plan Investor if in the sole judgment of the Plan Investor, any such waiver is adverse to the rights or interests of the Plan Investor).

(d)     The transactions contemplated by the Plan and the Confirmation Order to occur on the Effective Date shall have been consummated on or prior to the Closing Date.

(e)     The Plan Investor Termination Fee Order shall have been entered on or before April 5, 2010 and shall be a Final Order.

SECTION 5.08  <u>No Material Adverse Effect</u>.  There shall not have occurred any event, effect or change from and after December 31, 2009 which the Bankruptcy Court determines has had or could reasonably be expected to have a Material Adverse Effect.

ARTICLE VI
CONDITIONS TO THE OBLIGATIONS
OF THE COMPANY

The obligations of the Company to sell the New Money Shares to the Plan Investor at the Closing is subject to fulfillment, or the waiver, of each of the following conditions on or before the Closing Date:

SECTION 6.01  <u>Representations and Warranties to be True and Correct</u>.  The representations and warranties contained in <u>Article III</u> shall be true, complete and correct in all material respects on and as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of such date, except for representations and warranties that are made as of a specific date or time, which shall be true and correct in all material respects only as of such specific date or time.

SECTION 6.02  <u>Performance</u>.  The Plan Investor shall have performed and complied in all material respects with all covenants, agreements and obligations contained herein required to be performed or complied with by it prior to or at the Closing Date.

SECTION 6.03  <u>Purchase Price</u>.  The Plan Investor shall have delivered to the Company the Purchase Price on the Closing Date.

SECTION 6.04  <u>Delivery of Debt Agreements</u>.  The Company shall have received the New Value Alternative Loan Agreements, duly-executed and delivered, and such New Value Alternative Loan Agreements shall be in form and substance satisfactory to the Company.

SECTION 6.05  <u>Consent and Approvals</u>.  All material governmental and third party consents and approvals (including, without limitation, to the extent applicable, the expiration or termination of any waiting period under the HSR Act or any foreign antitrust law) necessary in connection with the offer and sale of the New Money Shares, the execution and filing where applicable, of the new Organizational Documents of the Company and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect.

SECTION 6.06  <u>Bankruptcy-Related Conditions</u>.

(a)     The Bankruptcy Court shall have entered the Confirmation Order, which order shall (without limitation) confirm the Plan and authorize the Debtors to execute this Agreement and authorize and approve the transactions contemplated herein, and such Confirmation Order shall have become a Final Order.

(b)     The Plan shall have become, or simultaneously with the issuance of the New Money Shares will become, effective.

ARTICLE VII
TERMINATION

SECTION 7.01  <u>Termination</u>.  At any time prior to the Closing, this Agreement may be terminated as follows:

(a)     by mutual written consent of the Plan Investor and the Company;

(b)     by the Plan Investor, if, as of such date of termination, the conditions specified in <u>Sections 5.01</u> and <u>5.02</u> (other than with respect to <u>Section 4.06(a)</u> which shall be subject to subsection (i)(5) below and Section 4.13 which shall be subject to subsection (o) below) hereto are not satisfied in all respects and any such breach shall have remained uncured for a period of ten (10) Business Days after the Plan Investor shall have given written notice of such breach to the Company (<u>provided</u> that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period), <u>provided</u> that, as of such date of termination of this Agreement by the Plan Investor, the conditions specified in <u>Sections 6.01</u> and <u>6.02</u> hereto are satisfied;

(c)     by the Company, if, as of such date of termination, the conditions specified in <u>Sections 6.01</u> or <u>6.02</u> hereto are not satisfied in all respects and any such breach shall have remained uncured for a period of fifteen (15) Business Days after the Company shall have given written notice of such breach to the Plan Investor (<u>provided</u> that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period), <u>provided</u> that, as of such date of termination of this Agreement by the Company, the conditions specified in <u>Sections 5.01</u> and <u>5.02</u> hereto are satisfied;

(d)     by Plan Investor or the Company, if the Bankruptcy Court has not entered the Confirmation Order by April 30, 2010 (<u>provided</u> that, subject to <u>Section 5.07(a)</u>, Plan Investor has the right to extend such date until not later than May 31, 2010) or the Confirmation Order has not become a Final Order within fifteen (15) days thereafter;

*Atrium Corporation*
*Equity Purchase Agreement*

(e)     by Plan Investor or the Company, if the Closing has not occurred on or before May 31, 2010, provided that no party shall be entitled to terminate this Agreement pursuant to this Section 7.01(e) if such party's failure to fulfill any of its obligations under this Agreement has been the primary cause of the failure of the Closing to occur on or before such date;

(f)     by the Plan Investor, upon written notice to the Company, if a Trigger Event has occurred;

(g)     subject to Section 8.07, by the Plan Investor, upon written notice to the Company;

(h)     by the Plan Investor, if the Bankruptcy Court shall not have approved the Disclosure Statement by March 18, 2010, either on the record of a hearing on the Disclosure Statement or by order;

(i)     by the Plan Investor, if (1) after the date hereof the Data Room is reopened to any party other than the Plan Investor (except to the extent reopened by or pursuant to order of the Bankruptcy Court, in which case this Agreement may not be so terminated), (2) the Board of Directors withdraws or changes its recommendation of this Agreement in a manner materially adverse to the Plan Investor, (3) the Board of Directors recommends an Acquisition Proposal, (4) the Company enters into a written agreement or letter of intent or agreement in principle providing for any Acquisition Proposal or (5) the Company breaches in any material respect any of its obligations under Section 4.06(a) hereof (provided, however, that the termination right set forth in this clause (5) shall expire upon the entry of the Plan Investor Termination Fee Order);

(j)     by the Company, if (1) the Board of Directors resolves in good faith that termination of this Agreement is necessary in order for the Company to accept any higher or better Acquisition Proposal as contemplated by Section 4.06(b), consistent with the Debtor's fiduciary duties under applicable law, or (2) the Bankruptcy Court has ordered the Company to terminate this Agreement in order to accept any Acquisition Proposal;

(k)     by the Plan Investor, if the Debtors fail to seek the Plan Investor Termination Fee Order on short notice on or before March 16, 2010 or the Plan Investor Termination Fee Order has not been entered on or prior to April 5, 2010;

(l)     by the Plan Investor or the Company, on or prior to May 31, 2010, if, as of the date of termination under this subsection (l), the sum of all amounts set forth in Section 1.06(a) to and including Section 1.06(h) is greater than the sum of (i) (A) if such date of termination is on or prior to April 30, 2010, $439.1 million, or (B) if such date of termination is after April 30, 2010 but on or prior to May 31, 2010, $447.3 million, and (ii) the amount of interest that accrues as provided in the proviso to Section 5.07(a); provided, however, that if as of any date on or prior to May 31, 2010, all of the conditions specified in Article V and Article VI have either been satisfied or waived by the party for whose benefit such conditions exist and the Company has satisfied its obligations under Section 4.02(c) (a "Scheduled Closing Date"), then the right of the Plan Investor to terminate this Agreement pursuant to this Section 7.01(l) shall expire three (3) Business Days after such Scheduled Closing Date; provided, further that

the Company may only exercise its right to terminate this Agreement pursuant to this subsection (l) if the Plan Investor's right to terminate this Agreement pursuant to this subsection (l) has expired and the Plan Investor has not waived such termination right within five (5) Business Days after such Scheduled Closing Date;

(m)　　by the Plan Investor, if the Plan is not accepted by at least two-thirds in amount of those holders of allowed Senior Secured Claims that vote on the Plan in accordance with section 1126(b) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3018;

(n)　　by the Company, if the Equity Commitment Letter from Golden Gate Private Equity, Inc. is terminated prior to the Closing;

(o)　　by the Plan Investor or the Company, if a breach of <u>Section 4.13</u> is not cured by the Company within ten (10) Business Days of such breach; and

(p)　　by the Senior Secured Agent on written notice to the Company and the Plan Investor, if a breach of <u>Section 4.13</u> is not cured by the Company within fifteen (15) Business Days of such breach.

SECTION 7.02　<u>Effect of Termination</u>.

(a)　　If this Agreement is terminated as permitted by <u>Section 7.01</u> hereto, this Agreement shall become null and void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: <u>Sections 4.05</u>, <u>7.02</u>, <u>8.03</u>, <u>8.07</u>, <u>8.09</u> and <u>8.15</u> hereto.  For the avoidance of doubt, the Plan Investor Termination Fee Order survives the termination of this Agreement.

(b)　　In the event that this Agreement is terminated pursuant to <u>Sections 7.01(f)</u>, <u>7.01(i)(2)</u>, <u>(i)(3)</u> or <u>(i)(4)</u>, <u>7.01(j)</u>, <u>7.01(l)</u> or <u>7.01(m)</u>,  the Termination Fee shall be paid by the Company and the Debtors in the manner provided in <u>Section 4.05(a)</u>.  Notwithstanding anything to the contrary in this Agreement, if and only if the Plan Investor actually receives the Termination Fee, then the Plan Investor's right to receive payment of the Termination Fee, if applicable, shall be the sole and exclusive remedy of the Plan Investor against the Company and the Subsidiaries, its direct or indirect equity investors and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents (collectively, the "<u>Company Group</u>") for any loss or damages suffered as a result of this Agreement and/or the transactions contemplated hereby, and upon payment of such Termination Fee, this Agreement shall terminate (except for the obligations that are expressly stated to survive the termination of this Agreement) and none of the members of the Company Group shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

(c)　　Nothing contained in this Agreement shall preclude or limit the ability of the Plan Investor to seek and obtain specific performance of the Company's obligations hereunder.

(d)　　Notwithstanding anything herein or otherwise, except to the extent provided in <u>Section 4.05(a)</u>, the Plan Investor shall not under any circumstances whatsoever have

*Atrium Corporation*
*Equity Purchase Agreement*

under this Agreement an administrative priority claim, a superpriority administrative claim or other priority claim, in each case, against the Debtors

ARTICLE VIII
MISCELLANEOUS

SECTION 8.01  <u>Financial Statements and Information</u>.  The Company will furnish to the Plan Investor, so long as it shall hold any of the New Money Shares, and to each other holder from time to time of any of the New Money Shares:

(a)  <u>Monthly Financials</u>.  As soon as available and in any event within 30 days after the end of each month, consolidated statements of operations of the Operating Company and its consolidated Subsidiaries for such period, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such period, setting forth in each case in comparative form the corresponding consolidated statements of operations and cash flows for the corresponding periods in the preceding fiscal year, accompanied by a certificate of a officer of Operating Company, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash flows of Operating Company and its consolidated Subsidiaries in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(b)  <u>Quarterly Financials</u>.  As soon as available and in any event within 45 days after the end of each quarterly fiscal period of each fiscal year, consolidated statements of operations of Operating Company and its consolidated Subsidiaries for such period, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such period, setting forth in each case in comparative form the corresponding consolidated statements of operations and cash flows for the corresponding periods in the preceding fiscal year, accompanied by a certificate of a officer of Operating Company, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash flows of Operating Company and its consolidated Subsidiaries in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(c)  <u>Annual Financials</u>.  As soon as available and in any event within 90 days after the end of each fiscal year, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for such year and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such year, setting forth in each case in comparative form the corresponding consolidated information as of the end of and for the preceding fiscal year, accompanied by an opinion, without material qualification, thereon of independent certified public accountants of recognized national standing, which opinion shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash

flows of Operating Company and its consolidated Subsidiaries as at the end of, and for, such fiscal year in accordance with GAAP, consistently applied; Operating Company shall supply such additional information and detail as to any item or items contained on any such statement that the Plan Investor (to the extent applicable) may reasonably require; all such information will be prepared in accordance with GAAP consistently applied; and

SECTION 8.02  Further Assurances.  Each of the parties shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable law or otherwise to (i) obtain from Governmental Authorities and other Persons all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement, including, without limitation, the Confirmation Order and the Approvals and any approvals required under the HSR Act (and any applicable foreign antitrust law), and (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the Bankruptcy Code, the HSR Act (and any applicable foreign antitrust law) or any other applicable law. From and after the Closing, each party to this Agreement shall execute, acknowledge and deliver such documents as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purposes hereof or to assure to any other party the benefits hereof.

SECTION 8.03  Expenses.  Except as otherwise specified in this Agreement, each party hereto will pay its own expenses in connection with the transactions contemplated hereby, whether or not such transactions shall be consummated.

SECTION 8.04  Financing.

(a)  The Plan Investor shall use its commercially reasonable efforts to arrange the financing on the terms and conditions described in the Debt Commitment Letters, including using commercially reasonable efforts to negotiate definitive agreements with respect thereto on the terms and conditions contained in the Debt Commitment Letters (or on other terms, provided such terms do not contain any condition to funding on the Closing Date that are not set forth in the Debt Commitment Letters that would reasonably be expected to impair or delay the consummation of the financing or the Closing).

(b)  The Company shall provide (and shall cause its Subsidiaries to provide), and each shall use their respective commercially reasonable efforts to cause their officers, employees, representatives and advisors to provide, to the Plan Investor all cooperation and information requested by the Plan Investor (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries) that is necessary in connection with the arrangement of the financing contemplated by this Section 8.04, including, without limitation, (i) participation in meetings, drafting sessions, due diligence sessions, management presentation sessions, road shows and other marketing meetings and sessions with rating agencies, (ii) assisting any tax or other structural planning undertaken by the Plan Investor in connection with the transactions contemplated hereby, (iii) assisting with the preparation of an offering memorandum, a confidential information memorandum for the bank lending (the bank book), materials for the road show and rating agency presentations, business projections, financial statements, (iv) executing and delivering any pledge and security

documents, other definitive financing or other documents as may be reasonably requested by the Plan Investor, including a certificate of the chief financial or other appropriate officer of any of the Company or its Subsidiaries with respect to solvency and financial matters, (v) furnishing the Plan Investor and its financing sources with financial and other pertinent information regarding the Company and its Subsidiaries as may reasonably be requested by the Plan Investor or as otherwise required to be delivered in connection with the financing contemplated hereunder, including, without limitation, all financial statements, historical and pro forma financial data, management's discussion and analysis or plan of operation and other information and data (including, without limitation, the information required by Rule 3-10 of Regulation S-X) of the type customarily required by financing sources in a financing similar to the debt financing, together with any reports of the Company's independent accountants with respect thereto (including, without limitation, a report with respect to an SAS 100 review), (vi) obtaining accountants' comfort letters, legal opinions, surveys and title insurance as may be reasonably requested by the Plan Investor, (vii) providing and preparing all materials necessary to obtain, and otherwise assist the Plan Investor in obtaining, customary rating agencies' confirmations or approvals for the Plan Investor's financing as reasonably requested by the Plan Investor and (viii) facilitating the pledge of collateral, including, without limitation, taking any actions and executing any documents reasonably requested by the Plan Investor in connection therewith (<u>provided</u> that none of such pledges shall be effective prior to the Closing).

SECTION 8.05  <u>No Survival of Representations and Warranties</u>.  None of the representations and warranties made by the Company herein or the documents or certificates contemplated hereby shall survive the Closing, and there shall be no liability of any party for any breach of any such representation or warranty.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, THE COMPANY IS NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE COMPANY, THE NEW MONEY SHARES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  THE PLAN INVESTOR ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE COMPANY HAS NOT MADE, AND THE COMPANY HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND THE PLAN INVESTOR HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND THE PLAN INVESTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST THE COMPANY AND ITS AFFILIATES AND EACH OF THEIR REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO THE PLAN INVESTOR OR ITS REPRESENTATIVES BY OR ON BEHALF OF THE COMPANY OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH.  WITHOUT LIMITING THE FOREGOING, THE COMPANY IS NOT MAKING ANY REPRESENTATION OR WARRANTY TO THE PLAN INVESTOR WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE COMPANY.  THE PLAN INVESTOR FURTHER ACKNOWLEDGES THAT THE PLAN INVESTOR HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE COMPANY AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE NEW MONEY SHARES AS THE PLAN INVESTOR DEEMED

NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PLAN INVESTOR IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

SECTION 8.06 <u>Parties in Interest</u>. All representations, covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

SECTION 8.07 <u>Liquidated Damages; Limitation on Damages</u>.

(a) In the event that the Plan Investor shall have exercised the termination option in <u>Section 7.01(g)</u>, or the Company shall have exercised the termination option in <u>Section 7.01(c)</u> or <u>7.01(n)</u> (except in the event that at the time of such termination the Plan Investor has the right to terminate this Agreement under <u>Section 7.01</u>, other than pursuant to <u>Section 7.01(g)</u>), then the Plan Investor shall pay to the Company a fee in the aggregate amount of Thirty Million Dollars ($30,000,000) (the "<u>Reverse Termination Fee</u>") in immediately available funds, such payment to be made concurrent with the termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, if the Company receives payment of the Reverse Termination Fee pursuant to this <u>Section 8.07</u> such payment shall be the sole and exclusive remedy of the Company and the Subsidiaries against the Plan Investor, its members and direct or indirect equity investors and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents (collectively, the "<u>Plan Investor Group</u>") for the loss suffered as a result of this Agreement as contemplated hereby, and upon payment of such Reverse Termination Fee, this Agreement shall terminate (except for the obligations which shall survive the termination of this Agreement) and none of the members of the Plan Investor Group shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. For the avoidance of doubt, in no event shall the Plan Investor be obligated to pay to the Company more than one Reverse Termination Fee under this Agreement.

(b) The Company shall not be entitled to the remedy of specific performance in respect of any of the Plan Investor's obligations hereunder.

(c) Notwithstanding any other provision of this Agreement, the aggregate liability of the Plan Investor Group for any loss suffered by the Company and its Subsidiaries under this Agreement or the Equity Commitment Letters shall not exceed Thirty Million Dollars ($30,000,000) whether or not the Reverse Termination Fee is required to be paid in respect of such obligations.

SECTION 8.08 <u>Notices</u>. All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by telecopier or telex, addressed as follows:

(a) if to the Company:

Atrium Corporation
3890 West Northwest Highway
Suite 500
Dallas, Texas 75220
Attention: Chief Financial Officer and General Counsel
Telecopy No.: (214) 905-9185 and (214) 905-4351

with a copy (which shall not constitute notice) to:

Paul, Hastings, Janofsky & Walker LLP
Park Avenue Tower
75 E. 55th Street
New York, New York 10022
Attention: Joel M. Simon and Luke P. Iovine, III
Telecopy No.: (212) 230-7649

(b)      if to the Plan Investor:

c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attention: Jeffrey Kenner
Telecopy No.: (212) 758-0406

and

c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara
Telecopy No.: (415) 983-2701

with a copy (which shall not constitute notice) to:

Mayer Brown LLP
1675 Broadway
New York, New York 10019
Attention: James B. Carlson
Telecopy No.: (212) 849-5515

and

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention:  Kathryn A. Coleman
Telecopy No.: (212) 299-6447

and

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
Attention:  Steven J. Reisman
Telecopy No.: (212) 697-1559

(c)     if to the Senior Secured Agent:

GE Business Financial Services, Inc.
500 West Monroe Street
Chicago, IL 60661
Attention:  Michele Kovatchis and Heidi Rinehart
Telecopy No.: (312) 441-7379

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, IL 60606
Attention:  Doug Bacon
Telecopy No.: (312) 993-9767

(d)     if to the Ad Hoc Group of Senior Secured Lenders:

c/o Wachtell, Lipton, Rosen & Katz
51 West 52nd St.
New York, NY 10019
Attention:  Scott K. Charles
Telecopy No.: (212) 403-2202

or, in any such case, at such other address or addresses as shall have been furnished in writing by such party to the others.

SECTION 8.09  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

SECTION 8.10  Entire Agreement.  This Agreement, including the Schedules and Exhibits hereto, constitutes the sole and entire agreement of the parties with respect to the subject matter hereof.  All Schedules and Exhibits hereto are hereby incorporated herein by reference.

SECTION 8.11  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.12  Amendments.  This Agreement may be amended or modified, and any provisions hereof waived and any date herein extended, only with the written consent of the Company, the Plan Investor, the Senior Secured Agent and Ad Hoc Group of Senior Secured Lenders.

SECTION 8.13  Severability.  If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

SECTION 8.14  Titles and Subtitles.  The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

SECTION 8.15  Third Party Beneficiary.

(a)  No Person shall be a third party beneficiary of any of the terms and provisions of this Agreement, other than the Senior Secured Agent, who shall, subject to subsection (b) below, be a third party beneficiary solely with respect to (i) Section 7.01(p) and (ii) the enforcement of the Company's right to receive the Reverse Termination Fee; it being understood and agreed that only the Company may receive the Reverse Termination Fee from the Plan Investor hereunder.

(b)  For a period of 120 days following the exercise of a termination right by either the Plan Investor or the Company causing the Reverse Termination Fee to become due pursuant to Section 8.07(a) (the "Agent's Enforcement Period"), the Senior Secured Agent shall have the exclusive right to bring an action to enforce the Company's right to the Reverse Termination Fee.  Such action must be pursued in the Bankruptcy Court in consultation with the Company and in no event may the Senior Secured Agent compromise, waive or effect a settlement of any right or claim of the Company without the Company's prior written consent which consent shall not be unreasonably withheld.

(c)  Other than as expressly set forth in subsection (b) above, nothing herein shall limit the Company's right to, or causes of action in connection with, the Reverse Termination Fee.  If the Senior Secured Agent does not commence an action to enforce the Company's rights during the Agent's Enforcement Period, the Company shall have the exclusive right to pursue the Reverse Termination Fee and enforce its rights thereto subject to any order of the Bankruptcy Court.

SECTION 8.16  <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)  "<u>Acquisition Proposal</u>" means any inquiry, proposal or offer for a merger, recapitalization, share exchange, stock purchase, debt-for-equity exchange, distribution of securities for the benefit of the stockholders of the Company, consolidation or similar transaction involving a sale or purchase of all or substantially all of the equity securities or Assets of the Company or the Subsidiaries, other than pursuant to this Agreement (except for (i) any debt-for-equity exchange or other transaction pursuant to which the Senior Secured Lenders exchange their debt for debt and/or equity of the Company and (ii) the Stand-Alone Alternative, neither of which shall constitute an Acquisition Proposal).

(b)  "<u>Ad Hoc Group of Senior Secured Lenders</u>" shall have the meaning specified in the Plan.

(c)  "<u>Administrative Claims</u>" shall have the meaning specified in the Plan.

(d)  "<u>Affiliate</u>" shall have the meaning specified in the Plan.

(e)  "<u>Agent's Enforcement Period</u>" shall have the meaning specified in <u>Section 8.15(b)</u>.

(f)  "<u>Agreement</u>" shall have the meaning specified in the preamble of this Agreement.

(g)  "<u>Approvals</u>" shall mean any approvals and other authorizations required by the Bankruptcy Code.

(h)  "<u>A/R Facility</u>" shall have the meaning specified in the Plan.

(i)  "<u>Assets</u>" means the assets and properties of the Company and the Subsidiaries.

(j)  "<u>Assumption Schedule</u>" shall have the meaning specified in <u>Section 4.01(b)(ii)</u>.

(k)  "<u>Bankruptcy Code</u>" shall have the meaning specified in the Plan.

(l)  "<u>Bankruptcy Court</u>" shall have the meaning specified in the recitals of this Agreement.

(m)  "<u>Benefit Plan</u>" shall mean at any time an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by any member of the ERISA Group or with respect to which the Company or its Subsidiaries could incur liability.

(n)     "Board" shall have the meaning specified in Section 4.14.

(o)     "Business" means the Operating Company and its Subsidiaries' business of manufacturing, distributing and selling residential windows, doors and other related building material products.

(p)     "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York.

(q)     "CCAA Proceeding" shall have the meaning specified in the Plan.

(r)     "Chapter 11 Cases" shall have the meaning specified in the Plan.

(s)     "Closing" and "Closing Date" shall have the respective meanings specified in Section 1.04.

(t)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the U.S. Treasury Regulations promulgated thereunder.

(u)     "Common Stock" means the common stock, $0.01 par value per share, of the Company.

(v)     "Company" shall have the meaning specified in the preamble of this Agreement.

(w)     "Confirmation Order" shall have the meaning specified in the Plan, which Confirmation Order shall be in form and substance reasonably satisfactory to the Plan Investor.

(x)     "Contract" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith, other than any Benefit Plans.

(y)     "Data Room" means a virtual data room in which the Company has posted all materials necessary for potential investors or acquirers to conduct due diligence on a transaction.

(z)     "Debt Commitment Letters" shall have the meaning specified in Section 3.09.

(aa)    "Debtors" shall have the meaning specified in the Plan.

(bb)    "Designated Acquisition Proposal" shall mean an Acquisition Proposal that is consummated by the Company and results in payment of the amounts set forth in Section 1.06(a), (b), (c), (d), (e), (f), (g), and (h) with such amounts being determined and calculated (including with respect to interest accrued at the default contract rate) as of the date of

*Atrium Corporation*
*Equity Purchase Agreement*

consummation of such Acquisition Proposal, and disregarding the proviso limitation set forth in <u>Section 1.06(d)</u>.

(cc)     "<u>Disclosure Statement</u>" shall have the meaning specified in the Plan.

(dd)     "<u>Effective Date</u>" shall have the meaning specified in the Plan.

(ee)     "<u>Environment</u>" shall mean ambient air, indoor air, soil, surface water, ground water, drinking water, land or subsurface strata and natural resources such as wetlands, flora and fauna.

(ff)     "<u>Environmental Claim</u>" shall mean, with respect to any Person, any written notice, claim, demand or other communication (collectively, a "<u>claim</u>") by any other Person alleging such Person's liability for any costs, cleanup costs, response, corrective action or other costs, damages to natural resources or other Property, personal injuries, fines or penalties arising out of or resulting from (i) the presence, Release or threatened Release into the Environment, of any Hazardous Material at any location, whether or not owned by such Person, or (ii) any violation of any Environmental Law.  The term "Environmental Claim" shall include, without limitation, any claim by any Person seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the known or suspected presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the Environment.

(gg)     "<u>Environmental Laws</u>" shall mean any and all applicable laws, rules or regulations of any Governmental Authority, any orders, decrees, judgments or injunctions and the common law in each case relating to pollution or protection of health, safety or the Environment, including without limitation, those relating to Releases or threatened Releases of Hazardous Materials into the Environment, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

(hh)     "<u>Equity Commitment Letters</u>" shall have the meaning specified in <u>Section 3.09</u>.

(ii)     "<u>Equity Interests</u>" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of capital of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, whether outstanding on or after the Closing Date.

(jj)     "<u>ERISA</u>" shall mean the United States Employee Retirement Income Security Act of 1974, as amended.

(kk)     "<u>ERISA Affiliate</u>" shall mean, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of

ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

(ll)   "Final Order" shall mean an order or a judgment entered by the Bankruptcy Court that is not stayed.

(mm)   "GAAP" shall mean generally accepted accounting principles in effect in the United States of America and set forth as of the relevant date in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

(nn)   "Governmental Order" means any order, writ, ruling, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

(oo)   "Governmental Authority" shall mean any government or political subdivision of the United States or any other country or any agency, authority, board, bureau, central bank, commission, department or instrumentality thereof or therein, including, without limitation, any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to such government or political subdivision.

(pp)   "Hazardous Material" means any and all pollutants, toxic or hazardous wastes or any other substances that is regulated pursuant to any Environmental Law (including, without limitation, asbestos, urea formaldehyde foam insulation and polychlorinated biphenyls).

(qq)   "HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(rr)   "Law" shall mean any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

(ss)   "Licenses" shall mean certificates of public convenience and necessity, franchises, licenses and other permits and authorizations from governmental authorities.

(tt)   "Lien" shall mean, with respect to any Property, any mortgage, deed of trust, lien, pledge, claim, charge, security interest or encumbrance of any kind, whether consensual or non-consensual, any other type of preferential arrangement in respect of such Property having the effect of a security interest or any filing consented to by the Company or any of its Subsidiaries of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority consented to by the Company or any of its Subsidiaries, including any easement, right-of-way or other encumbrance on title to Real Property, and any agreement to give any of the foregoing. For purposes of this Agreement, a Person shall be deemed to own subject to a Lien any Property that it has acquired

or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Property.

(uu) "<u>Material Adverse Effect</u>" shall mean (i) any change, event, occurrence or state of facts that has resulted or would reasonably be expected to result in a material adverse effect on the business, results of operations, financial condition, assets or liabilities of the Company and its Subsidiaries, taken as a whole, (ii) a material adverse effect on the ability of the Company to perform any of its material obligations under this Agreement or the Plan, or (iii) a material adverse effect on the legality, binding effect or enforceability of any material provision of this Agreement or any of the material rights and remedies of the Plan Investor hereunder or thereunder, excluding solely in the case of clause (i) any such change, event, occurrence or state of facts resulting from (a) changes in GAAP or changes in the regulatory accounting requirements applicable to any industry in which the Company or any of its Subsidiaries operates which occur or become effective after the date hereof, (b) changes in the financial or securities markets in the United States, (c) changes in the general economic or political conditions in the United States that do not have a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (d) changes (including changes of applicable law) or conditions generally affecting the industry in which the Company or any of its Subsidiaries operates and not specifically relating to or having a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (e) acts of war, sabotage or terrorism or natural disasters involving the United States of America that do not have a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (f) the announcement or consummation of the transactions contemplated by this Agreement (including any impact on customers or employees), (g) any failure, in and of itself, by the Company or any of its Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (it being understood that the cause for such failure may be taken into account in determining whether there has been a Material Adverse Effect, except to the extent the change, event, occurrence or state of facts causing such failure is otherwise described in any of clause (a) through (i) of this definition), (h) any action taken (or omitted to be taken) as required by this Agreement or at the request of the Plan Investor, or (i) any action taken by the Company or any of its Subsidiaries pursuant to any order of the Bankruptcy Court entered prior to the date hereof.

(vv) "<u>Multiemployer Plan</u>" shall mean at any time a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA (i) to which any member of the ERISA Group is then making or accruing an obligation to make contributions while a member of the ERISA Group, (ii) to which any member of the ERISA Group has within the preceding five plan years made contributions, including for these purposes any Person which ceased to be a member of the ERISA Group during such five year period, or (iii) with respect to which the Company or its Subsidiaries is reasonably likely to incur liability.

(ww) "<u>New By-Laws</u>" shall have the meaning specified in the Plan.

(xx) "<u>New Certificate of Incorporation</u>" shall have the meaning specified in <u>Section 1.01</u>.

(yy) "<u>New Common Stock</u>" shall have the meaning specified in the Plan.

(zz)    "New Money Shares" shall have the meaning specified in the recitals of this Agreement.

(aaa)    "New Value Alternative Loan Agreements" shall have the meaning specified in the Plan.

(bbb)    "Observer" shall have the meaning specified in Section 4.14.

(ccc)    "Operating Company" means Atrium Companies, Inc.

(ddd)    "Organizational Documents" of any Person shall mean such Person's charter, certificate of incorporation, code of regulations, by-laws, partnership agreement, operating agreement, limited liability company agreement, trust agreement, as applicable, and/or any other similar agreement, document or instrument.

(eee)    "Permitted Lien" shall have the meaning specified in the New Value Alternative Loan Agreements.

(fff)    "Person" means any individual, partnership, joint venture, association, joint stock company, corporation, trust, trustee, limited liability company, unincorporated organization, or other entity, including, without limitation, a Governmental Authority.

(ggg)    "Plan" shall have the meaning specified in the recitals of this Agreement.

(hhh)    "Plan Investor" shall have the meaning specified in the preamble of this Agreement.

(iii)    "Plan Investor Group" shall have the meaning specified in Section 8.07.

(jjj)    "Plan Investor Termination Fee Order" shall have the meaning specified in Section 4.05(a).

(kkk)    "Priority Claims" shall mean all priority claims allowed under the Bankruptcy Code.

(lll)    "Proceeding" shall mean any claim, counterclaim, action, judgment, suit, hearing, governmental investigation, arbitration or proceeding, including by or before any Governmental Authority and whether judicial or administrative.

(mmm)    "Projections" shall have the meaning specified in Section 4.02(a).

(nnn)    "Property" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any Person.

(ooo)    "Proprietary Rights" shall mean any patents, registered and common law trademarks, service marks, trade names, copyrights, licenses and other similar rights (including,

without limitation, know-how, trade secrets and other confidential information) and applications for each of the foregoing, if any.

(ppp)    "Purchase Price" shall have the meaning specified in Section 1.03.

(qqq)    "Real Property" shall mean all right, title and interest of the Company and its Subsidiaries (including, without limitation, any leasehold estate) in and to a parcel of real property owned or operated by the Company and its Subsidiaries, whether by lease, license or other use agreement, together with, in each case, all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof or thereon.

(rrr)    "Release" shall mean any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the Environment, except when in compliance with the terms of applicable laws and permits.

(sss)    "Representatives" shall have the meaning specified in Section 4.05(a).

(ttt)    "Reverse Termination Fee" shall have the meaning specified in Section 8.07.

(uuu)    "Securities Act" shall mean the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect from time to time.

(vvv)    "Senior Secured Agent" shall have the meaning specified in the Plan.

(www)    "Senior Secured Credit Agreement" shall have the meaning specified in the Plan.

(xxx)    "Scheduled Closing Date" shall have the meaning specified in Section 7.01(l).

(yyy)    "Stand-Alone Alternative" shall have the meaning specified in the Plan.

(zzz)    "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture, or other legal entity, of which such Person (x) owns, directly or indirectly, more than 50% of the stock or other ownership interests of such other legal entity or (y) controls the vote or otherwise has the right to elect, nominate or designate, more than 50% of the board of directors or other governing body of such corporation or other legal entity.

(aaaa)    "Taxes" shall mean any and all present or future taxes, imposts, duties, charges, fees, levies or other charges or assessments of whatever nature, including, but not limited to, income, gross receipts, excise, real or personal property, sales, withholding, social security, retirement, unemployment, occupation, use, service, license, net worth, payroll, franchise, and transfer and recording, imposed by the Internal Revenue Service or any taxing authority (whether domestic or foreign, including any federal, state, U.S. possession, county,

36

local or foreign government or any subdivision or taxing agency thereof), whether computed on a separate, consolidated, unitary, combined or any other basis, including interest, fines, penalties or additions to tax attributable to or imposed on or with respect to any such taxes, charges, fees, levies or other assessments.

(bbbb)  "Termination Fee" shall have the meaning specified in Section 4.05(a).

(cccc)  "Trigger Event" means any of the following: (a) the Debtors shall seek to confirm the Plan or any other plan of reorganization, or a Plan or other plan of reorganization shall have been confirmed, other than the Plan based on (i) the New Value Alternative (as defined in the Plan as in effect on the date hereof), (ii) the New Money Investment funded by the parties identified as the Plan Investor hereunder pursuant to the terms of this Agreement, and (iii) New Value Alternative Loans provided by the financing sources pursuant to the terms of the Debt Commitment Letters; or (b) the Debtors shall seek to effect, or there shall have been effected, any sale, transaction proposal or offer with respect to any dissolution, winding up, liquidation, reorganization, sale of capital stock or assets, merger, consolidation, equity or debt financing or restructuring (either under chapter 7 or chapter 11 of the Bankruptcy Code or otherwise) other than the Plan based on (i) the New Value Alternative (as defined in the Plan as in effect on the date hereof), (ii) the New Money Investment funded by the parties identified as the Plan Investor hereunder pursuant to the terms of this Agreement, and (iii) New Value Alternative Loans provided by the financing sources pursuant to the terms of the Debt Commitment Letters.

(dddd)  "UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Company and the Plan Investor have executed this Agreement as of the date first written above.

**COMPANY:**

ATRIUM CORPORATION

By: _____
       Name: Gregory T. Faherty
       Title:  President & Chief Executive Officer

**PLAN INVESTOR:**

ATRIUM WINDOW HOLDINGS, LLC

By: _____
       Name: Thomas M. Wolf
       Title:  Authorized Representative

IN WITNESS WHEREOF, the Company and the Plan Investor have executed this Agreement as of the date first written above.

**COMPANY:**

ATRIUM CORPORATION

By: _____

Name: Gregory T. Faherty
Title: President & Chief Executive Officer

**PLAN INVESTOR:**

ATRIUM WINDOW HOLDINGS, LLC

By: _____

Name: Thomas M. Wolf
Title: Authorized Representative

**Schedule 1.06(e) Plan Payments**

For purposes of <u>Section 1.06(e)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| A/R Facility Cap | $23,400,000.00 | $27,000,000.00 |

**Schedule 1.06(f) Plan Payments**

For purposes of <u>Section 1.06(f)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| DIP Claims Cap (net of cash) | $15,535,000.00 | $20,255,000.00 |

## Schedule 1.06(g) Plan Payments

For purposes of Section 1.06(g) of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| Administrative Claims and Priority Claims Cap | $6,450,000.00 | $6,300,000.00 |

**Schedule 1.06(h) Plan Payments**

For purposes of <u>Section 1.06(h)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| Cap on all other amounts necessary to consummate the Plan | $1,100,000.00 | $1,100,000.00 |

**Joint Plan of Reorganization**

[Attached]

## <u>Wire Instructions</u>

Atrium Companies, Inc.
Bank of America
Dallas TX

ABA# 026-009-593
ACCT# 0047-9796-7737

**EXHIBIT C**

## Equity Commitment Letters

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York  10022
Attn:  Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA  94111
Attn:  Rajeev Amara

Re:    Atrium Corporation

Gentlemen:

This equity commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint Plan of Reorganization attached hereto as Exhibit A, Golden Gate Private Equity, Inc. (the "Equity Investor", "GGC", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $129,200,000 (the "Commitment Amount") (at a price of $1,000 per unit) for Class B Units of Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner" and, together with GGC, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood and agreed that, notwithstanding anything to contrary in this Letter, GGC shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of GGC's pro rata portion (based on its commitment relative to the commitments of all Sponsors) of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable by Holdings pursuant to the New Value Investment Agreement. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as of the date hereof (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11

Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Plan Investor, the "<u>Plan</u>" and the "<u>Disclosure Statement</u>", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "<u>Equity Commitment Letters</u>"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.    <u>Conditions; Funding</u>. The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.    <u>Liquidated Damages</u>. Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all Sponsors) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "<u>Liquidated Damages Amount</u>".

3.    <u>Termination</u>. The Equity Investor's obligations hereunder (the "<u>Commitment</u>") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by GGC, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable, and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "<u>Expiration Date</u>"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the termination of the New Value Investment Agreement shall not relieve the Equity Investor of any

liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4.      Assignment. GGC reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned. The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5.      Single Obligor. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

6.      Submission to Jurisdiction; Waiver of Jury Trial. THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND

CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.    <u>Counterparts; Indemnity</u>.  This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement. In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed, to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.    <u>Amendments; No Waiver</u>.  This letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect. No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.    <u>No Third Party Beneficiary; Damages</u>.  Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the Senior Secured Agent are beneficiaries of this Letter. There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than Holdings (and the Target and the Senior

Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

   10. <u>Entire Agreement</u>. This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

\*  \*  \*  \*  \*

We look forward to working with you.

GOLDEN GATE PRIVATE EQUITY, INC.

By: _____
Name: David Dominik
Title: Authorized Signatory

So Agreed to and Accepted
this __ day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
Name:
Title:

We look forward to working with you.

GOLDEN GATE PRIVATE EQUITY, INC.

By: _____

        Name:  David Dominik
        *Title:  Authorized Signatory*

So Agreed to and Accepted
this 12th day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: *Thomas M Wolf*

Name:  Thomas M. Wolf
Title:    Authorized Representative

Exhibit A

First Amended Joint Plan of Reorganization

[attached]

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn:    Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn:    Rajeev Amara

Gentlemen:

The purpose of this letter is to set forth the equity commitments of certain affiliates of Kenner & Company, Inc. to invest $40.0 million in KWC Holdings, L.P., a Delaware limited partnership ("KWC") formed by Kenner & Company, Inc. ("Kenner") for purposes of KWC's investment in Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner and Golden Gate Capital ("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business"). KWC's investment in Holdings is subject to the terms and conditions of the Equity Commitment Letters described below. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as of March 12, 2010 (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We further understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which the Target is the debtor in possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization (the "Plan") filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement (the "Disclosure Statement") filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules,

annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Sponsors).

Each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to KWC or Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters. A copy of the Equity Commitment Letters from each of the Kenner Equity Investors listed below is attached hereto:

| Investors | Equity Commitment ($ in millions) |
|---|---|
| PPM America Private Equity Fund I, LP | $ 20.0 |
| Twin Bridge Capital Partners | 11.0 |
| Kenner Equities IV, L.P. | 9.0 |
| Total | $ 40.0 |

We look forward to working with you.

KWC HOLDINGS, L.P.

By: Kenner Equity Partners, LLC, its General
Partner

By: _____
Name: Thomas M. Wolf
Title:  Managing Director


So Agreed to and Accepted
this 12th day of March, 2010:


ATRIUM WINDOW HOLDINGS, LLC

By: _____
Name: Thomas M. Wolf
Title: Managing Director

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn: Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara

Re: Atrium Corporation

Gentlemen:

This equity commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint Plan of Reorganization attached hereto as Exhibit A, Kenner Equities IV, L.P. (the "Equity Investor", "Kenner IV", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $9,000,000 (the "Commitment Amount"), directly or indirectly, in Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner") and Golden Gate Private Equity, Inc. ("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood and agreed that, notwithstanding anything to contrary in this Letter, Kenner IV shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of Kenner IV's pro rata portion (based on its commitment relative to the commitments of all Sponsors) of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable by Holdings pursuant to the New Value Investment Agreement. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated March 12, 2010 (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in

1

possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Sponsors, the "Plan" and the "Disclosure Statement", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.    Conditions; Funding. The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.    Liquidated Damages. Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all Sponsors) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "Liquidated Damages Amount".

3.    Termination. The Equity Investor's obligations hereunder (the "Commitment") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by Kenner IV, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "Expiration Date"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of

2

competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the termination of the New Value Investment Agreement shall not relieve the Equity Investor of any liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4.    <u>Assignment</u>. Kenner IV reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned. The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5.    <u>Single Obligor</u>. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

3

6.    Submission to Jurisdiction; Waiver of Jury Trial. THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.    Counterparts; Indemnity. This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement. In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.    Amendments; No Waiver. This letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect. No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.    No Third Party Beneficiary; Damages. Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the

Exhibit A

<u>First Amended Joint Plan of Reorganization</u>

[attached]

Senior Secured Agent are beneficiaries of this Letter. There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than Holdings (and the Target and the Senior Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

10. _Entire Agreement_. This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

*  *  *  *  *

17620719

We look forward to working with you.

KENNER EQUITIES IV, L.P.

By: Kenner Equity Partners, LLC, its General
    Partner

By: _____
    Name: Jeffrey L. Kenner
    Title: Managing Director

So Agreed to and Accepted
this 2H day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
    Name: Jeffrey L. Kenner
    Title: Authorized Representative

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn: Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara

Re:     Atrium Corporation

Gentlemen:

This equity commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint Plan of Reorganization attached hereto as Exhibit A,. PPM America Capital Partners, LP (the "Equity Investor", "PPM", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $20,000,000 (the "Commitment Amount") (at a price of $1,000 per unit) for Class A Units of Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner") and Golden Gate Private Equity, Inc ("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood and agreed that, notwithstanding anything to contrary in this Letter, PPM shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of PPM's pro rata portion (based on its commitment relative to the commitments of all investors under the Equity Commitment Letters) of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable by Holdings pursuant to the New Value Investment Agreement. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as the date hereof (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors

in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Plan Investor, the "Plan" and the "Disclosure Statement", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.      Conditions; Funding. The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.      Liquidated Damages. Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all investors under the Equity Commitment Letters) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "Liquidated Damages Amount".

3.      Termination. The Equity Investor's obligations hereunder (the "Commitment") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by PPM, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable, and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "Expiration Date"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the

termination of the New Value Investment Agreement shall not relieve the Equity Investor of any liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4.   Assignment.  PPM reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates of itself or Kenner, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned.  The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5.   Single Obligor.  Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

6.   Submission to Jurisdiction; Waiver of Jury Trial.  THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER

("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.     <u>Counterparts; Indemnity</u>.  This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement.  In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed, to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement or performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.     <u>Amendments; No Waiver</u>.  This Letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect.  No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right.  No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right.  No waiver of any such right will be deemed a waiver of any other right hereunder.

9.     <u>No Third Party Beneficiary; Damages</u>.  Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the Senior Secured Agent are beneficiaries of this Letter.  There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights,

legal or equitable, in any person or entity other than Holdings (and the Target and the Senior Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

10. <u>Entire Agreement</u>. This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

*   *   *   *   *

We look forward to working with you.

PPM AMERICA PRIVATE EQUITY
FUND, LP

By: PPM America Capital Partners LLC
Its General Partner

By: _____
    Name:  Champak Raju
    Title:  Partner


By: _____
    Name:  Mark Staub
    Title:  Principal


So Agreed to and Accepted
this ___ day of March, 2010:


ATRIUM WINDOW HOLDINGS, LLC


By: _____
    Name:
    Title:

We look forward to working with you.

PPM AMERICA PRIVATE EQUITY
FUND, LP

By: _____
          Name:  Champak Raju
          Title:  Partner

By: _____
          Name:  Mark Staub
          Title:  Principal

So Agreed to and Accepted
this 12th day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
        Name: Thomas M. Wolf
        Title:  Authorized Representative

Exhibit A

<u>First Amended Joint Plan of Reorganization</u>

[attached]

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York  10022
Attn:   Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA  94111
Attn:   Rajeev Amara

                    Re:      Atrium Corporation

Gentlemen:

        This equity commitment letter (this "Letter") confirms the agreement that, subject to the
satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint
Plan of Reorganization attached hereto as Exhibit A,. Twin Bridge Capital Partners (the "Equity
Investor", "TBCP", "we" or "us") hereby commits that it and/or one or more of its affiliates will
invest $11,000,000 (the "Commitment Amount") (at a price of $1,000 per unit) for Class A Units
of Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed
by affiliates of Kenner & Company, Inc. ("Kenner") and Golden Gate Private Equity, Inc
("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings' investment
(the "New Value Investment") in substantially all of the equity interests of Atrium Corporation
(the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood
and agreed that, notwithstanding anything to contrary in this Letter, TBCP shall not, under any
circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase
equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the
New Value Investment) in an amount in excess of TBCP's pro rata portion (based on its
commitment relative to the commitments of all investors under the Equity Commitment Letters)
of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable
by Holdings pursuant to the New Value Investment Agreement.  We understand that the New
Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as of the
date hereof (the "New Value Investment Agreement"), between Holdings and the Target and,
upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower")
will be an indirect subsidiary of Holdings.

        We understand that the New Value Investment will be effected pursuant to the Plan (as
defined below) to be confirmed in the chapter 11 case in which Target is the debtor in
possession, currently pending in the United States Bankruptcy Court for the District of Delaware
as Case No. 10-10150 (the "Chapter 11 Case").  Certain of Target's subsidiaries are also debtors

1

in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Plan Investor, the "Plan" and the "Disclosure Statement", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.     Conditions; Funding. The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.     Liquidated Damages. Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all investors under the Equity Commitment Letters) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "Liquidated Damages Amount".

3.     Termination. The Equity Investor's obligations hereunder (the "Commitment") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by TBCP, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable, and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "Expiration Date"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the

2

termination of the New Value Investment Agreement shall not relieve the Equity Investor of any liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4. <u>Assignment</u>. TBCP reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned. The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5. <u>Single Obligor</u>. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

6. <u>Submission to Jurisdiction; Waiver of Jury Trial</u>. THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER

3

("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.      Counterparts; Indemnity. This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement. In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed, to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.      Amendments; No Waiver. This Letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect. No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.      No Third Party Beneficiary; Damages. Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the Senior Secured Agent are beneficiaries of this Letter. There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights,

legal or equitable, in any person or entity other than Holdings (and the Target and the Senior Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

10.     Entire Agreement.  This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

*     *     *     *     *

CHI99 5216989-11.084916.0013

We look forward to working with you.

TWIN BRIDGE CAPITAL PARTNERS

By: _____
     Name: Patrick Lunigan
     Title: senior Partner

So Agreed to and Accepted
this __ day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
     Name:
     Title:

We look forward to working with you.

TWIN BRIDGE CAPITAL PARTNERS

By: _____
          Name:
          Title:

So Agreed to and Accepted
this 12th day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
     Name:  Thomas M. Wolf
     Title:  Authorized Representative

Exhibit A

<u>First Amended Joint Plan of Reorganization</u>

[attached]

# Debt Commitment Letters

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York  10022
Attn:   Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA  94111
Attn:   Rajeev Amara

                    Re:     Atrium Corporation

Gentlemen:

        This commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the Joint Plan of Reorganization attached hereto as Exhibit A, GGC Unlevered Credit Opportunities, LLC (the "Mezzanine Debt Investor", "GGC", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $75,000,000 (the "Commitment Amount") for mezzanine debt securities having the terms set forth on Exhibit B of Atrium Companies, Inc., a Delaware corporation (the "Company" or the "Borrower") (the "Mezzanine Debt Investment"), in connection with, and only upon the consummation of, the investment (the "New Value Investment") by Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner" and, together with and affiliate of GGC, the "Sponsors") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business"), it being understood and agreed that GGC shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase debt securities of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of the Commitment Amount. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as of the date hereof (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, the Borrower will be an indirect subsidiary of Holdings.

        We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in possession, currently pending in the United States Bankruptcy Court for the District of Delaware

as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Plan Investor, the "Plan" and the "Disclosure Statement", respectively).

We understand that the financing required for the consummation of the Plan would consist of (i) a cash investment from the Sponsors and other investors of at least $169,200,000 million into Holdings in connection with the New Value Investment, (ii) loans in the aggregate amount of $185.0 million to be obtained by the Borrower on terms contemplated by the Plan and on the terms and conditions set forth in the Bank Facility Commitment Letter, dated as of the date hereof, from UBS Loan Finance LLC ("UBS") and UBS Securities LLC ("UBSS" and, together with UBS, the "UBS Commitment Parties") to Holdings (the "Bank Facility Commitment Letter") and the related agreements with the UBS Commitment Parties contemplated thereby (collectively together with the Bank Facility Commitment Letter, the "UBS Debt Letters") and (iii) a senior secured asset-based revolving credit facility to Borrower of up to $60.0 million (the "ABL Facility") on terms contemplated by the Plan and on the terms and conditions set forth in the Commitment Letter, dated as of the date hereof, from General Electric Capital Corporation ("GE") to Holdings (the "ABL Facility Commitment Letter") and the related agreements with GE contemplated thereby (collectively together with the Bank Facility Commitment Letter, the "GE Debt Letters"). The UBS Debt Letters and the GE Debt Letters are collectively referred to herein as the "Debt Commitment Letters".

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.     Conditions. The Mezzanine Debt Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Mezzanine Debt Investor) of (i) each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement, and (ii) the following additional conditions:

(a)     On the Effective Date, Holdings shall be issued mezzanine debt securities in accordance with the terms set forth on Exhibit B, and, except as contemplated in this Letter and the indebtedness contemplated by the Debt Letters, there shall not be outstanding any other indebtedness of Borrower or any of its subsidiaries.

(b)     The Mezzanine Debt Investor and each of Borrower and its material subsidiaries shall have executed, delivered and closed definitive customary investment documentation for the

Mezzanine Debt Investment.  The investment documentation shall be in conformity with this Letter and <u>Exhibit B</u>.

(c)  The transactions contemplated by the Debt Commitment Letters shall have been consummated in accordance with the terms of the Debt Commitment Letters

(d)  The transactions contemplated under the Equity Commitment Letters shall have been consummated in accordance with the terms of the Equity Commitment Letters

(e)  The transactions contemplated under the New Value Investment Agreement shall have been consummated in accordance with the terms and conditions of the New Value Investment Agreement and the Plan.

2.  <u>Covenants</u>.  The Mezzanine Debt Investor agrees to use its reasonable efforts to promptly, expeditiously and in good faith enter into definitive investment documentation for the mezzanine debt investments and transactions described in this Letter, which definitive documentation shall contain customary terms and conditions and shall be consistent with the terms and conditions set forth in this Letter.

3.  <u>Termination</u>.  The Mezzanine Debt Investor's obligation to fund the Commitment Amount (the "<u>Commitment</u>") will terminate and expire on the earliest to occur of (i) the consummation of the Mezzanine Debt Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by GGC, (iv) the date as of which the Mezzanine Debt Investor invests in or has otherwise funded to or for the benefit of Borrower an amount equal to the Commitment Amount, (v) 5:00 p.m., New York City time, on May 31, 2010 and (vi) the termination of any Sponsor's commitment under its Equity Commitment Letter (the "<u>Expiration Date</u>"); provided that the Mezzanine Debt Investor will not be liable for a breach of this letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement.  From and after the termination or expiration of the Commitment obligations contained in paragraph 1 of this Letter, the Mezzanine Debt Investor shall have no further liability or obligation to any Person as a result of the Commitment or this Letter.  Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target.  Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 4, 6, 7, 8, 9, 10 and 11 below shall survive any termination of the Commitment pursuant to this paragraph

4.  <u>Fees</u>.  As consideration for the GGC's agreements hereunder with respect to the Mezzanine Debt Investment, Holdings agrees to pay, or cause to be paid, to GGC as follows:

| | |
|---|---|
| <u>Commitment Fee</u>: | A commitment fee in an amount equal to 1.50% of the full amount of the Commitment in respect of the Mezzanine Debt Investment (the "<u>Mezzanine Loan Commitment Fee</u>"), fully earned and due and payable in cash upon the date hereof. |
| <u>Termination Fee</u>: | A termination fee in an amount equal to 1.00% of the full amount of the Commitment in respect of the Mezzanine Debt Investment |

|  | (the "<u>Mezzanine Loan Termination Fee</u>"), fully earned, due and payable in cash upon the termination of the Commitment (other than as a result of the consummation of the Mezzanine Debt Investment), if any. |
|---|---|
| <u>Closing Fee</u>: | A closing fee equal to 2.50% of the full amount of the Commitment in respect of the Mezzanine Debt Investment (the "<u>Closing Fee</u>"), fully earned, due and payable in cash upon the Closing Date. |

Holdings agrees to reimburse (or cause to be reimbursed) GGC for its reasonable legal fees and out-of-pocket expenses of one counsel for GGC. Holdings agrees that upon termination of the New Value Investment Agreement, Holdings will promptly pursue its rights and remedies against all parties under the New Value Investment Agreement to receive the Termination Fee (as defined in the New Value Investment Agreement). All fees shall be payable in U.S. dollars in immediately available funds to GGC for its own account, free and clear of and without deduction for any and all present or future applicable taxes (other than any income taxes payable by GGC), levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes). Once paid, no fee shall be refundable under any circumstances. GGC reserves the right to allocate, in whole or in part, to its respective affiliates certain fees payable to GGC hereunder in such manner as GGC and such affiliates shall agree in their sole discretion. Holdings' obligation to pay the foregoing fees will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute Holdings may have.

5. <u>Assignment</u>. GGC reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Mezzanine Debt Investor shall have no further obligation to hereunder (or to any other person or entity) with respect thereto. The rights of Holdings under this Letter may not be assigned in any manner without the Mezzanine Debt Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

6. <u>Single Obligor</u>. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or

other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

7.      Submission to Jurisdiction; Waiver of Jury Trial.  THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED.  THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS.  HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER.  THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

8.      Counterparts; Indemnity.  This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement.  In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed, to indemnify and hold the Mezzanine Debt Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

9.      Amendments; No Waiver.  No provision of this Letter may be amended, revoked or waived except by a writing signed and delivered by an authorized officer of each party.  No failure or delay on the part of either party in exercising any right hereunder will operate as a

waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

10.     <u>No Third Party Beneficiary</u>.   There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than Holdings. Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein.

11.     <u>Entire Agreement</u>.   This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

*     *     *     *     *

We look forward to wor<ing with you.

GGC UNLEVERAGED CREDIT
OPPORTUNITIES, LLC

By:

Name: David Dominik
Title: Authorized Signatory

So Agreed to and Accepted
this ___ day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
      Name:
      Title:

We look forward to working with you.

GGC UNLEVERED CREDIT
OPPORTUNITIES, LLC

By: _____

Name:  David Dominik
Title:  Authorized Signatory

So Agreed to and Accepted
this \12 day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____

Name: THOMAS M. WOLF
Title: AUTHORIZED SIGNATORY

Exhibit A

<u>Joint Plan of Reorganization</u>

[attached]

Exhibit B

Mezzanine Debt Terms

(i) Shall contain (x) representations and warranties that are customary for facilities of this type but in any shall event be as or less restrictive than those governing the debt facilities provided for in the Debt Letters (the "Facilities") and (y) covenants (which in the case of negative and financial covenants, shall be set with a cushion of no less than 10% wider than those set forth in the Facilities) and events of default (which shall include no less than a 90 day standstill to the Facilities), in each case that are customary for facilities of this type but in any shall event be less restrictive than those governing the Facilities;

(ii) Subordinated in right of payment on customary terms to the senior indebtedness under the Facilities;

(iii) A maturity date that is no shorter than six months later than the maturity date of the Facilities;

(iv) An interest rate not in excess of 15.0% per annum, of which no more than 12% per annum shall be payable in cash;

(iv) Subject to customary standstill provisions with respect to all senior indebtedness under the Facilities;

(v) Shall be unsecured; and

(vi) Shall have prepayment premiums not greater than 3% for prepayments made on or prior to the first anniversary of issuance, 2% for prepayments made after the first anniversary but on or prior to the second anniversary of issuance and 1% for prepayments made after the second anniversary but on or prior to the third anniversary of issuance.

March 12, 2010

Atrium Window Holdings, LLC
3890 West Northwest Highway, 5th Floor
Dallas, TX 75220
Attn: Chief Executive Officer

Ladies and Gentlemen:

General Electric Capital Corporation ("GE Capital" or the "Agent") is pleased to provide Atrium Window Holdings, LLC ("you" or the "Company") its commitment for a $60,000,000 senior secured plan of reorganization revolving credit facility (the "Credit Facilities") to Atrium Companies, Inc. (the "Borrower") to assist in the acquisition by you of the Borrower, its parent companies and its subsidiaries (the "Acquisition") on the terms and conditions set forth herein and in the attached Senior Secured Summary of Indicative Terms and Conditions with respect to the Credit Facilities dated March 12, 2010 (the "Senior Secured Revolving Term Sheet") and the Fee Letter (as defined in the Senior Secured Revolving Term Sheet).

The Senior Secured Revolving Term Sheet, together with this letter, hereinafter are referred to as the "Commitment Letter." The Credit Facilities will be used to provide for working capital and for general corporate purposes (including to finance permitted acquisitions), and (together with cash on the Company's balance sheet) to fund certain costs, fees and expenses associated with the Plan (as defined in the Senior Secured Revolving Term Sheet) and with the closing of the Credit Facilities.

Agent shall act as the administrative agent with respect to the Credit Facilities and the Lead Arranger (defined below) shall act as the sole lead arranger and sole bookrunner with respect to the Credit Facilities. The undersigned agrees that, without the prior written consent of Agent (i) no additional agents, co-agents, co-arrangers or co-bookrunners shall be appointed, or other titles conferred to any person or entity, in respect of the Credit Facilities, and (ii) no other lender under the Credit Facilities shall receive any compensation of any kind for its participation in the Credit Facilities.

We understand that the Debtors' (as defined in the Senior Secured Revolving Term Sheet) emergence from the Cases will require an equity investment of at least $150,000,000 in cash for capital stock. The remainder of the capital structure will consist of (i) $260,000,000 of secured high yield notes (the "Secured Notes") or (ii) a $185,000,000 senior secured term loan (the "Term Loan") and $75,000,000 of mezzanine notes (the "Mezzanine Notes").

Company agrees to pay all reasonable and documented out-of-pocket costs and out-of-pocket expenses incurred in connection with the syndication (if any), due diligence (including internal audit fees), preparation, negotiation, execution, and enforcement of this Commitment Letter and the initial documentation for the Credit Facilities (the "Credit Facilities Documentation"), regardless of whether such Credit Facilities Documentation is executed, including without limitation, the reasonable legal fees of one primary counsel and applicable local counsels to Agent and GE Capital Markets, Inc. (the "Lead Arranger"), not to exceed $275,000 in the aggregate.

1

Company further agrees to indemnify and hold harmless the Agent, all other agents under the Credit Facilities, the Lead Arranger, their affiliates, and their officers, directors, employees, agents and attorneys (each an "Indemnified Party") against any and all losses, claims, damages, costs, expenses (including reasonable and documented fees, time charges and expenses of attorneys) or liabilities of every kind whatsoever (collectively, the "Indemnified Obligations") to which any of the Indemnified Parties may become subject in connection with this commitment letter, except that Company shall not be liable for any Indemnified Obligations of any Indemnified Party to the extent (i) any of the foregoing is determined by a court of competent jurisdiction to have arisen from the gross negligence, bad faith or willful misconduct of such Indemnified Party (or its related parties or affiliates), (ii) resulting from any breach by an Indemnified Party of its obligations under the Commitment Letter, (iii) relating to any disputes solely among Indemnified Parties so long as the Company has met the conditions to the Senior Secured Credit Facilities or (iv) to the extent the Indemnified Parties have settled any such dispute or claim without your consent. The Indemnified Obligations will continue notwithstanding any termination of this commitment.

You agree that all information (including but not limited to projections) provided by or on behalf of you to Agent or the Lead Arranger in connection with the syndication or administration of the Credit Facilities may be disseminated by or on behalf of Agent or the Lead Arranger, as the case may be, and made available, to prospective lenders and participants, who have agreed to be bound by customary confidentiality undertakings (including, "click-through" agreements) reasonably acceptable to you, all in accordance with the Agent's or Lead Arranger's standard loan syndication practices (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally or in writing, including at prospective Lender or other meetings). You hereby further authorize the Agent or Lead Arranger to download copies of Borrower's and Sponsors' logos from their respective websites and post copies thereof on an Intralinks® or similar workspace and use such logos on any confidential information memoranda, presentations and other marketing and materials.

This Commitment Letter shall not be assignable by you without our prior written consent (and any purported assignment without such consent shall be null and void), and is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Parties. Agent may transfer and assign its commitment hereunder, in whole or in part, to any of its affiliates or to any prospective Lender acceptable to Company, which acceptance shall not be unreasonably withheld or delayed. Upon such assignment, Agent shall be released from the portion of its commitment hereunder that has been so transferred and assigned; provided, that any such assignment shall not relieve Agent from its obligation to fund on the closing date, unless and until such amounts are funded. Notwithstanding anything to the contrary herein, neither commencement nor completion of any syndications of the Senior Secured Credit Facilities is a condition to its commitments hereunder.

Company agrees that in any action arising in connection with this Commitment Letter or any transaction contemplated hereby the only damages that may be sought from Agent, all other agents and lenders under the Credit Facilities, Lead Arranger or any of their affiliates or any Indemnified Party are those which are direct and reasonably foreseeable as the probable result of any breach hereof. The Agent, all other agents and lenders under the Credit Facilities, the Lead Arranger and their affiliates shall not be liable under this Commitment Letter or any Credit Facilities Documentation or in respect of any act, omission or event relating to the transaction contemplated hereby or thereby, on any theory of liability, for any special, indirect, exemplary, consequential or punitive damages.

2

This Commitment Letter and Fee Letter are for your confidential use only and may not be disclosed by you to any person except that (i) such existence and contents may be disclosed (A) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (B) to the Sponsors, and other potential and actual co-investors, the Company and to their or your directors, affiliates, partners, members, stockholders, officers, employees, legal counsel, accountants and other advisors in each case on a confidential and "need-to-know" basis and in connection with the transactions contemplated hereby, (ii) (A) this Commitment Letter may be disclosed, by the Company, to the Office of the U.S. Trustee, to the statutorily appointed committee of unsecured creditors (the "Creditors Committee"), to the Senior Secured Agent (as defined in the Plan) and the Ad Hoc Group of Senior Secured Lenders (as defined in the Plan), and to their respective representatives and professional advisors on a confidential and "need to know" basis, and (B) this Commitment Letter may be disclosed, (I) to the extent required in motions, to be filed with the Bankruptcy Court solely in connection with obtaining the entry of an order approving the Company's and its subsidiaries' obligations in connection herewith and (II) in any proceeding relating to the confirmation of the Plan by the Court (as defined in the Senior Secured Revolving Term Sheet) or the entry of the Confirmation Order (as defined in the Senior Secured Revolving Term Sheet), (iii) the existence and contents of this Commitment Letter may be disclosed in any proxy, public filing, prospectus, offering memorandum, offering circular or other marketing materials in connection with the acquisition of the Company by Holdings or the financing thereof, (iv) this Commitment Letter may be disclosed to the rating agencies on a confidential and "need-to-know" basis and in connection with the proposed transactions and (v) this Commitment Letter may be disclosed to the lenders and arrangers of the Additional Exit Financing on a confidential and "need-to-know" basis and in connection with the proposed transactions. You shall provide the Agent prior notice of all press releases or advertisements that you or your subsidiaries prepare, in each case, that contain Agent's or any affiliate's name or describe Agent's financing commitment.

The Agent and its affiliates will use all confidential information provided to it or such affiliates by or on behalf of you, Borrower or Sponsors hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and shall treat confidentially all such information; provided that nothing herein shall prevent the Agent from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case the Agent, to the extent permitted by law, agree to inform you promptly thereof), (ii) upon the request or demand of any regulatory authority having jurisdiction over such person or any of their respective affiliates, (iii) to the extent that such information becomes publicly available other than by reason of improper disclosure by the Agent or any of its affiliates, (iv) to the extent that such information is received by the Agent from a third party that is not subject to confidentiality obligations to the Sponsors, you or the Borrower or its subsidiaries, or (v) to the Agent's affiliates and their respective employees, legal counsel who need to know such information in connection with the Commitment Letter and are informed of the confidential nature of such information; provided that the Agent shall be responsible for any such person's breach of this agreement.

The Senior Secured Revolving Term Sheet is intended to be indicative of the principal terms of the Credit Facilities and does not purport to specify all of the terms, representations and warranties, covenants and other provisions that will be contained in the final Credit Facilities Documentation; provided, that there shall be no financial covenants other than as specified therein.

3

If this Commitment Letter, the Fee Letter or any act, omission or event hereunder or thereunder becomes the subject of a dispute, each of the undersigned hereby waive trial by jury. Each of the undersigned hereby consent and agree that the state or federal courts located in New York County, State of New York shall have exclusive jurisdiction to hear and determine any claims pertaining to this Commitment Letter, the Fee Letter or any transaction relating hereto, any other financing related thereto, and any investigation, litigation or proceeding related to or arising out of any such matters, provided that the parties acknowledge that any appeals from those courts may have to be by a court located outside of such jurisdiction. Each of the undersigned hereby expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waive any objection which any of them may have based on lack of personal jurisdiction, improper venue or inconvenient forum. This Commitment Letter and the Fee Letter shall be governed by and shall be construed in accordance with the laws of the State of New York applicable to contracts made and performed in that state (without giving effect to conflicts of law principles).

This Commitment Letter and the Fee Letter supersede all prior discussions, writings, indications of interest and proposals with respect to the Credit Facilities previously delivered to you or your affiliates by Agent or any of its affiliates. Please indicate your acceptance of this commitment and return a signed copy of this Commitment Letter and the Fee Letter to Agent. This commitment and the agreements of the Agent herein will expire at 8:00 p.m., Chicago time, on March 12, 2010, unless on or prior to such time Agent shall have received a copy of this Commitment Letter and the Fee Letter executed by you. Notwithstanding acceptance of this Commitment Letter, the commitment and the agreements of the Agent herein will automatically terminate unless definitive Credit Facilities Documentation is executed on or before May 31, 2010. Upon expiration or termination of the commitment contained herein, Agent and its affiliates shall have no liability or obligation hereunder. Termination of this commitment shall not affect your obligations hereunder, including to pay any fees, costs or expenses provided for herein or in any other agreements entered into between you and Agent.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), Agent and each lender may be required to obtain, verify and record information that identifies Holdings (as defined in the Senior Secured Revolving Term Sheet), Parent (as defined in the Senior Secured Revolving Term Sheet) and the Company, which information includes the name, address, tax identification number and other information regarding Company that will allow Agent or such lender to identify Holdings, Parent and the Company in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to Agent and each lender.

We look forward to working with you and the management team of Atrium Companies, Inc. on this transaction.

Sincerely,

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: *Pamela Eskin*

Title: Duly Authorized Signatory

**ATRIUM WINDOW HOLDINGS, LLC**

_____

By:

Title:

Date: _____

We look forward to working with you and the management team of Atrium Companies, Inc. on this transaction.

Sincerely,

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____
Title:    Duly Authorized Signatory


**ATRIUM WINDOW HOLDINGS, LLC**

By:      Thomas M. Wolf
Title:    Authorized Representative


Date:    As of March 12, 2010

**Senior Secured Summary of Indicative Terms and Conditions ("Senior Secured Revolving Term Sheet")**
**Atrium Companies, Inc.**
**$60,000,000 Senior Secured Credit Facilities**
**March 12, 2010**

BORROWER:

Atrium Companies, Inc. as reorganized, or any other entity that purchases or assumes substantially all the assets of Atrium Companies, Inc., in each case in accordance with, and upon the effective date of the Plan (as hereinafter defined) ( "Borrower").

SPONSORS:

Golden Gate Capital and Kenner & Company (collectively, "Sponsors")

ADMINISTRATIVE AGENT: General Electric Capital Corporation ("GE Capital" or "Agent")

SOLE LEAD
ARRANGER AND
BOOKRUNNER:

GE Capital Markets, Inc. ("GECM")

LENDERS:

GE Capital and, after the closing date, its permitted assignees.

PRE-PETITION SECURED
FACILITY:

A senior secured credit facility (the "Pre-Petition Secured Facility") provided by GE Business Financial Services Inc. ("GEBFS"), as agent ("Pre-Petition Agent") and certain lenders (the "Pre-Petition Lenders") pursuant to the Second Amended and Restated Credit Agreement, dated as of October 15, 2008, by and among Atrium Companies, Inc., as borrower, ACIH, Inc. and certain subsidiaries of Atrium Companies, Inc., as guarantors, the Pre-Petition Agent and the Pre-Petition Lenders (as amended or otherwise modified, the "Pre-Petition Credit Agreement") consisting of (a) a revolving credit facility including a letter of credit subfacility and a swing line subfacility and (b) a term loan facility.

DIP FACILITY:

A $40,000,000 debtor-in-possession loan facility (the "DIP Facility") provided to the Borrower, in its capacity as a debtor and debtor-in-possession in a case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") jointly administered with the cases (collectively, the "Cases") of ACIH, Inc., Atrium Corporation, their Canadian subsidiary and certain of their domestic subsidiaries under chapter 11 of the Bankruptcy Code in such Court (collectively, the "Debtors").

1

**SENIOR SECURED**
**CREDIT FACILITIES:**   A revolving credit facility of $60,000,000 (the "Commitment," "Revolving Credit Facility" or "Senior Secured Credit Facilities"), which will include a letter of credit subfacility for $15,000,000 to be provided by GE Capital (the "LC Subfacility").

**REVOLVING CREDIT**
**AVAILABILITY:**   Availability under the Revolving Credit Facility would be limited to a borrowing base which, based upon GE Capital's due diligence to date, is expected to be the lesser of (A) the aggregate of (a) up to 85% of net amount of eligible accounts receivable (which shall include account debtors in both the U.S. and Canada), plus (b) the lesser of (i) up to 60% of Credit Parties' (as hereinafter defined) net amount of eligible raw materials valued at the lower of cost or market, or (ii) up to 85% of the NOLV Factor of eligible raw materials, plus (c) the lesser of (i) up to 60% of Credit Parties' net amount of eligible finished goods inventory valued at the lower of cost or market, or (ii) up to 85% of the NOLV Factor of eligible finished goods inventory, plus (d) the lesser of (i) up to 60% of Credit Parties' net amount of eligible work-in-process valued at the lower of cost or market, or (ii) up to 85% of the NOLV Factor of eligible work-in-process, minus (e) $6,000,000 (the "Borrowing Base"), or (B) $60,000,000. The NOLV Factor is the net orderly liquidation value of raw materials, finished goods inventory or work-in-process, as applicable, expressed as a percentage of net book value (lower of cost or market), as periodically updated by appraisals. Agent will retain the right from time to time to establish or modify reserves against availability, advance rates, and standards of eligibility, in each case in its reasonable credit judgment.

The LC Subfacility would provide for the issuance of letters of credit for the account of Borrower or its subsidiaries. GE Capital, as the L/C Issuer, may elect only to issue letters of credit in its own name or in the name of one of its affiliates. All letters of credit outstanding under the Pre-Petition Secured Facility and the DIP Facility shall be deemed to have been issued under the Revolving Credit Facility. Outstanding letters of credit will be reserved from availability under the Revolving Credit Facility.

Availability, as used herein, means the lesser of (x) the Commitment or (y) the Borrowing Base, less (z), in each case, reserves, if any, the outstanding principal balance of the Revolving Credit Facility and the stated amount of all letters of credit.

**USE OF PROCEEDS:**   To provide for working capital and for general corporate purposes (including to finance permitted acquisitions), and (together with cash on Borrower's balance sheet) to fund certain costs, fees and expenses associated with the Plan (as hereinafter defined) and with the closing of the Credit Facilities (as defined in the Commitment Letter). Any

2

advances for acquisitions would also be conditioned upon satisfaction of all of the conditions for acquisitions set forth in the Senior Secured Credit Facilities Documentation (as hereinafter defined).

TERM:

The lesser of (a) 4 years and (b) six months less than the tenor of the Secured Notes or the shorter tenor of the Term Loan and Mezzanine Notes, as applicable.

INTEREST RATES;
APPLICABLE MARGIN

The outstanding principal balance under the Revolving Credit Facility shall bear interest, at Borrower's option, at a fluctuating rate equal to (a) the Base Rate plus two and one-quarter percent (2.25%) per annum, or (b) LIBOR plus three and one-quarter percent (3.25%) per annum.

The Base Rate will be a floating rate defined as the highest of (a) the rate last quoted by The Wall Street Journal (or another national publication selected by the Agent) as the U.S. "Prime Rate," (b) the Federal Funds Rate plus 50 basis points, and (c) the sum of three-month LIBOR plus the excess of the LIBOR applicable margin over the Base Rate applicable margin.

LIBOR will be defined as, for each Interest Period, the greater of (a) the offered rate per annum for deposits of Dollars for the applicable Interest Period (as defined below) that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in each Interest Period and (b) the offered rate per annum for deposits of Dollars for an Interest Period of three (3) months that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day of the applicable Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by at least two major financial institutions reasonably satisfactory to Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

Interest Period means, with respect to any LIBOR Rate loan, the period commencing on the Business Day the Loan is disbursed, converted or continued as a LIBOR Rate loan and ending on the date one, two, three or six months (or, if available to all Lenders, nine or twelve months) thereafter, as selected by the Borrower in its notice of borrowing, conversion or continuation. No more than seven (7) Interest Periods shall be in effect at any time.

3

No loan may be converted into, or continued as, a LIBOR Rate loan at any time when an event of default shall have occurred and be continuing.

Interest on Base Rate loans will be payable monthly in arrears on the first day of each month. Interest on LIBOR Rate loans will be payable at the end of each Interest Period and, in addition, at the end of three months in the case of an Interest Period greater than three months. All interest on LIBOR Rate loans and all fees on Letters of Credit will be calculated using a 360 day year and actual days elapsed. All interest on Base Rate loans will be calculated using a 365/366 day year and actual days elapsed.

At the election of the Agent or Requisite Lenders, upon the occurrence and during the continuance of an event of default (or automatically upon the occurrence of a bankruptcy or payment event of default), the obligations shall bear interest at a default rate of interest equal to an additional two percent (2%) per annum over the rate otherwise applicable and such interest will be payable on demand.

SECURITY:

The Agent, for the benefit of itself and the Lenders, shall receive a first priority perfected security interest in all accounts, supporting obligations and other rights to payment, inventory, all documents, instruments and general intangibles (excluding intellectual property, provided that Agent (and its agents, representative and designees) shall receive a nonexclusive, royalty free, worldwide license or sublicense (subject to the terms of the underlying license) to use all of the Fixed Asset Collateral (as hereinafter defined) constituting intellectual property in connection with its exercise of its rights and remedies, including without limitation to collect all accounts or amounts owing under instruments or chattel paper and to complete the manufacture, packaging and sale of inventory) relating to such accounts and inventory, deposit accounts, cash and cash equivalents and all products and proceeds of the foregoing, in each case, of Borrower and the Guarantors, whether owned on the closing date or thereafter acquired (collectively, the "ABL Collateral").

To the extent that no adverse tax impact could reasonably be expected to result (an "Adverse Tax Impact"), all direct or indirect foreign (non-U.S. organized) subsidiaries of Holdings will grant liens and security interests on their assets to secure guaranties required to be provided by such subsidiaries as provided herein. If an Adverse Tax Impact exists with respect to a subsidiary, then with respect to such subsidiary no asset pledge shall be required, and such subsidiary shall not be included within the term "Guarantors" or "Credit Parties" as used in this Senior Secured Revolving Term Sheet. Notwithstanding the foregoing sentence, if (i) Borrower has elected prior to the closing date to include North Star Manufacturing (London) Ltd. ("North Star") as a Guarantor, (ii) a field examination and inventory appraisal with respect to North Star have been

4

completed, and (iii) all actions necessary to perfect the Agent's security interest in the ABL Collateral of North Star have been completed, the accounts receivable and inventory of North Star will be eligible for inclusion in the Borrowing Base, subject to all other eligibility criteria. Absent such election, loans and investments by Credit Parties to North Star shall be subject to reasonable limitations imposed by Agent.

The agent, trustee or other authorized representative of the holders of the indebtedness under the Secured Notes (the "Secured Note Agent") or the agent, trustee or other authorized representative of the holders of the indebtedness under the Term Loan (the "Term Loan Agent"), as applicable, shall receive a first priority perfected security interest in all assets of Borrower and the Guarantors other than the ABL Collateral, whether owned on the closing date or thereafter acquired (collectively, the "Fixed Asset Collateral"). The Secured Note Agent or Term Loan Agent, as applicable, shall have entered into an access and use agreement (the "Access and Use Agreement") in form and substance reasonably satisfactory to the Agent and the Secured Note Agent or Term Loan Agent, as applicable, which will include access and usage rights for Agent (and its agents, representatives and designees) with respect to the Fixed Asset Collateral for a sufficient period of time to enable Agent to complete the manufacturing and sales of inventory. The Mezzanine Notes will be unsecured, and the agent, trustee or other authorized representative of the holders of the indebtedness under the Mezzanine Notes will enter into a subordination agreement with Agent containing payment and subordination terms acceptable to Agent (the "Subordination Agreement").

The Collateral will be free and clear of other liens, claims, and encumbrances, except the liens securing the Secured Notes or the Term Loan, as applicable, and other permitted liens and encumbrances acceptable to the Agent (to be set forth in the Senior Secured Credit Facilities Documentation).

Agent's liens and security interests shall be evidenced by documentation reasonably satisfactory to Agent, including search results, collateral releases from prior lenders, landlord, mortgagee and bailee waivers, and in the case of real estate collateral, title insurance policies (supported by surveys) in amount, form and from an issuer reasonably satisfactory to the Secured Note Agent or Term Loan Agent, as applicable, and the Agent.

The Senior Secured Credit Facilities Documentation shall be separate and distinct from the documentation for the Secured Notes or the Term Loan and Mezzanine Notes, as applicable.

CH\1153978.12

GUARANTEES:

Obligations under the Senior Secured Credit Facilities will be guaranteed by North Star (if elected by Borrower as described under the heading "Security"), all domestic Subsidiaries of Borrower, by Holdings and by Parent (collectively, the "Guarantors", and together with Borrower, the "Credit Parties"). Holdings shall conduct no business other than ownership of the equity securities of Borrower, incidental and related activities and activities otherwise permitted by the Senior Secured Credit Facilities Documentation and incur no indebtedness except as permitted in the Senior Secured Credit Facilities Documentation. Parent shall conduct no business other than ownership of the equity securities of Holdings, incidental and related activities and activities otherwise permitted by the Senior Secured Credit Facilities Documentation and incur no indebtedness except as permitted in the Senior Secured Credit Facilities Documentation.

CASH MANAGEMENT:

Cash management system reasonably acceptable to Agent. Agent will require springing blocked account agreements for all deposit accounts of the Credit Parties (other than payroll, trust, tax or petty cash accounts) at closing. Agent may exercise full cash dominion if Availability is less than $6,000,000.

VOLUNTARY PREPAYMENTS:

The Borrower may voluntarily prepay any loans outstanding under the Senior Secured Credit Facilities, in each case, subject to concurrent payments of any applicable LIBOR breakage costs but otherwise without premium or penalty. Prepayment of such loans shall be applied as directed by Borrower.

FEES:

The fees payable to Agent as specified in the fee letter between Borrower and Agent dated on or about the date hereof (the "Fee Letter").

An unused commitment fee (the "Commitment Fee") in an amount equal to (a) three-quarters of one percent (0.75%), if the utilization of the Revolving Credit Facility is less than $30,000,000 and (b) one-half of one percent (0.50%), if the utilization of the Revolving Credit Facility is at least $30,000,000, in either case per annum on the average unused daily balance of the Revolving Credit Facility (less any outstanding letters of credit) such fee to be paid monthly to the Agent for the account of each of the Lenders under the Revolving Credit Facility on the first day of each calendar month.

Letter of credit fees for all letters of credit under the Senior Secured Credit Facilities in an amount equal to the LIBOR margin on Revolving Loans on the outstanding face amount of all letters of credit such fee to be paid monthly to the Agent for the account of the respective Lenders on the first day of each calendar month.

6

Normal and customary letter of credit fees to each L/C Issuer upon the issuance, amendment or extension of letters of credit at the prevailing rate. Such fees will be due and payable to the Agent for the account of the issuing bank or issuing banks, as the case may be, in respect of such letters of credit.

All fees will be calculated using a 360-day year and actual days elapsed.

LIBOR BREAKAGE:

Any payment (or conversion) of a LIBOR loan other than at the end of its Interest Period or at maturity, will be subject to customary breakage provisions.

DOCUMENTATION:

Subject, as applicable, to exceptions, materiality, qualifications and grace periods to be mutually agreed, the loan documents will contain affirmative covenants, negative covenants, indemnities, events of default and remedies, and representations and warranties. Agent may exercise springing cash dominion if Availability is less than $6,000,000 or if an event of default has occurred and is continuing. Management fees payable to Sponsors or its affiliates up to an amount to be determined per annum, exclusive of the transaction fee, if any, that is payable at closing, are permitted so long as no event of default is existing; provided, that once such event of default is cured or waived, the Borrower shall be permitted to pay any amount previously deferred. Sponsors shall be required to maintain voting control of the Borrower's board of directors or other similar governing body and shall be required to maintain ownership of not less than a specified amount of capital stock or other equity securities of the Borrower.

FINANCIAL
STATEMENTS
& OTHER REPORTS

Borrower shall deliver, at a minimum, the following statements and other reports:

- a borrowing base certificate on a monthly basis
- inventory summaries on a monthly basis
- accounts receivable agings on a monthly basis
- field audits, to be delivered on a bi-annual basis or three times annually if Availability falls below a to-be-determined level
- inventory appraisal, to be delivered on a bi-annual basis or three times annually if Availability falls below a to-be-determined level
- inventory, accounts receivable, and accounts payable reconciliations on a monthly basis
- unaudited monthly and audited year end financials

7

- annual projections

CONDITIONS TO CLOSING: The following conditions:

- The ownership, capital, corporate, tax, organizational and legal structure of Parent, if any, Holdings, if any, Borrower and its subsidiaries upon Closing shall be reasonably satisfactory to Agent.

- After giving effect to the funding at close (including the deemed issuance of the letters of credit outstanding under the Pre-Petition Secured Facility and the DIP Facility) and payment of all reasonable invoiced costs and out-of-pocket expenses related to the closing of the Senior Secured Credit Facilities, Borrower is required to have minimum Availability of $7,500,000.

- Sponsors, current investors, and others shall have invested a minimum of $150,000,000 of cash equity into the capital stock or other equity securities of Parent on terms and conditions reasonably acceptable to Agent.

- Borrower shall have received cash proceeds from the Secured Notes or the Term Loan and Mezzanine Notes (in each case, as defined in the commitment letter to which this Senior Secured Revolving Term Sheet is attached) pursuant to documentation in form and substance reasonably acceptable to Agent, together with cash on hand, cash proceeds from equity investments and borrowings under the Revolving Credit Facility, in a minimum amount sufficient to pay the Debtors' claimants the amounts contemplated under the Plan.

- Receipt by Agent of reasonably acceptable inventory appraisals prepared by an appraiser retained by Agent, which Agent shall undertake to obtain promptly.

- Receipt by Agent of a completed field examination conducted by Agent or its representatives of the ABL Collateral to be included in the Borrowing Base, which Agent shall undertake to obtain promptly.

- Borrower's existing accounts receivable securitization facility shall have been terminated and all liens securing obligations thereunder shall have been released.

- Agent shall have also received a reasonably satisfactory proforma closing balance sheet, adjusted to give effect to the transaction contemplated hereby.

8

- Receipt and review by Agent of available unaudited financial statements for the most recent monthly period prior to closing.

- There shall not have occurred any change, event, occurrence or state of facts since December 31, 2009 (other than those resulting from the commencement of the Cases) that has resulted or would reasonably be expected to result in a material adverse effect on the business, results of operations, financial condition, assets or liabilities of Parent and its subsidiaries, taken as a whole, (ii) a material adverse effect on the ability of Parent to perform any of its material obligations under the Equity Purchase Agreement (as defined below) or the Plan, or (iii) a material adverse effect on the legality, binding effect or enforceability of any material provision of the Equity Purchase Agreement or any of the material rights and remedies of the Sponsors under the Equity Purchase Agreement or thereunder, excluding solely in the case of clause (i) any such change, event, occurrence or state of facts resulting from (a) changes in generally accepted accounting principles or changes in the regulatory accounting requirements applicable to any industry in which Parent or any of its subsidiaries operates which occur or become effective after the date hereof, (b) changes in the financial or securities markets in the United States, (c) changes in the general economic or political conditions in the United States that do not have a materially disproportionate effect on Parent and its subsidiaries, taken as a whole, (d) changes (including changes of applicable law) or conditions generally affecting the industry in which Parent or any of its subsidiaries operates and not specifically relating to or having a materially disproportionate effect on Parent and its subsidiaries, taken as a whole, (e) acts of war, sabotage or terrorism or natural disasters involving the United States of America that do not have a materially disproportionate effect on Parent and its subsidiaries, taken as a whole, (f) the announcement or consummation of the transactions contemplated by the Equity Purchase Agreement (including any impact on customers or employees), (g) any failure, in and of itself, by Parent or any of its subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (it being understood that the cause for such failure may be taken into account in determining whether there has been a Material Adverse Effect, except to the extent the change, event, occurrence or state of facts causing such failure is otherwise described in any of clauses (a) through (i) of this definition), (h) any action taken (or omitted to be taken) as required by the Equity Purchase Agreement or at the request of the Sponsors, or (i) any action taken by Parent or any of its subsidiaries pursuant to any order of the Court entered prior to the date of the Equity Purchase Agreement.

9

- The preparation, execution and delivery of a senior secured credit agreement, the Access and Use Agreement, the Subordination Agreement, if applicable, and other documents executed in connection therewith (collectively, the "Senior Secured Credit Facilities Documentation") mutually acceptable to the Borrower and Agent.

- Both before and after giving effect to the closing, the absence of any Default or Event of Default under the Senior Secured Credit Facilities Documentation and the Secured Notes or the Term Loan and Mezzanine Notes, as applicable; and accuracy of representations and warranties in all material respects.

- There being no order or injunction or pending litigation in which there is a reasonable possibility of a decision which would have a material adverse effect on Parent, Holdings, the Borrower or any of its subsidiaries and no pending litigation seeking to enjoin or prevent the transactions contemplated hereby.

- The Acquisition shall have been consummated in material compliance with (a) applicable law, and (b) the terms and provisions of acquisition documents (the principal acquisition agreement is referred to herein as the "Equity Purchase Agreement") reasonably acceptable to Agent without waiver of any material term or condition thereof which has not been consented to by Agent.

- Agent's receipt of satisfactory corporate approval of the proposed transactions as well as opinions of counsel reasonably satisfactory to Agent. All governmental, regulatory and other third-party approvals and consents required by Agent with respect to the proposed transactions shall have been obtained and shall be final and non-appealable.

- The Debtors' Joint Plan of Reorganization ("Plan") and related disclosure statement and other solicitation materials, the Confirmation Order (as defined below) shall be on terms and conditions reasonably satisfactory to Agent (it being understood that the version of the Plan and related disclosure statement and other solicitation materials, if any, filed by the Debtors with the Court on January 20, 2010 are reasonably satisfactory to it) and no amendment, modification, supplement or waiver shall have been made to any or all of the Plan, the related disclosure statement and other solicitation materials, the Confirmation Order, in each case, without the prior written consent of Agent (not to be unreasonably withheld, delayed or conditioned), that, in the reasonable judgment of Agent, is materially adverse to the rights or interests of any or all of the Agent, the Lead Arranger and the Lenders, (ii) the Court shall

10

have entered an order, in form and substance reasonably satisfactory to the Agent (the "Confirmation Order"), confirming the Plan and approving the Plan-related solicitation procedures, and such order shall have become final and non-appealable, (iii) the Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior consent of Agent (not to be unreasonably withheld or delayed) if Agent determines such waiver is adverse to the Lenders), and (iv) the transactions contemplated by the Plan to occur on the effective date of the Plan shall have been consummated on the closing date and prior to or substantially contemporaneously with the initial funding of the Credit Facility.

- Such other normal and customary closing documents and customary closing deliveries deemed necessary or desirable by Agent and consistent with asset-based revolving credit facilities (which closing documents and closing deliveries shall not include due diligence materials).

ASSIGNMENTS AND PARTICIPATIONS:

Lenders will be permitted to make assignments in a minimum amount of $5 million (unless such assignment is of a Lender's entire interest in the Senior Secured Credit Facilities) to other financial institutions acceptable to Agent and, so long as no event of default has occurred and is continuing, Borrower, which acceptances shall not be unreasonably withheld or delayed; provided, however, that the approval of the Borrower shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders). All assignments of a Lender's interest in the Senior Secured Credit Facilities will be made via an electronic settlement system designated by Agent. As to assignments requiring Agent's consent (not to be unreasonably withheld or delayed), the withholding of such consent for assignments to Borrower, its affiliates or a holder of subordinated debt issued by Borrower or its affiliates shall not be deemed to be unreasonable. Assignee lenders shall have no greater rights to compensation than the assignor lenders.

REQUISITE LENDERS:

Lenders holding greater than 50% of the loan exposure (including unfunded commitments under the Revolving Credit Facility) under the Senior Secured Credit Facilities.

Certain amendments and waivers may require class votes or the consent of all Lenders, as appropriate.

GOVERNING LAW:

New York.

11

UBS LOAN FINANCE LLC
677 Washington Boulevard
Stamford, Connecticut 06901

UBS SECURITIES LLC
299 Park Avenue
New York, New York 10171

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Ave., Floor 36
New York, NY 10022

Bank Facility Commitment Letter

Ladies and Gentlemen:

You have advised UBS Loan Finance LLC ("UBS") and UBS Securities LLC ("UBSS" and, together with UBS, the "Commitment Parties", "we" or "us") that Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings" or "you") formed by affiliates of Kenner & Company, Inc. ("Kenner") and Golden Gate Capital ("GGC", together with Kenner, the "Sponsors"), proposes to acquire (the "Acquisition") substantially all the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business"). The Acquisition will be effected pursuant to a purchase agreement (the "Acquisition Agreement") between Holdings and Target. Upon consummation of the Acquisition, Atrium Companies, Inc., a Delaware corporation (the "Borrower") will be an indirect subsidiary of Holdings. You have also informed us that Target and certain of Target's other domestic subsidiaries, including Borrower, (the "Subsidiary Debtors" and, together with Target and Borrower, the "Debtors") are currently debtors-in-possession in a bankruptcy case (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Bankruptcy Cases have been consolidated for joint administration of the Debtors under Case No. 10-10150. You have further informed us that you, through the equity financing described below, intend to make a New Money Investment pursuant to, and as defined in, that certain Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010, (such plan, to the extent based on the New Money Alternative and the New Money Investment provided by you through the Equity Financing, together with all exhibits, schedules, annexes, supplements, annexes, supplements and modifications thereto that were filed on January 20, 2010 or filed thereafter and are in form and substance reasonably acceptable to the Lead Arranger (as defined below), (the "Plan")) and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes, supplements, amendments and modifications thereto that were filed on January 20, 2010, provided to us on or prior to the date hereof or that are filed thereafter and are in form and substance reasonably acceptable to the Lead Arranger (as defined below), the "Disclosure Statement"). All references to "dollars" or "$" in this agreement and the annexes and any other attachments hereto (collectively, this "Commitment Letter") are references to United States dollars.

We understand that, in connection with (i) the Acquisition; (ii) the repayment of the Debtors' creditors pursuant to the Plan (the "Creditor Repayment"); (iii) the repayment of certain existing indebtedness of the Debtors and the Acquired Business, including the Debtors' existing debtor-in-possession facility and existing securitization facility, pursuant to the Plan (the "Refinancing"); and (iv) the payment of fees, commissions and expenses in connection with the foregoing, and subject to the confirmation and effectiveness of the Plan pursuant to the Confirmation Order (as defined in Annex II hereto)

(the date of effectiveness of such Plan and the consummation of the Acquisition, the "<u>Effective Date</u>"), Borrower is seeking to obtain exit financing (funding under which will be made available to Borrower upon the Effective Date, the "<u>Exit Financing</u>") comprised of the following:

- a senior secured asset-based revolving credit facility to Borrower of up to $60.0 million (the "<u>ABL Facility</u>");

- a senior secured term loan facility to Borrower of $185.0 million (the "<u>Term Facility</u>"), as described in the Term Facility Summary of Principal Terms and Conditions attached hereto as <u>Annex I</u> (the "<u>Term Sheet</u>");

- the issuance by Borrower of $75.0 million aggregate gross proceeds of unsecured senior subordinated notes (the "<u>Notes</u>"), pursuant to a private placement to GGC or such other financing sources who are acceptable to GGC in its discretion (the "<u>Mezzanine Financing</u>"); and

- cash common equity investments in Holdings (to be reinvested by Holdings in Borrower) of not less than $169.2 million (as defined below) (the "<u>Equity Financing</u>") by the Sponsors and other co-investors reasonably acceptable to the Commitment Parties.

Immediately following the Transactions and the occurrence of the Effective Date of the Plan, and except as expressly provided by the Plan, none of Holdings, Target, Borrower nor any of their respective subsidiaries will have any indebtedness other than the ABL Facility, the Term Facility and the Mezzanine Financing. As used herein, the term "<u>Transactions</u>" means the Acquisition, the Exit Financing, the Creditor Repayment, the Refinancing, the entering into of this Commitment Letter, the entering into of the Fee Letter (as defined below), the entering into of the ABL Facility and the Term Facility and the initial borrowings thereunder and under the Mezzanine Financing, the Equity Financing and the payments of reasonable fees, commissions and out-of-pocket expenses in connection with each of the foregoing.

<u>Commitments</u>.

You have requested that UBS commit to provide the Term Facility and that UBSS agree to structure, arrange and syndicate the Term Facility.

UBS (in such capacity, the "<u>Initial Bank Lender</u>") is pleased to advise you of its commitment to provide the entire amount of the Term Facility to Borrower upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of the Initial Bank Lender and each other Bank Lender (as defined below) hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "<u>Bank Documentation</u>") with respect to the Term Facility reasonably satisfactory to the Initial Bank Lender, the other Lenders and you reflecting, among other things, the terms and conditions set forth in the Term Sheet, in <u>Annex II</u> hereto (the "<u>Conditions Annex</u>") and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Term Facility (the "<u>Fee Letter</u>"). You agree that the closing date of the Transactions and the concurrent closing and funding of the ABL Facility, and the Term Facility and Mezzanine Financing (the "<u>Closing Date</u>") shall be a date mutually agreed upon between you and us, but in any event shall not occur until all of the terms and conditions in this Commitment Letter (including the conditions to initial funding) have been satisfied or waived, and shall occur on the same date as the Effective Date of the Plan.

Syndication.

It is agreed that UBSS will act as the sole and exclusive advisor, arranger and bookmanager for the Term Facility, and, in consultation with you, will exclusively manage the syndication of the Term Facility, and will, in such capacities, exclusively perform the duties and exercise the authority customarily associated with such roles (in such capacity, the "Lead Arranger"). It is further agreed that no additional advisors, agents, co-agents, arrangers or managers will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Term Facility outside the terms contained in this Commitment Letter and the Fee Letter in order to obtain its commitment to participate in the Term Facility, in each case unless you and we so agree.

The Lead Arranger reserves the right, prior to or after execution of the Bank Documentation, in consultation with you, to syndicate all or a portion of the Initial Bank Lender's commitment to one or more institutions that will become parties to the Bank Documentation (the Initial Bank Lender and the institutions becoming parties to the Bank Documentation with respect to all or a portion of the Term Facility, the "Lenders"). Notwithstanding the Lead Arranger's right to syndicate the Term Facility and receive commitments with respect thereto, (i) the Initial Lender will not be relieved of all or any portion of its commitments hereunder prior to the initial funding under the Term Facility (unless in lieu thereof, the issuance of the Senior Notes is consummated on or prior to the closing date of the Transactions) and (ii) the Lead Arranger shall not syndicate to those financial institutions previously identified and agreed to by UBS and UBSS on or prior to the date hereof (such institutions, the "Disqualified Institutions"). Without limiting your obligations to assist with syndication efforts as set forth herein, the Initial Lender agrees that the completion of such syndication is not a condition to its commitments hereunder.

The Lead Arranger will exclusively manage all aspects of the syndication of the Term Facility in consultation with you, including selection of additional Lenders, determination of when the Lead Arranger will approach potential additional Lenders, awarding of any naming rights and the final allocations of the commitments in respect of the Term Facility among the additional Lenders. Until the consummation of a Successful Syndication (as defined in the Fee Letter), you agree to, and to cause the Sponsors, Borrower and the Acquired Business to, actively assist the Lead Arranger in achieving a timely syndication of the Term Facility that is reasonably satisfactory to the Lead Arranger and the Lenders participating in the Term Facility. To assist the Lead Arranger in its syndication efforts, you agree that you will, and will cause the Sponsors, Borrower and the Acquired Business and their and your respective representatives and advisors to (a) promptly prepare and provide all customary financial and other customary information as we may reasonably request with respect to Holdings, the Acquired Business and their respective subsidiaries and the Transactions, including but not limited to financial projections (the "Projections") relating to the foregoing, (b) ensure that such syndication efforts benefit materially from existing lending relationships of Holdings, the Acquired Business, the Sponsors and their respective subsidiaries, (c) make available to prospective Lenders senior management and advisors of each Sponsor, Holdings, Borrower, the Acquired Business and their respective subsidiaries at reasonable times and with reasonable prior notice, (d) host, with the Lead Arranger, one or more meetings with prospective Lenders under the Term Facility (at mutually convenient locations and times), (e) assist the Lead Arranger in the preparation of one or more confidential information memoranda reasonably satisfactory to the Lead Arranger and other customary marketing materials to be used in connection with the syndication of the Term Facility and (f) obtain, at your expense, monitored public corporate credit/family ratings of Borrower and ratings of the Term Facility from Moody's Investors Service ("Moody's") and Standard & Poor's Ratings Group ("S&P") (the "Ratings") and to participate actively in the process of securing such ratings, including having senior management of Holdings, the Acquired Business and Borrower meet with such rating agencies.

At our reasonable request, you agree to prepare or cause to be prepared a version of the information package and presentation and other customary marketing materials to be used in connection with the syndication that do not contain material non-public information concerning Holdings, Borrower, the Acquired Business, their respective affiliates or their securities to syndicate to prospective Lenders who do not wish to receive material non-public information (within the meaning of the federal and state securities laws). In addition, you agree that unless specifically labeled "Private — Contains Non-Public Information," no information, documentation or other data disseminated to prospective Lenders in connection with the syndication of the Term Facility, whether through an Internet website (including, without limitation, an IntraLinks workspace), electronically, in presentations at meetings or otherwise, will contain any material non-public information concerning Holdings, Borrower, the Acquired Business, their respective affiliates or their securities.

Information.

You hereby represent and warrant that (a) all information (other than the Projections, estimates, budgets, forward looking statements or general market or industry data) that has been or will be made available to us or any of the Lenders by or on behalf of you, the Borrower or the Acquired Business or any of your or their respective representatives in connection with the Transactions (the "Information"), when furnished or supplemented, taken as a whole, is and will be (such representation and covenant as related to Information about the Acquired Business shall be made to the best of Holdings' knowledge) complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not materially misleading and (b) the Projections that have been or will be made available to us or any of the Lenders by or on behalf of you or any of your representatives in connection with the Transactions have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made and at the time furnished or supplemented (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved and any variances may be material). You agree that if at any time prior to the later of (x) Closing Date or (y) the termination of the syndication of the Term Facility, as determined by the Lead Arranger, any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct at such time. You also agree to promptly advise us and the Lenders of all developments materially affecting any Sponsor, Holdings, Borrower, the Acquired Business, their respective subsidiaries or affiliates or the Transactions. In issuing the commitments hereunder and in arranging and syndicating the Term Facility, we are and will be using and relying on the Information without independent verification thereof.

Compensation.

As consideration for the commitments of the Lenders hereunder with respect to the Term Facility and the agreement of the Lead Arranger to structure, arrange and syndicate the Term Facility and to provide advisory services in connection therewith, you agree to pay, or cause to be paid, the fees set forth in the Term Sheet and the Fee Letter. Once paid, such fees shall not be refundable under any circumstances.

<u>Conditions</u>.

The commitment of the Initial Lender hereunder with respect to each of the Term Facility and the Lead Arranger's agreement to perform the services described herein may be terminated by the Lead Arranger if (i) by April 5, 2010 (the "<u>Approval Date</u>") an order of the Bankruptcy Court (the "<u>Plan Investor Termination Fee Order</u>") has not been entered, in form and substance reasonably satisfactory to the Initial Lender and Lead Arranger, approving the the Acquisition Agreement and the payment of the Termination Fee (as defined in the Acquisition Agreement) in accordance with the terms set forth therein; (ii) the Plan Investor Termination Fee Order has not been entered on or prior to the Approval Date, and such Plan Investor Termination Fee Order shall have remained in full force and effect and has not been vacated, stayed, reversed or modified or amended in any manner which the Lead Arranger determines in good faith to be adverse to the rights or interests of the Lead Arranger or the Lenders (except to the extent the Lead Arranger shall have consented in writing thereto); (iii) at any time prior to the date on which the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders have approved the Plan by the number of votes required by Section 1126 of the Bankruptcy Code, the Lock-Up Agreement (as defined in the Plan) has been terminated or otherwise fails to remain in full force and effect; (iv) any event, effect or change from and after December 31, 2009, shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect; "<u>Material Adverse Effect</u>" shall mean (i) any change, event, occurrence or state of facts that has resulted or would reasonably be expected to result in a material adverse effect on the business, results of operations, financial condition, assets or liabilities of the Acquired Business, taken as a whole, (ii) a material adverse effect on the ability of the Target to perform any of its material obligations under this Agreement or the Plan, or (iii) a material adverse effect on the legality, binding effect or enforceability of any material provision of the Acquisition Agreement or any of the material rights and remedies of Holdings thereunder, excluding solely in the case of clause (i) any such change, event, occurrence or state of facts resulting from (a) changes in generally accepted accounting principles or changes in the regulatory accounting requirements applicable to any industry in which the Target or any of its subsidiaries operates which occur or become effective after the date hereof, (b) changes in the financial or securities markets in the United States, (c) changes in the general economic or political conditions in the United States that do not have a materially disproportionate effect on the Acquired Business, taken as a whole, (d) changes (including changes of applicable law) or conditions generally affecting the industry in which the Target or any of its subsidiaries operates and not specifically relating to or having a materially disproportionate effect on the Acquired Business, taken as a whole, (e) acts of war, sabotage or terrorism or natural disasters involving the United States of America that do not have a materially disproportionate effect on the Acquired Business, taken as a whole, (f) the announcement or consummation of the transactions contemplated by the Acquisition Agreement (including any impact on customers or employees), (g) any failure, in and of itself, by the Target or any of its subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (it being understood that the cause for such failure may be taken into account in determining whether there has been a Material Adverse Effect, except to the extent the change, event, occurrence or state of facts causing such failure is otherwise described in any of clause (a) through (i) of this definition), (h) any action taken (or omitted to be taken) as required by the Acquisition Agreement, or (i) any action taken by Target or any of its subsidiaries pursuant to any order of the Bankruptcy Court entered prior to the date hereof; or (v) (a) any condition set forth in either Term Sheet or the Conditions Annex is not satisfied or (b) any covenant or agreement set forth in this Commitment Letter or the Fee Letter other than those described in the foregoing clause (a) is not materially complied with in the good faith judgment of the Lead Arranger

<u>Clear Market</u>.

From the date of this Commitment Letter until the earlier of (x) consummation of a Successful Syndication of the Term Facility, and (y) 60 days after the Closing Date, you will ensure that no financing (other than the ABL Facility, the Mezzanine Financing and an issuance of securities in the high yield bond market ("<u>High Yield Bonds</u>") in connection with the Transactions) for Holdings, Borrower, the Acquired Business or any of your or their respective subsidiaries or affiliates (excluding portfolio companies of the Sponsors other than Holdings, Borrower and the Acquired Business) is announced, syndicated or placed without the prior written consent of the Lead Arranger if such financing, syndication or placement would have, in the judgment of the Lead Arranger, a detrimental effect upon the primary syndication of the Term Facility.

<u>Indemnity and Expenses</u>.

By your acceptance below, you hereby agree to indemnify and hold harmless the Commitment Parties and the other Lenders and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of or in connection with this Commitment Letter, the Fee Letter, the Term Facility or any of the Transactions or the providing or syndication of the Term Facility (or the actual or proposed use of the proceeds thereof), and to reimburse each Indemnified Person promptly upon its written demand in reasonable detail with supporting documentation for any reasonable legal (but not more than one counsel for all Indemnified Persons unless there is an actual or potential conflict of interest) or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding; *provided* that any such obligation to indemnify, hold harmless and reimburse an Indemnified Person shall not be applicable (i) to the extent determined by a final non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the gross negligence, bad faith or willful misconduct of such Indemnified Person, (ii) to a material breach in bad faith of the obligation of such Indemnified Person to fund on the Closing Date or (iii) to any dispute solely among indemnified parties (other than any disputes involving the Administrative Agent or Collateral Agent in their respective capacities as such). In the case of an investigation, action or proceeding to which the indemnity in this paragraph applies, such indemnity and reimbursement obligations shall be effective whether or not such investigation, action or proceeding is brought by you, any Debtor, your equity holders or creditors or an Indemnified Person, whether or not an Indemnified Person is otherwise a party thereto and whether or not any aspect of the Commitment Letter, the Fee Letter, the Term Facility or any of the Transactions is consummated. You and we also agree that no Indemnified Person nor you or your affiliates nor Sponsors or their affiliates shall have any liability (whether direct or indirect, in contract, tort, equity or otherwise) to you or your or us or our subsidiaries or affiliates or to your or their or us or our respective equity holders or creditors arising out of, related to or in connection with any aspect of the Commitment Letter, the Fee Letter, the Term Facility or any of the Transactions, except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence, bad faith or willful misconduct. It is further agreed that the Commitment Parties shall have liability only to you (as opposed to any other person), and that the Initial Lender shall be liable solely in respect of its own commitment to the Term Facility on a several, and not joint, basis with any other Lender. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for

direct or actual damages resulting solely from the gross negligence, bad faith or willful misconduct of its obligations hereunder of such Indemnified Person as determined by a final and non-appealable judgment of a court of competent jurisdiction. You shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of such Indemnified Person. In addition, you hereby agree to reimburse us on the earlier of (x) the Closing Date or (y) the date of issuance of any High Yield Bonds, in each case after demand, together with reasonable supporting documentation, for all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses of one counsel for all of the Commitment Parties and to the extent reasonably necessary, additional local or special counsel, appraisal and audit expenses, and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the syndication and execution of the Term Facility, and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Fee Letter, the Bank Documentation and the administration, amendment, modification or waiver thereof (or any proposed amendment, modification or waiver).

Confidentiality.

This Commitment Letter is delivered to you upon the condition that neither the existence of this Commitment Letter and the Fee Letter nor any of their contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that (i) such existence and contents may be disclosed (A) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (B) to the Acquired Business, the Sponsors, your and their potential and actual co-investors to the extent previously identified to the Lead Arranger, and to their or your directors, affiliates, partners, members, stockholders, officers, employees, legal counsel, accountants and other advisors, in each case on a confidential and "need-to-know" basis and only in connection with the Transactions, (ii) (A) this Commitment Letter may be disclosed to the Office of the U.S. Trustee, to the official committee of unsecured creditors serving in the Debtor's bankruptcy cases (the "Creditors Committee"), to the Senior Secured Agent (as defined in the Plan) and the Ad Hoc Group of Senior Secured Lenders (as defined in the Plan), and to their respective representatives and professional advisors on a confidential and "need to know" basis, (B) upon granting of a motion to file the Fee Letter under seal, unredacted copies of the Fee Letter may be filed under seal with the Bankruptcy Court, and disclosed to the Office of the U.S. Trustee and to the respective professional advisors of the Creditors' Committee, the Senior Secured Agent and the Ad Hoc Group of Senior Secured Lenders (but not the members of the Creditors' Committee, the Senior Secured Agent or the lenders who are part of the Ad Hoc Group of Senior Secured Lenders) and such other persons or entities as determined by Lead Arranger in its sole discretion, in each case, on a confidential and "need to know" basis and (C) this Commitment Letter may be disclosed, after the execution and delivery thereof by you and the Lead Arranger, to the extent required in motions, in form and substance satisfactory to the Lead Arranger in its discretion, to be filed with the Bankruptcy Court solely in connection with obtaining and the entry of the Plan Investor Termination Fee Order and (iii) the information contained in Annex I to Moody's and S&P; *provided* that such information is supplied only on a confidential basis after consultation with the Lead Arranger.

Each Commitment Party agrees that it will treat as confidential all information provided to it hereunder by or on behalf of you, the Sponsor, Borrower, the Acquired Business or any of your or their respective subsidiaries or affiliates; *provided*, however, that nothing herein will prevent a Commitment Party from disclosing any such information (a) pursuant to the order of any court or administrative

agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such person agrees to inform you promptly thereof to the extent not prohibited by law), (b) upon the request or demand of any regulatory authority having jurisdiction over such person or any of its affiliates, (c) to the extent that such information is publicly available or becomes publicly available other than by reason of improper disclosure by such person, (d) to such person's affiliates and their respective officers, directors, partners, members, employees, legal counsel, independent auditors and other experts or agents who need to know such information and on a confidential basis, (e) to potential and prospective Lenders, participants and any direct or indirect contractual counterparties to any swap or derivative transaction relating to the borrower or its obligations under the Term Facility, in each case, who are advised of the confidential nature of such information, (f) received by such person on a non-confidential basis from a source (other than you, the Sponsor, Borrower, the Acquired Business or any of your or their affiliates, advisors, members, directors, employees, agents or other representatives) not known by such person to be prohibited from disclosing such information to such person by a legal, contractual or fiduciary obligation or (g) to the extent that such information was already in such Commitment Party's possession or is independently developed by such Commitment Party.

Other Services.

You acknowledge and agree that we and/or our affiliates may be requested to provide additional services with respect to either Sponsor, Holdings, Borrower, the Acquired Business and/or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit us or any of our affiliates to provide any services other than as set out herein.

Conflicts of Interest.

You acknowledge that (and waive any conflict of interest arising in connection with):

(a)    UBSS, UBS and/or their respective affiliates (the "UBS Group"), in its capacity as principal or agent is involved in a wide range of commercial banking and investment banking activities globally (including investment advisory; asset management; research; securities issuance, trading, and brokerage) from which conflicting interests or duties may arise and therefore, conflicts may arise between duties of UBSS or UBS hereunder and other duties or interests of UBSS, UBS or another member of the UBS Group;

(b)    UBSS, UBS and any other member of the UBS Group may, at any time, (i) provide services to any other person, (ii) engage in any transaction (on its own account or otherwise) with respect to you or any member of the same group as you or (iii) act in relation to any matter for any other person whose interests may be adverse to you or any member of your group (a "Third Party"), and may retain for its own benefit any related remuneration or profit, notwithstanding that a conflict of interest exists or may arise and/or any member of the UBS Group is in possession or has come or comes into possession (whether before, during or after the agreements hereunder) of information confidential to you; provided that such information shall not be shared with any Third Party. You accept that permanent or *ad hoc* arrangements/information barriers may be used between and within divisions of UBSS, UBS or other members of the UBS Group for this purpose and that locating directors, officers or employees in separate workplaces is not necessary for such purpose;

(c)      information which is held elsewhere within UBSS, UBS or the UBS Group but of which none of the individual directors, officers or employees having the conduct of transactions contemplated by this letter actually has knowledge (or can properly obtain knowledge without breach of internal procedures), shall not for any purpose be taken into account in determining UBSS's or UBS's responsibilities to you hereunder; and

(d)      neither UBSS or UBS nor any other member of the UBS Group shall have any duty to disclose to, or utilize for the benefit of, you, any non-public information acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

UBSS, UBS and the UBS Group operate rules, policies and procedures, including independence policies and permanent and *ad hoc* information barriers between and within divisions of UBSS, UBS and other members of the UBS Group, directed to ensuring that (i) the individual directors, officers and employees involved in an assignment undertaken by a member of the UBS Group (including the engagement hereunder) are not influenced by any such conflicting interest or duty and (ii) that any confidential information held by a member of the UBS Group is not disclosed or made available to any other client.

No Fiduciary Relationship.

You hereby acknowledge that we are acting solely as agent, lender, bookrunner or arranger, as applicable, in connection with the Term Facility.  You further acknowledge that we are acting pursuant to a contractual relationship created by this Commitment Letter that was entered into on an arm's length basis and in no event do the parties intend that any of us act or be responsible as a fiduciary to you or any of your subsidiaries, your stockholders or creditors (in each case, both pre-petition and post-petition) or any other person in connection with any activity that we may undertake or have undertaken in furtherance of the Term Facility, either before or after the date hereof.  We hereby expressly disclaim any fiduciary or similar obligations to any such person, either in connection with the Term Facility or this Commitment Letter or any matters leading up to either, and you hereby confirm your understanding and agreement to that effect.  Each of you and we agree that you and we are each responsible for making our own independent judgments with respect to the Term Facility, and that any opinions or views expressed by us to you regarding the Transactions, including but not limited to any opinions or views with respect to the price or market for your or your subsidiaries' debt, do not constitute advice or recommendations to you or any of your subsidiaries.  You, on behalf of yourself and your subsidiaries, hereby waive and release, to the fullest extent permitted by law, any claims that you or any of your subsidiaries may have against us with respect to any breach or alleged breach of any fiduciary or similar duty in connection with the Transactions or any matters leading up to the execution of this Commitment Letter or the Bank Documentation.

Governing Law, Etc.

This Commitment Letter and the commitment of the Lenders shall not be assignable by you without the prior written consent of us and the Lenders, and any purported assignment without such consent shall be void.  We reserve the right to employ the services of our affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to our affiliates certain fees payable to us in such manner as we and our affiliates may agree in our sole discretion.  Except as otherwise provided herein, you also agree that each Initial Lender may at any time and from time to time assign all or any portion of its respective commitments hereunder to one or more of its respective affiliates;

*provided*, that no Initial Lender shall be released from its obligation to fund on the Closing Date the portion of its commitment assigned to such affiliate. You further acknowledge that we may share with any of our affiliates, and such affiliates may share with us, any information related to Holdings, Borrower, the Acquired Business or any of their respective subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the Transactions; *provided*, that any such disclosure of such information shall be subject to the terms herein.

This Commitment Letter and the Fee Letter constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. No party has been authorized by any Commitment Party to make any oral or written statements or agreements that are inconsistent with this Commitment Letter and the Fee Letter. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each party hereto. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any Debtor or any other person other than the parties hereto, the Lenders and, with respect to the indemnification provided under the heading "Indemnity and Expenses," each Indemnified Person.

**This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby.** Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. Each party hereto hereby submits to the exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter, the Fee Letter or any of the matters contemplated hereby or thereby, and agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute. You irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Each of the parties hereto agrees that a final judgment in any such suit, action or proceeding may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law. You agree, on behalf of each Sponsor and their respective affiliates, that the foregoing provisions of this paragraph shall also apply to each Sponsor and their respective affiliates to the same extent as to you, and the extension of our commitments hereunder is being made in reliance on the foregoing.

Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), we and the other Lenders may be required to obtain, verify and record information that identifies each Sponsor, Holdings, Borrower and the Acquired Business which information includes the name, address and tax identification number and other information regarding them that will allow us or such Lender to identify them in accordance with

the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective as to us and the Lenders.

<u>General</u>.

Please indicate Holding's acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter prior to 9:00 p.m., New York City time, on March 12, 2010 (the "<u>Deadline</u>").  This Commitment Letter and the commitments of the Lenders hereunder and the agreement of the Lead Arranger to provide the services described herein are also conditioned upon Holdings' acceptance of this Commitment Letter and the Fee Letter and our receipt of executed counterparts hereof from Holdings on or prior to the Deadline.

Upon the earliest to occur of (A) March 18, 2010, unless on or before such date, the Bankruptcy Court enters an order approving the Disclosure Statement; (B) the Approval Date, unless the Plan Investor Termination Fee Order has been entered on or prior to such date and remains in full force and effect and has not been vacated, stayed, reversed, modified or amended in any manner which the Lead Arranger determines in good faith to be adverse to the rights or interests of any Commitment Party, the Lead Arranger or the Lenders; (C) April 30, 2010, unless the Confirmation Order (as defined in Annex II) has been entered on or prior to such date and remains in full force and effect and has not been vacated, stayed, reversed or modified or amended in any manner which the Lead Arranger determines in good faith to be adverse to the rights or interests of any Commitment Party, the Lead Arranger or the Lenders; (D) the effective date of the Plan; (E) the execution and delivery of the Bank Documentation by all of the parties thereto and the initial borrowings thereunder; and (F) June 1, 2010, the commitments of the Initial Lender hereunder and the agreement of the Lead Arranger to provide the services described herein shall automatically terminate unless the Initial Lender and the Lead Arranger shall, in their discretion, agree to an extension.  Holdings may terminate this Commitment Letter and all of the Initial Lender's commitments hereunder at any time upon 10 days prior written notice.  Holdings expressly acknowledges and agrees that the Alternate Transaction fee (as set forth in the Fee Letter), Expense Reimbursement (as set forth in the Fee Letter), expense reimbursement, confidentiality, indemnification and governing law and forum provisions in this Commitment Letter and the Fee Letter shall survive any termination of the commitments of the Initial Lender hereunder, and that good and valuable consideration has been given for Holdings continuing obligation to pay the Commitment Parties such amounts as and when provided for under the headings "Expense Reimbursement" and "Alternate Transaction" in the Fee Letter to the same extent as if the Commitment Letter, or the commitments of the Initial Lender hereunder, had not been terminated.  The provisions under the headings "Syndication" and "Clear Market" above shall survive the execution and delivery of the Bank Documentation.

[Signature Page Follows]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____James Boland_____
Name: James Boland
Title: MD

By: _____
Name:
Title: Warren Jervey
Executive Director and Counsel
Region Americas Legal

UBS SECURITIES LLC

By: _____James Boland_____
Name: James Boland
Title: MD

By: _____
Name:
Title: Warren Jervey
Executive Director and Counsel
Region Americas Legal

Accepted and agreed to as of
the date first written above:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
Name:
Title:

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Accepted and agreed to as of
the date first written above:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
    Name: THOMAS M. WOLF
    Title:

# TERM FACILITY

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| Borrower: | Atrium Companies, Inc. ("Borrower"), an indirect majority-owned subsidiary of Atrium Holdings, LLC ("Holdings"). |
| Sole Lead Arranger and Sole Bookrunner: | UBS Securities LLC ("UBSS" or the "Lead Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities (other than a Disqualified Institution), including UBS Loan Finance LLC ("UBS"), arranged by the Lead Arranger (collectively, as used in this Term Facility Term Sheet, the "Lenders"). |
| Administrative Agent and Collateral Agent: | UBS AG, Stamford Branch (the "Administrative Agent" and the "Collateral Agent"). |
| Type and Amount of Facility: | A senior secured term loan facility in an aggregate principal amount of $185.0 million (the "Term Facility"). |
| Purpose: | Proceeds of the Term Facility will be used to finance a portion of the Creditor Repayment and the Refinancing and to pay fees, commissions and expenses in connection therewith. |
| Maturity Date: | Five years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent set forth in the Commitment Letter and in Annex II to the Commitment Letter, a single drawing may be made on the Closing Date of the full amount of the Term Facility. |
| Amortization: | The Term Facility will amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Term Facility, with the balance payable on the maturity date. |
| Interest: | At Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below: |
| | A. Base Rate Option |

---

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Interest will be at the Base Rate plus the applicable Interest Margin, calculated on the basis of the actual number of days elapsed in a year of 365 days and payable quarterly in arrears. The Base Rate is defined, for any day, as a fluctuating rate per annum equal to the highest of (i) the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1%, (ii) the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch and (iii) LIBOR for an interest period of one-month beginning on such day plus 1%; *provided* that the Base Rate shall be deemed to be not less than 3.00% per annum.

Base Rate borrowings will be in minimum amounts to be agreed upon and will require one business day's prior notice.

B. LIBOR Option

Interest will be determined for periods to be selected by Borrower ("Interest Periods") of one, two, three or six months (or one or two weeks or nine or twelve months if available to all relevant Lenders) and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin; *provided* that (i) prior to the completion of syndication of the Term Facility (as determined by UBS and notified to Borrower), the interest period shall be one month and (ii) LIBOR shall be deemed to be not less than 2.00% per annum. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior written notice and will be in minimum amounts to be agreed upon.

Default Interest and Fees:

Upon the occurrence and during the continuance of an event of default or a payment default, interest will accrue (i) in the case of principal on any loan, at a rate of 2.0% per annum plus the rate otherwise applicable to the loans under the Term Facility and (ii) in the case of any other outstanding amount, at a rate of 2.0% per annum plus the non-default interest rate applicable to Base Rate loans, and will be payable on demand.

Interest Margins:

The applicable Interest Margin will be 3.50% for Base Rate loans and 4.50% for LIBOR Rate loans

| | |
|---|---|
| <u>Mandatory Prepayments</u>: | The Term Facility shall be prepaid in an amount equal to (a) 100% of the net cash proceeds received from the sale or other disposition of all or any part of the Term Facility Collateral after the Closing Date other than sales of inventory in the ordinary course of business and other than amounts reinvested in assets to be used or useful in Borrower's or Guarantors' business within 12 months of such disposition and subject to other exceptions to be mutually agreed, (b) 100% of the net cash proceeds received by Holdings or any of its subsidiaries from the issuance of debt after the Closing Date (other than permitted debt to be mutually agreed), (c) 100% of all casualty and condemnation proceeds received by Holdings or any of its subsidiaries, other than amounts reinvested in assets used or useful in Borrower's or the Guarantors' business within 12 months of such disposition and (e) 50% of excess cash flow of Borrower and its subsidiaries (to be defined in a manner to be agreed), subject to a stepdown based upon leverage ratio to be mutually agreed; provided that any voluntary prepayments of loans (including loans under the ABL Facility to the extent accompanied by permanent reductions of the commitments thereunder), other than prepayments funded with the proceeds of indebtedness, shall be credited against excess cash flow prepayment obligations on a dollar-for-dollar basis. |
| <u>Optional Prepayments</u>: | Permitted in whole or in part, with prior notice but without premium or penalty (except LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments to be agreed. |
| <u>Application of Prepayments</u>: | Prepayments of the Term Facility will be applied to scheduled amortization payments (i) in the case of optional prepayments, as directed by Borrower and (ii) in the case of mandatory prepayments, on a pro rata basis. |
| <u>Guarantees</u>: | The Term Facility will be fully and unconditionally guaranteed on a joint and several basis by Holdings and all of the existing and future direct and indirect subsidiaries of Holdings (other than Borrower) (collectively, the "<u>Guarantors</u>"), subject to exceptions for foreign subsidiaries to the extent such guarantees would be prohibited by applicable law or would result in materially adverse tax consequences; provided that in any event the Term Facility shall be fully and unconditionally guaranteed by any subsidiary who guarantees the ABL Facility. |
| <u>Security</u>: | The Term Facility and any hedging obligations to which a Lender or an affiliate of a Lender is a counterparty will be secured by a first-priority security interest in substantially all the present and after-acquired assets (other than the collateral securing the ABL Facility) of Holdings, Borrower and each subsidiary |

Guarantor (collectively the "<u>Term Facility Collateral</u>"), including but not limited to: (a) a perfected first-priority pledge of all the capital stock of Borrower and the capital stock of each subsidiary of Holdings (which pledge, in the case of any foreign subsidiary, shall be limited to 100% of the non-voting capital stock and 65% of the voting capital stock of foreign subsidiaries) and (b) perfected security interest in, and mortgages on, substantially all tangible and intangible assets of Borrower and each Guarantor (including but not limited to equipment, general intangibles, investment property, intellectual property, real property, intercompany notes, cash and proceeds of the foregoing wherever located, now or hereafter owned. All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, reasonably satisfactory to the Collateral Agent and Borrower, and none of the collateral shall be subject to any other pledges, security interests or mortgages, subject to exceptions to be mutually agreed upon.

Notwithstanding anything to the contrary, the Term Facility Collateral shall exclude (i) any fee owned real property with a value below an amount to be mutually agreed, (ii) motor vehicles and other assets subject to certificates of title, (iii) pledge and security interests prohibited by applicable law and contractual restrictions (provided that to the extent such law or contractual restriction no longer applies, such asset shall be included in the Term Facility Collateral) and (iv) those assets to the extent that Administrative Agent determines, in its reasonable discretion, that the burden or cost of obtaining such security interest outweighs the benefit to the Agents, hedge counterparties, cash management banks or the Lenders of the security interest afforded thereby.

<u>Conditions to Borrowing</u>:     Conditions precedent to borrowing under the Term Facility will be those set forth in the Commitment Letter and <u>Annex II</u> to the Commitment Letter, the absence of any continuing default or event of default, the accuracy of all representations and warranties, receipt of a customary borrowing notice, and there being no legal bar to the lenders making the loans.

<u>Representations and Warranties</u>:     Representations and warranties will apply to Holdings and its subsidiaries, will be subject to materiality levels and/or exceptions and/or qualifications to be negotiated and reflected in the Bank Documentation, and will include (without limitation):

Accuracy and completeness of financial statements (including pro forma financial statements); absence of undisclosed liabilities; no material adverse change (to be mutually defined); corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict

with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; Patriot Act and anti-terrorism law compliance; and creation, perfection and priority of security interests.

Affirmative Covenants:

Affirmative covenants will apply to Holdings and its subsidiaries, will be subject to thresholds and/or exceptions to be negotiated and reflected in the Bank Documentation and will include (without limitation):

Delivery of certified quarterly and audited annual financial statements, monthly management reports, reports to shareholders, notices of defaults, litigation and other material events, budgets and other information customarily supplied in a transaction of this type; payment of other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA) and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; agreement to hold annual meetings of Lenders; further assurances (including, without limitation, with respect to security interests in after-acquired property); commercially reasonable efforts to maintain public corporate credit/family ratings of Borrower and ratings of the Term Facility from Moody's and S&P (but not to maintain a specific rating); and unless otherwise agreed by the Lead Arranger, agreement to establish an interest rate protection program and/or have fixed rate financing on a percentage to be determined of the aggregate funded indebtedness of Borrower and its subsidiaries.

Negative Covenants:

Negative covenants will apply to Holdings and its subsidiaries, will be subject to thresholds and/or exceptions and/or materiality and/or qualifications to be negotiated and reflected in the Bank Documentation, and will include (without limitation):

1.  Limitation on dispositions of assets and changes of business and ownership.

2.  Limitation on mergers and acquisitions.

3.  Limitations on dividends, stock repurchases and redemptions and other restricted payments.

4.      Limitation on indebtedness (including guarantees and other contingent obligations and including the requirement to subordinate intercompany indebtedness on terms reasonably satisfactory to the Lead Arranger) and preferred stock and prepayment, amendment and redemption thereof.

5.      Limitation on loans and investments.

6.      Limitation on liens and further negative pledges.

7.      Limitation on transactions with affiliates.

8.      Limitation on sale and leaseback transactions.

9.      Limitation on capital expenditures.

10.     Maintenance of holding companies and/or any inactive subsidiaries as passive, non-operating enterprises.

11.     Limitation on restrictions affecting subsidiaries.

12.     No modification or waiver of material documents (including, without limitation, charter documents of Holdings and its subsidiaries or the Equity Financing) in any manner materially adverse to the Lenders without the consent of the Requisite Lenders.

13.     No change to fiscal year.

**Financial Covenants:**      Financial covenants will apply to Holdings and its consolidated subsidiaries and will be limited to:

1.      Minimum interest coverage ratio.

2.      Maximum leverage ratio.

**Events of Default:**      Events of default will be subject to materiality levels, default triggers, cure periods and/or exceptions to be negotiated and reflected in the Bank Documentation and will include (without limitation) the following: nonpayment, breach of representations and covenants, cross-defaults to indebtedness in excess of an amount to be mutually agreed, loss of lien on collateral, invalidity of guarantees, bankruptcy and insolvency events, ERISA events, judgments in excess of an amount to be mutually agreed and change of ownership or control (to be mutually defined).

Assignments and Participations:    Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under the Term Facility. Assignments will require payment of an administrative fee to and the consents of the Administrative Agent and Borrower, which consents shall not be unreasonably withheld or delayed; *provided* that no consent of Borrower shall be required (i) for an assignment to an existing Lender or an affiliate of an existing Lender or (ii) during a default or prior to the completion of the primary syndication of the Term Facility (as determined by the Lead Arranger). Notwithstanding the foregoing, in no event shall any loans or commitments be assigned to Disqualified Institutions. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Term Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Term Facility (except as to certain basic issues).

Expenses and Indemnification:    All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees (limited to one primary counsel for the Administrative Agent, and special and local counsel as necessary) and expenses and out-of-pocket expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of the Lenders, the Commitment Parties, the Administrative Agent and the Collateral Agent associated with the syndication of the Term Facility and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by Borrower on and after the Closing Date. In addition, all out-of-pocket expenses (including but not limited to reasonable out-of-pocket legal fees and expenses) of the Lenders and the Administrative Agent for workout proceedings, enforcement costs and documentary taxes associated with the Term Facility are to be paid by Borrower on and after the Closing Date.

Borrower will indemnify the Lenders, the Commitment Parties, the Administrative Agent and the Collateral Agent and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the Transactions and any actual or proposed use of the proceeds of any loans made under the Term Facility; *provided*, *however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred primarily by reason of the gross negligence, bad faith or willful misconduct of such person.

Defaulting Lenders:

The Bank Documentation shall contain provisions consistent with Administrative Agent's customary practices relating to "defaulting" Lenders (including, without limitation, provisions relating to the suspension of voting rights, rights to receive certain fees, and termination or assignment of commitments or Loans of such Lenders).

Yield Protection, Taxes
and Other Deductions:

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses and reserve and capital adequacy requirements. All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of the Lender's applicable lending office). The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrower will indemnify the Lenders and the Administrative Agent for such taxes paid by the Lenders and the Administrative Agent, as the case may be.

Required Lenders:

Lenders holding at least a majority of total loans and commitments under the Term Facility, with certain modifications or amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the Term Facility.

Governing Law and Forum:

The laws of the State of New York, except as to real estate and certain other collateral documents required to be governed by local law. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the exclusive jurisdiction of the state and federal courts located in The City of New York.

Counsel to the Commitment Parties, the
Administrative Agent and
Collateral Agent:

Latham & Watkins LLP.

## CONDITIONS TO CLOSING[1]

The commitment of the Lenders under the Commitment Letter with respect to the Term Facility, the agreements of the Commitment Parties to perform the services described in the Commitment Letter and the funding of the Term Facility are subject to the conditions set forth in the Commitment Letter and satisfaction or waiver of each of the conditions precedent set forth below.

1.      (i) the Plan Investor Termination Fee Order, in form and substance reasonably satisfactory to the Lead Arranger, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, reversed or modified or amended in any manner which the Lead Arranger determines in good faith to be adverse to the rights or interests of the Lead Arranger or the Lenders unless the Lead Arranger shall have consented thereto in writing, (ii) no amendment, modification, supplement or waiver which the Lead Arranger determines in good faith to be adverse to the rights or interests of the Lead Arranger or the Lenders shall have been made to any or all of the Plan, the related Disclosure Statement and other solicitation materials, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of the Lead Arranger and the Required Lenders (to be defined in the Term Facility), (iii) the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Lead Arranger (the "Confirmation Order"), confirming the Plan (which, as defined above, is based on the New Value Alternative and the New Money Investment provided by you from the proceeds of the Equity Financing), and (x) unless otherwise waived by the Lead Arranger and the Required Lenders (to be defined in the Term Facility), the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the Confirmation Order shall have expired, (y) unless otherwise waived by the Lead Arranger and the Required Lenders (to be defined in the Term Facility), no appeal or petition for review, rehearing or certiorari with respect to the Confirmation Order may be pending, and (z) the Confirmation Order shall otherwise be in full force and effect, and shall not have been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, (iv) the Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan which the Lead Arranger determines in good faith to be adverse to the rights or interests of the Lead Arranger or the Lenders shall have been satisfied or waived (with the prior written consent of the Lead Arranger and the Required Lenders (to be defined in the Term Facility) and (v) the transactions contemplated by the Plan and the Confirmation Order to occur on the effective date of the Plan shall have been consummated on or prior to the Closing Date. The Lead Arranger shall have reviewed, and be satisfied with, the final structure, terms and conditions and the documentation relating to the Acquisition, including the Acquisition Agreement (it being understood the Lead Arranger is satisfied with (x) the final execution copy of the Acquisition Agreement dated March 12, 2010, as provided to the Lead Arranger at 5:08 p.m. EST on March 12, 2010 and (y) the execution copies of those certain equity commitment letters, in each case dated March 12, 2010, by and between Holdings and each of Golden Gate Private Equity, Inc., K.W.C. Holdings, L.P., Kenner Equities IV, L.P., PPM America Private Equity Fund I, L.P. and Twin Bridge Capital Partners, as provided to the Lead Arranger at 5:56 p.m. EST on March 12, 2010 (collectively, the "Equity Commitment Letters")) (the Acquisition Agreement, together with the Equity Commitment Let-

---

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex II is attached

ters and any other documentation relating to the Acquisition, collectively, the "Acquisition Documents"). The Acquisition Agreement shall be fully executed by no later than March 12, 2010, and from and after Bankruptcy Court approval thereof, shall have remained in full force and effect without giving affect to any amendments, modifications or waivers which the Lead Arranger determines in good faith to be adverse to the rights or interests of the Lead Arranger or the Lenders without the prior written consent of the Lead Arranger. The Acquisition shall be consummated concurrently with the initial funding of the Term Facility in accordance with the Acquisition Documents, without waiver or amendment thereof or any consent thereunder) unless consented to by the Lead Arranger. Immediately following the Transactions, and except as expressly provided in the Plan or this Commitment Letter, neither Holdings nor any of its subsidiaries shall have any indebtedness or preferred equity, and no default shall exist under any material indebtedness of Holdings or any of its subsidiaries. The Administrative Agent shall have received reasonably satisfactory evidence of repayment of all indebtedness to be repaid on the Closing Date and the discharge (or the making of arrangements for discharge) of all liens other than liens permitted to remain outstanding under the Bank Documentation.

2.     Borrower shall have received the Equity Financing. The terms and documentation of the Equity Financing (to the extent of which does not consist of common stock) shall be reasonably satisfactory to the Commitment Parties.

3.     The Commitment Parties shall have received (i) as soon as available and in any event not later than April 14, 2010, audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Holdings and the Acquired Business for fiscal year 2009, which may contain a "going concern" qualification solely on account of the Bankruptcy Cases (the "Audited Financial Statements"), (ii) as soon as available and in any event within 45 days after the end of each fiscal quarter of the 2010 fiscal year, unaudited consolidated balance sheets and related statements of income and cash flows of Holdings and the Acquired Business for such fiscal quarter, for the period elapsed from the beginning of the 2010 fiscal year to the end of such fiscal quarter and for the comparable periods of the preceding fiscal year (the "Unaudited Financial Statements"), (iii) as soon as available and in any event within 30 days after the end of each fiscal month of the 2010 fiscal year, unaudited consolidated and consolidating balance sheets and related statements of income of Holdings and the Acquired Business for such fiscal month (it being acknowledged that the Commitment Parties have received unaudited consolidated and consolidating balance sheets and related statements of income for January 2010) and (iv) a pro forma consolidated and consolidating balance sheet and related statements of income and cash flows for Borrower (the "Pro Forma Financial Statements") for the last fiscal year covered by the Audited Financial Statements and for the latest period covered by the Unaudited Financial Statements and pro forma levels of EBITDA ("Pro Forma EBITDA") for the latest and twelve-month period ending with the latest period covered by the monthly financial statements required by clause (iii), promptly after the historical financial statements for such periods are available, in each case after giving effect to the Transactions. The financial statements referred to in clauses (i), (ii) and (iii) shall be prepared in accordance with accounting principles generally accepted in the United States. The Pro Forma Financial Statements shall be prepared on a basis consistent with pro forma financial statements set forth in a registration statement filed with the Securities and Exchange Commission and shall include a presentation pro forma for (A) the Transactions and (B) the application of fresh start accounting, to the extent applicable.

4.     Holdings and its subsidiaries and the transactions contemplated by the Commitment Letter shall be in compliance, in all material respects, with all applicable foreign and U.S. federal, state and local laws and regulations, including all applicable environmental laws and regulations. All necessary governmental and material third party approvals in connection with the Transactions shall have been obtained and shall be in effect.

5.      The ratio of (x) pro forma total consolidated indebtedness of Holdings as of the Closing Date after giving effect to the Transactions ("Pro Forma Consolidated Debt") to (y) Pro Forma EBITDA (calculated in a manner acceptable to the Lead Arranger) for the latest twelve-month period ending more than 15 days prior to the Closing Date shall not be greater than 4.95 x; *provided* that, in the event it is determined that the foregoing ratio may not be satisfied on the Closing Date, either Sponsor may make additional equity contributions in Holdings (to be reinvested by Holdings in Borrower) and such equity contributions shall be included in the calculation of Pro Forma EBITDA solely for purposes of determining compliance with the foregoing leverage ratio on the Closing Date.  To the extent that the Borrower elects to finance any OID or up-front fees, solely to the extent permitted by the Fee Letter, by increasing the aggregate principal amount of the Term Facility, then such indebtedness incurred to finance any such OID or up-front fees shall not be included in the calculation of Pro Forma Consolidated Debt for purposes of the determination of the foregoing ratio

6.      The Lenders shall have received all customary opinions, certificates and closing documentation as the Commitment Parties shall reasonably request, in form and substance reasonably satisfactory to the Commitment Parties.

7.      Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act at least 5 business days prior to the Closing Date.

8.      Holdings shall have complied with all of their respective obligations under, and the terms of, the Fee Letter.  All reasonable costs, fees, out-of-pocket expenses (including, without limitation, reasonable legal fees and out-of-pocket expenses and the fees and expenses of one primary counsel to the Commitment Parties and the Administrative Agent, and special and local counsel, appraisers and other advisors) and other compensation payable to the Lenders, the Commitment Parties, the Administrative Agent or the Collateral Agent shall have been paid to the extent invoiced and due.

9.      All of the requirements referred to in the Commitment Letter under "Syndication" shall have been satisfied, and the delivery to the Lead Arranger of the final confidential information memorandum referred to therein shall not have occurred later than April 20, 2010 (or such later time as may be agreed by the Lead Arranger in its reasonable discretion) and the Closing Date shall occur no less than ten business days from the date of delivery thereof.

10.     On or prior to April 14, 2010, as provided in the Commitment Letter, Borrower shall have conducted presentations with Moody's and S&P in order to obtain (a) a public corporate family rating from Moody's, (b) a public corporate credit rating from S&P and (c) a public credit rating for the Term  Facility from each of Moody's and S&P.

11.     On a pro forma basis, after giving effect to the Transactions, Borrower shall have "Minimum Liquidity" (as used herein, such term shall mean the sum of (a) unrestricted cash and cash equivalents on the consolidated balance sheet of Holdings and its Subsidiaries and (b) Availability (as defined in the ABL Facility)) of at least $15.0 million.

12.     Prior to or concurrently with the borrowings under the Term Facility, the documentation governing the ABL Facility shall have been executed and delivered providing revolving credit commitments in amount no less than $60.0 million.  The definitive documentation relating to the ABL

Facility, including any intercreditor arrangements between the ABL Facility and the Term Facility, shall be in form and substance reasonably satisfactory to the Commitment Parties.

13. Prior to or concurrently with the initial borrowings under the Term Facility, Borrower shall have received gross proceeds of $75.0 million from borrowings under the Mezzanine Facility. The Lead Arranger shall be reasonably satisfied with the terms and conditions of the Mezzanine Facility, provided that, in any event, the Mezzanine Facility (i) shall be subordinated in right of payment on customary terms to other senior indebtedness of the Borrower and the Guarantors, including without limitation, the Term Facility, (ii) shall not have a maturity date that is no shorter than six months later than the maturity date of the Term Facility, (iii) shall not have an interest rate in excess of 15.0% per annum, of which no more than 12% per annum shall be payable in cash, (iv) shall be subject to customary standstill provisions with respect to all senior indebtedness of the Borrower and the Guarantors, including without limitation, the Term Facility, (v) shall be unsecured, (vi) shall have representations and warranties that are customary for facilities of this type but in any shall event be as or less restrictive than those governing the Term Facility, (vii) shall have covenants (which in the case of negative and financial covenants, shall be set with a cushion of no less than 10% wider than those set forth in the Term Facility) and events of default (which shall include no less than a 90 day standstill to the ABL Facility and Term Facility), in each case that are customary for facilities of this type but in any shall event be less restrictive than those governing the Term Facility and (vii) not have prepayment premiums greater than 3% for prepayments made on or prior to the first anniversary of the Closing Date of the Mezzanine Facility, 2% for prepayments made after the first anniversary but on or prior to the second anniversary of the Closing Date of the Mezzanine Facility and 1% for prepayments made after the second anniversary but on or prior to the third anniversary of the Closing Date of the Mezzanine Facility.