**Exhibit 1** to **Exhibit A**

**Equity Purchase Agreement**

EQUITY PURCHASE AGREEMENT

between

ATRIUM CORPORATION

and

ATRIUM WINDOW HOLDINGS, LLC

Dated as of March 12, 2010

## EQUITY PURCHASE AGREEMENT

THIS EQUITY PURCHASE AGREEMENT dated as of March 12, 2010 (this "Agreement") is entered into by and between Atrium Corporation, a Delaware corporation (the "Company"), and Atrium Window Holdings, LLC, a Delaware limited liability company (the "Plan Investor"). Capitalized terms used herein but not otherwise defined herein shall have the respective meanings set forth in Section 8.16 of this Agreement or the Plan (as defined herein).

### WITNESSETH

WHEREAS, on January 20, 2010, the Company and certain of its affiliates, as debtors and debtors in possession, filed the Joint Plan of Reorganization of Atrium Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, a copy of which is attached hereto as Exhibit A (as amended from time to time, the "Plan")and the Disclosure Statement with respect to the Plan with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 10-10150 (BLS);

WHEREAS, the Company is currently operating the Business and managing its properties as debtor in possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to the New Value Alternative of the Plan, the undersigned Plan Investor, as an integral part of the Plan, has agreed to acquire from the Company 92.5% of the New Common Stock issued and outstanding as of the Effective Date (the "New Money Shares") in exchange for the Purchase Price (as defined below); and

WHEREAS, subject to the terms and conditions hereof, the Company desires to issue and sell to the Plan Investor and the Plan Investor desires to subscribe for and purchase (or to cause one or more of its designees to purchase) from the Company, the New Money Shares.

NOW THEREFORE, in consideration of these premises and the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereto agree as follows:

### ARTICLE I
### THE COMMON SHARES

SECTION 1.01 New Certificate of Incorporation. The Company shall adopt and file with the Secretary of State of the State of Delaware, on or before the Closing Date, an Amended and Restated Certificate of Incorporation in the form as approved by the Plan Investor (the "New Certificate of Incorporation").

SECTION 1.02 Authorization of New Money Shares. Subject to entry of the Confirmation Order and the Approvals, the Company has duly authorized the sale and issuance, pursuant to the terms and conditions of this Agreement, of the New Money Shares. The New Money Shares shall have the rights, preferences, privileges and restrictions set forth in the New Certificate of Incorporation.

SECTION 1.03  Issuance, Sale and Delivery of the New Money Shares.  Subject to the terms and conditions of this Agreement, the Company agrees to issue and sell to the Plan Investor, and the Plan Investor hereby agrees to purchase from the Company at the Closing, the New Money Shares for an aggregate cash purchase price equal to $169,200,000 (the "Purchase Price").

SECTION 1.04  Closing.  The closing of the sale and purchase of the New Money Shares (the "Closing") shall take place at the offices of Kirkland & Ellis LLP at 601 Lexington Avenue, New York, NY on the Effective Date, which date also shall be a Business Day following the date on which the conditions specified in Article V and Article VI have either been satisfied or waived by the party for whose benefit such conditions exist, or at such other location, date and time as may be agreed upon between the Plan Investor and the Company; provided that, subject to Section 5.07(a), the Plan Investor shall be permitted to extend the date of Closing by written notice to the Company until not later than May 31, 2010 (the "Closing Date").  At the Closing, the Company shall issue and deliver to the Plan Investor a stock certificate or certificates in definitive form, registered in the name of the Plan Investor, representing the New Money Shares being purchased by the Plan Investor at the Closing.  As payment in full for the New Money Shares being purchased by it at the Closing, and against delivery of the stock certificate or certificates therefor as aforesaid, on the Closing Date the Plan Investor shall transfer the aforesaid Purchase Price in immediately available funds to the account of the Company by wire transfer in accordance with the wire transfer instructions as set forth on Exhibit B hereto.

SECTION 1.05  Use of Proceeds.  The net proceeds received by the Company in exchange for the New Money Shares issued to the Plan Investor shall be used for the purposes set forth in the Plan.

SECTION 1.06  Plan Payments.  Subject to Section 7.01(l) and the terms of the Plan, at the Closing, the Plan Investor shall pay or cause to be paid the following amounts:

(a)  $7,500,000 in cash to the Senior Secured Agent for prompt pro rata distribution to the holders of Senior Secured Revolver Claims and Senior Secured Term Claims, plus

(b)  Cash equal to 95% of the amount of Senior Secured Revolver Claims and Senior Secured Term Claims outstanding as of the Closing Date, plus

(c)  Cash equal to 95% of the Senior Secured Revolver Interest Equivalent Claims and Senior Secured Term Interest Equivalent Claims (it being understood and acknowledged that interest shall have accrued at the default interest rate provided in the Senior Secured Credit Agreement) outstanding as of the Closing Date, plus

(d)  Cash equal to 100% of the Swap Contract Claims; provided that the aggregate of the amounts referred to in clauses (b) through (d) of this Section 1.06 shall not exceed the sum of (i) $385,077,750.25 and (ii) the amount of interest that accrues as provided in the proviso to Section 5.07(a), plus

(e)     Cash equal to 100% of the balance under the A/R Facility as of the Closing Date, provided that, for this purpose, such balance shall not exceed the applicable amount set forth on Schedule 1.06(e), plus

(f)     100% of the amount of DIP Claims as of the Closing Date after giving effect to the payment required by Section 4.04, provided that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(f), plus

(g)     100% of the amount of Administrative Claims and Priority Claims as of the Closing Date, provided that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(g), plus

(h)     All other amounts, including unbilled and accrued amounts, necessary to consummate the Plan, provided that, for this purpose, such amount shall not exceed the applicable amount set forth on Schedule 1.06(h).

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Plan Investor as of the date hereof and as of Closing Date that:

SECTION 2.01  Organization and Authority.  The Company and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of organization and, subject to the applicable bankruptcy and insolvency law, has full corporate power and authority to own its properties and to conduct its business as presently conducted and as proposed to be conducted by it and to enter into and perform this Agreement, to carry out the transactions contemplated by this Agreement and to issue, sell and deliver the New Money Shares to be sold and delivered to the Plan Investor at the Closing.  The Company and each of its Subsidiaries is duly qualified to do business as a foreign corporation, limited liability company or limited partnership, as applicable, in every jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect.

SECTION 2.02  Sale, Issuance and Delivery of New Money Shares; Other Shares Issued at Closing.  The issuance, sale and delivery of the New Money Shares at the Closing has been duly authorized by all necessary corporate action on the part of the Company (subject to entry of the Confirmation Order and the Approvals).  The New Money Shares when so issued and delivered at the Closing against delivery by the Plan Investor to the Company of the Purchase Price, will be duly and validly issued, fully paid and non-assessable, free from all Liens (other than those created by the Plan Investor), will not be subject to any preemptive or similar rights, and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and under applicable state and federal securities laws.  As of the Closing, the only issued and outstanding Equity Interests (and rights to acquire Equity Interests) of the Company shall be the New Money Shares issued to the Plan Investor at the Per Share Purchase Price and shares of New Common Stock (which shares shall constitute 7.5% of the New Money Shares issued and outstanding as of the Effective Date) issued to the Holders of 11.0% Senior

Subordinated Notes and 15.0% Senior Subordinated Notes pursuant to the Plan on the Effective Date.

SECTION 2.03 <u>Authority for Agreement; Effect of Transactions</u>.

(a)     The execution, delivery and performance by the Company of this Agreement and the New Certificate of Incorporation, and the consummation by the Company of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate action, subject to entry of the Confirmation Order and the Approvals. This Agreement has been duly executed and delivered by the Company and, subject to entry of the Confirmation Order and the Approvals, constitute valid and binding obligations of the Company enforceable in accordance with their respective terms.

(b)     The execution of and performance of the transactions contemplated by this Agreement and compliance with their provisions by the Company will not (i) violate any provision of law or regulation applicable to the Company and its Subsidiaries or any of their respective assets, (ii) result in the creation of any Lien upon any of the property of the Company or any of its Subsidiaries, (iii) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default under, or require a consent or waiver under, the Company's New Certificate of Incorporation or New By-Laws (each as in effect on the Effective Date), (iv) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute a default under, or require a consent or waiver under, any credit agreement, indenture, lease, agreement or other instrument to which the Company or any of its Subsidiaries is a party or by which it or any of their respective properties are bound, or any decree, judgment, license, permit, order, statute, rule or regulation applicable to the Company or any of its Subsidiaries, except, in the case of clause (i) and (iv), for such violations, consents, breaches or defaults as would not reasonably be expected to have a Material Adverse Effect.

SECTION 2.04 <u>No Solicitation or Advertisement</u>. Neither the Company nor any Person acting on its behalf has engaged, in connection with the offering of the New Money Shares, in any form of general solicitation or general advertising within the meaning of Rule 502(c) under the Securities Act.

SECTION 2.05 <u>Securities Act Registration</u>. Assuming the correctness of the representations and warranties of the Plan Investor contained herein, the offer, sale and delivery of the New Money Shares hereunder is exempt from the registration requirements under the Securities Act and applicable state securities or Blue Sky laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

SECTION 2.06 <u>Governmental Consents</u>. No material consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except (i) the filing of the New Certificate of Incorporation with the Secretary of State of the State of Delaware, (ii) the Approvals and (iii) any required filing under applicable federal or state securities laws.

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 2.07 [*Reserved*]

SECTION 2.08 Shares, etc.

(a)    Schedule 2.08(a) attached hereto correctly specifies as to each of the Company and its Subsidiaries (immediately prior to giving effect to the consummation of the transactions contemplated by the Plan on the Effective Date) (i) the number and type of its authorized Equity Interests and the number of Equity Interests outstanding and (ii) the name of each record and beneficial holder of such Equity Interests, together with the number (and percentage) of Equity Interests held by such holder. All of the outstanding Equity Interests of the Company and its Subsidiaries are duly authorized, validly issued, fully paid and non-assessable and all of such securities have been (or will have been) offered, issued and sold by the issuers thereof in accordance with all applicable laws. Except as set forth on Schedule 2.08(a) attached hereto, the outstanding Equity Interests of each of the Subsidiaries are owned by Company and its Subsidiaries, free of any Lien. Except as set forth on Schedule 2.08(a) attached hereto, the Company is not a party to any proxy, voting agreement, voting trust, shareholders agreement or similar agreement or restriction.

(b)    Except as contemplated by this Agreement and as set forth on Schedule 2.08(b) attached hereto, (i) there are no outstanding rights, options, warrants or agreements for the purchase from, or sale or issuance by, any of the Company and its Subsidiaries of any of its Equity Interests or securities convertible into or exercisable or exchangeable for such Equity Interests; (ii) there are no agreements on the part of any of the Company and its Subsidiaries to issue, sell or distribute any of its securities or assets (other than the sale of assets in the ordinary course of business); (iii) none of the Company and its Subsidiaries has any obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its securities or any interest therein or to pay any dividend or make any distribution in respect thereof and (iv) no Person is entitled to any rights with respect to the registration of any securities of any of the Company and its Subsidiaries under the Securities Act (or the securities laws of any other jurisdiction).

SECTION 2.09 Financial Statements. The Plan Investor has been furnished the qualified financial statements referred to on Schedule 2.09(a) attached hereto, which financial statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and present fairly in all material respects the financial position and the results of operations and cash flows of the Person(s) purported to be covered thereby as at the respective dates and for the respective periods indicated in conformity with GAAP (subject, in the case of any unaudited financial statements, to normal, year-end and audit adjustments and the omission of footnote disclosure).

SECTION 2.10 Tax Returns and Payments. Each of the Company and its Subsidiaries has filed all material Tax returns required by law to be filed and has paid all Taxes levied upon any of its Properties, assets, income, receipts, franchises or sales other than those not yet due, those not substantial in the aggregate being contested in good faith and by proper proceedings and against which adequate reserves are being maintained in accordance with GAAP and those returns the failure of which to be filed would not reasonably be expected to result in a Material Adverse Effect. Neither the Company nor its Subsidiaries are currently subject to any Federal or

state income Tax audits for any taxable period ending prior to the Closing Date, except as set forth on Schedule 2.10, and except for those that would not reasonably be expected to result in a Material Adverse Effect. Except as set forth in Schedule 2.10, none of the Company and its Subsidiaries has executed any waiver or waivers that would have the effect of extending the applicable statute of limitations in respect of any Tax liabilities. The charges, accruals and reserves in the financial statements of the Company and its Subsidiaries referred to on Schedule 2.09(a) attached hereto in respect of Taxes for the fiscal periods covered thereby are adequate in accordance with GAAP, and there are no known unpaid assessments for material additional taxes for any fiscal period or any basis therefor. There are no written unpaid assessments for material additional Taxes for any fiscal period (except those being contested in good faith for which adequate reserves have been made in accordance with GAAP) therefore.

SECTION 2.11 Contracts. Except as set forth on Schedule 2.11(a) or with respect to any Contract that the Company assumes pursuant to Section 365 of the Bankruptcy Code as of the Effective Date, none of the Company and its Subsidiaries is in default under any material contract or agreement to which it is a party or by which it is bound, nor, to the Company's knowledge, does any condition exist that, with notice or lapse of time or both, would constitute such default, excluding in any case such defaults that are not reasonably likely to have a Material Adverse Effect; provided, however, that pursuant to Section 365 of the Bankruptcy Codes, the Company and/or its Subsidiaries has rejected, and intends to reject, certain executory contracts and unexpired leases of non-material Real Property and the rejection of any such agreement shall not be considered inconsistent with the representation herein. Schedule 2.11(b) accurately and completely lists (x) all material agreements, if any, among any officers, directors, Affiliates or stockholders (or any of their Affiliates other than any of the Company and its Subsidiaries) of the Company, on the one hand, and any of the Company and its Subsidiaries, on the other hand, in effect on the date hereof and (y) all material agreements which are in effect on the date hereof in connection with the conduct of the Business of the Company and the Operating Company.

SECTION 2.12 Title to Properties; Liens; Leases. Each of the Company and its Subsidiaries has good title to all of its respective material Properties, including, without limitation, the Properties reflected in the balance sheet of the Operating Company dated December 31, 2009, referred to on Schedule 2.09(a) attached hereto, except Properties disposed of since such date in the ordinary course of business, free and clear of all Liens except Liens disclosed on Schedule 2.12.

SECTION 2.13 Litigation. Except for the Chapter 11 Cases and the related CCAA Proceeding and any motion, application, pleading or order filed in connection therewith, there is no Proceeding pending against, or to the knowledge of the Company, threatened in writing against or affecting, the Company or its Subsidiaries or any of its respective Properties before any Governmental Authority that (a) has a reasonable likelihood of being adversely determined and that, if determined or resolved adversely to such Company or its Subsidiaries in accordance with the plaintiff's demands, is reasonably likely to have (individually or in the aggregate) a Material Adverse Effect or (b) questions the validity of any of this Agreement or any action taken pursuant hereto or thereto or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that (c) if determined in a manner adverse to the Company would reasonably result, either individually or in the aggregate, in any Material Adverse Effect.

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 2.14 <u>Compliance with Law</u>. None of the Company and its Subsidiaries is in violation of or in default under any term of its Organizational Documents or of any contract, agreement, document, instrument, judgment, decree, order, law, statute, rule or regulation applicable to it or any of its Properties, in any way which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect. Without limiting the generality of the foregoing:

(a)     each of the Company and its Subsidiaries is, and in the last two years has been, in compliance with (and neither it nor, to the knowledge of the Company, any of their respective predecessors in interest has received any written notice to the contrary) and there is no Environmental Claim against or any judgment, decree or order binding upon or applicable to any of the Company and its Subsidiaries or any of their respective Properties under or on account of any Environmental Laws, except where the same has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect;

(b)     none of the Company and its Subsidiaries nor, to the knowledge of the Company, any other Person, has ever caused or permitted any Hazardous Materials to be disposed of on or under any real Property owned or leased by any of the Company and its Subsidiaries in any manner not permitted by all applicable Laws, except for any disposals that have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect; and

(c)     to the knowledge of the Company, all Hazardous Materials used or generated by any of the Company and its Subsidiaries (including any Persons or businesses merged into or otherwise acquired by any of the Company and its Subsidiaries) have been transported for treatment, recycling and/or disposal, as well as treated, recycled and/or disposed of, in compliance with all applicable Laws and regulations, except for any non-compliance that has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect.

SECTION 2.15 <u>ERISA</u>.

(a)     Each of the Company and its Subsidiaries and each ERISA Affiliate have operated and administered each Benefit Plan in compliance with all applicable laws except for such instances of noncompliance which have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect. Other than such liabilities or Liens as have not resulted in, and would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, (i) none of the Company or its Subsidiaries has incurred any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in Section 3 of ERISA), and no ERISA Affiliate has incurred any liability pursuant to Part 3 or Part 6 of Subtitle B of Title I of ERISA or Title IV of ERISA, and (ii) no event, transaction or condition has occurred or exists that would reasonably be expected to result in the incurrence of any such liability by any of the Company or its Subsidiaries or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of any of the Company and its Subsidiaries or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to such penalty or excise Tax provisions or to Section 401(a)(29) or 412 of the Code.

(b)     None of the Company or its Subsidiaries has ever maintained or has ever had any obligation to contribute to any Benefit Plan that is subject to Part 3 of Subtitle B of Title I or Title IV of ERISA or Section 401(a)(29) or 412 of the Code. No condition exists that presents a material risk to any of the Company and its Subsidiaries of liability in an amount that would reasonably be expected to result in a Material Adverse Effect as a result of a termination or funding waiver with respect to any Benefit Plan.

(c)     None of the Company or its Subsidiaries or any ERISA Affiliate has incurred or is reasonably expected to incur withdrawal liabilities under Section 4201 or 4204 of ERISA in respect of Multiemployer Plans that individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect. None of the Company or its Subsidiaries nor any ERISA Affiliate has failed to make any required contributions to Multiemployer Plans, other than failures that individually or in the aggregate have not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect. To the Company's knowledge, no Multiemployer Plan is, or is reasonably expected to be, insolvent, in reorganization or terminated within the meaning of Title IV of ERISA.

(d)     None of the Company or its Subsidiaries has any postretirement welfare benefit obligation (determined in accordance with Financial Accounting Standards Board of directors Statement No. 106, without regard to liabilities attributable to continuation coverage mandated by Section 4980B of the Code) in an amount that would reasonably be expected to result in a Material Adverse Effect.

(e)     Except as set forth on Schedule 2.15 (e), there has been no plan, fund or similar program established or maintained outside of the United States of America by any of the Company and its Subsidiaries or to which contributions are, or within the preceding five years have been, made or required to be made by any of the Company and its Subsidiaries (or any of their respective predecessors-in-interest) for the benefit of its employees or former employees residing outside of the United States of America.

SECTION 2.16 Proprietary Rights; Licenses. Each of the Company and its Subsidiaries has all Proprietary Rights and Licenses as are necessary for the conduct of their respective businesses as now conducted and as proposed to be conducted, except where the failure to have any such Proprietary Right and/or License has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect. Except for any instance that has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect, each such Proprietary Right and License is in full force and effect, all material obligations with respect thereto have been fulfilled and performed and, to the knowledge of the Company, there is no infringement thereon by any other Person. No default in the performance or observance by any of the Company and its Subsidiaries (or any of their predecessors in interest) of their obligations thereunder has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any Proprietary Right or License which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

SECTION 2.17 Government Regulation. None of the Company and its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act or the Investment Company Act of 1940, each as amended.

SECTION 2.18 <u>Foreign Assets Control Regulation, etc</u>. Neither the sale of the New Money Shares hereunder nor the use of the proceeds thereof by the Company or its Subsidiaries will violate the regulations enforced by the Office of Foreign Assets Control of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive orders relating thereto. Without limiting the foregoing, none of the Company and its Subsidiaries (a) is, or will become, a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or (b) engages or will engage in any dealings or transactions with any such Person. Each of the Company and its Subsidiaries is in compliance, in all material respects, with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, as amended, and the rules and regulations promulgated thereunder. No part of the proceeds from the sale of the New Money Shares hereunder will be used by the Company or its Subsidiaries, directly or indirectly, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 2.19 <u>Brokers; Schedule of Fees and Expenses</u>. No broker, investment banker, financial advisor or other Person, other than Moelis & Company and FTI Consulting, Inc., the fees and expenses of which will be paid by the Company under the Plan, is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company. The Company has furnished to the Plan Investor true and complete copies of all agreements between the Company and Moelis & Company, the Official Committee of Unsecured Creditors and FTI Consulting, Inc. approved or sought to be approved by the Bankruptcy Court relating to the transactions contemplated hereby.

<h2 style="text-align:center">ARTICLE III<br>REPRESENTATIONS AND WARRANTIES OF THE PLAN INVESTOR</h2>

The Plan Investor represents and warrants to the Company that:

SECTION 3.01 <u>Organization and Authority</u>. The Plan Investor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. The Plan Investor has now, and will have at the Closing, all requisite power to enter into this Agreement and the transactions contemplated hereby and to perform its obligations under the terms of this Agreement.

SECTION 3.02 <u>Validity</u>. This Agreement, when executed and delivered by the Plan Investor and each of the other parties thereto, will constitute a valid and legally binding obligation of the Plan Investor, enforceable in accordance with its terms, subject as to enforcement of remedies to applicable bankruptcy, insolvency, reorganization or similar laws affecting generally the enforcement of creditors' rights and subject to a court's discretionary authority with respect to the granting of a decree ordering specific performance or other equitable remedies.

SECTION 3.03 <u>Purchase Entirely for Own Account</u>. The Plan Investor hereby confirms that the New Money Shares to be purchased by the Plan Investor hereunder will be acquired for

investment for the Plan Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof.

SECTION 3.04  Reliance Upon Plan Investor's Representations.  The Plan Investor understands that the New Money Shares are being offered and sold to it in reliance upon specific exemptions from the registration requirements of the Securities Act and the rules and regulations promulgated thereunder and that the Company is relying upon the truth and accuracy of, and the Plan Investor's compliance with, the representations, warranties, agreements, acknowledgements and understandings of the Plan Investor set forth herein in order to determine the availability of such exemptions and the eligibility of the Plan Investor to acquire the New Money Shares.

SECTION 3.05  Restricted Securities.  The Plan Investor understands that the New Money Shares may not be sold, transferred, or otherwise disposed of without registration under the Securities Act or pursuant to an exemption therefrom, and that in the absence of an effective registration statement covering the New Money Shares or an available exemption from registration under the Securities Act, the New Money Shares must be held indefinitely.  The Plan Investor understands that no public market now exists for any of the New Common Stock, and that the Company has made no assurances that a public market will ever exist for the New Money Shares.

SECTION 3.06  Economic Risk: Sophistication.  The Plan Investor is able to bear the economic risk of an investment in the New Money Shares acquired by it pursuant to this Agreement and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the proposed investment and therefore has the capacity to protect its own interests in connection with such purchase.

SECTION 3.07  Accredited Investor.  The Plan Investor meets the criteria of an "accredited investor" as defined in Rule 501(a) of Regulation D adopted under the Securities Act.

SECTION 3.08  Legend.  The Plan Investor understands that certificates representing the New Money Shares may bear one or all of the following legends:

(a)  "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b)  Any legend required by the securities laws of any state to the extent such laws are applicable to the New Money Shares represented by the certificate so legended.

If any of the New Money Shares are (i) freely tradeable pursuant to Rule 144(b)(1) of the Securities Act or (ii) sold pursuant to an effective registration statement under the Securities Act,

the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such securities without the legends required by this Section 3.08 endorsed thereon.

SECTION 3.09 Equity and Debt Commitments. The Plan Investor has obtained, and is the recipient of, those certain equity commitment letters attached hereto as Exhibit C (the "Equity Commitment Letters") and those certain debt commitment letters attached hereto as Exhibit D (the "Debt Commitment Letters"). Each Equity Commitment Letter and Debt Commitment Letter is in full force and effect as of the date of this Agreement and there are no other conditions to the funding under the Equity Commitment Letters or Debt Commitment Letters other than those set forth or referred to, respectively, in each such Equity Commitment Letter or Debt Commitment Letter, as the case may be. The Company and the Senior Secured Agent (in its capacity as administrative agent under the Senior Secured Credit Agreement) are third party beneficiaries under the Equity Commitment Letters on the terms and conditions provided therein.

## ARTICLE IV

## ADDITIONAL AGREEMENTS

### SECTION 4.01 Conduct of the Business Prior to the Closing; Contracts.

(a)     The Company covenants and agrees that, except as described in Schedule 4.01(a), as required by Law or the Bankruptcy Court, as otherwise contemplated by this Agreement or the Plan or as consented to in writing by the Plan Investor (which consent shall not be unreasonably withheld), between the date hereof and the time of the Closing, the Company and each Subsidiary shall conduct itself only in the ordinary course of its business and in a reasonable manner consistent in nature, scope and magnitude with its past practice, and will only take actions usually taken in the ordinary course of its business, taking into account the pendency of the Chapter 11 Cases.

(b)     Contracts.

(i)     As soon as practicable after the date hereof, the Company shall provide the Plan Investor with a list of Contracts that have been assumed or rejected in connection with the Chapter 11 Cases prior to the date hereof. The Plan Investor acknowledges that any assumptions and rejections occurring prior to the date hereof, including any automatic rejections occurring as a result of the operation of the Bankruptcy Code, are final.

(ii)     In accordance with the Plan, the Company shall prepare a schedule of all prepetition Contracts that the Company proposes to assume (the "Assumption Schedule") and such Contracts shall be assumed on the Effective Date pursuant to the Plan. As soon as practicable after the entry of the order approving the Disclosure Statement but in no event later than April 2, 2010, the Company shall provide the Plan Investor with a draft Assumption Schedule. The Company shall reasonably consult and cooperate with the Plan Investor, and consider in good faith the views of the Plan Investor, with respect to the inclusion or exclusion of Contracts on the Assumption Schedule.

*Atrium Corporation*
*Equity Purchase Agreement*

(c)     At any time and from time to time, the Plan Investor may, by written notice to the Company, notify the Company that it wishes to include or exclude specific Contracts from the Assumption Schedule. The Company and the Plan Investor shall use their respective commercially reasonable efforts to agree on the final list of Contracts included in the Assumption Schedule; provided, however, that if the Company and the Plan Investor do not agree on the final list of Contracts, then the Plan Investor's decision shall prevail; provided, further, however, that the agreements listed on Schedule 4.01(b) attached hereto shall be assumed as of the Effective Date.

SECTION 4.02 Access to Information.

(a)     From the date hereof until the Closing, upon reasonable notice, the Company shall cause its officers, directors, employees, agents, representatives, accountants and counsel, and shall cause the Subsidiaries and each of the Subsidiaries' officers, directors, employees, agents, representatives, accountants and counsel to: (i) afford the officers, key employees, agents, accountants, counsel, financing sources and representatives of the Plan Investor reasonable access, during normal business hours, to the offices, properties, plants, other facilities, books and records of the Company and each Subsidiary and to those officers, directors, key employees, agents, accountants and counsel of the Company and of each Subsidiary who have any knowledge relating to the Company, any Subsidiary or the Business, (ii) promptly prepare and provide all customary financial and other customary and reasonable available written information as the Plan Investor may reasonably request with respect to the Company and/or the Debtors, and the transactions contemplated by this Agreement and any debt financing to be entered into in connection with the Plan, including but not limited to financial projections (the "Projections") relating to the foregoing, (iii) host, with the Plan Investor, meetings with financing sources to be arranged in connection with the Plan at a mutually convenient location and time, (iv) assist the Plan Investor in the preparation of one or more confidential information memoranda reasonably satisfactory to the Plan Investor and other customary marketing materials to be used in connection with debt financing and (v) furnish to the officers, employees, agents, accountants, counsel, financing sources and representatives of the Plan Investor such additional financial and operating data and other information regarding the assets, properties, liabilities and goodwill of the Company, the Subsidiaries and the Business (or legible copies thereof) as the Plan Investor may from time to time reasonably request; provided, however, that the Company may restrict the foregoing access and the disclosure of information to the extent that (A) in the reasonable judgment of the Company, any Law applicable to the Company requires the Company or any Subsidiary to restrict or prohibit access to any such properties or information, (B) in the reasonable judgment of the Company, the information is subject to confidentiality obligations to a third party, (C) such disclosure would result in disclosure of any trade secrets of third parties or (D) disclosure of any such information or document could result in the loss of attorney-client privilege; provided, however, that with respect to clauses (A) through (D) of this Section 4.02(a), the Company shall use all reasonable efforts (without any obligation to make any payments) (x) to obtain the required consent of such third party to provide such access or disclosure or (y) to develop an alternative to providing such information so as to address such matters that is reasonably acceptable to the Plan Investor and the Company.

(b)     The Plan Investor shall provide the Company with reasonable access to information regarding the Plan Investor and its Affiliates for inclusion in Company materials and

*Atrium Corporation*
*Equity Purchase Agreement*

filings relating to this Agreement or the transactions contemplated hereby (including the Disclosure Statement) if the Company requests such information and the inclusion of the requested Plan Investor (and Affiliate) information is required to be included in such materials or filings by applicable Law or the Bankruptcy Code.

(c)     The Company shall use commercially reasonable efforts to provide the Plan Investor with all information and data reasonably necessary for the Plan Investor to make a determination with respect to its termination rights set forth in Section 7.01(l) at least three (3) Business Days prior to the applicable Scheduled Closing Date (as defined below); provided, however, that in no event shall such information and data be delivered less than five (5) Business Days prior to May 31, 2010.

SECTION 4.03 Confidentiality. Except as permitted by Section 4.06 or as required by Law, the Bankruptcy Court, in connection with the Chapter 11 Cases, or any other court or governmental agency and subject to any requirements of legal process or applicable Law, neither the Plan Investor nor the Company, will, without the prior written consent of the Plan Investor or the Company, as applicable, disclose to any Person (other than to their respective affiliates, potential investors and financing sources, agents and those in a confidential relationship with the Plan Investor or the Company, as applicable, such as accountants and legal counsel, and in the case of the Plan Investor, (i) to sponsored funds and their respective members and/or limited partners, (ii) to certain other potential investors and (iii) to potential financing sources in connection with the New Value Alternative Loans or as otherwise required for any financing related to the transactions contemplated hereby) any confidential information provided to them and exchanged between them in connection with this Agreement and the consummation of the transactions contemplated hereby and thereby and each party agrees to keep confidential any confidential information obtained by it from the other party in connection with its investigations or otherwise in connection with these transactions and to use such confidential information only for the purposes of these transactions. The foregoing shall not limit a party's use or disclosure of any information disclosed by the other party that (a) was in the public domain at the time it was disclosed or has entered the public domain through no fault of the recipient (b) was known to the recipient at the time the information was received, (c) is used or disclosed with the prior written approval of the disclosing party, or (d) was independently developed by the recipient without any use of the disclosing party's confidential information.

SECTION 4.04 Payment of DIP Claims. The Company and the Plan Investor acknowledge and agree that the Company shall indefeasibly pay the DIP Claims immediately prior to the Closing in an amount equal to all of the cash of the Company.

SECTION 4.05 Bankruptcy Matters.

(a)     In consideration of the Plan Investor's efforts to date in connection with the transactions contemplated by this Agreement and the Plan, and its anticipated continued efforts during the period between the Disclosure Statement Hearing and the Effective Date, and recognizing that, in connection with the transactions contemplated hereby and in the Plan, the Plan Investor and its equity investors are incurring substantial fees, costs and expenses, including, without limitation, commitment fees, reasonable fees and expenses of counsel and other expenses, if (i) this Agreement is terminated pursuant to Section 7.01(m), then the Debtors

shall pay the Plan Investor within ten (10) Business Days after such termination an amount equal to $12,300,000 and (ii) (A) this Agreement is terminated pursuant to Sections 7.01(f), 7.01(i)(2), (i)(3) or (i)(4), 7.01(j) or 7.01(l) and (B) within nine (9) months after such termination the Company consummates a Designated Acquisition Proposal, then, within ten (10) Business Days of such consummation, the Company and the Debtors shall pay or reimburse the Plan Investor solely out of the proceeds of the consummated Designated Acquisition Proposal an amount equal to $12,300,000, and, in each of the cases described in subclauses (i) and (ii) above, the Plan Investor will apply these amounts to cover, among other things, any expenses incurred on or after January 20, 2010 in connection with its status as Plan Investor and the transactions contemplated hereby and the preparation, negotiation, execution and delivery of this Agreement, including in each case, without limitation, the commitment fees of prospective financing sources, fees and expenses of counsel, together with any out-of-pocket costs and expenses of the Plan Investor incurred in connection with the enforcement of any of its rights and remedies hereunder (collectively, the "Termination Fee"). The payment obligation in subclause (i) shall constitute an administrative expense of the Debtors in the Chapter 11 Cases under section 503 of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein or in any other document, the Company shall cause the payment of the Termination Fee pursuant to subclause (ii) above to be paid pursuant to such Acquisition Proposal by the party providing the consideration in such Acquisition Proposal directly to the Plan Investor. For the avoidance of doubt, in no event shall the Company be obligated to pay to the Plan Investor more than one Termination Fee under this Agreement.

(b)     The Company and the Debtors agree, subject to the entry of an order of the Bankruptcy Court approving this Agreement, to pay or reimburse the Plan Investor, promptly upon demand the amount of the filing fee incurred by the Plan Investor in connection with the filing made by it or its equity investors pursuant to the HSR Act in connection with the transactions contemplated by this Agreement.

(c)     The Debtors shall, on or before March 16, 2010, seek an order of the Bankruptcy Court on an expedited basis (the "Plan Investor Termination Fee Order"), in form and substance reasonably satisfactory to the Plan Investor, (i) authorizing the Debtors to pay the Termination Fee, if applicable, in accordance with clause (a) hereof, and (ii) authorizing the Debtors to execute this Agreement, and shall use its best efforts to cause the hearing on its motion to occur as soon as possible, and in no event shall the Plan Investor Termination Fee Order be entered later than April 5, 2010.

(d)     The Company shall use all reasonable efforts to obtain, and to consult with the Plan Investor to secure, the prompt entry of the Confirmation Order as soon as practicable following the date hereof and to consummate the transactions contemplated by this Agreement.

SECTION 4.06   Non-Solicitation.

(a)     The Company agrees that from and after the date hereof and through and including the conclusion of the hearing regarding the approval of the Plan Investor Termination Fee Order, neither it nor any of its Affiliates nor any of their respective directors or officers shall, and that it shall direct its and their respective key employees and representatives (including any investment banker, attorney or accountant retained by it or any of its Affiliates) (collectively, its

*Atrium Corporation*
*Equity Purchase Agreement*

"Representatives") not to, directly or indirectly, engage or continue to negotiate with any Person with respect to any potential Acquisition Proposal or acquisition of any of the material assets of the Company outside the ordinary course of business, including by providing access to the Data Room, management of the Company or the Company's professionals.

(b)     From and after the conclusion of the hearing to approve the Plan Investor Termination Fee Order, none of the Company or any of its Representatives will be precluded from providing information to, or discussing and negotiating with, any Person that has after the conclusion of the hearing to approve the Termination Fee notified the Company in-writing that it is considering making, or has made in writing, a bona fide Acquisition Proposal so long as the Company and its Representatives are not in violation of this Section 4.06. In addition, so long as the Company and its Representatives are not in violation of this Section 4.06, none of the Company or any of its Representatives will be precluded from executing an agreement after the conclusion of the hearing to approve the Termination Fee providing for an Acquisition Proposal or recommending any such Acquisition Proposal to the creditors of the Company, if (i) in the good faith opinion of the board of directors of the Company (the "Board of Directors") (after consultation with its financial advisors and outside legal counsel) such Acquisition Proposal provides a higher transaction value or is otherwise more favorable to the Company and its creditors than the transactions contemplated by this Agreement (it being understood and agreed that any such Acquisition Proposal must include aggregate consideration at least equal to the sum of (x) the Purchase Price, (y) the Termination Fee and (z) $3 million, in order to qualify as having a higher transaction value or be deemed more favorable to the Company and its creditors than the transaction contemplated hereby) and (ii) the Board of Directors believes in good faith than the transaction contemplated hereby) and (ii) the Board of Directors believes in good faith (after consultation with outside legal counsel) that the failure to authorize such actions would be inconsistent with its fiduciary duties under any applicable law, including the Bankruptcy Code. No Person considering making an Acquisition Proposal shall be provided non-public information by the Company unless such Person has executed a customary confidentiality agreement with the Company; provided that such confidentiality agreement shall not prohibit the Company from delivering any notice required by this Section 4.06.

(c)     The Company shall promptly inform the Plan Investor of any Acquisition Proposal and shall provide any information that the Plan Investor shall request regarding any such Acquisition Proposal.

SECTION 4.07 Further Action. The Company shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement to which it is a party and consummate and make effective the transactions contemplated hereby and thereby.

SECTION 4.08 Reimbursement. In the event the Closing has occurred, the Company shall reimburse the Plan Investor and each of its equity investors for and in respect of all documented fees, costs and expenses incurred by such persons arising from or in connection with their participation in the Chapter 11 Cases (including the New Value Alternative and the transactions contemplated by this Agreement), including without limitation commitment fees of prospective financing sources, reasonable fees and expenses of counsel and other expenses;

15                    *Atrium Corporation*
                     *Equity Purchase Agreement*

provided, however, that no such reimbursement shall be permitted to the extent that the making of such reimbursement would render the Plan unfeasible.

SECTION 4.09  HSR Act and Other Antitrust Laws.  No later than fifteen (15) Business Days after the date of the execution hereof, the Plan Investor and the Company will each make any filings required under the HSR Act and other foreign antitrust laws in connection with the transactions contemplated hereby. Each party hereto will cooperate with the other party hereto in accomplishing such filings and will keep the other party apprised of the status of any inquires made by any Governmental Authority with respect to this Agreement or the transactions contemplated hereby. Unless otherwise agreed by the Plan Investor, the Closing of the transactions contemplated hereby is expressly conditioned upon the waiting period relating to any such filings having duly expired or been duly terminated by the appropriate Governmental Authorities without the commencement of any Proceeding by any such Governmental Authority to restrain or postpone the transactions contemplated hereby. Each of the parties hereto shall use its commercially reasonable efforts to cause the waiting period under the HSR Act and other foreign antitrust laws to expire or be terminated, and to otherwise obtain all regulatory approvals in connection with any other antitrust approvals, as promptly as possible after the execution of this Agreement.

SECTION 4.10  Fees and Expenses.  Except as otherwise provided in this Agreement, all fees and expenses incurred in connection with the transactions contemplated hereby will be paid by the party incurring such fees or expenses, whether or not the Closing is consummated.

SECTION 4.11  Public Announcements.  Each of the Plan Investor and the Company will consult with each other before issuing, and, to the extent reasonably feasible, provide each other the opportunity to review and comment upon, any press release or other public statements with respect to the transactions contemplated hereby. Neither the Plan Investor nor the Company will issue any such press release or make any such public statement prior to such consultation, except as may be required by applicable law or pursuant to any requirement of any national securities exchange.

SECTION 4.12  Resignation of Directors of the Company.  As to each person serving as a member of the Board of Directors of the Company immediately prior to the Closing, either (a) the Company will cause each such member to execute and deliver a letter prior to the Closing, which will not be revoked or amended prior to the Closing, effectuating his or her resignation as a member of the Board of Directors of the Company effective immediately prior to the Closing or (b) the Plan will effectuate the reinstatement, removal or replacement of such person as a member of the Board of Directors of the Company effective immediately prior to the Closing.

SECTION 4.13  Audited Financial Statements.  On or before March 31, 2010, the Company shall deliver to the Plan Investor the qualified audited consolidated balance sheet of the Company and its Subsidiaries as of the end of the fiscal period ending December 31, 2009 and the qualified audited consolidated statement of operations and cash flows of the Company and its Subsidiaries for such fiscal year audited by Deloitte & Touche LLP, the Company's independent registered public accounting firm, which shall be prepared in a manner consistent in all material respects with the unaudited financial statements referred to on Schedule 2.09(a).

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 4.14 <u>Observers at Board Meetings</u>. The Plan Investor shall be entitled to designate one (1) observer (the "<u>Observer</u>") who shall be permitted (but not required) to attend and participate in meetings of the board of directors of the Company (the "<u>Board</u>") and any meetings of any committees (including audit committees) thereof and, subject to the provisions hereof, shall be entitled to receive all notices, reports and other material sent to the directors (including committee members) of the Company. Notwithstanding the foregoing, the Company shall have the right to withhold from the Observer written materials and other information, including portions of the minutes of meetings of the Board or any committees thereof, and exclude the Observer from any meeting of the Board or any committee thereof, if the Board determines, in its reasonable discretion, that the Observer's access to such information (i) could jeopardize any privilege or result in (a) a breach by the Company of its obligations under any agreement, arrangement or understanding or (b) a violation of any applicable law or (ii) is necessary or appropriate in furtherance of discharging the Board's fiduciary duties to the Company. For purposes of attending any meeting of the Board, the Observer shall not be permitted to vote on any matter and shall not participate in any action of the Board or any such committees. In addition, if the Board or any committee thereof (or their respective Representatives) is considering or discussing (i) any matter relating to this Agreement, (ii) an Acquisition Proposal or (iii) any other matter that involves a conflict of interest between the Company and the Plan Investor or any of its Affiliates, then the Company may withhold from the Observer the written materials and other information relating to such transaction and the Observer shall excuse himself or herself from any portion of a meeting in which such matters are discussed or considered.

ARTICLE V
CONDITIONS TO THE OBLIGATIONS
OF THE PLAN INVESTOR

The obligation of the Plan Investor to purchase the New Money Shares at the Closing is subject to the fulfillment, or the written waiver (to the extent permitted by Law) by the Plan Investor, of each of the following conditions on or before the Closing Date:

SECTION 5.01 <u>Representations and Warranties to be True and Correct</u>. The representations and warranties contained in <u>Article II</u> shall be true, complete and correct in all respects (without giving effect to any "Material Adverse Effect" or "materiality" qualifier contained therein) on and as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of such date (or to the extent any such representation or warranty, by its terms, is made as of a specific date or time, on and as of such specific date or time), except where the failure of any such representation or warranty to be so true and correct would not, individually or in the aggregate, result in, or reasonably be expected to result in, a Material Adverse Effect on and as of such specific date or time.

SECTION 5.02 <u>Performance</u>. The Company shall have substantially performed and materially complied with all covenants, agreements and obligations contained herein required to be performed or complied with by it prior to or at the Closing Date.

SECTION 5.03 <u>All Proceedings to be Satisfactory</u>. All corporate and other proceedings to be taken by the Company in connection with the transactions contemplated hereby and all

documents incident thereto shall be reasonably satisfactory in form and substance to the Plan Investor and its counsel, and the Plan Investor and its counsel shall have received all such counterpart originals or certified or other copies of such documents as they reasonably may request.

SECTION 5.04 Effectiveness of New Certificate of Incorporation. The New Certificate of Incorporation of the Company shall have been made effective by filing such New Certificate of Incorporation with the Secretary of State of the State of Delaware and the Plan Investor shall have received a filed copy of such New Certificate of Incorporation. The New Certificate of Incorporation shall continue to be in full force and effect as of the Closing Date.

SECTION 5.05 No Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the transactions contemplated hereby illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated hereby.

SECTION 5.06 Consent and Approvals. All material governmental and third party consents and approvals (including, without limitation, to the extent applicable, the expiration or termination of any waiting period under the HSR Act or any foreign antitrust law) necessary in connection with the offer and sale of the New Money Shares, the consummation of the transactions contemplated hereby, the execution and filing where applicable, of the new Organizational Documents of the Company and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect.

SECTION 5.07 Bankruptcy-Related Conditions.

(a) The Bankruptcy Court shall have entered the Confirmation Order, which Order shall be reasonably satisfactory to the Plan Investor and shall, without limitation, confirm the Plan, which Plan shall provide for (i) the payment of $7,500,000 in cash to the Senior Secured Agent for prompt pro rata distribution to the holders of Senior Secured Revolver Claims and Senior Secured Term Claims, and (ii) the payment to each Holder of a Senior Secured Revolver Claim or a Senior Secured Term Claim of an amount equal to ninety-five percent (95%) of the sum of (A) the principal amount of such Holder's Senior Secured Revolver Claim or Senior Secured Term Claim and (B) interest on such Claim, calculated at the default contract rate, through the earlier to occur of (x) the Effective Date and (y) April 30, 2010, provided that interest shall also accrue at the default contract rate during the period that the Plan Investor has extended the Closing Date pursuant to Section 1.04 or has extended the date by which the Confirmation Order must be entered pursuant to Section 7.01(d), and shall authorize the Debtors to execute this Agreement and authorize and approve the transactions contemplated herein and therein, and such Confirmation Order shall be a Final Order. Notwithstanding the foregoing, to the extent that any of the Company's conditions set forth in Sections 5.01, 5.02, 5.05, 5.06, 5.07 or 5.08 has not been satisfied as of April 30, 2010, then no interest shall accrue thereafter for so long that any such condition remains unsatisfied or not waived, up to a maximum of ten (10) days of no such interest accrual.

LEGAL_US_E # 87229585.4

*Atrium Corporation*
*Equity Purchase Agreement*

(b)     No material amendment, modification, supplement or waiver shall have been made to any or all of the Plan, the related Disclosure Statement and other solicitation materials, the Plan Supplement, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of the Plan Investor, Senior Secured Agent and Ad Hoc Group of Senior Secured Lenders.

(c)     The Plan (as supplemented by the Plan Supplement) shall have become, or simultaneously with the issuance of the New Money Shares will become, effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior written consent of the Plan Investor if in the sole judgment of the Plan Investor, any such waiver is adverse to the rights or interests of the Plan Investor).

(d)     The transactions contemplated by the Plan and the Confirmation Order to occur on the Effective Date shall have been consummated on or prior to the Closing Date.

(e)     The Plan Investor Termination Fee Order shall have been entered on or before April 5, 2010 and shall be a Final Order.

SECTION 5.08  No Material Adverse Effect.  There shall not have occurred any event, effect or change from and after December 31, 2009 which the Bankruptcy Court determines has had or could reasonably be expected to have a Material Adverse Effect.

## ARTICLE VI
## CONDITIONS TO THE OBLIGATIONS
## OF THE COMPANY

The obligations of the Company to sell the New Money Shares to the Plan Investor at the Closing is subject to fulfillment, or the waiver, of each of the following conditions on or before the Closing Date:

SECTION 6.01  Representations and Warranties to be True and Correct.  The representations and warranties contained in Article III shall be true, complete and correct in all material respects on and as of the Closing Date, with the same effect as though such representations and warranties had been made on and as of such date, except for representations and warranties that are made as of a specific date or time, which shall be true and correct in all material respects only as of such specific date or time.

SECTION 6.02  Performance.  The Plan Investor shall have performed and complied in all material respects with all covenants, agreements and obligations contained herein required to be performed or complied with by it prior to or at the Closing Date.

SECTION 6.03  Purchase Price.  The Plan Investor shall have delivered to the Company the Purchase Price on the Closing Date.

SECTION 6.04  Delivery of Debt Agreements.  The Company shall have received the New Value Alternative Loan Agreements, duly-executed and delivered, and such New Value Alternative Loan Agreements shall be in form and substance satisfactory to the Company.

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 6.05 <u>Consent and Approvals</u>. All material governmental and third party consents and approvals (including, without limitation, to the extent applicable, the expiration or termination of any waiting period under the HSR Act or any foreign antitrust law) necessary in connection with the offer and sale of the New Money Shares, the execution and filing where applicable, of the new Organizational Documents of the Company and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect.

SECTION 6.06 <u>Bankruptcy-Related Conditions</u>.

(a) The Bankruptcy Court shall have entered the Confirmation Order, which order shall (without limitation) confirm the Plan and authorize the Debtors to execute this Agreement and authorize and approve the transactions contemplated herein, and such Confirmation Order shall have become a Final Order.

(b) The Plan shall have become, or simultaneously with the issuance of the New Money Shares will become, effective.

## ARTICLE VII
## TERMINATION

SECTION 7.01 <u>Termination</u>. At any time prior to the Closing, this Agreement may be terminated as follows:

(a) by mutual written consent of the Plan Investor and the Company;

(b) by the Plan Investor, if, as of such date of termination, the conditions specified in <u>Sections 5.01</u> and <u>5.02</u> (other than with respect to <u>Section 4.06(a)</u> which shall be subject to subsection (i)(5) below and Section 4.13 which shall be subject to subsection (o) below) hereto are not satisfied in all respects and any such breach shall have remained uncured for a period of ten (10) Business Days after the Plan Investor shall have given written notice of such breach to the Company (<u>provided</u> that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period), <u>provided</u> that, as of such date of termination of this Agreement by the Plan Investor, the conditions specified in <u>Sections 6.01</u> and <u>6.02</u> hereto are satisfied;

(c) by the Company, if, as of such date of termination, the conditions specified in <u>Sections 6.01</u> or <u>6.02</u> hereto are not satisfied in all respects and any such breach shall have remained uncured for a period of fifteen (15) Business Days after the Company shall have given written notice of such breach to the Plan Investor (<u>provided</u> that no cure period shall be required for a breach which by its nature cannot reasonably be expected to be cured within such time period), <u>provided</u> that, as of such date of termination of this Agreement by the Company, the conditions specified in <u>Sections 5.01</u> and <u>5.02</u> hereto are satisfied;

(d) by Plan Investor or the Company, if the Bankruptcy Court has not entered the Confirmation Order by April 30, 2010 (<u>provided</u> that, subject to <u>Section 5.07(a)</u>, Plan Investor has the right to extend such date until not later than May 31, 2010) or the Confirmation Order has not become a Final Order within fifteen (15) days thereafter;

*Atrium Corporation*
*Equity Purchase Agreement*

(e) by Plan Investor or the Company, if the Closing has not occurred on or before May 31, 2010, provided that no party shall be entitled to terminate this Agreement pursuant to this Section 7.01(e) if such party's failure to fulfill any of its obligations under this Agreement has been the primary cause of the failure of the Closing to occur on or before such date;

(f) by the Plan Investor, upon written notice to the Company, if a Trigger Event has occurred;

(g) subject.to Section 8.07, by the Plan Investor, upon written notice to the Company;

(h) by the Plan Investor, if the Bankruptcy Court shall not have approved the Disclosure Statement by March 18, 2010, either on the record of a hearing on the Disclosure Statement or by order;

(i) by the Plan Investor, if (1) after the date hereof the Data Room is reopened to any party other than the Plan Investor (except to the extent reopened by or pursuant to order of the Bankruptcy Court, in which case this Agreement may not be so terminated), (2) the Board of Directors withdraws or changes its recommendation of this Agreement in a manner materially adverse to the Plan Investor, (3) the Board of Directors recommends an Acquisition Proposal, (4) the Company enters into a written agreement or letter of intent or agreement in principle providing for any Acquisition Proposal or (5) the Company breaches in any material respect any of its obligations under Section 4.06(a) hereof (provided, however, that the termination right set forth in this clause (5) shall expire upon the entry of the Plan Investor Termination Fee Order);

(j) by the Company, if (1) the Board of Directors resolves in good faith that termination of this Agreement is necessary in order for the Company to accept any higher or better Acquisition Proposal as contemplated by Section 4.06(b), consistent with the Debtor's fiduciary duties under applicable law, or (2) the Bankruptcy Court has ordered the Company to terminate this Agreement in order to accept any Acquisition Proposal;

(k) by the Plan Investor, if the Debtors fail to seek the Plan Investor Termination Fee Order on short notice on or before March 16, 2010 or the Plan Investor Termination Fee Order has not been entered on or prior to April 5, 2010;

(l) by the Plan Investor or the Company, on or prior to May 31, 2010, if, as of the date of termination under this subsection (l), the sum of all amounts set forth in Section 1.06(a) to and including Section 1.06(h) is greater than the sum of (i) (A) if such date of termination is on or prior to April 30, 2010, $439.1 million, or (B) if such date of termination is after April 30, 2010 but on or prior to May 31, 2010, $447.3 million, and (ii) the amount of interest that accrues as provided in the proviso to Section 5.07(a); provided, however, that if as of any date on or prior to May 31, 2010, all of the conditions specified in Article V and Article VI have either been satisfied or waived by the party for whose benefit such conditions exist and the Company has satisfied its obligations under Section 4.02(c) (a "Scheduled Closing Date"), then the right of the Plan Investor to terminate this Agreement pursuant to this Section 7.01(l) shall expire three (3) Business Days after such Scheduled Closing Date; provided, further that

the Company may only exercise its right to terminate this Agreement pursuant to this subsection (l) if the Plan Investor's right to terminate this Agreement pursuant to this subsection (l) has expired and the Plan Investor has not waived such termination right within five (5) Business Days after such Scheduled Closing Date;

(m)     by the Plan Investor, if the Plan is not accepted by at least two-thirds in amount of those holders of allowed Senior Secured Claims that vote on the Plan in accordance with section 1126(b) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3018;

(n)     by the Company, if the Equity Commitment Letter from Golden Gate Private Equity, Inc. is terminated prior to the Closing;

(o)     by the Plan Investor or the Company, if a breach of Section 4.13 is not cured by the Company within ten (10) Business Days of such breach; and

(p)     by the Senior Secured Agent on written notice to the Company and the Plan Investor, if a breach of Section 4.13 is not cured by the Company within fifteen (15) Business Days of such breach.

    SECTION 7.02  Effect of Termination.

(a)     If this Agreement is terminated as permitted by Section 7.01 hereto, this Agreement shall become null and void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: Sections 4.05, 7.02, 8.03, 8.07, 8.09 and 8.15 hereto. For the avoidance of doubt, the Plan Investor Termination Fee Order survives the termination of this Agreement.

(b)     In the event that this Agreement is terminated pursuant to Sections 7.01(f), 7.01(i)(2), (i)(3) or (i)(4), 7.01(j), 7.01(l) or 7.01(m), the Termination Fee shall be paid by the Company and the Debtors in the manner provided in Section 4.05(a). Notwithstanding anything to the contrary in this Agreement, if and only if the Plan Investor actually receives the Termination Fee, then the Plan Investor's right to receive payment of the Termination Fee, if applicable, shall be the sole and exclusive remedy of the Plan Investor against the Company and the Subsidiaries, its direct or indirect equity investors and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents (collectively, the "Company Group") for any loss or damages suffered as a result of this Agreement and/or the transactions contemplated hereby, and upon payment of such Termination Fee, this Agreement shall terminate (except for the obligations that are expressly stated to survive the termination of this Agreement) and none of the members of the Company Group shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

(c)     Nothing contained in this Agreement shall preclude or limit the ability of the Plan Investor to seek and obtain specific performance of the Company's obligations hereunder.

(d)     Notwithstanding anything herein or otherwise, except to the extent provided in Section 4.05(a), the Plan Investor shall not under any circumstances whatsoever have

22

*Atrium Corporation*
                                                                                                      *Equity Purchase Agreement*

under this Agreement an administrative priority claim, a superpriority administrative claim or other priority claim, in each case, against the Debtors

## ARTICLE VIII
## MISCELLANEOUS

SECTION 8.01 Financial Statements and Information. The Company will furnish to the Plan Investor, so long as it shall hold any of the New Money Shares, and to each other holder from time to time of any of the New Money Shares:

(a) Monthly Financials. As soon as available and in any event within 30 days after the end of each month, consolidated statements of operations of the Operating Company and its consolidated Subsidiaries for such period, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such period, setting forth in each case in comparative form the corresponding consolidated statements of operations and cash flows for the corresponding periods in the preceding fiscal year, accompanied by a certificate of a officer of Operating Company, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash flows of Operating Company and its consolidated Subsidiaries in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(b) Quarterly Financials. As soon as available and in any event within 45 days after the end of each quarterly fiscal period of each fiscal year, consolidated statements of operations of Operating Company and its consolidated Subsidiaries for such period, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such period, setting forth in each case in comparative form the corresponding consolidated statements of operations and cash flows for the corresponding periods in the preceding fiscal year, accompanied by a certificate of a officer of Operating Company, which certificate shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash flows of Operating Company and its consolidated Subsidiaries in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(c) Annual Financials. As soon as available and in any event within 90 days after the end of each fiscal year, consolidated statements of operations, cash flows and stockholders' equity of Operating Company and its consolidated Subsidiaries for such year and the related consolidated balance sheet of Operating Company and its consolidated Subsidiaries as of the end of such year, setting forth in each case in comparative form the corresponding consolidated information as of the end of and for the preceding fiscal year, accompanied by an opinion, without material qualification, thereon of independent certified public accountants of recognized national standing, which opinion shall state that said consolidated financial statements fairly present the consolidated financial condition, results of operations and cash

LEGAL_US_E # 87229585.4

*Atrium Corporation*
*Equity Purchase Agreement*

flows of Operating Company and its consolidated Subsidiaries as at the end of, and for, such fiscal year in accordance with GAAP, consistently applied; Operating Company shall supply such additional information and detail as to any item or items contained on any such statement that the Plan Investor (to the extent applicable) may reasonably require; all such information will be prepared in accordance with GAAP consistently applied; and

SECTION 8.02 Further Assurances. Each of the parties shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable law or otherwise to (i) obtain from Governmental Authorities and other Persons all consents, approvals, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement, including, without limitation, the Confirmation Order and the Approvals and any approvals required under the HSR Act (and any applicable foreign antitrust law), and (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the Bankruptcy Code, the HSR Act (and any applicable foreign antitrust law) or any other applicable law. From and after the Closing, each party to this Agreement shall execute, acknowledge and deliver such documents as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purposes hereof or to assure to any other party the benefits hereof.

SECTION 8.03 Expenses. Except as otherwise specified in this Agreement, each party hereto will pay its own expenses in connection with the transactions contemplated hereby, whether or not such transactions shall be consummated.

SECTION 8.04 Financing.

(a)     The Plan Investor shall use its commercially reasonable efforts to arrange the financing on the terms and conditions described in the Debt Commitment Letters, including using commercially reasonable efforts to negotiate definitive agreements with respect thereto on the terms and conditions contained in the Debt Commitment Letters (or on other terms, provided such terms do not contain any condition to funding on the Closing Date that are not set forth in the Debt Commitment Letters that would reasonably be expected to impair or delay the consummation of the financing or the Closing).

(b)     The Company shall provide (and shall cause its Subsidiaries to provide), and each shall use their respective commercially reasonable efforts to cause their officers, employees, representatives and advisors to provide, to the Plan Investor all cooperation and information requested by the Plan Investor (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of the Company and its Subsidiaries) that is necessary in connection with the arrangement of the financing contemplated by this Section 8.04, including, without limitation, (i) participation in meetings, drafting sessions, due diligence sessions, management presentation sessions, road shows and other marketing meetings and sessions with rating agencies, (ii) assisting any tax or other structural planning undertaken by the Plan Investor in connection with the transactions contemplated hereby, (iii) assisting with the preparation of an offering memorandum, a confidential information memorandum for the bank lending (the bank book), materials for the road show and rating agency presentations, business projections, financial statements, (iv) executing and delivering any pledge and security

documents, other definitive financing or other documents as may be reasonably requested by the Plan Investor, including a certificate of the chief financial or other appropriate officer of any of the Company or its Subsidiaries with respect to solvency and financial matters, (v) furnishing the Plan Investor and its financing sources with financial and other pertinent information regarding the Company and its Subsidiaries as may reasonably be requested by the Plan Investor or as otherwise required to be delivered in connection with the financing contemplated hereunder, including, without limitation, all financial statements, historical and pro forma financial data, management's discussion and analysis or plan of operation and other information and data (including, without limitation, the information required by Rule 3-10 of Regulation S-X) of the type customarily required by financing sources in a financing similar to the debt financing, together with any reports of the Company's independent accountants with respect thereto (including, without limitation, a report with respect to an SAS 100 review), (vi) obtaining accountants' comfort letters, legal opinions, surveys and title insurance as may be reasonably requested by the Plan Investor, (vii) providing and preparing all materials necessary to obtain, and otherwise assist the Plan Investor in obtaining, customary rating agencies' confirmations or approvals for the Plan Investor's financing as reasonably requested by the Plan Investor and (viii) facilitating the pledge of collateral, including, without limitation, taking any actions and executing any documents reasonably requested by the Plan Investor in connection therewith (provided that none of such pledges shall be effective prior to the Closing).

SECTION 8.05  No Survival of Representations and Warranties. None of the representations and warranties made by the Company herein or the documents or certificates contemplated hereby shall survive the Closing, and there shall be no liability of any party for any breach of any such representation or warranty. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, THE COMPANY IS NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE COMPANY, THE NEW MONEY SHARES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. THE PLAN INVESTOR ACKNOWLEDGES THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE COMPANY HAS NOT MADE, AND THE COMPANY HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND THE PLAN INVESTOR HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND THE PLAN INVESTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST THE COMPANY AND ITS AFFILIATES AND EACH OF THEIR REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO THE PLAN INVESTOR OR ITS REPRESENTATIVES BY OR ON BEHALF OF THE COMPANY OR ANY OF THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES IN CONNECTION THEREWITH. WITHOUT LIMITING THE FOREGOING, THE COMPANY IS NOT MAKING ANY REPRESENTATION OR WARRANTY TO THE PLAN INVESTOR WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE COMPANY. THE PLAN INVESTOR FURTHER ACKNOWLEDGES THAT THE PLAN INVESTOR HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE COMPANY AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE NEW MONEY SHARES AS THE PLAN INVESTOR DEEMED

25

NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PLAN INVESTOR IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

SECTION 8.06 <u>Parties in Interest</u>. All representations, covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

SECTION 8.07 <u>Liquidated Damages; Limitation on Damages</u>.

(a)     In the event that the Plan Investor shall have exercised the termination option in <u>Section 7.01(g)</u>, or the Company shall have exercised the termination option in <u>Section 7.01(c)</u> or <u>7.01(n)</u> (except in the event that at the time of such termination the Plan Investor has the right to terminate this Agreement under <u>Section 7.01</u>, other than pursuant to <u>Section 7.01(g)</u>), then the Plan Investor shall pay to the Company a fee in the aggregate amount of Thirty Million Dollars ($30,000,000) (the "<u>Reverse Termination Fee</u>") in immediately available funds, such payment to be made concurrent with the termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, if the Company receives payment of the Reverse Termination Fee pursuant to this <u>Section 8.07</u> such payment shall be the sole and exclusive remedy of the Company and the Subsidiaries against the Plan Investor, its members and direct or indirect equity investors and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents (collectively, the "<u>Plan Investor Group</u>") for the loss suffered as a result of this Agreement as contemplated hereby, and upon payment of such Reverse Termination Fee, this Agreement shall terminate (except for the obligations which shall survive the termination of this Agreement) and none of the members of the Plan Investor Group shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. For the avoidance of doubt, in no event shall the Plan Investor be obligated to pay to the Company more than one Reverse Termination Fee under this Agreement.

(b)     The Company shall not be entitled to the remedy of specific performance in respect of any of the Plan Investor's obligations hereunder.

(c)     Notwithstanding any other provision of this Agreement, the aggregate liability of the Plan Investor Group for any loss suffered by the Company and its Subsidiaries under this Agreement or the Equity Commitment Letters shall not exceed Thirty Million Dollars ($30,000,000) whether or not the Reverse Termination Fee is required to be paid in respect of such obligations.

SECTION 8.08 <u>Notices</u>. All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested, or sent by telecopier or telex, addressed as follows:

(a)     if to the Company:

Atrium Corporation
3890 West Northwest Highway
Suite 500
Dallas, Texas 75220
Attention: Chief Financial Officer and General Counsel
Telecopy No.: (214) 905-9185 and (214) 905-4351

with a copy (which shall not constitute notice) to:

Paul, Hastings, Janofsky & Walker LLP
Park Avenue Tower
75 E. 55th Street
New York, New York 10022
Attention: Joel M. Simon and Luke P. Iovine, III
Telecopy No.: (212) 230-7649

(b)     if to the Plan Investor:

c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attention: Jeffrey Kenner
Telecopy No.: (212) 758-0406

and

c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara
Telecopy No.: (415) 983-2701

with a copy (which shall not constitute notice) to:

Mayer Brown LLP
1675 Broadway
New York, New York 10019
Attention: James B. Carlson
Telecopy No.: (212) 849-5515

and

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Kathryn A. Coleman
Telecopy No.: (212) 299-6447

and

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
Attention: Steven J. Reisman
Telecopy No.: (212) 697-1559

(c)    if to the Senior Secured Agent:

GE Business Financial Services, Inc.
500 West Monroe Street
Chicago, IL 60661
Attention: Michele Kovatchis and Heidi Rinehart
Telecopy No.: (312) 441-7379

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
233 South Wacker Drive
Suite 5800
Chicago, IL 60606
Attention: Doug Bacon
Telecopy No.: (312) 993-9767

(d)    if to the Ad Hoc Group of Senior Secured Lenders:

c/o Wachtell, Lipton, Rosen & Katz
51 West 52nd St.
New York, NY 10019
Attention: Scott K. Charles
Telecopy No.: (212) 403-2202

or, in any such case, at such other address or addresses as shall have been furnished in writing by such party to the others.

SECTION 8.09 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

LEGAL_US_E # 87229585.4

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 8.10  Entire Agreement.  This Agreement, including the Schedules and Exhibits hereto, constitutes the sole and entire agreement of the parties with respect to the subject matter hereof. All Schedules and Exhibits hereto are hereby incorporated herein by reference.

SECTION 8.11  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.12  Amendments.  This Agreement may be amended or modified, and any provisions hereof waived and any date herein extended, only with the written consent of the Company, the Plan Investor, the Senior Secured Agent and Ad Hoc Group of Senior Secured Lenders.

SECTION 8.13  Severability.  If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

SECTION 8.14  Titles and Subtitles.  The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

SECTION 8.15  Third Party Beneficiary.

(a)     No Person shall be a third party beneficiary of any of the terms and provisions of this Agreement, other than the Senior Secured Agent, who shall, subject to subsection (b) below, be a third party beneficiary solely with respect to (i) Section 7.01(p) and (ii) the enforcement of the Company's right to receive the Reverse Termination Fee; it being understood and agreed that only the Company may receive the Reverse Termination Fee from the Plan Investor hereunder.

(b)     For a period of 120 days following the exercise of a termination right by either the Plan Investor or the Company causing the Reverse Termination Fee to become due pursuant to Section 8.07(a) (the "Agent's Enforcement Period"), the Senior Secured Agent shall have the exclusive right to bring an action to enforce the Company's right to the Reverse Termination Fee. Such action must be pursued in the Bankruptcy Court in consultation with the Company and in no event may the Senior Secured Agent compromise, waive or effect a settlement of any right or claim of the Company without the Company's prior written consent which consent shall not be unreasonably withheld.

(c)     Other than as expressly set forth in subsection (b) above, nothing herein shall limit the Company's right to, or causes of action in connection with, the Reverse Termination Fee. If the Senior Secured Agent does not commence an action to enforce the Company's rights during the Agent's Enforcement Period, the Company shall have the exclusive right to pursue the Reverse Termination Fee and enforce its rights thereto subject to any order of the Bankruptcy Court.

LEGAL_US_E # 87229585.4

*Atrium Corporation*
*Equity Purchase Agreement*

SECTION 8.16  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)  "Acquisition Proposal" means any inquiry, proposal or offer for a merger, recapitalization, share exchange, stock purchase, debt-for-equity exchange, distribution of securities for the benefit of the stockholders of the Company, consolidation or similar transaction involving a sale or purchase of all or substantially all of the equity securities or Assets of the Company or the Subsidiaries, other than pursuant to this Agreement (except for (i) any debt-for-equity exchange or other transaction pursuant to which the Senior Secured Lenders exchange their debt for debt and/or equity of the Company and (ii) the Stand-Alone Alternative, neither of which shall constitute an Acquisition Proposal).

(b)  "Ad Hoc Group of Senior Secured Lenders" shall have the meaning specified in the Plan.

(c)  "Administrative Claims" shall have the meaning specified in the Plan.

(d)  "Affiliate" shall have the meaning specified in the Plan.

(e)  "Agent's Enforcement Period" shall have the meaning specified in Section 8.15(b).

(f)  "Agreement" shall have the meaning specified in the preamble of this Agreement.

(g)  "Approvals" shall mean any approvals and other authorizations required by the Bankruptcy Code.

(h)  "A/R Facility" shall have the meaning specified in the Plan.

(i)  "Assets" means the assets and properties of the Company and the Subsidiaries.

(j)  "Assumption Schedule" shall have the meaning specified in Section 4.01(b)(ii).

(k)  "Bankruptcy Code" shall have the meaning specified in the Plan.

(l)  "Bankruptcy Court" shall have the meaning specified in the recitals of this Agreement.

(m)  "Benefit Plan" shall mean at any time an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by any member of the ERISA Group or with respect to which the Company or its Subsidiaries could incur liability.

*Atrium Corporation*
*Equity Purchase Agreement*

(n)     "Board" shall have the meaning specified in Section 4.14.

(o)     "Business" means the Operating Company and its Subsidiaries' business of manufacturing, distributing and selling residential windows, doors and other related building material products.

(p)     "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York.

(q)     "CCAA Proceeding" shall have the meaning specified in the Plan.

(r)     "Chapter 11 Cases" shall have the meaning specified in the Plan.

(s)     "Closing" and "Closing Date" shall have the respective meanings specified in Section 1.04.

(t)     "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the U.S. Treasury Regulations promulgated thereunder.

(u)     "Common Stock" means the common stock, $0.01 par value per share, of the Company.

(v)     "Company" shall have the meaning specified in the preamble of this Agreement.

(w)     "Confirmation Order" shall have the meaning specified in the Plan, which Confirmation Order shall be in form and substance reasonably satisfactory to the Plan Investor.

(x)     "Contract" means any contract, arrangement, note, bond, commitment, purchase order, sales order, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith, other than any Benefit Plans.

(y)     "Data Room" means a virtual data room in which the Company has posted all materials necessary for potential investors or acquirers to conduct due diligence on a transaction.

(z)     "Debt Commitment Letters" shall have the meaning specified in Section 3.09.

(aa)    "Debtors" shall have the meaning specified in the Plan.

(bb)    "Designated Acquisition Proposal" shall mean an Acquisition Proposal that is consummated by the Company and results in payment of the amounts set forth in Section 1.06(a), (b), (c), (d), (e), (f), (g), and (h) with such amounts being determined and calculated (including with respect to interest accrued at the default contract rate) as of the date of

consummation of such Acquisition Proposal, and disregarding the proviso limitation set forth in Section 1.06(d).

(cc) "Disclosure Statement" shall have the meaning specified in the Plan.

(dd) "Effective Date" shall have the meaning specified in the Plan.

(ee) "Environment" shall mean ambient air, indoor air, soil, surface water, ground water, drinking water, land or subsurface strata and natural resources such as wetlands, flora and fauna.

(ff) "Environmental Claim" shall mean, with respect to any Person, any written notice, claim, demand or other communication (collectively, a "claim") by any other Person alleging such Person's liability for any costs, cleanup costs, response, corrective action or other costs, damages to natural resources or other Property, personal injuries, fines or penalties arising out of or resulting from (i) the presence, Release or threatened Release into the Environment, of any Hazardous Material at any location, whether or not owned by such Person, or (ii) any violation of any Environmental Law. The term "Environmental Claim" shall include, without limitation, any claim by any Person seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the known or suspected presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the Environment.

(gg) "Environmental Laws" shall mean any and all applicable laws, rules or regulations of any Governmental Authority, any orders, decrees, judgments or injunctions and the common law in each case relating to pollution or protection of health, safety or the Environment, including without limitation, those relating to Releases or threatened Releases of Hazardous Materials into the Environment, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

(hh) "Equity Commitment Letters" shall have the meaning specified in Section 3.09.

(ii) "Equity Interests" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of capital of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, whether outstanding on or after the Closing Date.

(jj) "ERISA" shall mean the United States Employee Retirement Income Security Act of 1974, as amended.

(kk) "ERISA Affiliate" shall mean, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of

ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

(ll)    "Final Order" shall mean an order or a judgment entered by the Bankruptcy Court that is not stayed.

(mm)    "GAAP" shall mean generally accepted accounting principles in effect in the United States of America and set forth as of the relevant date in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

(nn)    "Governmental Order" means any order, writ, ruling, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

(oo)    "Governmental Authority" shall mean any government or political subdivision of the United States or any other country or any agency, authority, board, bureau, central bank, commission, department or instrumentality thereof or therein, including, without limitation, any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to such government or political subdivision.

(pp)    "Hazardous Material" means any and all pollutants, toxic or hazardous wastes or any other substances that is regulated pursuant to any Environmental Law (including, without limitation, asbestos, urea formaldehyde foam insulation and polychlorinated biphenyls).

(qq)    "HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(rr)    "Law" shall mean any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

(ss)    "Licenses" shall mean certificates of public convenience and necessity, franchises, licenses and other permits and authorizations from governmental authorities.

(tt)    "Lien" shall mean, with respect to any Property, any mortgage, deed of trust, lien, pledge, claim, charge, security interest or encumbrance of any kind, whether consensual or non-consensual, any other type of preferential arrangement in respect of such Property having the effect of a security interest or any filing consented to by the Company or any of its Subsidiaries of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority consented to by the Company or any of its Subsidiaries, including any easement, right-of-way or other encumbrance on title to Real Property, and any agreement to give any of the foregoing. For purposes of this Agreement, a Person shall be deemed to own subject to a Lien any Property that it has acquired

33

*Atrium Corporation*
                                      *Equity Purchase Agreement*

or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Property.

(uu) "Material Adverse Effect" shall mean (i) any change, event, occurrence or state of facts that has resulted or would reasonably be expected to result in a material adverse effect on the business, results of operations, financial condition, assets or liabilities of the Company and its Subsidiaries, taken as a whole, (ii) a material adverse effect on the ability of the Company to perform any of its material obligations under this Agreement or the Plan, or (iii) a material adverse effect on the legality, binding effect or enforceability of any material provision of this Agreement or any of the material rights and remedies of the Plan Investor hereunder or thereunder, excluding solely in the case of clause (i) any such change, event, occurrence or state of facts resulting from (a) changes in GAAP or changes in the regulatory accounting requirements applicable to any industry in which the Company or any of its Subsidiaries operates which occur or become effective after the date hereof, (b) changes in the financial or securities markets in the United States, (c) changes in the general economic or political conditions in the United States that do not have a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (d) changes (including changes of applicable law) or conditions generally affecting the industry in which the Company or any of its Subsidiaries operates and not specifically relating to or having a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (e) acts of war, sabotage or terrorism or natural disasters involving the United States of America that do not have a materially disproportionate effect on the Company and its Subsidiaries, taken as a whole, (f) the announcement or consummation of the transactions contemplated by this Agreement (including any impact on customers or employees), (g) any failure, in and of itself, by the Company or any of its Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (it being understood that the cause for such failure may be taken into account in determining whether there has been a Material Adverse Effect, except to the extent the change, event, occurrence or state of facts causing such failure is otherwise described in any of clause (a) through (i) of this definition), (h) any action taken (or omitted to be taken) as required by this Agreement or at the request of the Plan Investor, or (i) any action taken by the Company or any of its Subsidiaries pursuant to any order of the Bankruptcy Court entered prior to the date hereof.

(vv) "Multiemployer Plan" shall mean at any time a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA (i) to which any member of the ERISA Group is then making or accruing an obligation to make contributions while a member of the ERISA Group, (ii) to which any member of the ERISA Group has within the preceding five plan years made contributions, including for these purposes any Person which ceased to be a member of the ERISA Group during such five year period, or (iii) with respect to which the Company or its Subsidiaries is reasonably likely to incur liability.

(ww) "New By-Laws" shall have the meaning specified in the Plan.

(xx) "New Certificate of Incorporation" shall have the meaning specified in Section 1.01.

(yy) "New Common Stock" shall have the meaning specified in the Plan.

*Atrium Corporation*
*Equity Purchase Agreement*

(zz)    "New Money Shares" shall have the meaning specified in the recitals of this Agreement.

(aaa)    "New Value Alternative Loan Agreements" shall have the meaning specified in the Plan.

(bbb)    "Observer" shall have the meaning specified in Section 4.14.

(ccc)    "Operating Company" means Atrium Companies, Inc.

(ddd)    "Organizational Documents" of any Person shall mean such Person's charter, certificate of incorporation, code of regulations, by-laws, partnership agreement, operating agreement, limited liability company agreement, trust agreement, as applicable, and/or any other similar agreement, document or instrument.

(eee)    "Permitted Lien" shall have the meaning specified in the New Value Alternative Loan Agreements.

(fff)    "Person" means any individual, partnership, joint venture, association, joint stock company, corporation, trust, trustee, limited liability company, unincorporated organization, or other entity, including, without limitation, a Governmental Authority.

(ggg)    "Plan" shall have the meaning specified in the recitals of this Agreement.

(hhh)    "Plan Investor" shall have the meaning specified in the preamble of this Agreement.

(iii)    "Plan Investor Group" shall have the meaning specified in Section 8.07.

(jjj)    "Plan Investor Termination Fee Order" shall have the meaning specified in Section 4.05(a).

(kkk)    "Priority Claims" shall mean all priority claims allowed under the Bankruptcy Code.

(lll)    "Proceeding" shall mean any claim, counterclaim, action, judgment, suit, hearing, governmental investigation, arbitration or proceeding, including by or before any Governmental Authority and whether judicial or administrative.

(mmm)"Projections" shall have the meaning specified in Section 4.02(a).

(nnn)    "Property" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any Person.

(ooo)    "Proprietary Rights" shall mean any patents, registered and common law trademarks, service marks, trade names, copyrights, licenses and other similar rights (including,

without limitation, know-how, trade secrets and other confidential information) and applications for each of the foregoing, if any.

(ppp) "Purchase Price" shall have the meaning specified in Section 1.03.

(qqq) "Real Property" shall mean all right, title and interest of the Company and its Subsidiaries (including, without limitation, any leasehold estate) in and to a parcel of real property owned or operated by the Company and its Subsidiaries, whether by lease, license or other use agreement, together with, in each case, all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof or thereon.

(rrr) "Release" shall mean any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the Environment, except when in compliance with the terms of applicable laws and permits.

(sss) "Representatives" shall have the meaning specified in Section 4.05(a).

(ttt) "Reverse Termination Fee" shall have the meaning specified in Section 8.07.

(uuu) "Securities Act" shall mean the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect from time to time.

(vvv) "Senior Secured Agent" shall have the meaning specified in the Plan.

(www) "Senior Secured Credit Agreement" shall have the meaning specified in the Plan.

(xxx) "Scheduled Closing Date" shall have the meaning specified in Section 7.01(l).

(yyy) "Stand-Alone Alternative" shall have the meaning specified in the Plan.

(zzz) "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture, or other legal entity, of which such Person (x) owns, directly or indirectly, more than 50% of the stock or other ownership interests of such other legal entity or (y) controls the vote or otherwise has the right to elect, nominate or designate, more than 50% of the board of directors or other governing body of such corporation or other legal entity.

(aaaa) "Taxes" shall mean any and all present or future taxes, imposts, duties, charges, fees, levies or other charges or assessments of whatever nature, including, but not limited to, income, gross receipts, excise, real or personal property, sales, withholding, social security, retirement, unemployment, occupation, use, service, license, net worth, payroll, franchise, and transfer and recording, imposed by the Internal Revenue Service or any taxing authority (whether domestic or foreign, including any federal, state, U.S. possession, county,

local or foreign government or any subdivision or taxing agency thereof), whether computed on a separate, consolidated, unitary, combined or any other basis, including interest, fines, penalties or additions to tax attributable to or imposed on or with respect to any such taxes, charges, fees, levies or other assessments.

(bbbb) "Termination Fee" shall have the meaning specified in Section 4.05(a).

(cccc) "Trigger Event" means any of the following: (a) the Debtors shall seek to confirm the Plan or any other plan of reorganization, or a Plan or other plan of reorganization shall have been confirmed, other than the Plan based on (i) the New Value Alternative (as defined in the Plan as in effect on the date hereof), (ii) the New Money Investment funded by the parties identified as the Plan Investor hereunder pursuant to the terms of this Agreement, and (iii) New Value Alternative Loans provided by the financing sources pursuant to the terms of the Debt Commitment Letters; or (b) the Debtors shall seek to effect, or there shall have been effected, any sale, transaction proposal or offer with respect to any dissolution, winding up, liquidation, reorganization, sale of capital stock or assets, merger, consolidation, equity or debt financing or restructuring (either under chapter 7 or chapter 11 of the Bankruptcy Code or otherwise) other than the Plan based on (i) the New Value Alternative (as defined in the Plan as in effect on the date hereof), (ii) the New Money Investment funded by the parties identified as the Plan Investor hereunder pursuant to the terms of this Agreement, and (iii) New Value Alternative Loans provided by the financing sources pursuant to the terms of the Debt Commitment Letters.

(dddd) "UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

*[Remainder of page intentionally left blank]*

LEGAL_US_E # 87229585.4

*Atrium Corporation*
*Equity Purchase Agreement*

IN WITNESS WHEREOF, the Company and the Plan Investor have executed this Agreement as of the date first written above.

**COMPANY:**

ATRIUM CORPORATION

By: _____

Name: Gregory T. Faherty
Title: President & Chief Executive Officer

**PLAN INVESTOR:**

ATRIUM WINDOW HOLDINGS, LLC

By: _____

Name: Thomas M. Wolf
Title: Authorized Representative

IN WITNESS WHEREOF, the Company and the Plan Investor have executed this Agreement as of the date first written above.

**COMPANY:**

ATRIUM CORPORATION

By:  _____

Name: Gregory T. Faherty
Title:   President & Chief Executive Officer

**PLAN INVESTOR:**

ATRIUM WINDOW HOLDINGS, LLC

By:  _____

Name: Thomas M. Wolf
Title:   Authorized Representative

### Schedule 1.06(e) Plan Payments

For purposes of <u>Section 1.06(e)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| A/R Facility Cap | $23,400,000.00 | $27,000,000.00 |

## Schedule 1.06(f) Plan Payments

For purposes of <u>Section 1.06(f)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| DIP Claims Cap (net of cash) | $15,535,000.00 | $20,255,000.00 |

## Schedule 1.06(g) Plan Payments

For purposes of <u>Section 1.06(g)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| Administrative Claims and Priority Claims Cap | $6,450,000.00 | $6,300,000.00 |

## Schedule 1.06(h) Plan Payments

     For purposes of <u>Section 1.06(h)</u> of the Agreement, the amount in column (a) shall be the applicable amount on or before April 30, 2010 and the amount in column (b) shall be the applicable amount after April 30, 2010, but on or before May 31, 2010.

| Amount | (a) | (b) |
|---|---|---|
| Cap on all other amounts necessary to consummate the Plan | $1,100,000.00 | $1,100,000.00 |

## Joint Plan of Reorganization

[Attached]

## Wire Instructions

Atrium Companies, Inc.
Bank of America
Dallas TX

ABA# 026-009-593
ACCT# 0047-9796-7737

**EXHIBIT C**

## Equity Commitment Letters

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn: Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara

Re:    Atrium Corporation

Gentlemen:

This equity commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint Plan of Reorganization attached hereto as Exhibit A, Golden Gate Private Equity, Inc. (the "Equity Investor", "GGC", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $129,200,000 (the "Commitment Amount") (at a price of $1,000 per unit) for Class B Units of Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner" and, together with GGC, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood and agreed that, notwithstanding anything to contrary in this Letter, GGC shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of GGC's pro rata portion (based on its commitment relative to the commitments of all Sponsors) of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable by Holdings pursuant to the New Value Investment Agreement. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated as of the date hereof (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11

1

Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Plan Investor, the "Plan" and the "Disclosure Statement", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.      Conditions; Funding. The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.      Liquidated Damages. Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all Sponsors) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "Liquidated Damages Amount".

3.      Termination. The Equity Investor's obligations hereunder (the "Commitment") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by GGC, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable, and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "Expiration Date"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the termination of the New Value Investment Agreement shall not relieve the Equity Investor of any

2

liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4.    Assignment. GGC reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned. The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5.    Single Obligor. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

6.    Submission to Jurisdiction; Waiver of Jury Trial. THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND

3

CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.     Counterparts; Indemnity. This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement. In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed, to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.     Amendments; No Waiver. This letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect. No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.     No Third Party Beneficiary; Damages. Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the Senior Secured Agent are beneficiaries of this Letter. There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than Holdings (and the Target and the Senior

4

Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

10. <u>Entire Agreement</u>. This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

* * * * *

Mar 10 2010 7:45PM

03/10/2010 19:58 FAX

KIRKLAND-ELLIS

415-435-8147

P.3

007/022

We look forward to working with you.

GOLDEN GATE PRIVATE EQUITY, INC.

By:

Name: David Dominik

Title: Authorized Signatory

So Agreed to and Accepted
this ___ day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____

Name:

Title:

We look forward to working with you.

GOLDEN GATE PRIVATE EQUITY, INC.

By: _____
        Name: David Dominik
        *Title:* Authorized Signatory

So Agreed to and Accepted
this 12th day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
        Name: Thomas M. Wolf
        Title:   Authorized Representative

Exhibit A

First Amended Joint Plan of Reorganization

[attached]

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn:    Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn:    Rajeev Amara

Gentlemen:

The purpose of this letter is to set forth the equity commitments of certain
affiliates of Kenner & Company, Inc. to invest $40.0 million in KWC Holdings, L.P., a
Delaware limited partnership ("KWC") formed by Kenner & Company, Inc. ("Kenner")
for purposes of KWC's investment in Atrium Window Holdings, LLC, a Delaware
limited liability company ("Holdings") formed by affiliates of Kenner and Golden Gate
Capital ("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings'
investment (the "New Value Investment") in substantially all of the equity interests of
Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired
Business"). KWC's investment in Holdings is subject to the terms and conditions of the
Equity Commitment Letters described below.   We understand that the New Value
Investment will be effected pursuant to an Equity Purchase Agreement, dated as of March
12, 2010 (the "New Value Investment Agreement"), between Holdings and the Target
and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the
"Borrower") will be an indirect subsidiary of Holdings.

We further understand that the New Value Investment will be effected pursuant to
the Plan (as defined below) to be confirmed in the chapter 11 case in which the Target is
the debtor in possession, currently pending in the United States Bankruptcy Court for the
District of Delaware as Case No. 10-10150 (the "Chapter 11 Case").   Certain of Target's
subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly
administered with the Chapter 11 Case.  The terms of the New Value Investment are set
forth in the Joint Plan of Reorganization (the "Plan") filed with the Bankruptcy Court on
January 20, 2010 and a related disclosure statement (the "Disclosure Statement") filed
with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules,

annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Sponsors).

Each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to KWC or Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters. A copy of the Equity Commitment Letters from each of the Kenner Equity Investors listed below is attached hereto:

| Investors | Equity Commitment ($ in millions) |
|-----------|-----------------------------------|
| PPM America Private Equity Fund I, LP | $ 20.0 |
| Twin Bridge Capital Partners | 11.0 |
| Kenner Equities IV, L.P. | 9.0 |
| Total | $ 40.0 |

We look forward to working with you.

KWC HOLDINGS, L.P.

By: Kenner Equity Partners, LLC, its General
Partner

By: _____

Name: Thomas M. Wolf
Title:   Managing Director


So Agreed to and Accepted
this 16th day of March, 2010:


ATRIUM WINDOW HOLDINGS, LLC


By: _____

Name: Thomas M. Wolf
Title: Managing Director

March 12, 2010

Atrium Window Holdings, LLC
c/o Kenner & Company, Inc.
437 Madison Avenue
36th Floor
New York, New York 10022
Attn: Jeffrey Kenner

and

Atrium Window Holdings, LLC
c/o Golden Gate Capital
One Embarcadero Center
39th Floor
San Francisco, CA 94111
Attn: Rajeev Amara

Re:    Atrium Corporation

Gentlemen:

This equity commitment letter (this "Letter") confirms the agreement that, subject to the satisfaction of the conditions to confirmation set forth in this Letter and the First Amended Joint Plan of Reorganization attached hereto as Exhibit A, Kenner Equities IV, L.P. (the "Equity Investor", "Kenner IV", "we" or "us") hereby commits that it and/or one or more of its affiliates will invest $9,000,000 (the "Commitment Amount"), directly or indirectly, in Atrium Window Holdings, LLC, a Delaware limited liability company ("Holdings") formed by affiliates of Kenner & Company, Inc. ("Kenner") and Golden Gate Private Equity, Inc. ("GGC" and, together with Kenner, the "Sponsors") in connection with Holdings' investment (the "New Value Investment") in substantially all of the equity interests of Atrium Corporation (the "Target" and, together with its subsidiaries, the "Acquired Business") it being understood and agreed that, notwithstanding anything to contrary in this Letter, Kenner IV shall not, under any circumstances, be obligated to (or to cause any other person or entity to) contribute to, purchase equity of or otherwise provide funds to Holdings (or any other person or entity in respect of the New Value Investment) in an amount in excess of Kenner IV's pro rata portion (based on its commitment relative to the commitments of all Sponsors) of the liquidated damages (which shall not exceed $30,000,000 in the aggregate), if any, payable by Holdings pursuant to the New Value Investment Agreement. We understand that the New Value Investment will be effected pursuant to an Equity Purchase Agreement, dated March 12, 2010 (the "New Value Investment Agreement"), between Holdings and the Target and, upon consummation of the New Value Investment, Atrium Companies, Inc. (the "Borrower") will be an indirect subsidiary of Holdings.

We understand that the New Value Investment will be effected pursuant to the Plan (as defined below) to be confirmed in the chapter 11 case in which Target is the debtor in

17620719

possession, currently pending in the United States Bankruptcy Court for the District of Delaware as Case No. 10-10150 (the "Chapter 11 Case"). Certain of Target's subsidiaries are also debtors in chapter 11 cases that have been consolidated to be jointly administered with the Chapter 11 Case. The terms of the New Value Investment are set forth in the Joint Plan of Reorganization filed with the Bankruptcy Court on January 20, 2010 and a related disclosure statement filed with the Bankruptcy Court on January 20, 2010 (including all exhibits, schedules, annexes and supplements thereto that were filed on January 20, 2010 or that are filed thereafter and are in form and substance acceptable to the Sponsors, the "Plan" and the "Disclosure Statement", respectively).

Also, each of the Sponsors and certain other investors have each executed an equity commitment letter to Holdings in connection with the New Value Investment, substantially in the same form as this Letter (collectively, the "Equity Commitment Letters"), pursuant to which each of such investors has agreed to provide equity financing to Holdings in connection with the New Value Investment, subject in each case to the terms and conditions of the Equity Commitment Letters.

Capitalized terms used but not defined in this Letter have the meanings set forth in the Plan.

1.      Conditions; Funding.  The Equity Investor's foregoing commitment is subject to the satisfaction (and not waiver, except for any such waiver approved in writing in advance by the Equity Investor) of each and all of the conditions to closing in favor of Holdings set forth in the New Value Investment Agreement.

2.      Liquidated Damages.  Notwithstanding the foregoing, in the event the New Value Investment Agreement is terminated in a manner giving rise to an obligation of Holdings to pay liquidated damages to Target, the Equity Investor shall be obligated to fund its pro rata portion (based on its commitment relative to the commitments of all Sponsors) of such liquidated damages (which shall not exceed $30,000,000 in the aggregate). Such portion is referred to herein as the "Liquidated Damages Amount".

3.      Termination.  The Equity Investor's obligations hereunder (the "Commitment") will terminate and expire on the earliest to occur of (i) the consummation of the New Value Investment, (ii) the expiration or termination of the New Value Investment Agreement in accordance with the terms thereof, (iii) any amendment, modification or waiver of any provision of the New Value Investment Agreement not consented to in writing by Kenner IV, (iv) the date as of which the Equity Investor has funded to Target, on behalf of Holdings, an amount equal to the Commitment Amount or the Liquidated Damages Amount, as applicable and (v) the delivery of written notice by the Equity Investor to Holdings at any time that Holdings may terminate the New Value Investment Agreement in accordance with its terms (the "Expiration Date"); provided that (w) if any termination of the Commitment pursuant to the foregoing clause (v) is effected solely in reliance on Holdings' right to terminate the New Value Investment Agreement pursuant to Section 7.01(g) thereof, the Equity Investor shall deliver to Holdings, as a condition to the effectiveness of such termination, an amount equal to the Equity Investor's Liquidated Damages Amount, (x) to seek recovery from the Equity Investor for any such breach of this letter, litigation must be commenced against Equity Investor with respect thereto in a court of

competent jurisdiction no later than 6 months following the termination of the Commitment hereunder, (y) the Equity Investor will not be liable for a breach of this Letter unless Holdings is liable for a breach of its obligations set forth in the New Value Investment Agreement and (z) the termination of the New Value Investment Agreement shall not relieve the Equity Investor of any liability or obligation that it may have under Section 2 of this Letter with respect to the Liquidated Damages Amount arising on or prior to the Expiration Date (which liability or obligation shall be the Equity Investor's sole obligation hereunder in the event of such a termination), so long as a claim is made by the Target against Holdings in respect thereof prior to the date that is six months following the termination of the New Value Investment Agreement. Notwithstanding anything to the contrary set forth herein, neither this Letter nor the Commitment shall be effective unless there has been prior execution and delivery of the New Value Investment Agreement by Holdings and the Target. Any term or provision hereof to the contrary notwithstanding, this Section 3 and Sections 5, 6, 7, 8, 9 and 10 below shall survive any termination of the Commitment pursuant to this paragraph.

4.　　Assignment. Kenner IV reserves the right, prior to or after execution of definitive documentation for the financing transactions contemplated hereby, to assign any portion of its Commitment hereunder to one or more affiliates, and upon the actual funding of such assigned portion of the Commitment effective upon the funding of the entire Commitment Amount so assigned by one or more of such assignees, the Equity Investor shall have no further obligation to Holdings (or any other person or entity) with respect thereto; provided, however, that in the event that the Target does not consent to release the Equity Investor, such assignment shall not relieve the Equity Investor of its obligations hereunder until the funding of the entire Commitment Amount or Liquidated Damages Amount, as applicable, so assigned. The rights of Holdings under this Letter may not be assigned in any manner without the Equity Investor's prior written consent and any attempted assignment in violation of this paragraph shall be null and void and shall render the Commitment of no further force or effect.

5.　　Single Obligor. Notwithstanding anything that may be expressed or implied in this letter, Holdings, by its acceptance of the benefits of this Letter, covenants, agrees and acknowledges that no person or entity other than the undersigned shall have any obligation hereunder and that no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of the undersigned (and to the extent a portion of the Commitment is assigned to one or more permitted assignees, such permitted assignees) or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee (other than a permitted assignee of the Commitment hereunder) of any of the foregoing, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of the undersigned, as such, for any obligations of the undersigned under this letter or any documents or instrument delivered in connection herewith or for any claim based on, in respect of, or by reason of such obligations or their creation.

17620719

6.    Submission to Jurisdiction; Waiver of Jury Trial. THIS LETTER AND ANY CLAIM, COUNTERCLAIM, CONTROVERSY OR DISPUTE OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER ("CLAIM"), DIRECTLY OR INDIRECTLY, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE EQUITY INVESTOR AND HOLDINGS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE ADJUDICATION OF ANY CLAIM AND PERSONAL SERVICE WITH RESPECT THERETO OR THE UNITED STATES BANKRUPTCY COURT WHERE A BANKRUPTCY CASE INVOLVING THE EQUITY INVESTOR IS FILED. THE EQUITY INVESTOR HEREBY CONSENTS TO PERSONAL JURISDICTION, SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM ARISING OUT OF OR IN ANY WAY RELATING TO THIS LETTER IS BROUGHT BY ANY THIRD PARTY AGAINST HOLDINGS. HOLDINGS AND THE EQUITY INVESTOR EACH WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATING TO THIS LETTER. THE EQUITY INVESTOR AGREES THAT A FINAL JUDGMENT IN ANY PROCEEDING OR COUNTERCLAIM BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON THE EQUITY INVESTOR AND MAY BE ENFORCED IN ANY OTHER COURTS TO THE JURISDICTION OF WHICH THE EQUITY INVESTOR IS OR MAY BE SUBJECT, BY SUIT UPON SUCH JUDGMENT.

7.    Counterparts; Indemnity. This Letter may be signed in two or more counterparts (by facsimile or otherwise), any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement. In consideration of the undersigned's execution and delivery of this Letter to Holdings, Holdings agrees, whether or not definitive documentation with respect to the contemplated financing is executed to indemnify and hold the Equity Investor (and its Affiliates, and their respective directors, partners, officers, employees, agents and advisors) harmless from and against any and all liabilities or losses with respect to or arising out of the transactions contemplated by this Letter or the New Value Investment Agreement, or the execution, delivery, enforcement and performance, or consummation of the transactions under, the New Value Investment Agreement or any of the other agreements and financings and other transactions referred to herein or in any agreements executed in connection herewith.

8.    Amendments; No Waiver. This letter may not be amended or waived (i) prior the Effective Time without the written consent of the Target, the Senior Secured Agent, Holdings and the Equity Investor or (ii) after the Effective Time in any respect. No failure or delay on the part of either party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be deemed a waiver of any other right hereunder.

9.    No Third Party Beneficiary; Damages. Subject to the terms and conditions of this Letter and Sections 8.15(a) and (b) of the New Value Investment Agreement, the Target and the

17620719

Exhibit A

First Amended Joint Plan of Reorganization

[attached]

Senior Secured Agent are beneficiaries of this Letter. There is no express or implied intention to confer any rights, relief, remedies, benefits, obligations or liabilities on any third party, and nothing in this Letter is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than Holdings (and the Target and the Senior Secured Agent, as third party beneficiaries of this Letter as provided herein). Nothing set forth in this Letter contains or gives, or shall be construed to contain or to give, any person or entity, including any person or entity acting in a representative capacity, (other than Holdings, or the Target and the Senior Secured Agent as third party beneficiaries of this Letter as provided herein) any remedies under or by reason of, or any rights to enforce or cause Holdings to enforce, the commitments set forth herein. In no event shall any party or third party beneficiary of this Letter be entitled to any consequential, exemplary, special, indirect punitive damages or any equitable remedies (including without limitation any right to specific performance). Notwithstanding anything to the contrary in this Letter, any claim brought hereunder that requires a determination as to whether the conditions to Holdings' obligations under the New Value Investment Agreement have been satisfied shall be brought in the United States Bankruptcy Court where the bankruptcy case involving Target is filed.

10.      Entire Agreement.   This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, oral or written, between the parties with respect to the subject matter hereof.

*    *    *    *    *

We look forward to working with you.

KENNER EQUITIES IV, L.P.

By: Kenner Equity Partners, LLC, its General
Partner

By: _____
Name: Jeffrey L. Kenner
Title: Managing Director

So Agreed to and Accepted
this __day of March, 2010:

ATRIUM WINDOW HOLDINGS, LLC

By: _____
Name: Jeffrey L. Kenner
Title: Authorized Representative