IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ATRIUM CORPORATION, *et al.*,[1] | Case No. 10-10150 (BLS) |
| Debtors. | Jointly Administered |
| | Related to Docket No. 377 |

## OBJECTION OF MERRILL LYNCH CAPITAL SERVICES, INC. TO CONFIRMATION OF THE FIRST MODIFIED JOINT PLAN OF REORGANIZATION OF ATRIUM CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Merrill Lynch Capital Services, Inc., a secured creditor and party in interest herein ("Merrill Lynch"), hereby files this objection (the "Objection") to confirmation of the *First Modified Joint Plan of Reorganization of Atrium Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [**Docket No. 377**] (the "First Modified Plan") filed by the above-named debtors and debtors-in-possession (collectively, the "Debtors"). In support of this Objection, Merrill Lynch respectfully states the following:

### I. Background

1. On January 20, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors are currently operating their businesses and managing

---

[1] The Debtors include Atrium Corporation; ACIH, Inc.; Aluminum Screen Manufacturers, Inc.; Atrium Companies, Inc.; Atrium Door and Window Company – West Coast; Atrium Door and Window Company of Arizona; Atrium Door and Window Company of the Northeast; Atrium Door and Window Company of the Northwest; Atrium Door and Window Company of the Rockies; Atrium Enterprises, Inc; Atrium Extrusion Systems, Inc.; Atrium Florida, Inc.; Atrium Vinyl, Inc.; Atrium Window and Doors of Ontario, Inc.; Champion Window, Inc.; North Star Manufacturing (London) Ltd.; R.G. Darby Company, Inc.; Superior Engineered Products Corporation; Thermal Industries, Inc.; and Total Trim, Inc.

---

their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A. The Debtors' Indebtedness to Merrill Lynch and the Prepetition Senior Secured Lenders

2. Pursuant to that certain Credit Agreement, dated as of December 28, 2004 (the "<u>Credit Agreement</u>"), by and among Atrium Companies, Inc., as borrower, the guarantors party thereto, Merrill Lynch Capital, as administrative agent, and a group of lenders more particularly described in the Credit Agreement, the Debtors obtained certain loans and other financial accommodations to, *inter alia*, fund the Debtors' operations.

3. Thereafter, in connection with the Credit Agreement and the loans advanced thereunder, Atrium Companies, Inc. and Merrill Lynch Capital Services, Inc. entered into that certain International Swap Dealers Association, Inc. Master Agreement, dated as of January 13, 2005 (the "<u>Swap Contract</u>"). A true and correct copy of the Swap Contract is attached hereto as **Exhibit A**.

4. On October 15, 2008, Atrium Companies, Inc., as borrower, and each of the Debtors (other than Atrium Corporation), as guarantors, entered into that certain Second Amended and Restated Credit Agreement, dated as of October 15, 2008 (the "<u>Senior Secured Credit Agreement</u>"), by and among Atrium Companies, Inc., as borrower, the guarantors party thereto, GE Business Financial Services Inc., as administrative agent, and a group of lenders more particularly described in the Senior Secured Credit Agreement (collectively, the

"Prepetition Senior Secured Lenders"). The Senior Secured Credit Agreement amended and restated the Credit Agreement.[2]

5. As of the Petition Date, the Debtors were indebted to (a) the Prepetition Senior Secured Lenders in the aggregate amount of approximately $383.1 million under the Senior Secured Credit Agreement, and (b) Merrill Lynch in an amount in excess of $4.6 million for unpaid swap payments due under the Swap Contract.[3] The Debtors' indebtedness to the Prepetition Senior Secured Lenders and Merrill Lynch is secured by liens in substantially all of the Debtors' assets (as defined in the Senior Secured Credit Agreement, the "Collateral"). The liens in the Collateral held by the Prepetition Secured Lenders and Merrill Lynch, respectively, are equal in priority.

### B. The Subordination Provisions of the Senior Secured Credit Agreement

6. The Senior Secured Credit Agreement contains a "waterfall" provision governing the application of proceeds received "in respect of any sale of, collection from or other realization upon all or any party of the Collateral..."[4] Specifically, Section 12 of the Senior Secured Credit Agreement, entitled "Application of Proceeds," provides:

> The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

---

[2] The Credit Agreement was initially amended and restated by that certain Amended and Restated Credit Agreement, dated as of June 21, 2006, by an among Atrium Companies, Inc., as borrower, the guarantors party thereto, Merrill Lynch Capital, as administrative agent, and the other borrowers party thereto. The Amended and Restated Credit Agreement was amended and restated, in turn, by the Senior Secured Credit Agreement.

[3] Interest, costs of collection, attorneys' fees and other associated costs and expenses continue to accrue on the Debtors' indebtedness to Merrill Lynch under the Swap Contract to the extent permitted by the Swap Contract, the Senior Secured Credit Agreement, and applicable law.

[4] Senior Secured Credit Agreement, pg. 120.

(a)     First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Collateral Agent and its agents and counsel, and all reasonable expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith and all amounts for which the Collateral Agent is entitled to indemnification pursuant to the provisions of any Credit Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)     Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Creditors and their agents and counsel and all reasonable costs, liabilities and advances made or incurred by the other Creditors in connection therewith, in each case, equally and ratably in accordance with the respective amounts thereof then due and owing, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)     Third, without duplication of amounts applied pursuant to clauses (a) and (b) above to the indefeasible payment *in full* in cash, pro rata, of *interest and other amounts constituting Obligations (other than principal)* in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)     Fourth; to the indefeasible payment in full in cash, pro rata, of *principal amount of the Obligations*; and

(e)     Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Obligor or its successors or assigns) or as a court of competent jurisdiction may direct.[5]

7.     Thus, pursuant to the express provisions of the Senior Secured Credit Agreement, all "interest and other amounts constituting Obligations" owing under the Senior Secured Credit Agreement are entitled to indefeasible payment in full in cash prior to payment of the "principal amount of the Obligations." The Senior Secured Credit Agreement defines "Obligations" as follows:

---

[5] Id. (emphasis added).

> "Obligations" shall mean all amounts, direct or indirect, contingent or absolute, of every type or description (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and at any time existing, owing to any Creditor, or any of its Related Parties or their respective permitted successors, transferees or assignees, or any Indemnitee, pursuant to the terms of any Credit Document or any *Swap Contract* or secured by any of the Security Documents, whether or not the right of such Person to payment in respect of such obligations and liabilities is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy case or insolvency or liquidation proceeding.[6]

The Senior Secured Credit Agreement defines "Swap Contract," in turn, as follows:

> "Swap Contract" shall mean any agreement entered into in the ordinary course of business (as a bona fide hedge and not for speculative purposes) (including any master agreement and any agreement, whether or not in writing, relating to any single transaction) that is an interest rate swap agreement, basis swap, forward rate agreement, commodity swap, commodity option, forward commodity purchase agreement, equity or equity index swap or option, bond option, interest rate option, foreign exchange agreement, rate cap, collar or floor option or any other similar agreement (including any option to enter into any of the foregoing) and is designed to protect the Obligors against fluctuations in interest rates, currency exchange rates or similar risks (including any Interest Rate Protection Agreement entered into pursuant to Section 9.18) but excluding all forward commitments for the purchase of materials and utilities used in the ordinary course of business of Borrower and its Subsidiaries and not for speculative purposes.[7]

8. Clearly, the Swap Contract is a "Swap Contract" under the Senior Secured Credit Agreement and the Debtors' indebtedness to Merrill Lynch under the Swap Contract constitutes an Obligation under the Senior Secured Credit Agreement. Therefore, based on the priority of repayment set forth in the waterfall provision of the Senior Secured Credit Agreement, Merrill Lynch is entitled to payment in full of all amounts owed by the Debtors under the Swap Contract

---

[6] Id., pg. 24 (emphasis added).

[7] Id., pg. 33.

prior to the payment of any of the principal amount of the Debtors' indebtedness to the Prepetition Senior Secured Lenders under the Senior Secured Credit Agreement.

### C. The First Modified Plan Impermissibly Modifies the Contractual Subordination Provisions of the Senior Secured Credit Agreement

9. On March 16, 2010, the Debtors filed the First Modified Plan. The First Modifed Plan classifies "Senior Secured Claims" – i.e. the claims of the Prepetition Senior Secured Lenders under the Senior Secured Credit Agreement – into Class 4A for all purposes under the First Modified Plan.[8] The First Modified Plan classifies "Swap Contract Claims," including Merrill Lynch's claims under the Swap Contract, into Class 4B of the First Modified Plan to the extent the "New Value Alternative" or any "Alternative Acquisition Proposal" is effectuated under the First Modified Plan; however, the First Modified Plan treats Swap Contract Claims under Class 4A to the extent any "Stand-Alone Alternative" is implemented under the First Modified Plan.[9] Thus, in the event of a Stand-Alone Alternative, Senior Secured Claims and Swap Contract Claims are treated *pari passu* under the First Modified Plan.

10. The First Modified Plan's treatment of Class 4B claims under either a New Value Alternative or Alternative Acquisition Proposal fails to implement the contractual subordination provisions of the Senior Secured Credit Facility, which require payment in full of Merrill Lynch's claims under the Swap Contract prior to payment of any of the principal amount of the Debtors' indebtedness under the Senior Secured Credit Agreement. Moreover, under any Stand-Alone Alternative, the Plan provides for a pro rata distribution to the holders of Senior Secured

---

[8] First Modified Plan, Article III.C.4.

[9] Id., Article III.C.5.

Claims and Swap Contract Claims, which is directly contrary to the contractual payment priority established in the Senior Secured Credit Agreement.

## II.   Objections to Confirmation of the First Modified Plan

11.   Merrill Lynch objects to confirmation of the First Modified Plan because the First Modified Plan fails to enforce the contractual subordination provisions of the Senior Secured Credit Agreement.  Consequently, the First Modified Plan violates section 510(a) of the Bankruptcy Code and cannot be confirmed under section 1129(a)(1) of the Bankruptcy Code.

12.   Section 1129(a)(1) of the Bankruptcy Code provides that a plan can only be confirmed "[i]f the plan complies with the applicable provisions of this title."[10]  Among the applicable provisions of the Bankruptcy Code is section 510(a).

13.   Pursuant to section 510(a) of the Bankruptcy Code, a subordination agreement is "enforceable in a case under the Bankruptcy Code to the same extent that such agreement is enforceable under applicable non-bankruptcy law."[11]  In this case, as set forth above, the Senior Secured Credit Agreement contains an express subordination clause in the form of a waterfall provision.  The subordination provisions of Section 12 of the Senior Secured Credit Agreement are enforceable under section 510(a) of the Bankruptcy Code.

14.   Although a court must look to state law in interpreting subordination provisions[12] - here New York law[13] - in this case the plain meaning of the waterfall provision is unambiguous. The clear purpose of Section 12 of the Senior Secured Credit Agreement, as with all waterfall

---

[10] 11 U.S.C. § 1129(a)(1).

[11] 11 U.S.C. § 510(a); *see also In re PWS Holding Corp.*, 228 F.3rd 224, 243 (3rd Cir. 2000); *HSBC Bank USA and JPMorgan Chase Bank v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355 (1st Cir. 2004).

[12] *See, e.g., In re Dura Automotive Systems, Inc.*, 379 B.R. 257, 265-270 (Bankr. D.Del. 2007); *In re Bank of New England Corp.*, 364 F.3d at 366.

[13] Senior Secured Credit Agreement, pg. 130.

provisions, is to establish a priority scheme whereby debt payments received are applied to repay certain obligations in full before any repayment of certain other obligations. Here, the waterfall provision expressly provides for payment in full of amounts owed to Merrill Lynch under the Swap Contract prior to any payment of the Debtors' principal indebtedness to the Prepetition Senior Secured Lenders under the Senior Secured Credit Agreement.

15. Each of the Prepetition Senior Secured Lenders, as a signatory to the Senior Secured Credit Agreement, agreed to subordinate their right to payment of principal under the Senior Secured Credit Agreement to the payment in full of swap contract claims in accordance with Section 12 of the Senior Secured Credit Agreement. The waterfall provision of the Senior Secured Credit Agreement is, therefore, a subordination agreement that must be enforced pursuant to section 510(a) of the Bankruptcy Code.

16. As discussed above, however, the First Modified Plan improperly modifies the parties' rights under the Senior Secured Credit Agreement. Specifically, the First Modified Plan ignores the subordination provisions of the Senior Secured Credit Agreement and, in the event a Stand-Alone Alternative is implemented, treats Senior Secured Claims and Swap Contract Claims as equal in priority for distribution purposes. Such treatment improperly modifies Merrill Lynch's senior right to payment under the provisions of the Senior Secured Credit Agreement and violates section 510(a) of the Bankruptcy Code. Consequently, the First Modified Plan is not confirmable under section 1129(a)(1) of the Bankruptcy Code.

17. For all of the foregoing reasons, the Court should deny confirmation of the First Modified Plan.

## III. Reservation of Rights

18. Merrill Lynch reserves all of its rights to raise any and all additional arguments and/or objections to confirmation of the First Modified Plan at the confirmation hearing scheduled for April 28, 2010.

**WHEREFORE, PREMISES CONSIDERED**, Merrill Lynch respectfully requests that the Court (i) sustain this Objection; (ii) deny confirmation of the First Modified Plan; and (iii) grant such other and further relief as is appropriate and just under the circumstances. Merrill Lynch also requests general relief.

**Dated:** April 21, 2010
Wilmington, DE

Respectfully submitted,

EDWARDS ANGEL PALMER & DODGE LLP

*/s/ R. Craig Martin*
R. Craig Martin (No. 5032)
929 North Market Street, 15th Floor
Wilmington, Delaware 19801
Phone: (302) 777-7770
Fax: (302) 777-7263
Email: rcmartin@eapdlaw.com

-and-

R. Michael Farquhar – SBT # 06828500
Matthew T. Ferris – SBT # 24045870
**WINSTEAD PC**
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2199
(214) 745-5400
(214) 745-5390 (Facsimile)

*Counsel for Merrill Lynch Capital Services, Inc.*